# EXHIBIT J

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

GARY AND BETHANNE TILLOTSON, As Parents of SEAN C. TILLOTSON, and BETHANNE TILLOTSON, AS Administratrix for the ESTATE OF SEAN C. TILLOTSON,
Plaintiffs
V. Civil Action No. 16-296-LM
DARTMOUTH-HITCHCOCK MEDICAL CENTER,
Defendants.

VIDEO DEPOSITION OF DAVID R. CHAVEZ, M.D., taken at Lebanon, New Hampshire, on March 24, 2017, before Cynthia Foster, LCR No. 14, a Licensed Court Reporter within and for the State of New Hampshire.



APPEARANCES:

Bruce W. Felmly, Esquire
Nicholas F. Casolaro, Esquire
McLane Middleton, Professional Association
900 Elm Street, P.O. Box 326
Manchester, New Hampshire, 03105-0326, on behalf of the Plaintiffs, Gary and Bethanne Tillotson, as Parents of Sean C. Tillotson, and Bethanne Tillotson, as Administratrix for the Estate of Sean C. Tillotson.

Kaveh S. Shahi, Esquire
Cleary, Shahi & Aicher, P.C.
P.O. Box 6740
110 Merchants Row, 3rd Floor
Rutland, Vermont, 05702-6740, on behalf of the Defendant, Dartmouth-Hitchcock Medical Center.

Also present: Stephanie Stone, Claims Manager.



INDEX


Direct Examination by Mr. Felmly 6


EXHIBITS


44 DHMC Website, David R. Chavez, MD 17

45 Summary by Dr. Chavez 77

46 Pager records, DHMC 313-349 123

47 Letter, Dr. Chavez to Dr. Harris, 5/9/2014 143


REQUESTS


Page 44, Curriculum Vitae 14


INSTRUCTIONS NOT TO ANSWER


Pages 28, 29, 30 (2), 34, 68, 72, 78




STIPULATION

It is agreed that the deposition shall be taken in the first instance in stenotype and when transcribed may be used for all purposes for which depositions are competent under New Hampshire practice.

Notice, filing, caption and all other formalities are waived. All objections except as to form are reserved and may be taken in court at trial.

It is further agreed that if the deposition is not signed within thirty (30) days after submission to counsel, the signature of the deponent is waived.

VIDEOGRAPHER: The time is 9 o'clock a.m., and we are on the record.

MR. FELMLY: Good morning. This is the videotaped and transcribed deposition of Dr. David Chavez of Dartmouth-Hitchcock Medical Center. The date is March 24th, 2017, at approximately 9 a.m. The deposition is being taken in Civil Action number 16-296 LM in the U.S. District Court for the District of the New Hampshire and the caption is Gary and Bethanne Tillotson versus Dartmouth-Hitchcock Medical Center.

My name is Bruce Felmly. With me is Nicholas Casolaro of McLane Middleton. We're counsel for the plaintiffs. I'll let defense counsel introduce himself and his team.

MR. SHAHI: Good morning. This is Kaveh Shahi. I'm here with Stephanie Stone for Dartmouth-Hitchcock Medical Center.

MR. FELMLY: We've agreed that as we have in other depositions that we'll be following the usual New Hampshire stipulations which, essentially, in brief summary, mean that notice,



filing, caption and other formalities are waived. All objections other than those to form are preserved until the time of trial. The witness will be afforded a copy of the transcribed deposition and will have 30 days for signature and signature is waived after the 30 days. Is that agreeable, Counsel?

MR. SHAHI: Yes, it is. Thank you.

DAVID CHAVEZ, M.D., DULY SWORN

DIRECT EXAMINATION

BY MR. FELMLY:

Q Good morning, Doctor. As I mentioned, I'm Bruce Felmly, and Mr. Casolaro and I are going to be taking your deposition today although I'll be doing the talking on our end.

Would you please start off by stating your full name and your professional and business address?

A My name is David Richard Chavez, and my professional address is Dartmouth-Hitchcock Medical Center, Section of Pediatric Surgery, and the address is One Medical Center Drive, Lebanon, New Hampshire. 03756.



Q And what is your date of birth?

A December 19th, 1959.

Q What I'd like to do by way of starting off is just to go over a few of the ground rules or procedures that apply to this video deposition. And let me just ask you, to start that, have you ever given a deposition previously?

A Not as a named, I guess, Defendant. I was a resident, and in the past they queried me on my involvement in the care of a patient.

Q Okay. So there was, though, a legal proceeding where you were sworn in and gave testimony?

A Yes.

Q And was it just on the one occasion?

A There was a second where I was an attending that cared for a patient that eventually filed suit against the surgeon that referred the patient to me so I was deposed to support the case of the patient.

Q And were those two cases here in the Dartmouth-Hitchcock area or earlier in your training?

A Earlier. First one was in northern California



when I was a resident at Stanford. And the second was when I was an attending in Billings, Montana.

Q We will be probably following similar proceedings to those so there'll be some fresh memory, I'm sure, from that.

Have you ever testified in a court proceeding? In other words, be in the courtroom and provide live testimony?

A Yes, but it wasn't for a legal reason. It was a guardianship.

Q I see. But you did in that case provide sworn testimony?

A Yes.

Q Well, again, the nature of the dialogue and questioning and answering will be somewhat similar, I'm sure, to what you experienced then. But let me just ask you one other thing.

Have you ever been retained or provided expert opinion testimony in connection with a forensic medical matter?

A Yes. But just as a review of the chart and then written opinion but never having to take it to

court and testify based on that.
Q And do you recall whether or not your testimony or your opinions in that regard were offered on behalf of the Plaintiff in that case or on behalf of the medical providers?
A It was the medical providers.
Q And how many times have you, approximately, done that?
A Twice.
Q Both times for the providers?
A Yes.
Q Do you have any of those cases pending now where you're currently serving as an expert witness in reviewing cases?
A No.
Q So in terms of what we'll do today and what my responsibilities are to try to ask you questions that you can understand and do that in a fashion that allows them to be on the record and on the video, if for any reason you don't understand my question, either the terminology is not clear or I for whatever reason don't make myself clear, just bring that to my attention and I'll try to



rephrase it.
Counsel may interpose an objection. Almost all the time that is just for the record and you'll go forward to answer, but Mr. Shahi will advise you if he's asserting privilege or something else that may result in him perhaps indicating you should not answer.
We're going to go several hours here, and I'll go through it as, hopefully, as efficiently as I can. If you need a break though before we're concluded, just bring that to my attention. The only thing I would ask is that if there's a question pending we get that answered before we all leave the room to break. Does that all sound agreeable to you?
A Yes.
Q The other thing that is important in these kind of conversations on the record is when we communicate in less formal fashion we commonly use body language, head nods, we nod our head yes and no, we say um-hum and all that.
A Yes.
Q None of that goes very well on a deposition.



A Right.
Q And yet it's almost endemic to the process. So if I say to you is that a yes or could you answer in a narrative way, don't take offense at that. I'm just trying to get a good record, and it happens in virtually every deposition.
A Sure.
Q Okay? So let's first start talking about what your professional activities are in your position here at the Medical Center. What is your current responsibility or your professional obligations at that facility?
A I work as a full-time pediatric urologist. That involves taking care of children that are in utero as well as up to 18 years of age that have any type of congenital trauma or infectious diseases of the genitourinary track. I also take care of adult patients when I'm on call so I still practice some adult urology.
And being at a teaching institution, I regularly work with residents teaching them how to diagnose and treat surgical conditions, medical students, so I'm working with them day



in and day out. Also teaching them differential diagnoses, treatment, followup and then physical examination. So that's pretty much it.
Q Do you work solely at Dartmouth-Hitchcock Medical Center or do you sometimes provide services at other medical institutions?
A I do have outreach clinics. The one clinic I do, it's still under the Dartmouth-Hitchcock organization. It's down in Manchester, New Hampshire. And then I do outpatient surgery at the Elliot One Day Surgery off of Queen City Avenue.
Q And the Elliot One Day Surgery, is that affiliated with Dartmouth-Hitchcock or is that separate?
A That's a good question. I think that's in transition. They haven't really made a decision what type of relationship they have. That's a honest answer to the best of my understanding.
Q Thank you. In terms of the urology practice here at Dartmouth-Hitchcock, approximately how many urologists, attending urologists, do you have on your rolls or your staff?

A Adult and pediatric?
Q Yes.
A Probably around nine.
Q And in addition, there then are folks in training who would be residents and medical students?
A Yes.
Q And in terms of your residency programs in urology, are they specific so that certain of the residents are assigned to pediatric urology or is it lumped more generally into urology?
A During the course of their residency, the residents, and there's two per year, they will do three-month blocks of pediatric urology as a PGY 2 and a PGY 4. So you get a total of six months of pediatric training in their total residency here.
Q And if I understood you with regard to the two of them, is the entire urology program staffed by two urology residents per year?
A So a total of 8.
Q And when they leave, they will all have been exposed to those blocks of instructions in



pediatric urology, but they will not be solely focused on pediatric urology?
A No. They would need additional training.
Q Can I have the bio information? I don't have a full-blown CV from you, but I'm guessing you probably have one some place.
A Yes.
Q And I'll make a request that we don't get it now, but what I did take off the internet is information on you which I'll ask you to take a look at and then we'll have it marked. And this, I gather, is sort of biographical information that's available for patients and colleagues to learn about you on the Dartmouth-Hitchcock website, is that right?
A Yes. It's kind of a snapshot.
Q Right. And from that, what I'm taking away from it is that your areas of focus include robotic surgery, stone disease, reconstructive pediatric urology and Third World medicine. I had the sense from what you said earlier that your heavy focus is on the pediatric side. Do I have that right?



A Correct.
Q So within these areas of robotic and stone disease, Third World medicine, are you still pretty much focused on the pediatric urology portion?
A With robotic, I will operate on adults if they have a comparable condition that I find in children because when I was practicing in Montana, I would work on adults as well as children so there is some back and forth between adult and pediatric with my practice. But I am a full-time pediatric urologist at this institution.
Q And in terms of your training and medical education, it appears you graduated from the Dartmouth Medical School here in Hanover in 1988. Is that correct?
A Yes.
Q And then went on to a general surgery internship in Portland, Oregon, from '88 to '89?
A Correct.
Q And then had residencies in general surgery at Stanford, California, in '89 to '91, and then



back here for urology residency in Dartmouth-Hitchcock from '91 to '95?
A Correct.
Q And then two fellowships are noted; one in endourology at Beth Israel Deaconess in Boston from '95 to '96, and then pediatric urology at Duke from '96 to '97.
A Those are correct.
Q And then in terms of board certification, urology was obtained by you in 1999 and pediatric urology in 2010.
A Correct.
Q And are those certifications something that come up for periodic renewal or replenishment from time to time?
A Yes.
Q And what's the sort of schedule for that or how do you plan that that will be happening in your case?
A It's every ten years based on the most, the oldest. So I come up for renewal in 2020.
Q What I don't have in the bio would be some of the other information that would round out your

professional background and career, and let me start by saying I'm assuming that from time to time you may have published papers or worked on the publication of various medical articles or periodic submissions?
A Yes.
Q And can you tell me how would you describe the nature of your professional writing that's been published in your field?
A It would have been during most of my fellowships which would have been primary clinical research involving stone disease, lithotripsy and renal. So biomedical engineering with different types of tissues in a rabbit model, and then some clinical, you know, case reports.
Q Why don't I ask the stenographer to mark this internet bio.
(Exhibit 44 marked for identification)
Q Have any of your writings or publications dealt in significant way with renal cancer?
A No.
Q And how about, and, obviously, what I'm going to be doing is to try to learn whether any of your



writings might bear on some of the issues in this case obviously.
A Um-hum.
Q How about interpretation of ultrasonic imagery in the nature of the organs that a urologist would be dealing with such as the kidney?
A I would say no.
Q And how about the issue of identification of echogenic areas or masses within the kidney and differential diagnosis of those?
A No.
Q In terms of your work with the residents that are part of your urology program here, I'm presuming that a great portion of that would involve them being oversighted by you in actual patient clinical care; is that right?
A Yes.
Q And apart from that portion, the day-to-day interaction and oversight and direction that you provide, is there also more formal lecture-type training, didactic-type training that you participate in?
A Yes. There's Friday morning conferences where



we give lectures and discuss various topics.
Q And we're missing those this morning.
A It was early. It was earlier.
Q Good. In terms of those gatherings, are they a situation where all 8 of the then pending residents in the four classes come together or is it a larger group than that?
A It's larger. It's the whole clinical faculty with whatever resident is still onsite because they do offsite rotations.
Q But when you say whole clinical faculty, do you mean in urology?
A Yes. That would include nurse practitioners and the faculty. The nursing staff usually don't come to that.
Q But it's not every doctor in the hospital?
A No. Just our section.
Q Is that a procedure or a process where there is discussion of interesting cases or particular problems, sort of a grand rounds?
A It can be a specific topic or it can be interesting cases. Sometimes we do xray conferences also.



Q Do you know if the medical circumstances involving Sean Tillotson and the echogenic area in his kidney that had been followed for a number of years and then his medical events in May through the time of his death was ever the subject of discussion in any of those meetings?
A It was not.
Q In terms of your professional activities in the hospital, are there particular administrative responsibilities apart from your clinical care or just the general oversight of the residents, are there particular titles or jobs that you take on or rotate through that relate to the delivery of quality medical services?
A I participate in a monthly preoperative care conference for just pediatric patients. So it involves anesthesia, general pediatric surgery, ear, nose and throat pediatric surgery, dermatology pediatric and also dermatology and plastic surgery, and then all the preoperative staff that, anesthesia, so it's to try to deal with any concerns or just processes to make medical care safer.

Q In terms of the way your particular work is assigned or the way you perform it during the course of the typical week or month at the Medical Center here, do you have a call schedule or an on-duty schedule or something that tells you when you are going to be the pediatric urologist that is going to be sort of on the floor or seeing patients?
A Yes. We have a call schedule.
Q Does that schedule also then identify who will be the residents that will be on with you from the urology practice?
A Yes.
Q Are there any awards or particular recognitions that you received in your, let's start here at Dartmouth-Hitchcock, your professional career here, that are of significance to you and that you're proud of?
A No. I've only been here for four years so I haven't had time to get any awards yet.
Q How about on the way getting here along the way. Anything in particular that stands out?
A No.



Q Apart from, I know you have very large responsibilities here at the hospital, apart from that, in the sort of Upper Valley community, are there other either professional engagements you have or activities for which you are committing significant portions of your time?
A No.
Q With regard to the instruction and supervision, oversight of the urology residents, are there protocols or guidelines that describe the way in which that is to be accomplished within the urology practice?
A Yes.
Q I, for example, received in discovery in this case a supervision policy that applied to the radiology practice, and I've gone through that. I gather from your answer there may be something similar for other practice areas including urology.
A Yes.
Q And does that policy as expressed and as applied indicate that with regard to residents that the



attending physicians bear responsibility for supervising the quality and nature of their care?
A Yes.
Q So that that relationship, attending to resident working on the cases together, am I correct that that requires and places on the attending the responsibility of doing sufficient oversight and work to be sure that the attending is satisfied that the work is within the standard of care and appropriate?
A Yes.
Q And if for some reason it is not, for some reason the resident is in error or makes a mistake, is the attending, one, responsible to, hopefully, catch it, and if not, will be the party who will be responsible for that impact on the patient?
A Well, just depends on the timeline. I mean, if you find an error that can be corrected, it's just a simple thing.
Q Right.
A You correct it, and there's no error to the



patient or harm to the patient. So depends on the situation.
Q And that would be the way, since I'm sure people in training can certainly make mistakes as can highly trained professionals, that would be what you'd want to have happen before there's any injury; that any problem gets corrected and the patient is not compromised, right?
A Correct.
Q But if there is an error made and it is not caught or noted until after injury occurred, in the context of this training relationship, is the supervisor, the attending, the party that is seen to be responsible under the way the hospital runs the system and the way the protocols work?
A Yes.
Q My understanding is that in May of 2014 when Sean Tillotson had the experience of the episode of blood in his urine and came into the facility, into the emergency room, on that evening which was May 1, 2014, a doctor named Rachel Moses was a urology resident that had

interaction with his case. Is that consistent with your understanding?
A Yes.
Q And at that time, Dr. Moses was what, how far along in the residency program, if you can recall?
A I believe she was a PGY 2.
Q And I think I've heard that she is still here at the hospital; is that correct?
A She is.
Q Okay. So she is now, what, a senior resident just starting to finish up?
A She is in her chief residency here.
Q Okay. And will be completing that, what, June?
A This coming June.
Q And do you know where she's planning to go after that?
A She will be doing a fellowship in reconstructive urology at the University of Utah.
Q Do you work commonly with Dr. Moses?
A Not since she rotated off the service. Now she's more on the adult service.
Q I see. And when did that happen where she moved



more from pediatric to adult?
A It would have been probably, she started the service in March. Would have been toward June, I guess, that would have finished her three-month stint. So if she started in March of 2014, she finished in June of '14. Then she would have a year off doing other adult services and then she'd come back on the service for another three months during her PGY 4 year. So that would have been the last time I worked with Rachel.
Q So there would have been sort of two concentrated periods during her residency training here where you would have been working closely with her?
A Yes.
Q First one being in the time frame that included Sean's care here in May so from March of 2014 to June 2014 she would have been working closely with you as a resident on the pediatric urology service?
A Yes.
Q And then was off doing the adult work for a



while, and then came back during the, for a three-month stint a year later?
A Yes.
Q And you would have worked with her again?
A Yes. Um-hum.
Q You should say yes.
A Yes.
Q And how would you describe your impressions of Dr. Moses in terms of her skills or her abilities as a resident?
A Very thorough, and she's progressed along just as any resident in their training will.
Q Having in mind that Sean Tillotson and his mom were in the emergency room on that evening of May 1st, 2014, and I don't have any evidence that they ever met Dr. Moses, but I do understand from the record that she was consulted in connection with his care, she would have had at that time, what, about two months of pediatric work on the service under her belt?
A Something of that. Yes.
Q March and April of 2014?
A I believe. If I have the dates correct.



Q Has there ever been with respect to Dr. Moses any issue involving discipline or question of professional capability or competence that has caused you any concern?
MR. SHAHI: I'm going to instruct the witness not to answer that on the grounds of quality assurance.
MR. FELMLY: I was not asking whether there had been a Quality Assurance Committee, mortality or morbidity program. I was just asking generally about concerns with her medical care and competence had that ever come up. So I will pursue that with the court, but I don't take that objection.
MR. SHAHI: I sent you a letter yesterday with two case citations that hold that performance evaluations of residents is QA protected.
BY MR. FELMLY:
Q In terms of your licensure, I'm assuming you're licensed here in the State of New Hampshire as a doctor?
A Yes.

Q Any other states where your license is still active?
A Montana.
Q Have there ever been any limitations or actions involving your licensure in terms of the quality of care or relating to discipline?
MR. SHAHI: Only to the extent it's been publicly, made public. Publicly announced.
A No.
Q How about hospital privileges throughout your career in various training as well as here at Dartmouth-Hitchcock? Have there ever been any restrictions or limitations as a result of the oversight bodies having concern with limiting your privileges?
A No.
Q Do you have a recollection of when you first learned of Sean Tillotson's death?
A It was some time in the fall of 2014.
Q What was the context of that coming to your attention?
MR. SHAHI: Again, I'm going to instruct the witness not to answer that as it would



impinge on peer review process.
MR. FELMLY: All right. Well, I don't know that.
Q Did you learn of this in connection with peer review process or not?
MR. SHAHI: Well, I'm going to again instruct him not to answer that question.
Q At the time you learned of Sean's death in the fall of 2014 which I'll represent to you that he died on June 30th so some several months later, did you at that time have a recollection of this patient that you had come in contact with back in May?
A No.
Q So in terms of learning of his death and recognizing that at that point, whether it's five or six months earlier you had been in touch with him and met his parents and the like, none of that rang a bell or caused you to any have any memory of his situation?
A Not until I reviewed the chart.
Q Okay. And did you review the chart then in the fall of 2014?



MR. SHAHI: Again, to the extent that that involves the peer review process, I'm going to instruct him not to answer.
MR. FELMLY: Well, Kaveh, let me just say, I think I'm, particularly in light of the memory issue and without, I respect the challenge, but I respect your comment about the, I take your comment about the peer review process, but finding out when he reviews a chart in relation to possibly refreshing his memory, he said not until I reviewed the chart. And so I'm asking not in what context he reviewed it, but in the fall of 2014, did you review Sean Tillotson's chart. I think that's a perfectly appropriate question.
MR. SHAHI: So I think, again, this is, this doesn't involve what's transpired at this deposition, but you're aware of our position that following a complaint through Dr. Harris made by the Tillotsons that the activities that were pursued in the context of the peer review process will all be privileged. So I think to the extent that you're asking Dr. Chavez what he



did relative to that process involved in 2014, then I would instruct him not to answer.
MR. FELMLY: I'm not asking him that. So that doesn't bear on what I'm asking. I moved away from that so that we could avoid this problem. What I asked him is did he first review those records after Sean's death in the fall of 2014. If his answer was no, I never looked at them until last Thursday that might be relevant, but I'm not asking him a specific question about did he do it as part of peer review. I may later ask that, and you'll instruct him, but I'm not asking him that. But I don't want to debate it with you either so we'll file the motion and we'll dealt with it.
MR. SHAHI: Okay. Thank you.
MR. FELMLY: And I'm just going to reserve the right, if the court disagrees with you, to pursue it again, and I'm trying to avoid having to redepose witnesses because I do regard this as a proper area, and I've tried to structure the question accordingly, but I hear what you're saying.

MR. SHAHI: Thank you.
BY MR. FELMLY:
Q Going back to the way you expressed this, Dr. Chavez, there comes a time when you read his records, and upon reading the records, did you remember portions of his care?
A Yes.
Q And on that score, was that limited to the experience of seeing him with his parents on May 9th or did you remember things beyond your actual face-to-face interaction?
A No. It was limited to that visit where I saw him in clinic.
Q And in that context, and I'm trying to get a sense as to how, now refreshed by reading the record, how much comes back to you. Did you remember his appearance or his physical size and nature?
A Looking through the record, yes. That's why we write good notes. It helps.
Q Did you remember his mom and dad being there at that visit?
A I remember his mother being there, but I cannot



clearly remember his father being there.
Q Did you remember medical student Fantasia being there?
A Yes.
Q In terms of the scope of records you're reviewing the first time you reviewed them after his death, what was that scope? He's got a history here for a number of years at Dartmouth-Hitchcock Medical Center. I'm not sure how many years or how many records you reviewed. What's your best memory?
MR. SHAHI: Again, I think we're going down the path of asking him questions about what he did which at the time was relative to peer review process so I'm going to instruct him not to answer. If you want to ask him about the time of treatment or preparation for this deposition, that's fine, but I think your questions are still in fall of 2014. If that's the case, I'm going to instruct him not to answer as to what portions of the record he reviewed.
Q Well, apart from anything related to the peer



review process that Attorney Shahi keeps referencing, are there other occasions when you've reviewed his records?
A For the deposition.
Q So we're here on March 24th, 2017, and in anticipation of this proceeding you reviewed his records.
A Yes.
Q Okay. And, approximately, when did that occur?
A It was when risk management approached me, and I can't remember exactly when that was.
Q But is that something within the last month or several weeks or is that six months ago?
A Oh, probably within, it's been kind of a drawn-out process so it could be as long as six months, but I know I've reviewed them within the last two months, three months.
Q And have you reviewed them in the last few days just in terms of refreshing your memory before you came in here to answer questions?
A Yes. I looked at them probably three days ago.
Q And when you looked at them three days ago, did you look at them alone or did you look at them



with counsel?
A That was alone.
Q Are there occasions where you've gone through these records with other people?
A Other than counsel?
Q Well, I don't know. I mean, my understanding is some other witnesses have indicated that they've reviewed them with Mr. Shahi. They've reviewed them with the paralegal staff at Dartmouth-Hitchcock. I believe in one case Mr. Monahan in risk management was mentioned. I don't know who you -- and I'm not asking you what you and they said. I'm just asking you who was there. So you have reviewed them with Attorney Shahi on some prior occasion?
A Yes.
Q Would that have been about six months ago?
A No. More recently than that.
Q And the first time you reviewed them outside of the peer review process, you reviewed them with who?
A Mr. Shahi.
Q So now I'm just a bit confused. On how many

occasions have you gone through the records with Mr. Shahi?
A Probably two to three.
Q In addition to written or typed-up records, have you reviewed imagery from the ultrasound?
A Yes.
Q And on how many occasions have you done that?
A Two to three times. Possibly more. It's hard to say.
Q Have you accessed the imagery on your own, apart from working with counsel looking at them?
A Yes.
Q And inquiring of your study?
A Yes.
Q And when is the last time you did that?
A Within the last month.
Q Have you reviewed the imagery with any radiologist?
A No.
Q Any other doctors?
A Outside of quality review?
MR. SHAHI: Yes. Outside of any quality review.



A Not that I can recall.
Q In terms of the scope of the records review you made on multiple occasions when you've done it, can you tell me the dimension or the extent of the record that you believe you've reviewed?
MR. SHAHI: And all in the context of this litigation.
A Starting back to Sean's first CT scan. So that would have been 2004, I believe.
Q Should I assume from that that you would have reviewed both the inhospital notes and the radiology reports as well as the imagery going back?
A Yes.
Q So you've reviewed the emergency room records from the May 1st visit?
A Yes.
Q And on how many occasions have you reviewed those?
A It's hard to say. Probably 2 to 3 also.
Q Apart from conversations with counsel and leaving aside whatever morbidity and mortality issues are out there, have you spoken to,



communicated with any of the other providers that were involved in that visit of May 1 and, ultimately, 2 because it goes a little bit past midnight, I think, involving Sean Tillotson?
A I'd speak with Rachel Moses. She's on service, and so I do see her frequently.
Q How about the attending radiologist that signed the final report, Dr. Yen? Any conversations with her about Sean Tillotson's case at all?
A No.
Q Or Brian Girard who was the radiology resident that day?
A No.
Q Or there's two other radiology residents that had some involvement in looking at some of the films, Dr. Lewis and Dr. Towle. Any contacts with them?
A No.
Q The pediatric resident who was in the Emergency Department that evening was Dr. Shepard. Have you ever spoken with Dr. Shepard about this case?
A No.



Q Do you know Dr. Shepard?
A I don't know her personally, and she may have talked to me on the phone about other cases, but I couldn't point her out.
Q And then there's Dr. Yanofsky, and he's an emergency room doctor. You know him?
A I know him. He was here when I was a medical student.
Q But not talked to him about Sean Tillotson's case?
A No.
Q Anybody else that I haven't mentioned that you might have had conversations with or talked with about this case?
A No.
Q Any of your attending colleagues in urology that you might have bounced issues off of or what do you think of this or we've got this lawsuit pending and there's an issue about this? Anything at all that involves drawing on colleagues that you might have confidence in and might want their insights?
A Not at this point.

Q I'm not sure what you mean by that. Not to date?
A Not to date. No, not to date.
Q And let me circle back to your comments about Rachel Moses. You've indicated you see her commonly. Obviously, you've been on service with her. Have you recounted or discussed anything about the Sean Tillotson matter in connection with any of those conversations?
A When I was on vacation in California, Rachel called me. She paged me or called me by cell, and she was just inquiring if she should be able to speak with Mr. Shahi because he contacted her in regards to this case, and I said Rachel, he is an attorney that works for Dartmouth-Hitchcock. You can speak with him. And that was basically it.
Q But there was no discussion of what happened or her observations or this is what I remember from that night or anything substantive about the case?
A Correct.
Q And have not had further discussions with her



since.
A No.
Q In terms of your review of the imagery, the ultrasonic imagery and the CT imagery, is it the case that you believe you've looked at all of the kidney-related imagery going back to the initial examinations that were done back in 2004 or '06?
A Yes.
MR. SHAHI: Again, relative to preparation in this case.
Q When you were either having the visit with the Tillotsons in the office meeting with them to discuss Sean's care on May 9th or in terms of being prepared or going forward to get ready for that meeting, do you know what the extent of the imagery was that you reviewed at that point? Was that when you looked at everything that had ever been done on him involving kidney or did you look at a smaller subsection of that and have now looked at more?
A You know, it was such a long time ago, I cannot recall exactly the extent of my review of the



radiology, but I know I got a good sense of what was going on by reviewing my colleagues' notes from previous visits and comparing the recent ultrasounds prior to the visit, and the ultrasound performed on the emergency room visit, more importantly, was reviewed completely before that visit.
Q Before the Tillotsons arrived in May?
A I cannot recall doing that, but I was told by review of the chart archives, I guess, that I may have looked at it a day or so after he went to the emergency room, but I cannot recall that.
Q So there's a couple of audit trails, they're called, here in the hospital parlance. There is an audit trail that is used within the Radiology Department called the PACS system.
A Um-hum.
Q Which identifies providers entering that database, I guess, and it has time stamps, and it indicates what imagery they are looking at marked by certain numbers called accession numbers that identify entries. If the person entering that is within the radiology group or



staff, they're identified by name. If they're not, they have identification commonly by a moniker called CIS and that if I understand it and I may not, you may understand it better than I, that means somebody outside of the radiology group has gone into that system to review it, but it doesn't tell us exactly who. It does tell us what time it happened.
A Uh-huh.
Q Do you believe that you entered, well, you're telling us, I think, that you have looked at it, and you believe that you did go in and look at some of that imagery before the Tillotsons arrived, and it may have been on May 2nd?
A Correct.
Q And is that something in terms of a task or a step in the evaluation of a patient that is not uncommon for you where the patient has had radiological studies and workups?
A If a patient comes in while I'm not on call, and let's say the follow day a resident that was on the service saw the patient and said Dr. Chavez, I saw this patient. They're maybe going to be

referred to you. These are the studies that were performed. I would review them with the resident or sometimes I'd just review them by myself because the resident may not be with me when they call. So yes, if I'm notified of a study by someone and that patient will be seeing me in the future, I usually will take time to look at it.
Q How would you describe your professional level of expertise as an urologist board certified in general urology and pediatric urology in the evaluation or interpretation of ultrasonic images of, say, the kidney or the area of the kidney?
A I'm qualified to do what any pediatric urologist would be able to do.
Q I have no idea what that means because I'm not one.
So does that mean you're qualified to make interpretations of it and make patient decisions and treatment options accordingly or --
A It means I can review the film, make a tentative diagnosis and then make a tentative treatment.



Q And the tentative part becomes more certain through what type of further confirmation?
A Time. Just continued observation of the process and the patient.
Q So it does not require, though, either by rule or by practice, course of practice, that it be, that your tentative diagnosis or tentative determination is confirmed by one of the radiologists on staff?
A No. They are the gold standard. Radiologists are the most qualified physician trained to review radiological and ultrasonic imaging.
Q So what I'm trying to find out is whether your level of experience and confidence and your sense of your capabilities in that area is such that you do not feel you need to, necessarily, although you may, either have a review by the gold standard radiologist or not when you're making those decisions.
A I do not feel qualified to make a final diagnosis based on radiologic imaging. That is the radiologist's bailiwick.
Q So I think I hear you saying you do come in



contact with this area of information imagery and the process you've been trained with respect to it, and you have confidence in a level of expertise on it, but you would regard the board certified radiologist as having a likely higher level of experience?
A Yes.
Q Would you be comfortable testifying in a matter in court with respect to expertise issues or matters requiring expertise and would you intend -- or I guess let me strike that. Let me try to say it better.
In presentation of a matter in an evidentiary way where opinions and objections and diagnoses are made, are you comfortable in presenting those indicating you have the requisite expertise to provide such opinions?
MR. SHAHI: Again, I'm going to object to the form. You can answer if you understand the question.
A Let me clarify. If there was a diagnosis made by a board certified radiologist and the questioning matter was in court, I could comment



on, based on their interpretation if my interpretation was similar or not similar, but I don't know if I would outrank it.
Q Would you be inclined to consider providing deference to the board certified radiologist if there was a variance or disagreement between your interpretation and his or hers?
MR. SHAHI: Again, object to the form.
A The question again? I didn't --
Q Oh, I'm sorry. So in that hypothetical, if you will, if there is testimony of board certified radiologists and nobody disputes appropriate qualifications and they have a different view than that which is yours with respect to the same imagery, and mindful of your expertise, would you be likely deferential or be inclined to defer to the opinions and views of the radiologist or not?
MR. SHAHI: Objection to the form. Go ahead.
A It depends on the global picture of the clinical situation. You can't make a decision on what to do in management of a patient by just looking at

an xray. So you have to take the totality of the patient's history, family history, potential, confounding factors before you proceed or don't proceed with further care.
Q Do I understand that when you, on May 9th when you were meeting with the Tillotsons, both Sean and his parents, and discussing what was presented that you actually presented some of the imagery to them while you were present?
A That's my recollection, and that's my normal protocol. So it was a long time ago, and I can't recall which images I would have shown, but I did show them imaging.
Q In the context of what the inquiry was of a boy that, 17-year-old kid that has another occasion of blood in his urine after a sporting practice, he has been followed for an area for a number of years, echogenic area in his left kidney, and that's been monitored and followed and measured and commented on, in that context, what would have been the nature of or the identity of the imagery that you would have most likely focused on in showing to try to explain things to the



parents?
A The area where they see the hyperechoic area. So it would be the left side of the kidney.
Q Of the left kidney?
A Yes.
Q And the purpose of that is, I assume, so this visual aid, this diagnostic tool with visual images, may help you give them an understanding of what the diagnosis might be or how it might compare to earlier studies?
A Yes.
Q And I'm presuming that in that context, the preference, if you had a preference, would be that it is seen as stable or unchanged rather than, for example, dramatically growing or enlarging, right?
MR. SHAHI: Object to the form. Go ahead.
A Usually I will take the image from the most recent study and put it on the screen and then take the image from the next most recent so I can compare them because that would make the most sense, and they're side by side. And I will scroll through side by side those images so



they have a good sense of what is going on. That's my normal pattern of practice. But that's from memory. I can't say I did that. That was a long time ago. But that's what I normally do.
Q And where changes in size are part of the inquiry or the concern, would you explain to the patient the way in which the ultrasonic imageries, images, during the examination are actually calipered or sized and measured as required?
A That is not usually the depth most patients require to understand there's something that's stable or not.
Q You know what cine clips are, I assume, in terms of ultrasonic imagery?
A From what I understand, it's more of a live show. It's live.
Q What I understand it to be is that as either the radiologist or the technician, depending on who's on duty, is moving the probe over the body, you're getting recorded, essentially, realtime imagery of what the sonic energy is



demonstrating from the software.
A Correct.
Q And at any rate, many studies have several cine clips with these video sections or clips. A laymen's fair way to describe it?
A Yes.
Q Do you have a recollection when you were reviewing Sean Tillotson's imagery with the parents whether you showed them the cine clips of the area of the kidney?
A I cannot recall.
Q Is that the type of imagery that you would typically bring up in that type of a visit as opposed to simply showing the sort of frozen images that were made during the study?
A It depends on what you're looking at because if you want to see something that's moving during the study, the cine clip is very helpful, but the problem with cine clips in kidney examinations is there's so much movement of the kidney. So you see the probe is stable and the kidney is doing this because of respirations. So it's better to get a click, click, click.

It's like trying to see what's happening when a horse is running. If you really want to see what's going on, you have to take a still, a still, because it's too much movement for the cine clip to really help. It can be confusing.
Q Are there advantages though to the cine clip in terms of giving the observer imagery that shows the surrounding area around the area of the focus that you're really looking at and getting the sense as to adjacent structures and what might be in the immediate neighborhood of the organ you're looking at?
A I can't comment on that. I'm not trained to do that.
Q With regard to your preparation for the deposition, have you reviewed or become knowledgeable about the content of the depositions of the other witnesses we've taken?
A No.
MR. SHAHI: Other than discussions with counsel.
MR. FELMLY: Well, you wouldn't tell him anything that happened, would you?



MR. SHAHI: He said no so you asked that.
Q So I'll represent to you that we've taken Dr. Yen's deposition, Dr. Girard's deposition. We took now Dr. Fantasia's, the medical student who was with you that day. Dr. Yanofsky, Dr. Shepard, and we're going to be taking Dr. Moses' deposition, I believe, 13th or 14th of April. And some were on video and all were transcribed.
A Um-hum.
Q You haven't reviewed those depositions, I understand?
A Correct. I have not reviewed them.
Q And we've already established, but I just like to do things like that, you haven't talked with formally or informally as people that have been deposed about what they might have said or what the content was?
A I have not spoken with them with regards to that.
Q Have you done any research with respect to the medical radiology or urology issues that are involved in Sean Tillotson's case?



A Yes.
Q And what's the nature of it or the scope of it?
A Superficial, just to get a sense of how rare this entity is.
Q Are you talking about the entity being this particular tumor that he had?
A Yes.
Q Have you reviewed the autopsy report?
A Not, it has not been given to me. Just snippets.
MR. SHAHI: Again, distinguishing documents versus conversations. Conversations with counsel are privileged, but if you've seen the document, you can testify as to that.
A I cannot recall reviewing the document.
Q So let me represent to you that the autopsy report, well, first of all, let me do one thing before I do that.
Do you have an understanding as to the facts in at least a general sense of Sean's death on June 30th, 2014? Do you know what happened to him as reported?
MR. SHAHI: Again, if you've seen those in



documents as opposed to conversations with counsel.
A I've seen, or -- see, the confusion is with quality.
Q Let me try to rephrase it and see if I can make it easy.
Let me represent to you that on that day June 30th, 2014, Sean, age 17, was going to a youth leadership conference in Jackson Hole, Wyoming. He had been selected for it. He was traveling alone. He had traveled from the East Coast and was changing planes or planning to change planes in the Denver, Colorado, airport. The various First Responder reports indicate essentially that he collapsed in the gate area, he received treatment at the scene, he expired, and an autopsy took place the day after at the Denver Medical Examiner's office. That autopsy report is in evidence. I can pull it and show it to you, but let me just tell you the piece that is most significant to my questions is when they autopsied him, they found that his left kidney had a very large, they described and

appreciated it as a 21 centimeter by 11 centimeter area of tumor, that that had actually extended to some extent into the adjacent veins and that there was what I'm going to describe as an embolic type event where pieces of the tumor that were necrotic had broken off and traveled to the area of his lungs and heart and caused a pulmonary cardiac type arrest, and that was the mechanism of his death.

For my purposes or the question that I'm asking is is that consistent with your knowledge that at least at the time of his death he had approximately a 21 by 11 centimeter malignant tumor in his area of his kidney.

MR. SHAHI: So you can answer that, but if you can, please carve out what counsel has told you and what other information you've learned through the peer review process. So to the extent you've seen that in documents.

A Some of the information you're quoting to me was revealed during our peer review.

MR. SHAHI: No. No, no. You can't, no discussion of what you learned in peer review or



no discussion of what you learned from counsel.

A So that's why it's confusing.

MR. SHAHI: If you can in your own mind carve those two out, and I would suggest to you that you should think about what documents you've reviewed, and if that information was in those documents in writing, then I would try to respond to that.

Q So why don't you try to respond to that. I'm not sure I could. But what I'm going to do is show you the autopsy report, and we'll do it a different way here in a moment.

A But wasn't your question when I first learned of it?

Q No, the question really started with have you done some research, and you told me you had done some research, I think you indicated somewhat superficial, but it was related, as I understood you, Doctor, to the nature of the lesion or the problem that he had which is why we got talking about what was the problem he had. Now, first of all, did I take that right and understand that's where you were going?



A Yes.

Q Okay. So have you done research into tumors of the kidney in either young adults or older teenagers for purposes of trying to educate yourself a bit about what happened to this young man, recognizing that this apparently is not a common phenomenon?

A Prior to Sean's case, I'd had exposure to this type of tumor in adults so it wasn't new information that people can have tumor emboli from a renal cell carcinoma. What I was trying to determine was how often does that happen in children, and it's very rare with what superficial research I've done.

Q When you say this type of a tumor, how would you describe the tumor that you're characterizing by type?

A I cannot recall the cell type other than it was a renal cell. There are several types of renal cell carcinomas.

Q The mechanism of his apparently immediate death being breaking off of tumor, traveling to the heart, that is something you have, in an adult



context have heard of or seen before?

A Yes.

Q And the mechanism of that phenomenon in a young person, I assume, would be the same although, thankfully, it doesn't happen anywhere near as frequently as it may with adults.

A It's similar where if the tumor outgrows its blood supply, part of it can break off and embolize.

Q As part of your urology care of patients and particularly pediatric patients, some adult patients, are you involved in managing malignancy of the kidney?

A Yes.

Q Does that expertise and that work involve becoming familiar with the way kidney tumors progress by expansion or growth or I suppose possibly by spreading to adjacent organs including this process of fragments breaking off, that's within your area of experience and expertise?

A It's within my area of expertise and experience, but what my experience tells me is this does not

happen unless someone has a very high staged disease.
Q So with regard to Sean Tillotson and just referencing what I'm going to read you from the autopsy report, let me find the place where they tell us actual dimension.
MR. CASOLARO: Page 410.
Q So what I'm looking at is Exhibit 14 in Dr. Yen's deposition. It's the Denver autopsy report. The top of the page they indicate, I'll just, actually, you can read along, and I'll look at this copy. I'm on page 410.
"The left kidney weighs 1010 grams. The kidney is sectioned to show a heterogeneous reddish-tan, multinodular soft mass, 21 by 11 centimeters, with widespread prominent milky white necrosis. The mass extends through the lumen of the left renal vein and focally into the lumen of the inferior vena cava. The right renal vein is without special note."
Now, that's a large malignant tumor, right?
A Yes.
Q And in terms of, are there known or are there



models that you're familiar with that would approximate or identify the likely growth rate of a tumor like that?
A I'm not aware of them. There may be in the oncological literature, but I cannot comment on that.
Q Bringing to bear the knowledge and the information you have on a more general basis, do you think it is more likely than not that on May 1st, 2014, and then again nine days later, eight days later on May 9, that that tumor would have been present to some size within his kidney?
A Yes.
Q And recognizing that it may well have grown some in the ensuing 50 or 60 days, depending from which day we measure it to the date of his death?
A Yes.
Q It's likely that it was also a very large tumor on May 1 and on May 9?
MR. SHAHI: Object to the form. Go ahead.
A It's likely it was there and of good size.
Q A tumor of good size, recognizing that within



less than two months the size was going to be 21 by 11 centimeters, had there been additional radiological diagnostic studies, either CAT scan or MRI, is it probable that recognizing the capabilities of those types of imagery that had that been done, it would likely have been observed?
A It would have been seen. Likely.
Q And if seen, if the clinicians saw and those studies had been undertaken and seen, can you describe for me what would be either the level of urgency or the level of medical intervention that most likely would have been put into play with that additional information?
MR. SHAHI: Object to the form.
A If that tumor had been found, it would have been staged. So that means they would have to figure out had it spread anywhere, and to what extent did it involve the vena cava and had it grown into the heart because it sounds like it's possible that may have been part of the issue.
Once you know that someone has vena caval involvement or possibly atrial involvement with



the tumor or tumor thrombus, that becomes a very difficult and challenging case because you have to decide is it curable or not. That dictates what you do after that.
Q So for starters, if you get back the study, the radiological study, and it indicates there is a large tumor, possibly or even probably malignant, it would be staged by some form of a biopsy, I assume?
A In this case, you could argue, if it showed a continuous growth of a tumor thrombus from the left kidney up into the vena cava and into the heart, no biopsy would be necessary because it would obviously be a malignant tumor.
Q So then there would be brought to bear specialists in treating both oncologically and urologically how to intervene with this type of case?
A Yes. With an advanced renal cell carcinoma.
Q So if the -- let's just take it in certain stages here. If you had the tumor present on the kidney, and we know from this autopsy report that it extends through the lumen of the left

renal vein and focally into the lumen of the inferior vena cava?
A Yes.
Q Hold off on the issue of whether it's up in the area of the heart and has invaded that for the moment in this question, if it's in the area of the adjacent organs to the kidney?
A Um-hum.
Q Is that a matter that in your experience is dealt with surgically in many cases?
A Yes. It can be surgically removed, but you may not get all of the disease.
Q And the kidney system has the, I would think of it as an advantage, I'm not sure how you think of it, but we have two of these organs, and I'm assuming that not uncommonly, when one is terribly diseased that organ is removed, and the patient continues to survive on the remaining kidney, is that so?
A Yes. Paired organs are a good thing.
Q And there is the ability, I gather, in cases where there's invasion of adjacent vessels surgical reconstruction can also occur of those



vessels with the goal of trying to remove as much of the mass tumor effect as possible?
A Yes.
Q And then the issue is, an issue remains which is is there present cellular malignant tissue or cells that need to be eliminated for the good of the patient through some other adjutant therapy whether it's radiation or chemo or immunosuppressive or some other treatment?
A Yes, but when you plan your surgery, you take into account where the tumor thrombus is. You cannot have this discussion without taking that into consideration. We'd never operate on someone to remove that part of the kidney and mass and leave a thrombus in the vena cava. So it's really important to know the final stage and how high that tumor thrombus goes before you discuss any type of treatment.
Q Okay.
A In a theoretical situation, in a different patient that had a tumor this size but no thrombus, you could remove it, but we're not talking about that patient in this situation.



Q When you say no thrombus, what do you mean by that, Doctor?
A Where something grows out of the tumor into the renal vein and grows up, it's sort of like just like a snake. It grows in the renal vein and then it goes up the vena cava.
Q And are you, I know from this report there is invasion into the left renal vein and into the inferior vena cava, do you know from this report that you have the thrombus, if you describe it that way, extending up that vessel to the heart?
A I have not read this document in completion so I can't say that. It's theoretical. But if someone has that much thrombus, what you presented to me, you have to do the next check, is it any higher, because if you don't plan your operation --
Q No, I understand.
A -- with that, you could really, you know, not do the patient good.
Q So you're not able to, one, you haven't been asked to, by the people you've dealt with in the defense of this case to review this report and



make that assessment, have you?
MR. SHAHI: Objection. Well, again, our conversations are confidential so don't answer that question.
Q Well, let's do the easy part. You haven't read this document?
A No.
Q And you have not made that assessment about the extension of the malignancy beyond the area of the kidney.
A Correct.
Q And are you planning to?
A Planning to read this document?
Q No. Planning to provide input or assessment on that issue as part of this case?
A No.
MR. SHAHI: Again, outside of --
A That's out of my expertise.
Q That's really what I was trying to find out because I have this feeling I may hear this again today, but it may not be from you.
MR. SHAHI: I don't want to say you started it, but you started it.

MR. FELMLY: I understand. I understand. No secrets here, Kaveh.
Q So had this situation resulted in further imagery, it would have, it would have identified a large tumor present, and it would have put into motion very serious high level inquiries and efforts to make determinations by Sean Tillotson's medical team?
MR. SHAHI: Again, objection to the form. Go ahead.
A It would have triggered a different care pathway.
Q I mean, this would have been seen as a life and death risk?
A It is life and death, but I can't comment on how urgent, other than within a few days or weeks that we would have a plan and set in motion.
Q It would have been unlikely if it had been discovered in the May 2014 time frame, either on the 1st or 2nd or the 9th, it would have been unlikely that the situation would have been such that Sean Tillotson on June 30th would have been at continued risk for pieces of that tumor



coming off.
MR. SHAHI: Object to the form.
Q Is that a fair statement? That tumor would have been removed, one way or the other?
MR. SHAHI: Same objection.
A Depending on what the final stage and assessment on its resectability and its curability. So that's the question for an oncologist or surgical oncologist.
Q Why don't we take a short break. We're making good progress, but I want to organize my thoughts a little bit before I go into a different area.
VIDEOGRAPHER: The time is 10:26. This is the end of disk number 1 and we're off the record.
(Recess taken)
VIDEOGRAPHER: The time is 10:41. We are back on the record.
BY MR. FELMLY:
Q Dr. Chavez, have you in your review of the imagery, including preparing for this deposition and going back over it, have you run the cine



clips in this case and looked at them?
A If I had, it would have been just a fleeting glimpse because I don't usually find them helpful in kidney cases.
Q Let me ask you about some documents that we use in litigation, and this is going be to be more have you ever seen or participated in this, and let me just lay the ground work a little bit.
A Um-hum.
Q We serve Interrogatories which are written questions to Dartmouth-Hitchcock. In the ordinary course, they respond with answers, and it goes back and forth, and we also serve Requests for Production of Documents, and they respond to those and then they provide documents or they don't as the case may be, and we sometimes have some discussions about that.
A Yes.
Q So Exhibit 4 are the Interrogatory Answers of Dartmouth-Hitchcock. Exhibit 5 are the Responses to Interrogatories.
My first question to you will be do you think you've ever seen these documents in this



form?
A No, I have not.
Q It is also possible, sometimes it happens, that particular questions which make up this document can be presented to a witness even though it's not in exactly this format, and I'm really going to be asking you, do you have any recollection or belief that you provided the information that went into the Answers of these Interrogatories?
A No.
MR. SHAHI: Again, outside of any conversations with counsel.
A No.
Q I mean, I realize you've talked with counsel about the case, but in terms of knowing that they were being incorporated as Answers, you didn't have that knowledge?
A I did not know.
Q And as far as responses on the production of documents request, is it similar that you didn't believe in any discussions that you were providing information that was going into these documents or at least have that conscious

knowledge?
MR. SHAHI: I'm going to, well, if it's, if it's in context of conversations with counsel --
A Um-hum.
MR. SHAHI: -- then you should not answer that question.
Q I'm really asking you, do you have a conscious knowledge or did you have a conscious knowledge that you were purposely helping to respond to these documents?
MR. SHAHI: Again, I don't, I know you're trying to dance around it, but I don't see how you can, if he has a conscious knowledge based on what counsel has asked him, I think that's really asking him what he knows through counsel.
MR. FELMLY: I'm not trying to dance around it. I'm trying to clearly in a way that I've done for a long time avoid the privilege objection by trying to find out was he part of a group that answered these Interrogatories. I'm not asking whether or not something was learned and incidentally came in there. He said he's never seen them, and I'm just trying to



establish that he's not the author of these Answers. That's really where I'm going.
MR. SHAHI: Well, he's never seen the document. The difficulty is that you're trying to ask him about the substantive nature of the responses, and I'm just simply saying to him to the extent that he's had conversations about what's substantively covered in those responses of counsel, he's not to respond to them.
Q Let me go back then to the top. You've never seen the documents before, is that right?
A Correct.
Q You have not sat down and gone through these various items in here and tried to answer them in any personal way?
MR. SHAHI: Okay. Again, if you're referring to -- I'm going to let him answer if you're referring to looking at these documents which he said he has not, but, again, if you're talking substantively, then I'm going to instruct him not to answer to the extent that any items in those documents which you have never seen before but if in substance subject of



discussions with counsel, you're not to answer that.
Q Let's do it this way then. Why don't you take a look at the Answers to Interrogatories, and, again, I'm not asking you to read every word in them, but if you could page through them and just get a sense as to the nature of the questions, and let me know if you believe that you've been involved in answering any of those questions.
MR. SHAHI: Okay. I'll make a representation that all of Dr. Chavez's contacts, as he told you, have been involving counsel. So there's no point in this exercise because if he has not seen the documents, the only possible way that he would be aware of any questions in there would be by discussions with counsel. That would be privileged.
MR. FELMLY: Okay. Let's leave it there then because I don't think that would stand up, but we'll see.
BY MR. FELMLY:
Q I realize that I'm bouncing around to different



subjects, and that's because I take things out of order in my outline. I'm not trying to confuse you.
Going back to your clinical interaction with Sean Tillotson and the family, do I understand that prior to them coming to your office on May 9th, you don't believe you had any prior treatment of Sean or was involved in his clinical care?
A That's correct.
Q I realize you had apparently looked at some record information and may have accessed some of the imagery; is that true?
A I was, yes, made aware of it.
Q Now, you have provided us a summary, and Nick, if I could have copies of it, this has been, I say you provided it, counsel provided at our request a summary, but it's my understanding that you cooperated or worked with Mr. Shahi to prepare this; is that right?
A That's correct.
Q And you carefully reviewed it, I gather, is that true, before it was given to me?

A Yes.
Q And the statement that we're looking at here which goes for a page and a third, to the best of your knowledge is true and accurate?
A Yes.
Q Why don't we mark that as an exhibit.
(Exhibit 45 marked for identification)
Q And this would have been a preparation with your involvement in it that happened some time over a fairly recent period before this deposition, I assume?
A Yes.
Q Have you ever written out any prior statement or summary of your involvement in the Sean Tillotson matter?
MR. SHAHI: You can answer that question with the exception of anything having to do with peer review or anything having to do with any kind of Medical Board investigation.
A Um-hum. I would say no.
Q Well, let me, I'm going to ask it very specifically. Without identifying first where it went, have you ever written out a statement?



MR. SHAHI: Okay. Again, with the exceptions that I noted --
A Um-hum.
MR. SHAHI: -- you can answer.
A Give me that question again.
Q Yeah. I'm not accepting his qualification on it. He knows that. I'm interested, first of all, has there ever been an occasion where you have written out a narrative or written out a statement or made some sort of a writing that summarized your recollections? That one can be answered yes or no. And then the question becomes "to whom," and that may raise a different issue.
MR. SHAHI: I think he may not, that special threshold question, I'm instructing you not to answer that if you did so in the context of whether it was a peer review or whether it was an investigation by a board of medicine, outside of any of those activities.
A I understand.
MR. SHAHI: Have you prepared something other than what's in front of you?



A No. I have not.
MR. FELMLY: Okay. So we'll follow that up as well, Kaveh.
Q So let me take you into this statement and ask you some questions about it, and in terms of the first paragraph, when we did talk about some of this before, you referenced the fact that there was a medical student, Jen Fantasia, and that she obtained the history and performed the initial physical exam on Sean on May 9th. Is that correct?
A Correct.
Q Now, I've taken her deposition, and I understand that at that time she was actually a medical student that was on a rotation in your urology service from a non-Dartmouth Medical School; is that your understanding?
A Yes.
Q And did you know where she was from?
A I recall vaguely because I don't set up the clerkships, but she may have been from UMass?
Q I believe she was from UMass.
A That's what I vaguely recall.



Q My understanding is she was up there for approximately a month-long period. Is that consistent with your memory?
A Yes.
Q And do you know how the cycle of one-month internship or rotation for somebody like that would work in terms of is it a calendar month or when would it most likely start and stop?
A No. I couldn't tell you. They just show up and we work with them, and then they're gone.
Q Were you involved at all in her selection or interviews or how it came to be that she was picked to be the person that came to Dartmouth?
A No, I was not.
Q Prior to her arriving and you meeting her when she got here, did you have any knowledge or prior experience with her?
A No.
Q Didn't know her qualifications or information about her?
A None.
Q Do you know whether on May 9th when she is working with you on Sean Tillotson's case

whether you'd ever worked with her before?
A I cannot recall.
Q Would she be in the rotation logs or the sort of on call and the system by which people are assigned by date? In other words, would a visiting medical student get in that same cycle?
A Normally, they would tag along with a resident of their choice, and they may be on call with them or may not be on call. I don't think it's required.
Q At the time you're interacting with her as a medical student on a one-month rotation, would I be right in assuming that you were presuming she had a very limited amount of expertise with regard to urologic matters?
A I have to preface that because she was a subintern. So that means she had already finished three years of medical school so she may have had more than a third-year medical student and was just starting clerkships. She wasn't a complete rookie.
Q Do you have a memory of her?
A Vaguely.



Q Any memory of in any way her standing out in terms of either the quality of her insights or the work that she did, anything about your impressions on her?
A All I can say is she seemed very thorough when she presented a case. From reviewing my note and her note, that's what I recall.
Q But you're not able as you sit here today to determine whether or not you had ever actually worked with her before this date?
A It's possible she may have scrubbed into a case during that month while I was operating, but I cannot recall.
Q Was there any particular reason she was selected to work with you on Sean Tillotson's case?
A No. It's random. Their clinic days are just kind of this is a good day for you to be there. You know, Dr. Pace, our attending urologist, sets up clinical rotations for the visiting students. He usually gives the Chief Resident that power to say I think you'd be best served by going here today, this clinic or that OR. So it can be random.



Q And it looks like you were relying on her to do a review of the chart and to perform initial physical exam and then report back to you various things that she observed.
A Well, that's not completely correct. I review the chart myself. She, because I need to cross-check what she sees and what she eventually puts in her note because I'm, especially with a medical student, responsible for what's in the note.
Q And you would not be relying upon her to interpret ultrasonic images at that level of her career, right?
A Correct.
Q I will represent to you when I took her deposition recently she disclaimed that at that point in her career she did not have the expertise or skill to review ultrasounds and that would have been your expectation of somebody at that level of training?
A Correct.
Q The way the medical record for that visit is set up, actually, give me the one we previously



marked. The way the medical record is set up, the first page of the urology visit.
MR. CASOLARO: 308.
Q So we marked Sean Tillotson's medical record in Dr. Yanofsky's deposition as number 24. There's sort of several markings of this because of the different size periods that it goes back to, but in the visit that Ms. Fantasia wrote up, there is a fairly detailed note that she described physical findings, described prior medications, described prior medical history, lab and imaging orders, and then we come to page 313 which I'm showing you, and there is now a more focused discussion of this consultation, and if you then work through that, it goes through and talks about the symptoms that she observed, the physical exam, and then if you go to page 315, Doctor, the bottom of the Bates stamped page 315, you'll see an entry in bold that says pertinent radiologic, radiology studies reviewed by me with Sean and his parents, both films and report.
Now, this is her note. And I know at the

end of it you sign on it and attest that you reviewed it and you concur, and I'm trying to get an understanding from reviewing this, when it says the radiology studies were reviewed by me with Sean and his parents, who's the me?
A That's myself. Not the medical student. She wouldn't know how to do that.
Q Is this a portion of the note that is actually sort of autogenerated or auto put into the template, recognizing that it's going to be describing the actions of the attending rather than a medical student?
A This, you mean the highlighted area here?
Q Yes.
A Yes. That's a part of it.
Q So that's going to show up in essentially any case where the radiological studies are going to be reviewed?
A Correct.
Q It will say reviewed by me, it will populate in Sean and his parents?
A No. There's an asterisk. I have to put in parents. It does not generate parents. It's a



blank that I put in when I go through the note. So I have to physically put that in there.
Q So how is that happening then where she is, what I'm going to be getting at is what parts of this does she write and what parts of this do you write and where do you do your editing? Basically trying to find out.
A I can edit the whole thing.
Q In this case, do you know other than what you just told me which is that you apparently edited that heading to note the Tillotsons and you, are there other edits that you made to this note?
A There may be, but I can't recall exactly what they are.
Q And in terms of the timing or sequence of this note in relation to this family being in the office on the afternoon of May 9th, is this note prepared before they see you, does she do her physical exam, do the note, talk to you, or do you all talk and then she goes to do her note and you edit it, you know, after they've gone and sort of more like an after-visit note? How does it happen?



A Depends on the, how fast the medical student is with typing. Sometimes they will sit with their computer and talk to the patient and type as they collect information. And then so that's a rough draft, and then she'll come out, some people will, or other medical students will just go in and talk, write down things and we'll gather in the treatment room, outside away from the patients, so we can discuss freely.
And then once we've discussed their findings, and looked at usually the xray and labs and any pertinent data, we'll go back in as a team and reintroduce the medical student and then we'll say okay. Now I'm here to kind of check you. So I go through the physical exam and then talk, because the parents are right there asking questions as we do so. So with the patient.
And then we sit and discuss, go through, that's when we would go through the xrays and then we would say this is our plan. I usually walk out, have a, it's called an After Visit Summary. So I print it, and it's basic like



phrase or two that I put in there that are pertinent to the diagnosis. I'll print it out, then carry it back into the parents and give it to them so there's no confusion on what we should do going forward. But I can't remember what Jen did. That's how it works usually.
Q But can you remember or can you say that you believe that in this case, before you started to meet with the parents --
A Yes.
Q -- and Sean, and go through the imagery, that you and she had already taken her initial findings and impressions, and you had talked about it, you had shared your thoughts back and forth on this so that when you went in there to talk with them, you pretty much knew the direction you were going to be heading?
MR. SHAHI: Objection to the form. Go ahead.
A The best I can recall is that that's usually what will happen. Sometimes the medical student will come out and we'll just go right in and talk to the parents, then come back out and go

over the final, you know, plan because I've usually added stuff to the data collection, we'll come back, discuss the case, look at the xrays.

So there's a variation on how you can do this. But before we go back with the final working diagnosis and plan, we've chatted about it. It's not like the medical student just does, makes, what are you going to do, that's fine and just do with that. No. I have to be innately involved in the collection of data, reviewing of the data and then formulation of the plan.

Q So if you go to page 216 in that Exhibit 24 there's a portion, rather detailed paragraph called assessment, and then there's another detailed paragraph called -- 316. I misspoke. So this, these two paragraphs have a very specific discussion regarding the issue of the hematuria and how it has been evaluated and references the renal cyst, and it discusses that there have been serial ultrasounds, and you're talking about the assessment there and also then



your, I say your because it sounds like you're the one that does the plan of management, is that right?

A Um-hum. Right.

Q That would be then part of this, and what I'm trying to get a sense as of when you first go in and say, hi, I'm Dr. Chavez and this is Nurse Fantasia and get to know them a little bit, you talk, whether this is likely already prepared or is this going to be evolving based on questions they ask or things that come up in the conversation?

A It evolves after discussion from what I recall.

Q Okay.

A And meeting the parents. There's no way I could have come up with this plan without knowing, you know, what had happened. So I need to talk to the patient.

Q And before you would have talked to the patient here, you and Ms. Fantasia would have looked at the images, the ultrasonic images?

A Usually we do, but sometimes the first time we'll look at them is in the room with the



parents. So it varies.

Q But in this situation, at least on that afternoon, that period of time of review, you would have been reviewing them with her, whether, with Fantasia, whether it was before or in the room with the parents?

A Yes.

Q Okay.

A Best I can recall.

Q And you would be the person who would be providing the interpretation and she was getting whatever learning and education came from that process.

A Yes.

Q Do you have any recollection of any particular input by the parents or questions or information they may have provided that you thought was important?

A No. I cannot recall any specifics.

Q Do you have a recollection with respect to Nurse Fantasia whether -- not nurse. Intern Fantasia, whether she, after the Tillotson case had gone by, whether you continued to work with her on



other cases while she was completing that one-month rotation?

A I can't recall it, but it's possible. She could have scrubbed into a case or we might have seen other patients in clinic. There should be a record of that.

Q What would that record be? That call schedule?

A No. It would be patient records. If I saw more patients than one that day, I probably saw other patients with Ms. Fantasia.

Q But if I was trying to find out how many other, because I don't get to review other patients' records, if I was trying to find out how many other occasions you might have worked with her, how would we do that?

A You'd have to go through all the cases I did that period of time and see if she was listed as a medical student in the op note. That would be one way. And then there may have been a schedule that someone drafted and said she would be working with pediatric urology service on these dates in the future, but I can't tell you because I didn't make up her schedule.

Q Now, in your summary, underneath those records, the second paragraph, you say the chart shows that Sean was seen in the ED on the evening of May 1. So I'm presuming from that statement that you've see that Emergency Department chart.
A Yes.
Q And just in terms of the timing of it, what are the, and leaving aside looking at it in the last, you know, couple of weeks or something like that, in connection with his treatment, when do you believe you saw him?
A That visit I'm pretty certain I would have reviewed that recent note.
Q Did you have any contact with the actual emergency room doctors by way of consultation, either Dr. Yanofsky or Resident Shepard?
A That evening? No.
Q Or --
A Because I was not on call that evening.
Q Or in anticipation of the visit on May 9th of this patient? I mean, do you have any either recollection or reason to believe that you had talked with them about what their observations



were?
A No.
Q How about Ms. Moses? Dr. Moses? Did you have any communication with her since she was the radiological or the urologic resident and actually consulted on the case that evening? Did you communicate with her?
A I can't recall. I really can't.
Q So let's go to page Bates number 295 and then we'll take you to another page here in a moment. What, if you go to, this is the Emergency Department record from, if you go to the middle of the page, you'll see on page 295 under imaging, renal ultrasound, parens, wet read per radiology resident, close parens, change in appearance of complex left renal cyst, no significant interval change in size.
Did you note or did that comment about according to the radiology resident on a wet read that there was a change in the appearance of the complex left renal cyst, did that come to your attention?
A I cannot recall. It may have if I reviewed the



note on that day, and I'm very certain I reviewed it.
Q Did you become aware that as a consequence of information about including the information about the ultrasound that the patient was discharged on bed rest that evening and had to be on sort of restricted activities as he went forward until he was going to be seen by your service? Did you know that?
A I was made aware that probably during the date of the visit but not before then.
Q That would be May 5/9, right? May 9th?
A But that's kind of a standard recommendation for anybody that has gross hematuria associated with physical activity. Someone that plays football, someone who plays rugby. So that's a generic recommendation, not specific to, you know, just Sean. That would be a standard protocol.
Q Do you have a recollection, I'll represent to you this is what we were told by the emergency room person, is that the family was concerned about that because he had SATs coming up, and there was a concern as to whether or not he was



going to be restricted and frustrated over that sort of discharge.
A I wasn't made aware of that.
Q So go to page 357 if you would, please, Doctor?
MR. SHAHI: 275?
Q 375 in Exhibit 24. These are, can you confirm the discharge instructions that were provided to the patient? Actually Bethanne Tillotson actually signs down in the middle of the page?
A Yes.
Q And the instructions that were provided them as they left the Emergency Department that evening included the fact that renal ultrasounds showed a change in the left renal cyst which may be contributing to the bleeding.
Was that information information that you knew either on May 2nd when you reviewed certain records or on May 9th when you had the patient and his mom and dad there?
A I was made aware of the change by reviewing the records when I saw the Tillotsons on May 9th. When I reviewed it, I can't recall, other than I was told maybe by a resident to review it on the

2nd, but I can't tell you specifically why -- I just reviewed it for thoroughness and to make sure that there wasn't an obvious issue.
Q So the studies that are done on May 1, the ultrasonic studies and examinations, were looking to see if there was a change in the area of the cyst from prior studies, is that true?
A Well, that's one of the reasons. There might have been other reasons why this young man had blood in his urine. So it was one of the many causes of possible bleeding.
Q But this is a young man that for a number of years had been followed with periodic ultrasounds in an effort to watch that particular area of echogenicity -- I'm sure I'm mispronouncing that.
A No. That's close.
Q -- in the left kidney, and in laymen's terms what you're looking for is to see if it's changing, right?
A Yes.
Q Okay. So now the emergency room department according to these records is told by the



radiology resident that it's changed. Is that of medical significance to you?
A It is. But it has to be taken in context that it was a wet read and it's not a final, final call.
Q But are you confident that when the patient arrives in your office on May 9th that one of the things on your mind was that you needed to get to the bottom of this notion that there was at least seen on a wet read a change in the area of the cyst that may be contributing to the bleeding, at least in the eyes of the person in the emergency room that wrote it down?
A I would review that whole ultrasound, and, yes, take that into consideration, but if I saw something else that was like, whoa, that's probably the bleeding cause, I would just take the whole picture.
Q Did you see something else that said, whoa, that's probably the bleeding cause?
A No.
Q One of the things you were looking hard for, I gather, as it's not uncommon would be stone



evidence, right?
A Stones or calcifications. Yes.
Q And I gather that was one of the things that was examined, and there was no apparent evidence of kidney stones in that left kidney; was that true?
A Well, the calcification was still present, but there was no new stones in the collecting system.
Q So as you're meeting with the parents, are you indicating to the Tillotsons and Sean that indeed we have a reported finding from the radiology that there is a change in the appearance of the cyst? Is that something you told Tillotsons?
A I cannot recall.
Q If you were aware of it, and you're there informing them about their son and this circumstance, and change is one of the things that, obviously, you'd be looking for, if you were aware of it, wouldn't you have told them that?
A It really depends on if when I pull the images



up and I compare them side by side and go, I might have said there's no obvious change. I may have said that. Yes. But I usually compare the images so we would have discussed any changes there.
Q Now, when do you believe is the first time that you saw remeasured images of the left kidney done by the resident, Brian Girard, the radiology resident?
A When you review the films, you see cursors and you look down, and it's usually in the bottom left, the length that these will tell you so that's part of reviewing the films is you look at the length of the kidneys, and there may be more than one measurement, but it's usually the one that has the length associated with the number on the bottom that you're more concerned with because ultrasounds are pretty, sometimes it's operator dependent so you have to look at where they put their cursors to decide what data they'd like.
Q And you've never talked to Brian Girard to find out what actually was the methodology or the

circumstances the evening of May 1 that led to a remeasurement of the kidney?
A Correct.
Q So you don't know as you sit here what caused him to do that?
A No. I don't. I can't say why.
Q As you sit here, do you have a recollection of what his initial measurement of the longitudinal dimension of the left kidney was when he did the ultrasonic imagery before he went back and on the computer remeasured?
A No. I can't recall.
Q The range of appropriate or average acceptable typical size for a 17-year-old five-foot-five or thereabouts young man in terms of longitudinal size of the kidney would be in what range? What would you be looking for?
A Well, I'd have to look at the nomogram. That's what I usually base it on is the length of the kidney. So it varies. I can see kids that have, he's almost adult size so he could have a 12, 12 and a half to if it's a short person, ten centimeters. So it can vary. That's why



nomograms help because it tells you the standard deviation.
Q Would you also in a young man that has had multiple prior studies, would it be important to look and see what the size of that kidney was measured in the images that were taken? Recognizing he's growing, obviously, but would that be important?
A And it is. It's in the report. I usually take the measurement from the previous exam and put it underneath the present so you have a kind of a tally right there where you can see a difference if there is one.
Q So you're not going to want to see 15.8 for a longitudinal size with the calipers on a left kidney, are you, on a kid like this?
A I mean, that would be out of the standard deviation probably.
Q How about 13.5?
A That's closer.
Q And am I right that while we're looking at size and making comparisons that the other driver of that issue is you want there to be a comparison



between the right kidney and the left kidney that is within a fairly narrow range. I think it's commonly reported as one centimeter; does that sound right?
A Sounds right.
Q So if you have one, the right kidney reporting out at, you know, 11 and some fraction and you've got the left one reporting out at 15.8, that comparison would be of concern.
A It would.
Q So that's what was in front of you in the films that were the original study done before the remeasurement --
A Um-hum.
Q -- on May 9th, and you would have noted that.
A I would have seen those, but it's, the thing is, you have to correlate it with the final report. And so it's like it's there, and you filter it through all the information you're interpreting during the visit, but there must be a reason why the radiologist said this was what they thought was the correct. And I can tell you, looking at an ultrasound, it's various shadows. Lot of



shadows. So there is room for interpretation where it starts and where it stops. It's not like the end of this table where it's obvious, you've got a ruler here and go to that end. You can measure it. It can be blurry. So that's why there's some variation from study to study in my experience.
Q So you'd want to get an understanding as to why and how were those more abnormal longitudinal lengths either resolved or dealt with or reconsidered?
A If there was some, if there was more concern than what you saw by reviewing the studies, they can have several overlays of measurements, and it isn't pertinent to the overall picture. So I don't know -- no, I don't call radiologists every time there's more than one set of measurements. That doesn't happen.
Q No. Of course not. What I was focusing on is a situation where there's a set of measurements on the left kidney size longitudinally because or in sequence from the initial images showing sizes that are clinically abnormal and one of

them very abnormal. 15.8.
A But that wasn't a measurement of the cyst that had changed. So that's really where, you know, that's what they noticed the change in was the cyst. They didn't notice anything with the size. So going back to the original wet read, it was more the cyst had changed, not the kidney had changed. That's a different thing. But it doesn't mean I disregard it, but I'm thinking, okay, what's this showing me.
Q Is there any step you believe you took analytically looking at that series of images and having the longitudinal size and staying with that for a moment, is there anything you did that gave you additional information as to how the abnormal size of the left kidney longitudinally was resolved or sorted out in the radiology process?
MR. SHAHI: Object to form. Go ahead.
A Other than reviewing all the films and looking for, you know, looking at the edges of the kidney and how, you know, and it can be somewhat indeterminate, that might be where they said



well, I like this better and then you change your mind and you like this better. So it's not uncommon to hone in on what you think is the best measurement. So I don't understand your question, and I'm answering it in that fashion.
Q So when Nicholas took Ms. Fantasia's, Doctor now, Fantasia's deposition, she said she had no recollection and did not believe she had ever seen any remeasured images in connection with this patient. And we asked her very specifically. We showed them to her. She said she did not believe she had seen those before. Can you state under oath unequivocally that you had the remeasured images in front of you when you were examining these images on May 9th?
MR. SHAHI: Object to the form. You can answer.
A Yes. I can state under oath that I saw those images.
Q The remeasured images?
A Yes. They would not have been not included for some reason. They should have been there. Yes.
Q Do you understand that on the first occasions



that my office received supposedly all the images from Dartmouth-Hitchcock Medical Center the remeasured images were not included in what we were provided?
MR. SHAHI: You can answer that question outside of any information given to you by counsel.
Q That's not in dispute. We didn't get them from, before suit when we were provided them originally, and then when Attorney Shahi provided them as part of the court, he did not receive them from the hospital, and we had to make a separate request after the issue came up later in a deposition. So we didn't get them. How are you so sure you got them?
MR. SHAHI: All right. So, again, objection to the form. So the question, I don't know what the question really is.
MR. FELMLY: It's an objection to form. You've made it.
A As far as I know, any image that is obtained during the study will be shown to any provider that needs to go into PACS and review it. There



would be no reason to not allow me to see those images. So I don't know what, I don't think that's an issue. Not giving me access to that. Because as far as I can recall, I saw all those images.
Q And Ms. Fantasia would have been with you at that time.
A That's correct.
Q Do you believe there was a discussion with the Tillotsons that indicated to them that there had been a remeasuring of the images?
A I cannot recall if that fine detail was discussed.
Q Did you know that in addition to Dr. Girard going back and remeasuring the longitudinal length of the left kidney that he also went back and remeasured his measurement of the actual echogenic area of cyst?
A No. I did not.
Q What was the original measurement of the area of cyst on the night of May 1 that Dr. Girard used the calipers and measured?
A I can't recall, but if you want to show them to

me, I'd be more than happy to review it. That's almost three years ago.
Q But I think you just told me you weren't aware that he also remeasured that and came up with a lower reading; is that true?
A No. What I said was that we were talking about the length measurements.
Q Right, and you said, and that's important, because what they were really interested in is the cyst. And that was, what I'm telling you, he went back unsatisfied with both of those measurements and he also remeasured the cyst, and I understand from your testimony you didn't know that before I told you that. Is that true?
A That the cysts were remeasured.
Q The area of cyst was remeasured with the caliper.
A I cannot recall knowing that. Yes.
Q And the reason he did it is because it was over two. It was large. It was larger. You didn't know that.
A I knew that it had been up to 2.2 centimeters in 2010. So I don't know what the pertinent



information there, if it hadn't changed in four years? If you look at the other ultrasound reports? So taken in the totality of it.
Q Well, when that happened, let's just go to that. Your reference on the bottom of your summary on page 1, you actually talk about that there had been a measurement of 2.2 centimeters on April 9th as noted in Dr. Poplack's April 4, 2012, report?
A Yes.
Q So what happened, according to what I believe you're writing here, is that when Dr. Poplack read the ultrasonic size of the echogenic area in 2012, he did not report it out on that date at 2.2. Correct? He reported it out at 1.1 or something like that. But then he made a reference to a finding that was done in 2010.
A You'd have to look at the report to be exact. That's the only way I can really comment on that.
Q What I'm looking at here is Exhibit 13, and so if we first go to the report on 2012, and if we go to, so we're at a page that is Bates stamped



PL000006, and I'm going to be focusing on 7. Is this the reference up at the top of the page where there's a 2.2 reference that you're talking about that Steven Poplack made?
A No. I think it was on a different study.
Q Well, just stay with me. You say that he noted it in his April 4, 2012 report. In other words, what I'm saying is, what I understood you to be saying is that he --
A Yes.
Q He references in a 2012 report previous medical findings and references a 4/9/10 report with an area measurement of 2.2. Do I have that right?
A That's what I said, yes. It's 2.2 by 1.1.
Q And you're saying, therefore, that reference tends to suggest there was some historic precedence for the cyst being measured at that size?
A Well, yes, but, again, it's variable. It's not like a micrometer. It can vary.
Q And you're saying the measurement can vary. You're not saying that this area of lesion or mass or calcium, whatever, is changing or



varying in size?
A Well, it usually doesn't get smaller.
Q Right.
A That's what's confusing if they have an earlier measure that's bigger and a later measure that's smaller.
Q And in the day he's measuring it it's at 1.3.
A Right. So that's two years earlier, it was two centimeters. Now two years later, it's smaller. So you have to take this into consideration. It's had some variability in its size.
Q So now go to the report that he's referencing and take a look at Dr. Sargent's report for the April 2010 examination which is the one that he is referencing, that set of studies.
A Yes.
Q And now looking at page 0009, we are examining Steven Sargent's reading of the 2010 report that Poplack was referencing, and what does he measure out in the report or reference in the report as the size of the echogenic area?
A It says 11 millimeters or 1.1 centimeters.
Q So he did not use a 2.2 size that is referenced

in Poplack's two-years-later report.
A That's correct.
Q Now, there is --
A It's also, this report also says something about, it says right kidney.
Q I'm not sure what you're trying to sort out, Doctor. So here's my point, which is you seem to be offering up this suggestion that there had been some precedent or some history of this lesion being measured at 2.2 and made that point by saying that reference shows up in Poplack's 2012 report which references back to an April 9, 2010, report, and indeed, when you go to that report, the radiologist making the finding doesn't use 2.2 but uses 1.1.
A Correct.
Q So --
A So there's variability. That's what I'm trying to say in that statement. There's variability.
Q Isn't another way of saying that that there had never been in all the years of prior review of Sean's echogenic area a reported-out finding by the radiologist that said I believe the size of



the lesion is over two. The only place that that comes is Poplack makes a reference to it because he saw it in a slide or one of the images there, but it's not the one that Dr. Sargent used to size the lesion in 2010.
MR. SHAHI: Objection to the form. You can answer.
A I think it just shows that ultrasound studies can vary. That's what it shows.
Q Now, when did the Poplack analysis that you've laid out in that paragraph that we just went through, this recognition and going back through and trying to see if there's any, when did you do this determination of trying to search out whether there was any historic precedent for a lesion reading larger than 2 centimeters? That wasn't on May 9th, was it?
A No. I can't say I reviewed that on May 9th.
Q So this is something you've actually looked at as part of the preparation of this statement and done that analysis in the last several weeks; isn't that true?
MR. SHAHI: Objection to form.



A I can't recall exactly when I reviewed that, but it could have been later than that.
Q It wasn't done as part of the treatment and assessment and diagnosis of Sean Tillotson at the time?
MR. SHAHI: Same objection.
Q True?
A It did not play in the assessment of his care.
Q You weren't sitting there on the afternoon of May 9th saying but I'm reassured because I've seen that Dr. Poplack made a note in 2012 that referenced a study in 2010, and I think that that should cause me to not be concerned over the measurement that the resident made on May 1 at over 2. You wouldn't have done that because you've already told me twice today you didn't even know he'd remeasured the cyst.
A Yes.
MR. SHAHI: Object to the form. Go ahead.
Q Right?
MR. SHAHI: Same objection.
A I didn't know he had remeasured it, but you go to the data you see, and the fact that he



remeasured, it doesn't change the fact that I looked at the films and did not see a significant change.
Q Okay. But you didn't know he remeasured it.
A Correct.
MR. SHAHI: Same objection.
Q All right. So all of this analysis that we're talking about here about the 2012 and 2010 is something that was prepared during your work on this file in terms of the litigation.
MR. SHAHI: Objection to the form. You can answer.
A I prepared this as I reviewed the chart and going through thought processes. That's why the stability of this cyst, not just from that one piece of information, but if you look at all the reports tell me that I had a lot of good trends that this was not changing.
Q So yesterday we received from counsel information in supplementary discovery that includes pager records.
A Um-hum.
Q Between people that communicate in the hospital

setting. And we're going to follow up on some of that because it only includes some of the providers, but I want to show you, and I'm going to mark here in a second, this was a portion of what we were provided, but I'm really going to be interested here in primarily one page. It's not your pager record, I'll reassure you at the outset, but if you look at this body of pager records and go to page 317, and this is in the format maintained by the hospital, and if you go down to about halfway through the page and you look at the entry that I'm pointing you to?
A Can I just look at the structure though?
Q Oh, sure.
A Never seen this before. How is it structured? It says archive message. Okay. And then you've got client, the doctor's name or whoever. Is that the person that sent the page or received the page?
Q We're going to be asking some of those questions.
A Okay.
Q But, trust me, you and I are in the same boat on



this except that I saw it yesterday and you're seeing it for the first time today. But I think when we get to the one that I'm interested in, it may become somewhat clearer. But good questions.
It will be clear, though, that Rachel Moses is involved in one way or another either as a recipient or a sender of these pager messages, and this is data, accumulating her data. If you go down on page 317 to the entry that is just below the midpoint on the page, you will see that on May 1, 2014, about 10:53 thereabout p.m.
A Okay.
Q Which is the time frame when Sean is in the emergency room, there was a message with Michelle T. Shepard. Now, she is the emergency room resident who we've deposed who said that she was the person who reached out to Rachel Moses although I don't think she remembered her name.
A Okay.
Q Whoever was on call as the urology resident.
A Um-hum.



Q And that message in this entry says Michelle T. Shepard - Callback:57001, 17 year old Tillotson, mass on L kidney. I assume that's left kidney, right?
A Yes.
Q Larger. Now, I don't have a pager. Thank heavens. I've got too many things chasing me down with messages and emails and the like. I'm assuming the pager has an ability to send some sort of short narrative information.
A Sort of text page, yes.
Q And this looks like that type of an entry, does it not?
A Yes.
Q And reading this, having in mind that the two professionals involved in the communication are Moses and Shepard, does it appear that Michelle Shepard is asking for a call back from Rachel Moses involving Sean Tillotson and indicating that the subject to be discussed is that the mass on the left kidney is larger?
A From that text, I would say yes.
Q Now, you will remember that in the emergency



room records that I showed you before, there were two references to the cyst having changed. One was the wet reading and its change. One was to the parents in the discharge instructions it's changed and may be contributing to the bleeding. But it wasn't called a mass. And the change was never described, but here the description is that the change is larger, correct?
A No. What it says is a mass which could have been also a cyst. I mean, when you text/page people, you don't always put exactly what you mean. It's just get back to me. There's a problem.
Q No, I understand that. I understand that the word "mass" may be seen as somewhat broader than cyst, and that really wasn't where I was going. It may be generic. But I am going on the fact that she's calling to the attention of the urology resident that's on call, I need to speak to you about this young man's situation --
A Um-hum.
Q -- because I've got information that the mass,

call it cyst if you'd like, in the left kidney is larger. And larger would be words of concern rather than reassurance, true?
A It just means, let me put it on my list, I will call you when I can. It's not life-threatening, that type of page. You're like okay. And Rachel is running around doing stuff. She has to -- so I don't know how long it took her to return the page.
Q So assuming that information is in the record, can you explain to me how the final radiology report in this case ends up indicating that the mass is stable and that it is not changed in size?
MR. SHAHI: Objection to the form.
Q How does that happen? With these professionals talking about changes with this cyst, the mass is larger, how does it happen that we end up getting into your hands through the Radiology Department a final report that has data that is not consistent with these findings that are being told to the Emergency Department people?
MR. SHAHI: Objection to the form.



A How it happens is this is a preliminary review of what information they have. So it's a work in progress. It's not like someone had a gunshot wound to their abdomen. This is an ultrasound. Doesn't even say what the modality is. So it's okay, I'll call you back, and I'll figure out what's going on.
Now, the pediatric resident that was interpreting this or talking to people doesn't routinely evaluate people with ultrasound because they're in the, they're just working in the emergency room for a few months. So they're concerned, but they're not the ones that can make the final call and is this really changed or not. They're concerned and justly that something may be up, but they can't make the final call.
Q So did Rachel Moses in the period of time between this consultation and communications she had with Resident Shepard and up until the time when you see the patient on May 9th brief you or communicate with you about this issue of a possible discrepancy in the size of the mass or



the lesion?
A Not that I can recall. What I, you know, would assume, I can't recall, is Rachel would contact me and say there was someone in the emergency room that came in, and they had a new problem. They're going to come see you in a, you know, some period of time. You might want to look at the films. Maybe that's why I looked at them, but I can't recall going back and looking at them.
Q We're going to mark the pager records.
(Exhibit 46 marked for identification)
Q Do you know if either Dr. Moses or you actually communicated back and made the decision that the boy should be on bed rest?
A I wasn't on call that night so I wasn't involved in that decision.
Q So you don't know if she did.
A I don't know.
Q Do you know any of the circumstances of how it came to be that he was seen on the 9th, and in particular, the nature of any discussions between the parents and the urology service over



how to get him in there as quickly as possible?
A No. I was not privy to that conversation.
Q When you did the research you told me you had done with respect to tumors and the unusual quality of this, did you find any cases involving children with renal cancers where there were parallels to what had happened to Sean?
A Not exactly.
Q What was the variation on the ones you found?
A The majority presented earlier stage with different symptoms.
Q You, in looking at the imagery, did not see any, according to your report, you said you didn't see anything that indicated to you or pointed to a malignant etiology; is that right?
A Correct.
Q You make a comment that the difficulty in visualizing the upper pole of the left kidney was likely due to gas in the colon or the stomach. Was that describing just what the report said or are you saying when I looked at the imagery, I noted that there may be gas in

the colon or the stomach?
A I noted that, and it's a common finding in a lot of ultrasounds on either side, right or left. That's why you have some blurring of the edges of the structures you're looking at.
Q So when that imagery is taken of the left kidney, is that a movement of the ultrasonic probe that's sort of in the left flank area or the left back of the patient as opposed to the abdomen?
A You'd have to, to see the kidney well, you have to place the probe back here, but the colon can sometimes be in between the kidney and the skin so you have to sometimes look at it through the gas, partially gas-filled organ.
Q Well, my understanding was that the colon can obviously be aberrant or different place, but in general, wouldn't you expect the colon to be positioned more to the front of the patient rather than the area of the kidney?
A No. It can be lateral to the kidney.
Q And how about the stomach? Isn't the stomach --
A The stomach is anterior.



Q And indeed, a skilled ultrasonic operator trying to get imagery of the kidney, left kidney, would know how to maximize the ability to avoid involvement or obscuring by the colon or the stomach, would they not?
A Not necessarily. Someone can come in with a lot of gas and make it more difficult to perform the procedure.
Q Was there anything in the record here that indicated that there was some problem that was encountered during the administration of the ultrasound because of what was believed to be gas? Is that a matter of record in this case?
MR. SHAHI: Objection. Go ahead.
A Not that I can recall.
Q I mean, if you're trying to sort out in the face of a young man that has blood in his urine and has the history of this supposed cyst in his left kidney that's been followed for many years and they have been looking for changes, and you're now at a spot where you cannot properly visualize that organ, the left kidney, assume for the moment that you cannot properly



visualize the organ to your satisfaction, what happens?
A That was not the case in this case.
Q Okay. So you say. But assume for the moment that that was the case. In other words, if you had the hypothetical situation where you're saying I just cannot get a good enough visualization of this area, this upper pole of the left kidney, what happens then in terms of managing patient care?
MR. SHAHI: Again, objection to the form. You can answer.
A You might repeat the study at a different time.
Q What about the issue that Dr. Yen raised and added to the final report where she added the words "a CT scan might be helpful." Would that be an alternate way to get better visualization of what might be there?
A It may be, and it would be indicated if you thought after looking at the whole picture that would be part of your workup.
Q Did you know that that part of the final report where the reference to the CT was placed was



added by the attending and it was not on the resident's original preliminary report?
A No. I don't know how they edit and compound their records so I couldn't know that timeline.
Q I mean, you wouldn't likely have gone and read the preliminary report by the resident, would you?
A I don't think they release the preliminary report as far as I know.
Q So that the report you're going to see when you go to review this case on May 2nd or on the 9th is going to be Dr. Yen's final report?
A Should be.
Q So if I represent to you that the original resident who did the examination without her present did not have the language in there about the difficulty of visualization in that upper pole and didn't have the reference to that a CT scan may be helpful, and I represent to you that that was added by the attending when she reviewed it, that was not known to you before today.
A Correct.

129

Q There are enormously detailed reports called the E audit reports that identify by moment by moment when professionals enter the medical record.
A Sure.
Q And we marked it. It was provided by the hospital. It's Exhibit 19. I'm not going to take you through all of that. I'm going to talk to you very briefly about a couple of things though. So have you seen this document before?
A No, I have not.
Q So you would not have gone through the E document report to try to spot the places where Dr. Chavez entered the record and reviewed things?
A No.
Q You have looked at or have not looked at the other audit trail which is that PACS report which is the one that does it by radiologic --
A No. I have not.
Q So the reason that you know that you entered the records, I believe you're correct, on May 2nd is from what source?

130

MR. SHAHI: Other than our conversations.
A Other than our conversations?
Q You don't know.
A I was, no. It's just conversation with my attorney.
Q Okay. So and that's fine. But just so I'm clear because I won't spend a whole lot of time on these, one, I believe it's accurate that you did on May 2nd make various entries, if I can call it that, into the record. You are not able to tell me between May 2 and May 9th whether you went into the Sean Tillotson record at any other times?
A I cannot recall.
Q Just as an example here, this is the radiology study, and I'll be able to show him. I'm just going to give you an example. The way we know people enter the record in part is on May 9th, 2014, this particular study which was numbered 2294838, that particular study is one of the early examinations. It's actually the 2004 initial ultrasound. It's clear that at 3:31 to 4:37, several entries were made on the afternoon

131

of May 9th into that record and the image reviewed which we know is in the general time frame when the Tillotsons are in there, and I am moving to the assumption that the CIS over here is likely you or perhaps you sitting there with Ms. Fantasia going into them. Jen Fantasia.
A Possible.
Q And there's a variety of these studies where on May 9th there is an entry from a nonradiology viewer CIS and that sounds to you, I gather, without us pinpointing every one of them to make sense, right?
A Yes.
Q Okay. Because you believe that that is a time when you did.
A As far as I can recall.
Q Okay. I'm presuming it was important to you on the afternoon of May 9th that the final ultrasound report on Sean's care that was signed by Dr. Yen described the lesion, if I can call it that, as stable or unchanged.
A Yes. I mean, can you pull up the report so we can look at it?

132

Q Sure.
A See what the verbage is?
Q We actually have it marked. So what this Exhibit 12 is, the way it's set up, just to try to be clear with you, the final report is actually at the top and the preliminary report is down below at the bottom, but so what you're looking at at the top of page 1 is the final report and will tell you the actual verbage. So you will note, particularly in terms of the impression at the bottom, stable, 11 millimeter echogenic focus/lesion in the upper pole of the left kidney. So there's the stability word that I was referencing before, and that's an important word to you, I assume?
A Yes. Also it says no new lesions were visualized.
Q And if, hypothetically, this report read differently, I have it in front of me, I know how it reads so I know it doesn't say this, but I just want to find out how you would be thinking if it were different. If, for example, the report indicated that there is a change, a

measurable change observed in the size of the area of echogenic focus, and there is a concern with respect to the measurement size of the left kidney and has been remeasured, but there is a concern with the size of the left kidney, is that the kind of information, assuming it was phrased in some appropriate radiological way to make those points, do you do anything different on those facts than what you do with the reference to a stable 11 millimeter echogenic mass?

MR. SHAHI: Objection to the form.

A This is all hypothetical?

Q Yeah. Right.

A It would also depend on the patient's history because if this child had never had bleeding before, and it was only a two-year period, then I would be more worried maybe this is something that is growing faster, but, you know, in the context of things, the time frame in which this change occurs is very important also.

Q Do you know when he last had frank hematuria in his blood before the May 1 event?



A Reported to me? And by reviewing his chart? It was way back in his first presentation. I think it was 2004.

Q Are you not aware that he had one incident or so in the midstream there for a short period?

A No. That never was discussed.

Q But so now he's got it, and what I'm saying is that assume that the report indicated, and we say it's hypothetical, let's assume the report had the same kind of information that was in the emergency room record and in the pager note to Dr. Moses. In other words, we are seeing an observed increase in the size and change in the area of echogenic focus. In other words, the radiology report was asked for, it was ordered, it was done and it was reported back the changes that showed up in the emergency room record and in the hospital's paging archives, does that cause you to do anything different or look at it with any more detail?

MR. SHAHI: Same objection.

A We're talking about a different patient now?

Q We're talking about a hypothetical.



A Okay.

MR. SHAHI: Same.

Q But this patient with different facts in terms of what the report says.

A Yes.

MR. SHAHI: Same objection.

A Well, I would, if he wasn't, he or she wasn't bleeding actively, and there wasn't any sign of infection, I would still watch and I wouldn't, you know, proceed with any type of study that requires contrast or radiation if I'm not certain it's going to yield something that is very important. So it's not a knee reflex, just a knee jerk response to go to the next level of imaging for children who are stable, and if it's new onset pain, if the ultrasound doesn't show something that's concerning.

Q What if instead of what I just told you the report had said in doing the ultrasonic examination, we have not been able to visualize to our satisfaction the area of the left kidney in the upper pole and believe that additional imaging needs to be undertaken in order to



accurately assess the status of the lesion. If it said something like that, that additional imaging would happen, would it not?

MR. SHAHI: Same objection.

A In a different patient, if that's what you're telling me, yes, I would probably reassess the way to image that patient.

Q And finally, if the imaging had been something along these lines or the report was there is an area of apparent mass effect in the upper pole of the left kidney. It appears that it may be tissue. It does not appear to be gas in the colon or in the stomach but may represent some sort of lesion that is not clearly evident on prior studies, assume it said something like that, that would be of great concern, would it?

MR. SHAHI: Same objection to the form.

A That would trigger, yes, more workup.

Q In terms of this issue of more workup, and I'm mindful that these are expensive procedures, but the bottom line would be if you felt you had a need to do a CT scan, if either the radiologist or the urologist says look, this kid needs a CT

scan?
A Yes.
Q He's going to get a CT scan, right?
A Correct.
Q Okay. I mean, they're available in the hospital. I'm sure there's an incremental cost to it, but you wouldn't not do it because of --
A No. It's not a cost issue.
Q Okay.
A It's radiation exposure and whatever risk there is of starting some malignant process in a patient with exposing them to xrays.
Q So you don't do it unless he needs it. And in that context, how do you interpret the note that Dr. Yen added to the report? She says it would be helpful. Well, is that a recommendation that you do it?
A It depends on the clinical situation. So the radiologist may never have met the patient, and they're looking at a film. So they don't know the complete history. They may have known, they may know the radiology history because they look at the prior studies, but we always take our



radiology colleagues' advice in the context of the whole picture. So it's not an absolute, but it's not something I disregard. I don't disregard what my colleagues from radiology suggest, but it just didn't seem indicated with this, what data I had.
Q That wouldn't be a situation, recognizing, I mean, she's the attending, she's added that comment in, what would be the down side of getting her on the pager and saying Dr. Yen, I've got this note where you say it would be helpful. Are you saying to me you think we should CT scan this kid? Wouldn't that be an appropriate course?
A It's one of many appropriate clinical courses.
Q You didn't talk with her about this, did you?
A No, I did not.
Q I think I'm about done, Kaveh, if I can just have a minute to a review quickly with Nick. I know the Doctor's got other things. I'm trying to conclude that quickly.
VIDEOGRAPHER: Would you like to go off the record?



MR. FELMLY: Yes.
VIDEOGRAPHER: The time is 12:08. We're off the record.
(Recess taken)
BY MR. FELMLY:
Q When Dr. Moses is on call as the urology resident on the evening of May 1 and has an interchange with Dr. Shepard, would it be her responsibility to then coordinate with a urology attending about the events of that evening involving this patient?
A Yes. In some way she touched base either with whoever was on call that night or the following day.
Q So I have not seen, maybe you can correct me if I'm wrong, I haven't seen any note or progress note or anything else that documents or memorializes a conversation or interchange between Dr. Moses and any attending in urology. Have you seen that?
A I have not.
Q And you don't remember that conversation happening with you although you can't exclude



that it did?
A On that evening? I can't exclude it.
Q I mean, you weren't, you told me, I think, you were not on call that evening?
A I was not on call.
Q So it was very unlikely it was you that evening?
A I've been called when I'm on vacation so I'm not protected.
Q What I'm more interested in is whether or not perhaps one of your other colleagues spoke to her that evening, and do we know that?
A I cannot comment on that. I don't know.
Q But we would be able to find out who was on duty that night?
A Yes.
Q And the ordinary pitch or the ordinary course of action would be that the on call urology resident would call the on call urology attending before they'd start tracking you down on vacation?
A True.
Q Okay. And you have no memory of one of your attending colleagues calling you and talking

with you about Sean Tillotson and saying I notice he's coming in on the 9th, and let me tell you a little bit about this. You don't remember any briefing along those lines?
A No. I do not.
Q In the records it describes Dr. Mark Harris as being the primary care doctor that referred Sean Tillotson in, and when the visit is over and on May 9th you actually write Dr. Harris a note thanking him for the referral, and I'm just trying to get an understanding of it. As far as I know, Dr. Harris didn't have anything to do with him being in the emergency room on the evening of May 1. He had been involved for quite a long time in Sean's prior care, and I have no doubt he would have been listed as his primary care doctor. What I'm really getting at is whether the letter you're writing him is because Harris has been in his care and is his patient as opposed to suggesting that Harris had some communications in the last week and a half relating to this new episode of hematuria.
But that's a long way of saying did you



have any communications with Harris that you know of relating to the May 1 incident or is this more of an artifact from a prior referral relationship?
A When someone comes into Clinic, their primary doctor is populated as the person that will receive a report on the visit. Even if that patient wasn't immediately or directly referred by that patient, I think it's important to send information to the referring or the primary medical person. Could be advanced nurse practitioner, a DO, an MD, or a PA. They get a copy of my note so they know, wait a minute, something's going on with my patient.
Q And that makes sense, but I just wanted to exclude, it doesn't mean that Dr. Harris had to have been involved on the evening of May 1 in this emergency room thing. It could have been more the usual practice you just described.
A Yes.
Q Okay. Just so we're clear of what we're talking about here, this is that letter, I'm just going to mark it, but what you described made perfect



sense to me. That looks like that kind of a letter.
A Yes.
Q Okay. All right. Thank you very much. I'm going to have this marked, and I don't have any further questions at this time. We have some legal issues between us that we'll have to sort out, but I appreciate your courtesy and cooperation. I hope I didn't keep you too late.
A No.
VIDEOGRAPHER: The time is 12:18. This is the end of disk number 2. The deposition is concluded, and we're off the record.
(Exhibit 47 marked for identification)



I have carefully read the foregoing deposition, and the answers made by me are true.

_______________________
DAVID R. CHAVEZ, M.D.

STATE OF ___________________
_________________________, SS.

At_____________________on the ___________ day of _______________________ A.D. 2017, personally appeared the above-named DAVID R. CHAVEZ, M.D. and made oath that the foregoing answers subscribed by him are true.

Before me,

__________________
Notary Public

C E R T I F I C A T E

I, Cynthia Foster, Registered Professional Reporter and Licensed Court Reporter, duly authorized to practice Shorthand Court Reporting in the State of New Hampshire, hereby certify that the foregoing pages, numbered 5 through 143 are a true and accurate transcription of my stenographic notes of the deposition of DAVID R. CHAVEZ, M.D. who was first duly sworn by me on March 24, 2017, for use in the matter indicated on the title sheet, as to which a transcript was duly ordered;

I further certify that I am neither attorney nor counsel for, nor related to or employed by any of the parties to the action in which this transcript was produced, and further that I am not a relative or employee of any attorney or counsel employed in this case, nor am I financially interested in this action.

Dated at West Lebanon, New Hampshire, thi[illegible] day of April, 2017.

Cynthia Foster

____________________________

Cynthia Foster, LCR

**A**

**A.D** 144:12
**a.m** 5:1,7
**abdomen** 122:4 125:10
**aberrant** 125:17
**abilities** 27:10
**ability** 65:21 119:9 126:3
**able** 41:12 45:16 67:21 82:8 130:10,16 135:20 140:13
**abnormal** 104:9 104:23 105:1 105:16
**above-named** 144:13
**absolute** 138:2
**acceptable** 101:13
**accepting** 78:6
**access** 108:3
**accessed** 37:10 76:12
**accession** 43:21
**accomplished** 22:12
**account** 66:11
**accumulating** 118:9
**accurate** 77:4 130:8 145:6
**accurately** 136:1
**action** 1:10 5:8 140:17 145:14 145:18
**actions** 29:4 85:11
**active** 29:2
**actively** 135:8
**activities** 11:9 20:8 22:5 31:20 78:20 95:7
**activity** 95:15
**actual** 18:15 33:11 61:6 93:14 108:17 132:9
**added** 89:2 127:15,15 128:1,20 137:15 138:8
**addition** 13:4 37:4 108:14
**additional** 14:3 63:2,14 105:15 135:22 136:2
**address** 6:18,20 6:22
**adjacent** 53:10 57:3 60:18 65:7,22
**adjutant** 66:7
**administration** 126:11
**administrative** 20:9
**Administratix** 1:7
**Administratrix** 2:5
**adult** 11:18,19 13:1 15:11 25:22 26:1,7 26:23 59:23 60:11 101:21
**adults** 15:6,9 59:3,9 60:6
**advanced** 64:19 142:11
**advantage** 65:14
**advantages** 53:6
**advice** 138:1
**advise** 10:5
**affiliated** 12:14
**afforded** 6:4
**after-visit** 86:22
**afternoon** 86:17
91:3 115:9 130:23 131:18
**age** 11:15 56:8
**ago** 35:13,21,22 36:17 42:22 49:11 51:4 109:2
**agreeable** 6:7 10:15
**agreed** 4:3,11 5:20
**ahead** 48:20 50:17 62:21 69:10 88:19 105:19 115:19 126:14
**Aicher** 2:7
**aid** 50:7
**airport** 56:13
**allow** 108:1
**allows** 9:19
**alternate** 127:17
**amount** 81:14
**analysis** 114:10 114:21 116:7
**analytically** 105:12
**anesthesia** 20:17 20:21
**announced** 29:8
**answer** 3:11 10:4,7 11:4 12:19 22:18 28:6 29:23 30:7 31:3 32:2 32:8 34:16,21 35:20 47:19 57:15 68:3 73:5 74:14,17 74:21 75:1 77:16 78:4,17 106:17 107:5 114:7 116:12 127:12
**answered** 10:14
73:20 78:12
**answering** 8:16 75:9 106:5
**answers** 71:12 71:19 72:9,16 74:2 75:4 144:2,14
**anterior** 125:23
**anticipation** 35:6 93:20
**anybody** 40:12 95:14
**apart** 18:18 20:10 22:1,2 34:23 37:10 38:21
**apparent** 99:4 136:10
**apparently** 59:6 59:21 76:11 86:10
**appear** 119:17 136:12
**appearance** 33:17 94:16,20 99:14
**APPEARANC...** 2:1
**appeared** 144:13
**appears** 15:15 136:11
**applied** 22:16,22
**apply** 7:5
**appreciate** 143:8
**appreciated** 57:1
**approached** 35:10
**appropriate** 23:11 31:14 48:12 101:13 133:7 138:14 138:15
**approximate** 62:2
**approximately** 5:7 9:7 12:21 35:9 57:13 80:2
**April** 27:22 54:8 110:7,8 111:7 112:14 113:12 145:20
**archive** 117:16
**archives** 43:10 134:18
**area** 7:21 20:2 32:21 45:13 46:15 47:1 49:17,18 50:2 50:2 52:10 53:8,8 56:15 57:2,7,14 60:20,22 65:5 65:6 68:9 70:13 85:13 97:6,15 98:10 108:18,20 109:16 110:13 111:13,22 112:21 113:22 125:8,20 127:8 133:2 134:14 135:21 136:10
**areas** 14:18 15:2 18:9 22:19
**argue** 64:10
**arrest** 57:8
**arrived** 43:8 44:14
**arrives** 98:7
**arriving** 80:15
**articles** 17:4
**artifact** 142:3
**aside** 38:22 93:8
**asked** 32:6 54:1 67:22 73:14 106:10 134:15
**asking** 28:8,11 31:11,23 32:3

32:4,10,13 34:13 36:12,13 57:11 72:7 73:7,15,21 75:5 87:17 117:20 119:18
**asserting** 10:5
**assess** 136:1
**assessment** 68:1 68:8,14 70:6 89:16,23 115:4 115:8
**assigned** 13:10 21:2 81:5
**associated** 95:14 100:16
**Association** 2:3
**assume** 38:10 50:6 51:15 60:4 64:9 77:11 119:3 123:3 126:22 127:4 132:15 134:8,9 136:15
**assuming** 17:2 28:20 65:16 81:13 119:9 121:10 133:6
**assumption** 131:4
**assurance** 28:7,9
**asterisk** 85:22
**atrial** 63:23
**attending** 7:15 8:2 12:22 23:1 23:5,7,9,15 24:13 39:7 40:16 82:18 85:11 128:1,20 138:8 139:10 139:19 140:19 140:23
**attention** 9:23 10:12 29:21 94:22 120:19
**attest** 85:1
**attorney** 35:1 36:15 41:15 107:10 130:5 145:13,16
**audit** 43:13,15 129:2,18
**author** 74:1
**authorized** 145:3
**auto** 85:9
**autogenerated** 85:9
**autopsied** 56:22
**autopsy** 55:8,16 56:17,18 58:11 61:5,9 64:22
**available** 14:13 137:5
**Avenue** 12:12
**average** 101:13
**avoid** 32:5,19 73:18 126:3
**awards** 21:14,20
**aware** 31:18 62:4 75:16 76:14 95:3,10 96:3,20 99:17 99:21 109:3 134:4

**B**

**back** 15:10 16:1 26:8 27:1 30:12 33:3,16 38:8,13 41:4 42:6,7 64:5 70:19,23 71:13 74:10 76:4 83:3 84:7 87:12 88:3,14 88:23 89:3,6 101:10 105:6 108:15,16 109:11 113:12 114:12 119:18 120:13 122:6 123:9,14 125:9 125:12 134:2 134:16
**background** 17:1
**bailiwick** 46:22
**base** 101:19 139:12
**based** 9:1 16:20 46:21 48:1 73:13 90:10
**basic** 87:23
**basically** 41:17 86:7
**basis** 62:8
**Bates** 84:18 94:9 110:23
**bear** 18:1 23:1 32:4 62:7 64:15
**becoming** 60:16
**bed** 95:6 123:15
**behalf** 2:4,9 9:4 9:5
**belief** 72:8
**believe** 25:7 27:23 36:10 38:5,9 42:5 44:10,12 54:7 72:21 75:8 76:7 79:22 88:8 93:11,22 100:6 105:11 106:8,12 108:9 110:11 113:23 129:22 130:8 131:14 135:22
**believed** 126:12
**bell** 30:19
**belt** 27:20
**best** 12:19 34:11 77:3 82:21 88:20 91:9 106:4
**Beth** 16:5
**Bethanne** 1:5,6 2:4,5 5:10 96:8
**better** 44:4 47:12 52:23 106:1,2 127:17
**beyond** 33:10 68:9
**bigger** 112:5
**Billings** 8:2
**bio** 14:4 16:22 17:17
**biographical** 14:12
**biomedical** 17:13
**biopsy** 64:9,13
**birth** 7:1
**bit** 36:23 39:3 59:5 70:12 71:8 90:8 141:3
**blank** 86:1
**bleeding** 96:15 97:11 98:12,17 98:20 120:6 133:16 135:8
**blocks** 13:14,23
**blood** 24:20 49:16 60:8 97:10 126:17 133:23
**blurring** 125:4
**blurry** 104:5
**board** 16:9 45:10 47:4,22 48:5,11 77:19 78:19
**boat** 117:23
**bodies** 29:14
**body** 10:20 51:22 117:8
**bold** 84:19
**Boston** 16:5
**bottom** 84:18 98:9 100:11,17 110:5 132:7,11 136:21
**bounced** 40:17
**bouncing** 75:23
**Box** 2:3,8
**boy** 49:14 123:15
**break** 10:10,14 60:8 70:10
**breaking** 59:22 60:19
**Brian** 39:11 100:8,22
**brief** 5:23 122:21
**briefing** 141:4
**briefly** 129:9
**bring** 9:23 10:11 52:13
**Bringing** 62:7
**broader** 120:16
**broken** 57:6
**brought** 64:15
**Bruce** 2:2 5:13 6:12
**business** 6:17

**C**

**C** 1:6,7 2:5,6 145:1,1
**calcification** 99:7
**calcifications** 99:2
**calcium** 111:23
**calendar** 80:7
**California** 7:23 15:23 41:10
**caliper** 109:17
**calipered** 51:10
**calipers** 102:15 108:22
**call** 11:18 21:4,9

44:20 45:5 81:4,8,9 92:7 93:19 98:5 104:16 118:22 119:18 120:20 121:1,5 122:6 122:14,17 123:16 130:10 131:20 139:6 139:13 140:4,5 140:17,18,18
**Callback:57001** 119:2
**called** 41:11,11 43:14,16,21 44:3 87:22 89:16,17 120:6 129:1 140:7
**calling** 120:19 140:23
**cancer** 17:20
**cancers** 124:6
**capabilities** 46:15 63:5
**capability** 28:3
**caption** 4:8 5:10 6:1
**carcinoma** 59:11 64:19
**carcinomas** 59:20
**cardiac** 57:8
**care** 7:10 11:14 11:18 18:16 20:10,15,23 23:3,10 26:18 27:18 28:12 29:6 33:6 42:14 49:4 60:10 69:11 76:9 115:8 127:10 131:19 141:7,15,17,19
**cared** 7:16
**career** 17:1
21:16 29:11 83:13,17
**carefully** 76:22 144:1
**carry** 88:3
**carve** 57:16 58:4
**case** 7:18 8:12 9:4 16:19 17:15 18:2 22:16 25:1 28:16 34:20 36:10 39:9,22 40:10,14 41:14 41:21 42:5,11 54:23 59:8 64:2,10,18 67:23 68:15 71:1,16 72:15 80:23 82:6,11 82:15 85:17 86:9 88:8 89:3 91:22 92:4 94:6 121:12 126:13 127:3,3 127:5 128:11 145:17
**cases** 7:20 9:12 9:14 19:19,22 23:6 40:3 65:10,21 71:4 92:1,16 124:5
**Casolaro** 2:2 5:14 6:13 61:7 84:3
**CAT** 63:3
**catch** 23:16
**caught** 24:11
**cause** 98:17,20 115:13 134:19
**caused** 28:4 30:19 57:7 101:4
**causes** 97:11
**cava** 61:19 63:19 64:12 65:2
66:15 67:6,9
**caval** 63:22
**cell** 41:11 59:11 59:18,19,20 64:19
**cells** 66:6
**cellular** 66:5
**Center** 1:11 2:9 5:6,12,19 6:21 6:22 11:10 12:5 21:4 34:9 107:2
**centimeter** 57:1 57:2,13 103:3
**centimeters** 61:16 63:2 101:23 109:22 110:7 112:9,22 114:16
**certain** 13:9 43:21 46:1 64:20 93:12 95:1 96:17 135:12
**certainly** 24:4
**certification** 16:9
**certifications** 16:13
**certified** 45:10 47:5,22 48:5 48:11
**certify** 145:5,12
**challenge** 31:6
**challenging** 64:2
**change** 56:13 94:15,17,20 96:14,20 97:6 98:10 99:13,19 100:2 105:4 106:1 116:1,3 120:3,7,8 132:23 133:1 133:21 134:13
**changed** 98:1
105:3,7,8 110:1 120:2,5 121:13 122:14
**changes** 51:6 100:5 121:17 126:20 134:16
**changing** 56:12 97:20 111:23 116:18
**characterizing** 59:16
**chart** 8:22 30:21 30:22 31:9,11 31:14 43:10 83:2,6 93:2,5 116:13 134:1
**chasing** 119:7
**chatted** 89:7
**Chavez** 1:16 3:4 3:5,7 5:5 6:9 6:19 31:23 33:4 44:22 70:21 90:7 129:14 144:5 144:14 145:8
**Chavez's** 75:12
**check** 67:15 87:15
**chemo** 66:8
**chief** 25:13 82:20
**child** 133:16
**children** 11:14 15:8,10 59:13 124:6 135:15
**choice** 81:8
**cine** 51:15 52:3,9 52:18,19 53:5 53:6 70:23
**circle** 41:4
**circumstance** 99:19
**circumstances** 20:1 101:1 123:20
**CIS** 44:3 131:4 131:10
**citations** 28:16
**City** 12:11
**Civil** 1:10 5:8
**Claims** 2:11
**clarify** 47:21
**classes** 19:6
**clear** 9:21,22 118:6 130:7,22 132:5 142:21
**clearer** 118:4
**clearly** 34:1 73:17 136:14
**Cleary** 2:7
**clerkships** 79:21 81:20
**click** 52:23,23,23
**client** 117:17
**clinic** 12:7 33:13 82:16,22 92:5 142:5
**clinical** 17:11,15 18:16 19:8,11 20:10 48:21 76:4,9 82:19 137:18 138:15
**clinically** 104:23
**clinicians** 63:9
**clinics** 12:7
**clip** 52:18 53:5,6
**clips** 51:15 52:4 52:4,9,19 71:1
**close** 94:15 97:17
**closely** 26:15,19
**closer** 102:20
**Coast** 56:12
**collapsed** 56:15
**colleagues** 14:14 40:16,21 138:4 140:10,23
**colleagues'** 43:2 138:1
**collect** 87:4

**collecting** 99:8
**collection** 89:2 89:11
**colon** 124:20 125:1,12,16,18 126:4 136:13
**Colorado** 56:13
**come** 16:13,21 19:6,15 26:8 28:12 30:12 46:23 84:12 87:5 88:22,23 89:3 90:11,16 94:21 123:6 126:6
**comes** 33:4,16 44:20 114:2 142:5
**comfortable** 47:8,15
**coming** 25:15 29:20 70:1 76:6 95:22 141:2
**comment** 31:7,8 47:23 53:13 62:5 69:15 94:18 110:19 124:18 138:9 140:12
**commented** 49:20
**comments** 41:4
**Committee** 28:9
**committing** 22:6
**common** 59:7 125:2
**commonly** 10:19 25:20 41:6 44:2 103:3
**communicate** 10:19 94:7 116:23 122:22
**communicated** 39:1 123:14
**communication** 94:4 119:16
**communicatio...** 122:19 141:21 142:1
**community** 22:4
**comparable** 15:7
**compare** 50:10 50:21 100:1,3
**comparing** 43:3
**comparison** 102:23 103:9
**comparisons** 102:22
**competence** 28:3 28:12
**competent** 4:6
**complaint** 31:19
**complete** 81:21 137:21
**completely** 43:6 83:5
**completing** 25:14 92:1
**completion** 67:12
**complex** 94:16 94:21
**compound** 128:3
**compromised** 24:8
**computer** 87:3 101:11
**concentrated** 26:13
**concern** 28:4 29:14 51:7 95:23 103:9 104:12 121:2 133:2,5 136:16
**concerned** 95:21 100:17 115:13 122:13,15
**concerning** 135:17
**concerns** 20:22 28:11
**conclude** 138:21
**concluded** 10:11 143:13
**concur** 85:2
**condition** 15:7
**conditions** 11:22
**conference** 20:16 56:9
**conferences** 18:23 19:23
**confidence** 40:21 46:14 47:3
**confident** 98:6
**confidential** 68:3
**confirm** 96:6
**confirmation** 46:2
**confirmed** 46:8
**confounding** 49:3
**confuse** 76:3
**confused** 36:23
**confusing** 53:5 58:2 112:4
**confusion** 56:3 88:4
**congenital** 11:16
**connection** 8:20 27:18 30:4 41:9 93:10 106:9
**conscious** 72:23 73:7,8,13
**consequence** 95:3
**consider** 48:4
**consideration** 66:13 98:15 112:10
**consistent** 25:1 57:11 80:3 121:21
**consultation** 84:14 93:15 122:19
**consulted** 27:18 94:6
**contact** 30:12 47:1 93:14 123:3
**contacted** 41:13
**contacts** 39:16 75:13
**content** 53:17 54:18
**context** 24:12 29:20 31:12,21 33:14 38:6 49:14,20 50:12 60:1 73:3 78:17 98:3 133:20 137:14 138:1
**continued** 46:3 69:23 91:23
**continues** 65:18
**continuous** 64:11
**contrast** 135:11
**contributing** 96:15 98:11 120:5
**conversation** 90:12 124:2 130:4 139:18 139:22
**conversations** 10:18 38:21 39:8 40:13 41:9 55:12,12 56:1 68:3 72:12 73:3 74:7 130:1,2
**cooperated** 76:19
**cooperation** 143:9
**coordinate** 139:9
**copies** 76:16
**copy** 6:4 61:12 142:13
**correct** 15:1,17 15:21 16:3,8 16:12 23:6,23 24:9 25:9 27:23 41:22 44:15 52:2 54:13 68:11 74:12 76:10,21 79:11,12 83:5 83:14,21 85:19 101:3 103:22 108:8 110:15 113:2,16 116:5 120:9 124:17 128:23 129:22 137:4 139:15
**corrected** 23:20 24:7
**correlate** 103:17
**cost** 137:6,8
**counsel** 4:13 5:15,16 6:7 10:2 36:1,5 37:11 38:21 53:21 55:13 56:2 57:16 58:1 72:12,14 73:3,14,15 74:9 75:1,14 75:18 76:17 107:7 116:19 145:13,16
**couple** 43:13 93:9 129:9
**course** 13:12 21:3 46:6 71:12 104:19 138:14 140:16

**courses** 138:15
**court** 1:1,18 4:10 5:9 8:7 9:1 28:13 32:18 47:9,23 107:11 145:3,4
**courtesy** 143:8
**courtroom** 8:8
**covered** 74:8
**cross-check** 83:7
**CT** 38:8 42:4 127:16,23 128:18 136:22 136:23 137:3 138:13
**curability** 70:7
**curable** 64:3
**current** 11:11
**currently** 9:13
**Curriculum** 3:10
**cursors** 100:10 100:20
**CV** 14:5
**cycle** 80:5 81:6
**Cynthia** 1:17 145:2,22
**cyst** 89:21 94:16 94:21 96:14 97:7 98:11 99:14 105:2,5 105:7 108:18 108:21 109:10 109:12,16 111:17 115:17 116:15 120:2 120:11,17 121:1,17 126:18
**cysts** 109:15

**D**

**dad** 33:21 96:19
**dance** 73:12,16
**Dartmouth** 15:16 80:13
**Dartmouth-Hi...** 1:11 2:9 5:5,11 5:19 6:20 7:21 12:4,8,14,21 14:15 16:2 21:16 29:12 34:9 36:10 41:16 71:11,20 107:2
**data** 87:12 89:2 89:11,12 100:20 115:23 118:9,9 121:20 138:6
**database** 43:19
**date** 5:6 7:1 41:2 41:3,3 62:16 81:5 82:10 95:10 110:14
**Dated** 145:19
**dates** 27:23 92:22
**David** 1:16 3:4 5:5 6:9,19 144:5,13 145:8
**day** 11:23 12:1 12:11,13 39:12 43:11 44:21 54:5 56:7,17 62:16 82:17 92:9 95:1 112:7 139:14 144:12 145:20
**day-to-day** 18:18
**days** 4:12 6:5,7 35:18,21,22 62:10,11,15 69:16 82:16
**Deaconess** 16:5
**deal** 20:21
**dealing** 18:6
**dealt** 17:19 32:15 65:10 67:22 104:10
**death** 20:5 29:18 30:8,15 32:7 34:7 55:21 57:9,12 59:21 62:17 69:14,15
**debate** 32:14
**December** 7:2
**decide** 64:3 100:20
**decision** 12:17 48:22 123:14 123:17
**decisions** 45:20 46:19
**Defendant** 2:9 7:8
**Defendants** 1:12
**defense** 5:15 67:23
**defer** 48:17
**deference** 48:5
**deferential** 48:16
**delivery** 20:14
**demonstrating** 52:1
**Denver** 56:13,18 61:9
**department** 39:20 43:16 93:5 94:12 96:12 97:22 121:20,22
**depend** 133:15
**dependent** 100:19
**depending** 51:20 62:15 70:6
**depends** 23:19 24:1 48:21 52:16 87:1 99:23 137:18
**deponent** 4:14
**deposed** 7:18 54:17 118:17
**deposition** 1:16 4:3,12 5:4,7 6:5,14 7:5,7 10:23 11:6 31:18 34:18 35:4 53:16 54:3,3,7 61:9 70:22 77:10 79:13 83:16 84:5 106:7 107:14 143:12 144:2 145:8
**depositions** 4:6 5:21 53:18 54:11
**depth** 51:12
**dermatology** 20:19,19
**describe** 17:7 22:11 27:8 45:9 52:5 57:4 59:16 63:11 67:10
**described** 56:23 84:9,10,11 120:7 131:20 142:19,23
**describes** 141:6
**describing** 85:11 124:21
**description** 120:8
**detail** 108:12 134:20
**detailed** 84:9 89:15,17 129:1
**determination** 46:8 114:14
**determinations** 69:7
**determine** 59:12 82:9
**deviation** 102:2 102:18
**DHMC** 3:4,6
**diagnose** 11:22
**diagnoses** 12:2 47:15
**diagnosis** 18:10 45:23 46:7,21 47:21 50:9 88:2 89:7 115:4
**diagnostic** 50:7 63:3
**dialogue** 8:15
**dictates** 64:3
**didactic-type** 18:21
**died** 30:10
**difference** 102:13
**different** 17:13 48:13 58:12 66:20 69:11 70:13 75:23 78:14 84:7 105:8 111:5 124:12 125:17 127:13 132:22 133:8 134:19 134:22 135:3 136:5
**differential** 12:1 18:10
**differently** 132:19
**difficult** 64:2 126:7
**difficulty** 74:4 124:18 128:17
**dimension** 38:4 61:6 101:9
**Direct** 3:2 6:10
**direction** 18:19 88:17
**directly** 142:8
**disagreement** 48:6

**disagrees** 32:18
**discharge** 96:2,7 120:4
**discharged** 95:6
**discipline** 28:2 29:6
**disclaimed** 83:16
**discovered** 69:19
**discovery** 22:15 116:20
**discrepancy** 122:23
**discuss** 19:1 42:14 66:18 87:9,19 89:3
**discussed** 41:7 87:10 100:4 108:13 119:20 134:6
**discusses** 89:21
**discussing** 49:7
**discussion** 19:19 20:6 41:18 57:23 58:1 66:12 84:14 89:19 90:13 108:9
**discussions** 41:23 53:20 71:17 72:21 75:1,17 123:22
**disease** 14:19 15:3 17:12 61:2 65:12
**diseased** 65:17
**diseases** 11:17
**disk** 70:15 143:12
**dispute** 107:8
**disputes** 48:12
**disregard** 105:9 138:3,4
**distinguishing** 55:11
**District** 1:1,2 5:9 5:9
**doctor** 6:12 19:16 24:22 28:22 40:6 58:19 67:2 84:18 96:4 106:6 113:7 141:7,17 142:6
**doctor's** 117:17 138:20
**doctors** 37:20 93:15
**document** 55:14 55:15 67:12 68:6,13 72:4 74:4 129:10,13
**documents** 55:11 56:1 57:19 58:5,7 71:5,14,15,23 72:20,23 73:10 74:11,18,22 75:15 139:17
**doing** 6:15 17:23 23:8 25:18 26:7,23 43:9 52:22 121:7 135:19
**doubt** 141:16
**Dr** 3:5,7,7 5:5 25:4,20 27:9 27:16 28:1 31:19,23 33:3 39:8,16,16,20 39:21 40:1,5 44:22 54:3,3,4 54:5,6,7 61:9 70:21 75:12 82:18 84:5 90:7 93:16 94:3 108:14,21 110:8,12 112:13 114:5 115:11 123:13 127:14 128:12 129:14 131:20 134:12 137:15 138:10 139:6,8 139:19 141:6,9 141:12 142:16
**draft** 87:5
**drafted** 92:20
**dramatically** 50:15
**drawing** 40:20
**drawn-out** 35:15
**Drive** 6:22
**driver** 102:22
**due** 124:20
**Duke** 16:7
**duly** 6:9 145:3,9 145:11
**duty** 51:21 140:13

**E**

**E** 129:2,12 145:1 145:1
**ear** 20:18
**earlier** 7:21,23 14:21 19:3 30:17 50:10 112:4,8 124:11
**early** 19:3 130:21
**East** 56:11
**easy** 56:6 68:5
**echogenic** 18:9 20:2 49:18 108:18 110:13 112:21 113:22 132:12 133:2 133:10 134:14
**echogenicity** 97:15
**ED** 93:3
**edges** 105:21 125:4
**edit** 86:8,21 128:3
**edited** 86:10
**editing** 86:6
**edits** 86:12
**educate** 59:4
**education** 15:15 91:12
**effect** 66:2 136:10
**efficiently** 10:9
**effort** 97:14
**efforts** 69:7
**eight** 62:10
**either** 9:21 22:4 32:14 42:12 46:5,17 51:19 59:3 63:3,11 69:19 82:2 93:16,21 96:17 104:10 118:7 123:13 125:3 136:22 139:12
**eliminated** 66:6
**Elliot** 12:11,13
**Elm** 2:3
**emails** 119:8
**emboli** 59:10
**embolic** 57:5
**embolize** 60:9
**emergency** 24:21 27:14 38:15 39:19 40:6 43:5,12 93:5,15 94:11 95:20 96:12 97:22 98:13 118:15,16 119:23 121:22 122:12 123:4 134:11,17 141:13 142:18
**employed** 145:13,17
**employee** 145:16
**encountered** 126:11
**endemic** 11:2
**endourology** 16:5
**ends** 121:12
**energy** 51:23
**engagements** 22:5
**engineering** 17:13
**enlarging** 50:16
**enormously** 129:1
**ensuing** 62:15
**enter** 129:3 130:18
**entered** 44:10 129:14,21
**entering** 43:18 43:23
**entire** 13:19
**entity** 55:4,5
**entries** 43:22 130:9,23
**entry** 84:19 117:12 118:10 119:1,12 131:9
**episode** 24:19 141:22
**error** 23:14,20 23:23 24:10
**especially** 83:9
**Esquire** 2:2,2,7
**essentially** 5:23 51:22 56:15 85:16
**establish** 74:1
**established** 54:14
**Estate** 1:7 2:5
**etiology** 124:16
**evaluate** 122:10
**evaluated** 89:20

**evaluation** 44:17 45:12
**evaluations** 28:17
**evening** 24:22 27:14 39:20 93:3,17,19 94:6 95:6 96:12 101:1 139:7,10 140:2 140:4,6,11 141:14 142:17
**event** 57:5 133:23
**events** 20:4 139:10
**eventually** 7:16 83:8
**evidence** 27:15 56:19 99:1,4
**evident** 136:14
**evidentiary** 47:14
**evolves** 90:13
**evolving** 90:10
**exact** 110:18
**exactly** 35:11 42:23 44:7 72:6 86:13 115:1 120:12 124:9
**exam** 79:10 83:3 84:17 86:19 87:15 102:10
**examination** 3:2 6:10 12:3 51:9 112:14 128:15 135:20
**examinations** 42:7 52:20 97:5 130:21
**examined** 99:4
**Examiner's** 56:18
**examining** 106:15 112:17
**example** 22:15 50:15 130:15 130:17 132:22
**exception** 77:17
**exceptions** 78:2
**exclude** 139:23 140:2 142:16
**exercise** 75:14
**exhibit** 17:18 61:8 71:19,20 77:6,7 89:14 96:6 110:21 123:12 129:7 132:4 143:14
**EXHIBITS** 3:3
**expansion** 60:17
**expect** 125:18
**expectation** 83:19
**expensive** 136:20
**experience** 24:19 33:9 46:14 47:6 60:20,22,23 65:9 80:17 104:7
**experienced** 8:17
**expert** 8:20 9:13
**expertise** 45:10 47:4,9,10,17 48:15 60:15,21 60:22 68:18 81:14 83:18
**expired** 56:16
**explain** 49:23 51:7 121:11
**exposed** 13:23
**exposing** 137:12
**exposure** 59:8 137:10
**expressed** 22:22 33:3
**extended** 57:3
**extending** 67:11
**extends** 61:17 64:23
**extension** 68:9
**extent** 29:7 31:1 31:23 38:4 42:16,23 57:3 57:19 63:18 74:7,21
**eyes** 98:12

**F**

**F** 2:2 145:1
**face** 126:16
**face-to-face** 33:11
**facility** 11:12 24:21
**fact** 79:7 96:13 115:23 116:1 120:18
**factors** 49:3
**facts** 55:20 133:9 135:3
**faculty** 19:8,11 19:14
**fair** 52:5 70:3
**fairly** 77:10 84:9 103:2
**fall** 29:19 30:9 30:23 31:13 32:8 34:19
**familiar** 60:16 62:1
**family** 49:2 76:5 86:16 95:21
**Fantasia** 34:2 79:8 84:8 90:8 90:20 91:5,21 91:21 92:10 108:6 131:6,6
**Fantasia's** 54:4 106:6,7
**far** 25:4 72:19 107:21 108:4 128:9 131:16 141:11
**fashion** 9:18 10:19 106:5
**fast** 87:1
**faster** 133:19
**father** 34:1
**feel** 46:16,20
**feeling** 68:20
**fellowship** 25:18
**fellowships** 16:4 17:10
**Felmly** 2:2 3:2 5:3,13,20 6:11 6:13 28:8,19 30:2 31:4 32:3 32:17 33:2 53:22 69:1 70:20 73:16 75:19,22 79:2 107:19 139:1,5
**felt** 136:21
**field** 17:9
**figure** 63:17 122:7
**file** 32:15 116:10
**filed** 7:16
**filing** 4:8 6:1
**film** 45:22 137:20
**films** 39:16 84:21 100:10 100:13 103:11 105:20 116:2 123:8
**filter** 103:18
**final** 39:8 46:20 66:16 70:6 89:1,6 98:4,4 103:17 121:11 121:20 122:14 122:17 127:15 127:22 128:12 131:18 132:5,8
**finally** 136:8
**financially** 145:17
**find** 15:7 23:20 46:13 61:5 68:19 71:3 73:19 86:7 92:11,13 100:22 124:5 132:21 140:13
**finding** 31:9 99:12 110:17 113:14,22 125:2
**findings** 84:10 87:11 88:13 111:12 121:21
**fine** 34:18 89:10 108:12 130:6
**finish** 25:12
**finished** 26:4,6 81:18
**first** 4:4 7:23 11:8 26:17 29:17 32:6 34:6 36:19 38:8 55:17 56:14 58:13,21 71:22 77:22 78:7 79:6 84:2 90:6,22 100:6 106:23 110:22 118:2 134:2 145:8
**five** 30:17
**five-foot-five** 101:14
**flank** 125:8
**fleeting** 71:2
**floor** 2:8 21:8
**focally** 61:18 65:1
**focus** 14:18,22 53:9 133:2 134:14

**focus/lesion** 132:12
**focused** 14:2 15:4 49:22 84:13
**focusing** 104:19 111:1
**folks** 13:4
**follow** 44:21 79:2 117:1
**followed** 20:3 49:17,19 97:13 126:19
**following** 5:21 8:4 31:19 139:13
**followup** 12:2
**football** 95:15
**foregoing** 144:1 144:14 145:5
**forensic** 8:21
**form** 4:10 6:2 47:19 48:8,19 50:17 62:21 63:15 64:8 69:9 70:2 72:1 88:18 105:19 106:16 107:17 107:19 114:6 114:23 115:19 116:11 121:15 121:23 127:11 133:12 136:17
**formal** 10:19 18:20
**formalities** 4:9 6:1
**formally** 54:16
**format** 72:6 117:10
**formulation** 89:12
**forth** 15:10 71:13 88:15
**forward** 10:4 42:15 88:5 95:8
**Foster** 1:17 145:2,22
**found** 56:22 63:16 124:10
**four** 19:6 21:19 110:1
**fraction** 103:7
**fragments** 60:19
**frame** 26:17 69:19 118:14 131:3 133:20
**frank** 133:22
**freely** 87:9
**frequently** 39:6 60:6
**fresh** 8:5
**Friday** 18:23
**front** 78:23 103:11 106:14 125:19 132:19
**frozen** 52:14
**frustrated** 96:1
**full** 6:17
**full-blown** 14:5
**full-time** 11:13 15:12
**further** 4:11 41:23 46:2 49:4 69:3 143:6 145:12 145:15
**future** 45:7 92:22

**G**

**Gary** 1:5 2:4 5:10
**gas** 124:20,23 125:15 126:7 126:13 136:12
**gas-filled** 125:15
**gate** 56:15
**gather** 14:12 22:18 65:21 76:22 87:8 98:23 99:3 131:10
**gatherings** 19:4
**general** 15:19,22 20:11,17 45:11 55:20 62:8 125:18 131:2
**generally** 13:11 28:11
**generate** 85:23
**generic** 95:16 120:18
**genitourinary** 11:17
**getting** 21:21 51:22 53:9 86:4 91:11 121:19 138:10 141:17
**Girard** 39:11 100:8,22 108:14,21
**Girard's** 54:3
**give** 19:1 50:8 78:5 83:23 88:3 130:17
**given** 7:7 55:9 76:23 107:6
**gives** 82:20
**giving** 53:7 108:3
**glimpse** 71:3
**global** 48:21
**go** 7:4 10:4,8,9 25:16 44:12 48:19 50:17 62:21 69:10 70:12 74:10 84:17 86:1 87:7,12,15,19 87:20 88:11,18 88:22,23 89:6 89:14 90:6 92:16 94:9,11 94:12 96:4 100:1 104:4 105:19 107:23 110:4,22,23 112:12 113:13 115:19,22 117:9,10 118:10 126:14 128:11 135:14 138:22
**goal** 66:1
**goes** 10:23 39:3 66:17 67:6 71:13 77:3 84:7,15 86:20
**going** 6:13 10:8 17:22 21:6,7 28:5 29:22 30:6 31:2 32:17 33:3 34:12,15,20 38:12 42:6,15 43:2 44:23 47:18 51:1 53:3 54:6 56:8 57:4 58:10,23 61:4 63:1 70:23 71:6 72:6,22 73:2 74:2,17,20 76:4 77:21 82:22 85:10,16 85:17 86:4 88:5,17 89:9 90:10 95:8 96:1 102:14 105:6 108:15 111:1 114:12 116:14 117:1,3 117:5,20 120:17,18 122:7 123:6,9 123:11 128:10 128:12 129:7,8 130:17 131:6 135:12 137:3 142:14,22 143:5
**gold** 46:10,18
**good** 5:3,17 6:12 11:5 12:16 19:4 33:20 43:1 51:1 62:22,23 65:20 66:6 67:20 70:11 82:17 116:17 118:4 127:7
**graduated** 15:15
**grams** 61:13
**grand** 19:20
**great** 18:14 136:16
**gross** 95:14
**ground** 7:4 71:8
**grounds** 28:6
**group** 19:7 43:23 44:6 73:20
**growing** 50:15 102:7 133:19
**grown** 62:14 63:19
**grows** 67:3,4,5
**growth** 60:17 62:2 64:11
**guardianship** 8:11
**guess** 7:8 26:4 43:10,19 47:11
**guessing** 14:5
**guidelines** 22:11
**gunshot** 122:4

**H**

**half** 101:22 141:21
**halfway** 117:11
**Hampshire** 1:2

1:17,18 2:4 4:6 5:10,22 6:23 12:10 28:21 145:5,19
**hands** 121:19
**Hanover** 15:16
**happen** 24:6 25:23 59:12 60:5 61:1 86:23 88:21 104:18 121:16 121:18 136:3
**happened** 41:18 44:8 53:23 55:22 59:5 77:9 90:17 110:4,11 124:7
**happening** 16:18 53:1 86:3 139:23
**happens** 11:6 72:3 122:1 127:2,9
**happy** 109:1
**hard** 37:8 38:20 98:22
**harm** 24:1
**Harris** 3:7 31:19 141:6,9,12,19 141:20 142:1 142:16
**head** 10:20,20
**heading** 86:11 88:17
**hear** 32:22 46:23 68:20
**heard** 25:8 60:1
**heart** 57:7 59:23 63:20 64:13 65:5 67:11
**heavens** 119:7
**heavy** 14:21
**help** 50:8 53:5 102:1
**helpful** 52:18
71:4 127:16 128:19 137:16 138:12
**helping** 73:9
**helps** 33:20
**hematuria** 89:20 95:14 133:22 141:22
**heterogeneous** 61:14
**hi** 90:7
**high** 61:1 66:17 69:6
**higher** 47:5 67:16
**highlighted** 85:13
**highly** 24:5
**historic** 111:16 114:15
**history** 34:8 49:2,2 79:9 84:11 113:9 126:18 133:15 137:21,22
**hold** 28:16 65:4
**Hole** 56:9
**hone** 106:3
**honest** 12:19
**hope** 143:9
**hopefully** 10:9 23:16
**horse** 53:2
**hospital** 19:16 20:9 22:2 24:15 25:9 29:10 43:14 107:12 116:23 117:10 129:7 137:6
**hospital's** 134:18
**hours** 10:8
**hyperechoic** 50:2
**hypothetical** 48:10 127:6 133:13 134:9 134:23
**hypothetically** 132:18

**I**

**idea** 45:17
**identification** 17:18 18:8 44:2 77:7 123:12 143:14
**identified** 44:1 69:4
**identifies** 43:18
**identify** 21:10 43:22 62:2 129:2
**identifying** 77:22
**identity** 49:21
**image** 50:18,20 107:21 131:1 136:7
**imageries** 51:9
**imagery** 18:4 37:5,10,17 38:12 42:3,4,4 42:6,17 43:20 44:13 47:1 48:15 49:9,22 51:16,23 52:8 52:12 53:7 63:5 69:4 70:22 76:13 88:11 101:10 124:13,23 125:6 126:2
**images** 45:13 49:12 50:8,23 51:9 52:15 83:12 90:21,21 99:23 100:4,7 102:6 104:22
105:12 106:9 106:14,15,19 106:20 107:2,3 108:2,5,11 114:4
**imaging** 46:12 46:21 49:13 84:11 94:14 135:15,23 136:3,8
**immediate** 53:11 59:21
**immediately** 142:8
**immunosuppr...** 66:9
**impact** 23:17
**impinge** 30:1
**important** 10:17 66:16 91:18 102:4,8 109:8 131:17 132:15 133:21 135:13 142:9
**importantly** 43:6
**impression** 132:11
**impressions** 27:8 82:4 88:13
**incident** 134:4 142:2
**incidentally** 73:22
**inclined** 48:4,16
**include** 14:18 19:13
**included** 26:17 96:13 106:21 107:3
**includes** 116:21 117:2
**including** 22:19 60:19 70:22
95:4
**incorporated** 72:16
**increase** 134:13
**incremental** 137:6
**indeterminate** 105:23
**INDEX** 3:1
**indicate** 22:23 56:14 61:10
**indicated** 36:7 41:5 58:17 108:10 124:15 126:10 127:19 132:23 134:8 138:5 145:10
**indicates** 43:20 64:6
**indicating** 10:7 47:16 99:11 119:19 121:12
**infection** 135:9
**infectious** 11:16
**inferior** 61:19 65:2 67:9
**informally** 54:16
**information** 14:4,10,13 16:23 47:1 57:17,20 58:6 59:10 62:8 63:14 72:8,22 76:12 80:19 87:4 91:16 95:4,4 96:16 103:19 105:15 107:6 110:1 116:16 116:20 119:10 120:23 121:10 122:2 133:6 134:10 142:10
**informing** 99:18
**inhospital** 38:11

**initial** 42:7 79:10 83:2 88:12 101:8 104:22 130:22
**injury** 24:7,11
**innately** 89:11
**input** 68:14 91:16
**inquiries** 69:6
**inquiring** 37:13 41:12
**inquiry** 49:14 51:7
**insights** 40:22 82:2
**instance** 4:4
**institution** 11:20 15:13
**institutions** 12:6
**instruct** 28:5 29:22 30:7 31:3 32:2,13 34:15,20 74:21
**instructing** 78:16
**instruction** 22:9
**instructions** 3:11 13:23 96:7,11 120:4
**intend** 47:11
**interacting** 81:11
**interaction** 18:19 25:1 33:11 76:4
**interchange** 139:8,18
**interested** 78:7 109:9 117:6 118:3 140:9 145:18
**interesting** 19:19,22
**Intern** 91:21
**internet** 14:9 17:17
**internship** 15:19 80:6
**interpose** 10:2
**interpret** 83:12 137:14
**interpretation** 18:4 45:12 48:1,2,7 91:11 104:1
**interpretations** 45:20
**interpreting** 103:19 122:9
**Interrogatories** 71:10,21 72:9 73:20 75:4
**Interrogatory** 71:19
**interval** 94:17
**intervene** 64:17
**intervention** 63:12
**interviews** 80:12
**introduce** 5:16
**invaded** 65:5
**invasion** 65:22 67:8
**investigation** 77:19 78:19
**involve** 18:15 31:17 60:15 63:19
**involved** 32:1 39:2 54:23 60:12 75:9 76:8 80:11 89:11 118:7 119:16 123:16 141:14 142:17
**involvement** 7:10 39:15 63:23,23 77:9 77:14 126:4
**involves** 11:14 20:17 31:2 40:20
**involving** 17:12 20:2 28:2 29:5 39:4 42:19 75:13 119:19 124:6 139:11
**Israel** 16:5
**issue** 18:8 28:2 31:6 40:19 63:21 65:4 66:4,4 68:15 78:14 89:19 97:3 102:23 107:13 108:3 122:22 127:14 136:19 137:8
**issues** 18:1 38:23 40:17 47:9 54:22 143:7
**items** 74:14,22

**J**

**Jackson** 56:9
**Jen** 79:8 88:6 131:6
**jerk** 135:14
**jobs** 20:12
**June** 25:14,15 26:3,6,19 30:10 55:21 56:8 69:22
**justly** 122:15

**K**

**Kaveh** 2:7 5:17 31:4 69:2 79:3 138:18
**keep** 143:9
**keeps** 35:1
**kid** 49:15 102:16 136:23 138:13
**kidney** 18:6,9 20:3 42:19 45:13,14 49:18 50:3,4 52:10 52:19,21,22 56:23 57:14 59:3 60:13,16 61:13,14 62:12 64:12,22 65:7 65:13,19 66:14 68:10 71:4 97:18 99:5,5 100:7 101:2,9 101:16,20 102:5,16 103:1 103:1,6 104:21 105:7,16,22 108:16 113:5 119:3,3,21 121:1 124:19 125:7,11,13,20 125:21 126:2,2 126:19,22 127:9 132:13 133:4,5 135:21 136:11
**kidney-related** 42:6
**kidneys** 100:14
**kids** 101:20
**kind** 10:17 14:16 35:14 77:19 82:17 87:14 95:13 102:11 133:6 134:10 143:1
**knee** 135:13,14
**knew** 88:16 96:17 109:22
**know** 17:15 20:1 22:1 25:16 30:2 35:16 36:6,12 40:1,2 40:6,7 42:16 42:22 43:1 48:3 51:15 55:21 63:22 64:22 66:16 67:7,9,19 72:18 73:11 75:8 79:19 80:5,19,22 82:18 84:23 85:7 86:9,21 89:1 90:8,17 93:9 95:9,17 101:4 103:7 104:16 105:3 105:21,22 107:18,21 108:2,14 109:14,21,23 115:17,22 116:4 121:8 123:2,6,13,18 123:19,20 126:3 127:22 128:3,4,9 129:21 130:3 130:17 131:2 132:19,20 133:19,22 135:10 137:20 137:22 138:20 140:11,12 141:12 142:2 142:13
**knowing** 72:15 90:16 109:18
**knowledge** 57:11 62:7 72:17 73:1,8,8 73:13 77:4 80:16
**knowledgeable** 53:17
**known** 61:23 128:21 137:21
**knows** 73:15 78:7

**L**

**L** 119:3
**lab** 84:11

**labs** 87:12
**laid** 114:11
**language** 10:20 128:16
**large** 22:1 56:23 61:21 62:19 64:7 69:5 109:20
**larger** 19:7,8 109:20 114:16 119:6,21 120:8 121:2,2,18
**late** 143:9
**lateral** 125:21
**lawsuit** 40:18
**lay** 71:8
**laymen's** 52:5 97:18
**LCR** 1:17 145:22
**leadership** 56:9
**learn** 14:14 17:23 30:4
**learned** 29:18 30:8 57:17,23 58:1,13 73:21
**learning** 30:15 91:12
**leave** 10:14 13:22 66:15 75:19
**leaving** 38:22 93:8
**Lebanon** 1:17 6:23 145:19
**lecture-type** 18:20
**lectures** 19:1
**led** 101:1
**left** 49:18 50:3,4 56:22 61:13,18 64:12,23 67:8 94:16,21 96:12 96:14 97:18 99:5 100:7,12 101:9 102:15 103:1,8 104:21 105:16 108:16 119:3,21 121:1 124:19 125:3,6 125:8,9 126:2 126:19,22 127:9 132:13 133:3,5 135:21 136:11
**legal** 7:11 8:10 143:7
**length** 100:12,14 100:16 101:19 108:16 109:7
**lengths** 104:10
**lesion** 58:19 111:22 113:10 114:1,5,16 123:1 131:20 136:1,14
**lesions** 132:16
**let's** 11:8 21:15 44:21 64:20 68:5 75:3,19 94:9 110:4 134:9
**letter** 3:7 28:15 141:18 142:22 143:2
**level** 45:9 46:14 47:3,6 63:11 63:12 69:6 83:12,20 135:14
**Lewis** 39:16
**license** 29:1
**licensed** 1:17 28:21 145:3
**licensure** 28:20 29:5
**life** 69:13,15
**life-threatening** 121:5
**light** 31:5
**limitations** 29:4 29:13
**limited** 33:8,12 81:14
**limiting** 29:14
**line** 136:21
**lines** 136:9 141:4
**list** 121:4
**listed** 92:17 141:16
**literature** 62:5
**lithotripsy** 17:12
**litigation** 38:7 71:6 116:10
**little** 39:3 70:12 71:8 90:8 141:3
**live** 8:9 51:17,18
**LM** 5:8
**logs** 81:3
**long** 35:15 42:22 49:11 51:4 73:18 121:8 141:15,23
**longitudinal** 101:8,15 102:15 104:9 105:13 108:15
**longitudinally** 104:21 105:17
**look** 14:11 35:23 35:23 42:20 44:12 45:8 61:12 75:4 89:3 90:23 100:11,13,19 101:18 102:5 110:2,18 112:13 116:16 117:8,12,13 123:7 125:14 131:23 134:19 136:23 137:22
**looked** 32:9 35:21,22 42:5 42:18,21 43:11 44:11 71:1 76:11 87:11 90:20 114:19 116:2 123:8 124:22 129:17 129:17
**looking** 33:19 37:11 39:15 43:20 48:23 52:16 53:9,12 61:8 74:18 77:2 93:8 97:6 97:19 98:22 99:20 101:17 102:21 103:22 105:12,20,21 110:21 112:17 123:9 124:13 125:5 126:20 127:20 132:8 137:20
**looks** 83:1 119:12 143:1
**lot** 103:23 116:17 125:2 126:6 130:7
**lower** 109:5
**lumen** 61:18,19 64:23 65:1
**lumped** 13:11
**lungs** 57:7

**M**

**M.D** 1:16 6:9 144:5,14 145:8
**maintained** 117:10
**majority** 124:11
**making** 46:19 70:10 102:22 113:14
**malignancy** 60:13 68:9
**malignant** 57:13 61:21 64:8,14 66:5 124:16 137:11
**man** 59:6 97:9 97:12 101:15 102:3 126:17
**man's** 120:21
**management** 35:10 36:11 48:23 90:2
**Manager** 2:11
**managing** 60:12 127:10
**Manchester** 2:4 12:9
**March** 1:17 5:6 26:3,5,18 27:22 35:5 145:9
**mark** 17:16 77:6 117:4 123:11 141:6 142:23
**marked** 14:11 17:18 43:21 77:7 84:1,4 123:12 129:6 132:3 143:5,14
**markings** 84:6
**mass** 61:15,17 66:2,15 111:23 119:3,21 120:6 120:10,16,23 121:13,17 122:23 133:11 136:10
**masses** 18:9
**matter** 8:21 41:8 47:8,13,23 65:9 77:15 126:13 145:10
**matters** 47:10 81:15
**maximize** 126:3
**McLane** 2:3 5:14

**MD** 3:4 142:12
**mean** 5:23 19:12 23:19 36:6 41:1 45:19 67:1 69:13 72:14 85:13 93:21 102:17 105:9 120:11 120:13 126:16 128:5 131:22 137:5 138:8 140:3 142:16
**means** 44:5 45:17,22 63:17 81:17 121:4
**measurable** 133:1
**measure** 62:16 104:5 112:5,5 112:20
**measured** 49:19 51:10 102:6 108:22 111:17 113:10
**measurement** 100:15 101:8 102:10 105:2 106:4 108:17 108:20 110:7 111:13,21 115:14 133:3
**measurements** 104:14,18,20 109:7,12
**measuring** 112:7
**mechanism** 57:9 59:21 60:3
**medical** 1:11 2:9 5:5,11,19 6:21 6:22 8:21 9:5,6 11:10,23 12:5 12:6 13:5 15:14,16 17:4 20:1,4,14,23 21:4 28:11 34:2,9 40:7 54:4,22 56:18 63:12 69:8 77:19 79:8,14 79:16 81:6,12 81:18,19 83:9 83:22 84:1,4 84:11 85:6,12 87:1,6,13 88:21 89:8 92:18 98:2 107:2 111:11 129:3 142:11
**medications** 84:10
**medicine** 14:20 15:3 78:19
**meet** 88:9
**meeting** 42:13 42:16 49:6 80:15 90:15 99:10
**meetings** 20:6
**memorializes** 139:18
**memory** 8:6 30:20 31:5,10 34:11 35:19 51:3 80:3 81:22 82:1 140:22
**mentioned** 6:12 36:11 40:12
**Merchants** 2:8
**message** 117:16 118:15 119:1
**messages** 118:8 119:8
**met** 27:16 30:18 137:19
**methodology** 100:23
**Michelle** 118:16 119:1,17
**micrometer** 111:20
**middle** 94:12 96:9
**Middleton** 2:3 5:14
**midnight** 39:4
**midpoint** 118:11
**midstream** 134:5
**milky** 61:16
**millimeter** 132:11 133:10
**millimeters** 112:22
**mind** 27:13 58:3 98:8 106:2 119:15
**mindful** 48:15 136:20
**minute** 138:19 142:13
**mispronouncing** 97:16
**missing** 19:2
**misspoke** 89:17
**mistake** 23:15
**mistakes** 24:4
**modality** 122:5
**model** 17:14
**models** 62:1
**mom** 27:13 33:21 96:19
**moment** 58:12 65:6 94:10 105:14 126:23 127:4 129:2,3
**Monahan** 36:11
**moniker** 44:3
**monitored** 49:19
**Montana** 8:3 15:9 29:3
**month** 21:3 35:12 37:16 80:7 82:12
**month-long** 80:2
**monthly** 20:15
**months** 13:16 26:9 27:19 30:10,17 35:13 35:16,17,17 36:17 63:1 122:12
**morbidity** 28:10 38:22
**morning** 5:3,17 6:12 18:23 19:2
**mortality** 28:10 38:22
**Moses** 24:23 25:4,20 27:9 27:16 28:1 39:5 41:5 94:3 94:3 118:6,19 119:17,19 122:18 123:13 134:12 139:6 139:19
**Moses'** 54:7
**mother** 33:23
**motion** 32:15 69:6,17
**moved** 25:23 32:4
**movement** 52:20 53:4 125:7
**moving** 51:21 52:17 131:4
**MRI** 63:4
**multinodular** 61:15
**multiple** 38:3 102:4

**N**

**name** 5:13 6:17 6:19 44:1 117:17 118:20
**named** 7:8 24:22
**narrative** 11:4 78:9 119:10
**narrow** 103:2
**nature** 8:15 17:8 18:5 23:2 33:18 49:21 55:2 58:19 74:5 75:7 123:22
**near** 60:5
**necessarily** 46:16 126:6
**necessary** 64:13
**necrosis** 61:17
**necrotic** 57:6
**need** 10:10 14:3 46:16 66:6 83:6 90:17 120:20 136:22
**needed** 98:8
**needs** 107:23 135:23 136:23 137:13
**neighborhood** 53:11
**neither** 145:12
**never** 8:23 32:8 66:13 73:23 74:3,10,23 100:22 113:21 117:15 120:7 133:16 134:6 137:19
**new** 1:2,17,18 2:4 4:6 5:9,22 6:23 12:9 28:21 59:9 99:8 123:5 132:16 135:16 141:22 145:5 145:19
**Nicholas** 2:2 5:14 106:6
**Nick** 76:15 138:19
**night** 41:20

108:21 123:16 139:13 140:14
**nine** 13:3 62:10
**nod** 10:20
**nods** 10:20
**nomogram** 101:18
**nomograms** 102:1
**non-Dartmouth** 79:16
**nonradiology** 131:9
**normal** 49:10 51:2
**normally** 51:5 81:7
**northern** 7:23
**nose** 20:18
**Notary** 144:20
**note** 61:20 82:6 82:7 83:8,10 84:9,23 85:8 86:1,11,12,16 86:17,19,20,22 92:18 93:13 94:18 95:1 115:11 132:10 134:11 137:14 138:11 139:16 139:17 141:9 142:13
**noted** 16:4 24:11 78:2 103:15 110:8 111:6 124:23 125:2
**notes** 33:20 38:11 43:2 145:7
**notice** 4:8 5:23 105:5 141:2
**noticed** 105:4
**notified** 45:5
**notion** 98:9
**number** 5:8 20:4 34:8 49:17 70:15 84:5 94:9 97:12 100:17 143:12
**numbered** 130:19 145:6
**numbers** 43:21 43:22
**nurse** 19:13 90:7 91:20,21 142:11
**nursing** 19:14

**O**

**o'clock** 5:1
**oath** 106:13,18 144:14
**object** 47:18 48:8 50:17 62:21 63:15 70:2 105:19 106:16 115:19
**objection** 10:2 28:14 48:19 68:2 69:9 70:5 73:19 88:18 107:17,19 114:6,23 115:6 115:21 116:6 116:11 121:15 121:23 126:14 127:11 133:12 134:21 135:6 136:4,17
**objections** 4:9 6:2 47:14
**obligations** 11:12
**obscuring** 126:4
**observation** 46:3
**observations** 41:19 93:23
**observed** 63:7 83:4 84:16 133:1 134:13
**observer** 53:7
**obtained** 16:10 79:9 107:21
**obvious** 97:3 100:2 104:3
**obviously** 17:22 18:2 41:6 64:14 99:20 102:7 125:17
**occasion** 7:14 36:15 49:15 78:8
**occasions** 35:2 36:3 37:1,7 38:3,18 92:14 106:23
**occur** 35:9 65:23
**occurred** 24:11
**occurs** 133:21
**offense** 11:4
**offered** 9:3
**offering** 113:8
**office** 42:13 56:18 76:7 86:17 98:7 107:1
**offsite** 19:10
**Oh** 35:14 48:10 117:14
**okay** 7:11 11:8 25:11,14 30:22 32:16 35:9 59:2 66:19 74:16 75:11,19 78:1 79:2 87:14 90:14 91:8 97:22 105:10 116:4 117:16,22 118:13,21 121:6 122:6 127:4 130:6 131:14,17 135:1 137:5,9 140:22 142:21 143:4
**old** 119:2
**older** 59:3
**oldest** 16:21
**on-duty** 21:5
**once** 63:22 87:10
**oncological** 62:5
**oncologically** 64:16
**oncologist** 70:8 70:9
**one-month** 80:5 81:12 92:2
**ones** 122:13 124:10
**onset** 135:16
**onsite** 19:9
**op** 92:18
**operate** 15:6 66:13
**operating** 82:12
**operation** 67:17
**operator** 100:19 126:1
**opinion** 8:20,23
**opinions** 9:3 47:14,17 48:17
**opposed** 52:14 56:1 125:9 141:20
**options** 45:21
**order** 76:2 135:23
**ordered** 134:15 145:11
**orders** 84:12
**ordinary** 71:12 140:16,16
**Oregon** 15:20
**organ** 53:12 65:17 125:15 126:22 127:1
**organization** 12:9
**organize** 70:11
**organs** 18:5 60:18 65:7,15 65:20
**original** 103:12 105:6 108:20 128:2,14
**originally** 107:10
**outgrows** 60:7
**outline** 76:2
**outpatient** 12:10
**outrank** 48:3
**outreach** 12:7
**outset** 117:8
**outside** 36:19 37:21,22 44:5 68:17 72:11 78:20 87:8 107:6
**overall** 104:15
**overlays** 104:14
**oversight** 18:19 20:11 22:10 23:8 29:14
**oversighted** 18:15

**P**

**P.C** 2:7
**p.m** 118:12
**P.O** 2:3,8
**PA** 142:12
**Pace** 82:18
**PACS** 43:16 107:23 129:18
**page** 3:10 61:7 61:10,12 75:6 77:3 84:2,12 84:17,18 89:14 94:9,10,13,13 96:4,9 110:6 110:23 111:2 112:17 117:6,9 117:11,18,19 118:10,11

119:11 121:6,9 132:8
**paged** 41:11
**pager** 3:6 116:21 117:7,8 118:8 119:6,9 123:11 134:11 138:10
**pages** 3:12 145:6
**paging** 134:18
**pain** 135:16
**Paired** 65:20
**papers** 17:3
**paragraph** 79:6 89:15,17 93:2 114:11
**paragraphs** 89:18
**paralegal** 36:9
**parallels** 124:7
**parens** 94:14,15
**parents** 1:5 2:5 30:18 33:9 49:7 50:1 52:9 84:21 85:5,21 85:23,23 87:16 88:3,9,23 90:15 91:1,6 91:16 99:10 120:4 123:23
**parlance** 43:14
**part** 18:13 32:11 46:1 51:6 60:8 60:10 63:21 66:14 68:5,15 73:19 85:15 90:5 100:13 107:11 114:20 115:3 127:21 127:22 130:18
**partially** 125:15
**participate** 18:22 20:15
**participated** 71:7
**particular** 19:19 20:9,12 21:1 21:14,22 55:6 72:4 82:14 91:15 97:15 123:22 130:19 130:20
**particularly** 31:5 60:11 132:10
**parties** 145:14
**parts** 86:4,5
**party** 23:17 24:13
**path** 34:13
**pathway** 69:12
**patient** 7:10,16 7:17,19 18:16 23:18 24:1,1,8 30:12 44:17,18 44:20,22,23 45:6,20 46:4 48:23 51:8 65:18 66:7,21 66:23 67:20 87:3,18 90:18 90:19 92:8 93:21 95:5 96:8,18 98:6 106:10 122:21 125:9,19 127:10 134:22 135:3 136:5,7 137:12,19 139:11 141:20 142:8,9,14
**patient's** 49:2 133:15
**patients** 11:18 14:13 20:16 21:8 51:12 60:10,11,12 87:9 92:5,9,10
**patients'** 92:12
**pattern** 51:2
**pediatric** 6:21 11:13 13:1,10 13:14,16 14:1 14:2,19,22 15:4,11,12 16:6,11 20:16 20:17,18,19 21:6 26:1,20 27:20 39:19 45:11,15 60:11 92:21 122:8
**peer** 30:1,4 31:2 31:8,21 32:11 34:14,23 36:20 57:18,21,23 77:18 78:18
**pending** 9:12 10:13 19:5 40:19
**people** 24:3 36:4 54:16 59:10 67:22 81:4 87:6 116:23 120:12 121:22 122:9,10 130:18
**perfect** 142:23
**perfectly** 31:14
**perform** 21:2 83:2 126:7
**performance** 28:17
**performed** 43:5 45:2 79:9
**period** 77:10 80:2 91:3 92:17 122:18 123:7 133:17 134:5
**periodic** 16:14 17:5 97:13
**periods** 26:13 84:7
**person** 43:22 60:4 80:13 91:10 95:21 98:12 101:22 117:18 118:18 142:6,11
**personal** 74:15
**personally** 40:2 144:13
**pertinent** 84:20 87:12 88:2 104:15 109:23
**PGY** 13:15,15 25:7 26:9
**phenomenon** 59:7 60:3
**phone** 40:3
**phrase** 88:1
**phrased** 133:7
**physical** 12:2 33:17 79:10 83:3 84:10,17 86:19 87:15 95:15
**physically** 86:2
**physician** 46:11
**physicians** 23:1
**picked** 80:13
**picture** 48:21 98:18 104:15 127:20 138:2
**piece** 56:20 116:16
**pieces** 57:5 69:23
**pinpointing** 131:11
**pitch** 140:16
**PL000006** 111:1
**place** 14:6 56:17 61:5 114:1 125:12,17
**placed** 127:23
**places** 23:7 129:13
**Plaintiff** 9:4
**plaintiffs** 1:9 2:4 5:15
**plan** 16:18 66:10 67:16 69:17 87:21 89:1,7 89:13 90:2,16
**planes** 56:12,13
**planning** 25:16 56:12 68:12,13 68:14
**plastic** 20:20
**play** 63:13 115:8
**plays** 95:15,16
**please** 6:16 57:16 96:4
**point** 30:16 40:4 40:23 42:17 75:14 83:17 113:7,10
**pointed** 124:15
**pointing** 117:12
**points** 133:8
**pole** 124:19 127:8 128:18 132:12 135:22 136:10
**policy** 22:16,22
**Poplack** 110:12 111:4 112:19 114:2,10 115:11
**Poplack's** 110:8 113:1,11
**populate** 85:20
**populated** 142:6
**portion** 15:5 18:14,18 85:8 89:15 117:4
**portions** 22:6 33:6 34:21
**Portland** 15:20
**position** 11:10 31:18
**positioned** 125:19
**possible** 63:21 66:2 72:3

75:16 82:11 92:3 97:11 122:23 124:1 131:7
**possibly** 31:10 37:8 60:18 63:23 64:7
**potential** 49:3
**power** 82:21
**practice** 4:7 11:19 12:20 15:11 21:12 22:13,17,19 46:6,6 49:16 51:2 142:19 145:4
**practicing** 15:8
**practitioner** 142:12
**practitioners** 19:13
**precedence** 111:17
**precedent** 113:9 114:15
**preface** 81:16
**preference** 50:13,13
**preliminary** 122:1 128:2,6 128:8 132:6
**preoperative** 20:15,20
**preparation** 34:17 42:10 53:15 77:8 114:20
**prepare** 76:20
**prepared** 42:15 78:22 86:18 90:9 116:9,13
**preparing** 70:22
**present** 2:11 49:9 62:12 64:21 66:5
69:5 99:7 102:11 128:16
**presentation** 47:13 134:2
**presented** 49:8,8 67:15 72:5 82:6 124:11
**presenting** 47:16
**preserved** 6:3
**presuming** 18:14 50:12 81:13 93:4 131:17
**pretty** 12:3 15:4 88:16 93:12 100:18
**previous** 43:3 102:10 111:11
**previously** 7:7 83:23
**primarily** 117:6
**primary** 17:11 141:7,17 142:5 142:10
**print** 87:23 88:2
**prior** 36:15 43:4 59:8 76:6,8 77:13 80:15,17 84:10,11 97:7 102:4 113:21 136:15 137:23 141:15 142:3
**privilege** 10:5 73:18
**privileged** 31:22 55:13 75:18
**privileges** 29:10 29:15
**privy** 124:2
**probable** 63:4
**probably** 8:4 13:3 14:6 26:2 35:14,21 37:3 38:20 64:7 92:9 95:10
98:17,20 102:18 136:6
**probe** 51:21 52:21 125:8,12
**problem** 24:7 32:6 52:19 58:20,21 120:14 123:5 126:10
**problems** 19:20
**procedure** 19:18 126:8
**procedures** 7:5 136:20
**proceed** 49:4,4 135:10
**proceeding** 7:11 8:8 35:6
**proceedings** 8:5
**process** 11:2 19:18 30:1,5 31:2,8,22 32:1 34:15 35:1,15 36:20 46:3 47:2 57:18 60:19 91:13 105:18 137:11
**processes** 20:22 116:14
**produced** 145:15
**production** 71:14 72:19
**professional** 2:3 6:17,20 11:9 11:11 17:1,8 20:8 21:16 22:4 28:3 45:9 145:2
**professionals** 24:5 119:16 121:16 129:3
**program** 13:19 18:13 25:5 28:10
**programs** 13:8
**progress** 60:17 70:11 122:3 139:16
**progressed** 27:11
**prominent** 61:16
**proper** 32:21
**properly** 126:21 126:23
**protected** 28:18 140:8
**protocol** 49:11 95:18
**protocols** 22:11 24:16
**proud** 21:18
**provide** 8:9,12 12:5 18:20 47:17 68:14 71:15
**provided** 8:19 72:8 76:15,17 76:17 91:17 96:7,11 107:4 107:9,11 117:5 129:6
**provider** 107:22
**providers** 9:5,6 9:10 39:1 43:18 117:3
**providing** 48:4 72:22 91:11
**public** 29:8 144:20
**publication** 17:4
**publications** 17:19
**publicly** 29:8,8
**published** 17:3,9
**pull** 56:19 99:23 131:22
**pulmonary** 57:8
**purpose** 50:6
**purposely** 73:9
**purposes** 4:5 57:10 59:4
**pursue** 28:13 32:19
**pursued** 31:21
**put** 50:19 63:13 69:5 85:9,22 86:1,2 88:1 100:20 102:10 120:12 121:4
**puts** 83:8

**Q**

**QA** 28:17
**qualification** 78:6
**qualifications** 48:13 80:19
**qualified** 45:15 45:19 46:11,20
**quality** 20:14 23:2 28:7,9 29:5 37:21,22 56:4 82:2 124:5
**Queen** 12:11
**queried** 7:9
**question** 9:21 10:13 12:16 28:2 30:7 31:15 32:11,22 47:20 48:9 57:10 58:13,15 65:6 68:4 70:8 71:22 73:6 77:16 78:5,12 78:16 106:5 107:5,17,18
**questioning** 8:16 47:23
**questions** 9:17 34:13,19 35:20 56:21 71:11 72:4 75:8,10 75:17 79:5

87:17 90:10 91:16 117:21 118:5 143:6
**quickly** 124:1 138:19,21
**quite** 141:15
**quoting** 57:20

**R**

**R** 1:16 3:4 144:5 144:13 145:1,8
**rabbit** 17:14
**Rachel** 24:23 26:11 39:5 41:5,10,14 118:6,18 119:18 121:7 122:18 123:3
**radiation** 66:8 135:11 137:10
**radiologic** 46:21 84:20 129:19
**radiological** 44:19 46:12 63:3 64:6 85:17 94:5 133:7
**radiologist** 37:18 39:7 46:18 47:5,22 48:5,18 51:20 103:21 113:14 113:23 136:22 137:19
**radiologist's** 46:22
**radiologists** 46:9 46:10 48:12 104:16
**radiology** 22:17 38:12 39:11,14 43:1,15,23 44:5 54:22 84:20 85:4 94:15,19 98:1 99:13 100:9 105:18 121:11 121:19 130:15 134:15 137:22 138:1,4
**raise** 78:13
**raised** 127:14
**random** 82:16 82:23
**rang** 30:19
**range** 101:13,16 103:2
**rare** 55:3 59:13
**rate** 52:3 62:2
**reached** 118:18
**read** 33:4 61:4 61:11 67:12 68:5,13 75:5 94:14,20 98:4 98:10 105:6 110:13 128:5 132:18 144:1
**reading** 33:5,15 109:5 112:18 114:16 119:15 120:3
**reads** 132:20
**ready** 42:15
**realize** 72:14 75:23 76:11
**really** 12:17 53:2 53:5,9 58:15 66:16 67:19 68:19 72:6 73:7,15 74:2 94:8 99:23 105:3 107:18 109:9 110:19 117:5 120:17 122:14 141:17
**realtime** 51:23
**reason** 8:10 9:20 9:22 23:13,14 82:14 93:22 103:20 106:22 108:1 109:19 129:21
**reasons** 97:8,9
**reassess** 136:6
**reassurance** 121:3
**reassure** 117:7
**reassured** 115:10
**recall** 9:2 25:6 38:1 42:23 43:9,12 49:12 52:11 55:15 59:18 79:20,23 81:2 82:7,13 86:13 88:20 90:13 91:9,19 92:3 94:8,23 96:22 99:16 101:12 108:4 108:12,23 109:18 115:1 123:2,3,9 126:15 130:14 131:16
**receive** 107:12 142:7
**received** 21:15 22:15 56:16 107:1 116:19 117:18
**Recess** 70:17 139:4
**recipient** 118:8
**recognition** 114:12
**recognitions** 21:14
**recognizing** 30:16 59:6 62:14,23 63:4 85:10 102:7 138:7
**recollection** 29:17 30:11 49:10 52:7 72:7 91:15,20 93:22 95:19 101:7 106:8
**recollections** 78:11
**recommendati...** 95:13,17 137:16
**reconsidered** 104:11
**reconstruction** 65:23
**reconstructive** 14:19 25:18
**record** 5:2 9:19 10:3,18 11:5 27:17 33:16,19 34:21 38:5 70:16,19 76:12 83:22 84:1,4 92:6,7 94:12 117:7 121:10 126:9,13 129:4 129:14 130:10 130:12,18 131:1 134:11 134:17 138:23 139:3 143:13
**recorded** 51:22
**records** 3:6 32:7 33:5,5 34:5,10 35:3,7 36:4 37:1,4 38:2,15 92:8,13 93:1 96:18,21 97:23 116:21 117:9 120:1 123:11 128:4 129:22 141:6
**recounted** 41:7
**reddish-tan** 61:15
**redepose** 32:20
**reference** 110:5 110:17 111:2,3 111:15 112:20 113:11 114:2 127:23 128:18 133:10
**referenced** 79:7 112:23 115:12
**references** 89:21 111:11,12 113:12 120:2
**referencing** 35:2 61:4 112:12,15 112:19 132:14
**referral** 141:10 142:3
**referred** 7:17 45:1 141:7 142:8
**referring** 74:17 74:18 142:10
**reflex** 135:13
**refreshed** 33:15
**refreshing** 31:10 35:19
**regard** 9:3 13:18 22:9,23 32:20 47:4 53:15 61:3 81:15
**regarding** 89:19
**regards** 41:14 54:19
**Registered** 145:2
**regularly** 11:21
**reintroduce** 87:13
**relate** 20:13
**related** 34:23 58:18 145:13
**relating** 29:6 141:22 142:2
**relation** 31:9 86:16
**relationship** 12:18 23:5

24:12 142:4
**relative** 32:1 34:14 42:10 145:16
**release** 128:8
**relevant** 32:10
**relying** 83:1,11
**remaining** 65:18
**remains** 66:4
**remeasured** 100:7 101:11 106:9,14,20 107:3 108:17 109:4,12,15,16 115:17,22 116:1,4 133:4
**remeasurement** 101:2 103:13
**remeasuring** 108:11,15
**remember** 33:6 33:10,17,21,23 34:1,2 35:11 41:19 88:5,7 119:23 139:22 141:4
**remembered** 118:19
**remove** 66:1,14 66:22
**removed** 65:11 65:17 70:4
**renal** 17:12,20 59:11,19,19 61:18,20 64:19 65:1 67:4,5,8 89:21 94:14,16 94:21 96:13,14 124:6
**renewal** 16:14 16:21
**repeat** 127:13
**rephrase** 10:1 56:5
**replenishment** 16:14
**report** 39:8 55:8 55:17 56:19 58:11 61:5,10 64:22 67:7,9 67:23 83:3 84:22 102:9 103:17 110:9 110:14,18,22 111:7,11,12 112:12,13,18 112:20,21 113:1,4,12,13 113:14 121:12 121:20 124:14 124:22 127:15 127:22 128:2,6 128:9,10,12 129:13,18 131:19,22 132:5,6,9,18 132:23 134:8,9 134:15 135:4 135:19 136:9 137:15 142:7
**reported** 55:22 99:12 103:3 110:15 134:1 134:16
**reported-out** 113:22
**Reporter** 1:18 145:3,3
**reporting** 103:6 103:8 145:4
**reports** 17:15 38:12 56:14 110:3 116:17 129:1,2
**represent** 30:9 54:2 55:16 56:7 83:15 95:19 128:14 128:19 136:13
**representation** 75:12
**request** 14:8 72:20 76:18 107:13
**Requests** 3:9 71:14
**require** 46:5 51:13
**required** 51:11 81:10
**requires** 23:7 135:11
**requiring** 47:10
**requisite** 47:17
**research** 17:11 54:21 58:16,17 59:2,14 124:3
**resectability** 70:7
**reserve** 32:17
**reserved** 4:10
**residencies** 15:22
**residency** 13:8 13:12,17 16:1 25:5,13 26:13
**resident** 7:9 8:1 19:9 23:5,14 24:23 25:11 26:20 27:10,12 39:11,19 44:21 45:3,4 81:7 82:20 93:16 94:5,15,19 96:23 98:1 100:8,9 115:14 118:17,22 120:20 122:8 122:20 128:6 128:15 139:7 140:18
**resident's** 128:2
**residents** 11:21 13:5,10,13,20 18:12 19:6 20:11 21:11 22:10,23 28:17 39:14
**resolved** 104:10 105:17
**respect** 28:1 31:6,7 47:2,9 48:14 54:21 91:20 124:4 133:3
**respirations** 52:22
**respond** 58:8,9 71:12,15 73:9 74:9
**Responder** 56:14
**response** 135:14
**responses** 71:21 72:19 74:6,8
**responsibilities** 9:17 20:10 22:2
**responsibility** 11:11 23:1,8 139:9
**responsible** 23:15,17 24:14 83:9
**rest** 95:6 123:15
**restricted** 95:7 96:1
**restrictions** 29:13
**result** 10:6 29:13
**resulted** 69:3
**retained** 8:19
**return** 121:9
**revealed** 57:21
**review** 8:22 30:1 30:5,22 31:2,8 31:13,21 32:7 32:12 34:15 35:1 36:20 37:21,23 38:2 42:3,23 43:10 44:6 45:2,3,22 46:12,17 57:18 57:21,23 67:23 70:21 77:18 78:18 83:2,5 83:18 91:3 92:12 96:23 98:14 100:10 107:23 109:1 113:21 122:1 128:11 138:19
**reviewed** 30:21 31:11,12 34:6 34:11,22 35:3 35:6,16,18 36:8,8,14,19 36:20 37:5,17 38:5,11,15,18 42:17 43:6 53:16 54:11,13 55:8 58:6 76:22 84:20 85:2,4,18,20 93:13 94:23 95:2 96:17,22 97:2 114:18 115:1 116:13 128:21 129:14 131:2
**reviewing** 9:14 34:6 43:2 52:8 55:15 82:6 85:3 89:12 91:4 96:20 100:13 104:13 105:20 134:1
**reviews** 31:9
**Richard** 6:19
**right** 11:1 14:15 14:17,23 18:16 23:22 24:8 30:2 32:18 50:16 58:22 61:19,21 74:11

76:20 81:13 83:13 87:16 88:22 90:3,4 95:12 97:20 99:1 102:12,21 103:1,4,5,6 107:16 109:8 111:13 112:3,8 113:5 115:20 116:7 119:4 124:16 125:3 131:12 133:14 137:3 143:4
**risk** 35:10 36:11 69:14,23 137:10
**robotic** 14:18 15:2,6
**rolls** 12:23
**rookie** 81:21
**room** 10:14 24:21 27:14 38:15 40:6 43:5,12 87:8 90:23 91:6 93:15 95:21 97:22 98:13 104:1 118:15 118:17 120:1 122:12 123:5 134:11,17 141:13 142:18
**rotate** 20:13
**rotated** 25:21
**rotation** 79:15 80:6 81:3,12 92:2
**rotations** 19:10 82:19
**rough** 87:5
**round** 16:23
**rounds** 19:20
**routinely** 122:10
**Row** 2:8
**rugby** 95:16
**rule** 46:5
**ruler** 104:4
**rules** 7:4
**run** 70:23
**running** 53:2 121:7
**runs** 24:15
**Rutland** 2:9

**S**

**S** 2:7
**safer** 20:23
**Sargent** 114:5
**Sargent's** 112:13 112:18
**sat** 74:13
**satisfaction** 127:1 135:21
**satisfied** 23:9
**SATs** 95:22
**saw** 33:12 44:22 44:23 63:9 92:8,9 93:11 96:21 98:15 100:7 104:13 106:18 108:4 114:3 118:1
**saying** 17:2 32:23 46:23 74:6 111:8,9 111:15,21,22 113:11,20 115:10 124:22 127:7 134:7 138:10,12 141:1,23
**says** 84:19 85:4 112:22 113:4,5 117:16 119:1 120:10 132:16 135:4 136:23 137:15
**scan** 38:8 63:3 127:16 128:19 136:22 137:1,3 138:13
**scene** 56:16
**schedule** 16:17 21:4,5,9,10 92:7,20,23
**school** 15:16 79:16 81:18
**scope** 34:5,7 38:2 55:2
**score** 33:8
**screen** 50:19
**scroll** 50:23
**scrubbed** 82:11 92:4
**Sean** 1:6,7 2:5,6 20:2 24:19 27:13 29:18 31:13 39:4,9 40:9 41:8 49:6 52:8 54:23 56:8 61:3 69:7 69:22 76:5,8 77:14 79:10 80:23 82:15 84:4,21 85:5 85:21 88:11 93:3 95:18 99:11 115:4 118:14 119:19 124:8 130:12 141:1,7
**Sean's** 26:18 30:8 32:7 38:8 42:14 55:20 59:8 113:22 131:19 141:15
**search** 114:14
**second** 7:15 8:2 93:2 117:4
**secrets** 69:2
**section** 6:21 19:17
**sectioned** 61:14
**sections** 52:4
**see** 8:12 25:23 39:6 41:5 50:2 52:17,21 53:1 53:2 56:3,5 73:12 75:21 84:19 86:18 92:17 93:5 94:13 97:6,19 98:19 100:10 101:20 102:5 102:12,14 108:1 114:13 115:23 116:2 118:11 122:21 123:6 124:13 124:15 125:11 128:10 132:2
**seeing** 21:8 33:9 45:6 118:2 134:12
**seen** 24:14 50:14 55:13,23 56:3 57:19 60:1 63:8,9,10 69:13 71:7,23 73:23 74:3,11 74:23 75:15 92:4 93:3 95:8 98:10 103:16 106:9,12 115:11 117:15 120:16 123:21 129:10 139:15 139:16,20
**sees** 83:7
**selected** 56:10 82:14
**selection** 80:11
**send** 119:9 142:9
**sender** 118:8
**senior** 25:11
**sense** 14:21 33:15 43:1 46:15 50:22 51:1 53:10 55:3,20 75:7 90:6 131:12 142:15 143:1
**sent** 28:15 117:18
**separate** 12:15 107:13
**sequence** 86:15 104:22
**serial** 89:22
**series** 105:12
**serious** 69:6
**serve** 71:10,13
**served** 82:21
**service** 25:21,22 26:3,8,21 27:20 39:5 41:6 44:22 79:16 92:21 95:9 123:23
**services** 12:6 20:14 26:7
**serving** 9:13
**set** 69:17 79:20 83:22 84:1 104:17,20 112:15 132:4
**sets** 82:19
**setting** 117:1
**shadows** 103:23 104:1
**Shahi** 2:7,7 5:17 5:18 6:8 10:4 28:5,15 29:7 29:22 30:6 31:1,16 32:16 33:1 34:12 35:1 36:8,15 36:22 37:2,22 38:6 41:13 42:10 47:18 48:8,19 50:17 53:20 54:1 55:11,23 57:15 57:22 58:3 62:21 63:15

68:2,17,22 69:9 70:2,5 72:11 73:2,5 73:11 74:3,16 75:11 76:19 77:16 78:1,4 78:15,22 88:18 96:5 105:19 106:16 107:5 107:10,16 114:6,23 115:6 115:19,21 116:6,11 121:15,23 126:14 127:11 130:1 133:12 134:21 135:2,6 136:4,17
**shared** 88:14
**she'd** 26:8
**she'll** 87:5
**sheet** 145:10
**Shepard** 39:20 39:21 40:1 54:6 93:16 118:16 119:2 119:17,18 122:20 139:8
**short** 70:10 101:22 119:10 134:5
**Shorthand** 145:4
**show** 49:13 51:18 56:19 58:11 61:14 80:9 85:16 108:23 117:3 130:16 135:16
**showed** 52:9 64:10 96:13 106:11 120:1 134:17
**showing** 49:23 52:14 84:13 104:22 105:10
**shown** 49:12 107:22
**shows** 53:7 93:2 113:11 114:8,9
**side** 14:22 50:3 50:22,22,23,23 100:1,1 125:3 138:9
**sign** 85:1 135:8
**signature** 4:13 6:6,6
**signed** 4:12 39:7 131:19
**significance** 21:17 98:2
**significant** 17:20 22:6 56:21 94:17 116:3
**signs** 96:9
**similar** 8:4,17 22:19 48:2,2 60:7 72:20
**simple** 23:21
**simply** 52:14 74:6
**sit** 82:8 87:2,19 101:4,7
**sitting** 115:9 131:5
**situation** 19:5 24:2 30:20 48:22 66:20,23 69:3,21 91:2 104:20 120:21 127:6 137:18 138:7
**six** 13:15 30:17 35:13,15 36:17
**size** 33:17 51:6 62:12,22,23 63:1 66:21 84:7 94:17 101:14,16,21 102:5,15,21 104:21 105:6 105:13,16 110:13 111:18 112:1,11,21,23 113:23 114:5 121:14 122:23 133:1,3,5 134:13
**sized** 51:10
**sizes** 104:23
**skill** 83:18
**skilled** 126:1
**skills** 27:9
**skin** 125:13
**slide** 114:3
**smaller** 42:20 112:2,6,9
**snake** 67:5
**snapshot** 14:16
**snippets** 55:10
**soft** 61:15
**software** 52:1
**solely** 12:4 14:1
**somebody** 44:5 80:6 83:20
**something's** 142:14
**somewhat** 8:16 58:17 105:22 118:4 120:16
**son** 99:18
**sonic** 51:23
**sorry** 48:10
**sort** 14:12 16:17 19:20 21:7 22:3 26:12 52:14 67:4 78:10 81:3 84:6 85:9 86:22 95:7 96:2 113:6 119:10,11 125:8 126:16 136:14 143:7
**sorted** 105:17
**sound** 10:15 103:4
**sounds** 63:20 90:1 103:5 131:10
**source** 129:23
**speak** 39:5 41:13 41:16 120:20
**special** 61:20 78:16
**specialists** 64:16
**specific** 13:9 19:21 32:10 89:19 95:17
**specifically** 77:22 97:1 106:11
**specifics** 91:19
**spend** 130:7
**spoke** 140:10
**spoken** 38:23 39:21 54:19
**sporting** 49:16
**spot** 126:21 129:13
**spread** 63:18
**spreading** 60:18
**SS** 144:9
**stability** 116:15 132:13
**stable** 50:14 51:14 52:21 121:13 131:21 132:11 133:10 135:15
**staff** 12:23 19:14 20:21 36:9 44:1 46:9
**staffed** 13:19
**stage** 66:16 70:6 124:11
**staged** 61:1 63:17 64:8
**stages** 64:21
**stamped** 84:18 110:23
**stamps** 43:19
**stand** 75:20
**standard** 23:10 46:10,18 95:13 95:18 102:1,17
**standing** 82:1
**stands** 21:22
**Stanford** 8:1 15:23
**start** 6:16 7:6 11:8 17:2 21:15 80:8 140:19
**started** 26:2,5 58:15 68:22,23 88:8
**starters** 64:5
**starting** 7:3 25:12 38:8 81:20 137:11
**starts** 104:2
**state** 1:18 28:21 106:13,18 144:8 145:4
**statement** 70:3 77:2,13,23 78:10 79:4 93:4 113:19 114:20
**states** 1:1 29:1
**stating** 6:16
**status** 136:1
**stay** 111:6
**staying** 105:13
**stenographer** 17:16
**stenographic** 145:7
**stenotype** 4:4
**step** 44:17 105:11
**Stephanie** 2:11 5:18
**Steven** 111:4

112:18
**stint** 26:5 27:2
**STIPULATION** 4:1
**stipulations** 5:22
**stomach** 124:21 125:1,22,22,23 126:5 136:13
**stone** 2:11 5:18 14:19 15:2 17:12 98:23
**stones** 99:2,5,8
**stop** 80:8
**stops** 104:2
**Street** 2:3
**strike** 47:11
**structure** 32:21 117:13
**structured** 117:15
**structures** 53:10 125:5
**student** 34:2 40:8 54:4 79:8 79:15 81:6,12 81:20 83:9 85:6,12 87:1 87:13 88:21 89:8 92:18
**students** 11:23 13:6 82:20 87:6
**studies** 44:19 45:1 50:10 52:3 63:3,10 84:20 85:4,17 97:4,5,7 102:4 104:13 112:15 114:8 131:8 136:15 137:23
**study** 37:13 45:6 50:19 52:15,18 64:5,6 103:12 104:6,6 107:22 111:5 115:12
127:13 130:16 130:19,20 135:10
**stuff** 89:2 121:7
**subintern** 81:17
**subject** 20:6 74:23 119:20
**subjects** 76:1
**submission** 4:13
**submissions** 17:5
**subscribed** 144:15
**subsection** 42:20
**substance** 74:23
**substantive** 41:20 74:5
**substantively** 74:8,20
**sufficient** 23:8
**suggest** 58:4 111:16 138:5
**suggesting** 141:20
**suggestion** 113:8
**suit** 7:16 107:9
**summarized** 78:11
**summary** 3:5 5:23 76:15,18 77:14 87:23 93:1 110:5
**superficial** 55:3 58:18 59:14
**supervising** 23:2
**supervision** 22:9 22:16
**supervisor** 24:13
**supplementary** 116:20
**supply** 60:8
**support** 7:18
**suppose** 60:17
**supposed** 126:18
**supposedly** 107:1
**sure** 8:6,17 11:7 23:9 24:3 34:10 41:1 58:10 65:14 97:3,15 107:15 113:6 117:14 129:5 132:1 137:6
**surgeon** 7:17
**surgery** 6:21 12:10,11,13 14:19 15:19,22 20:17,18,20 66:10
**surgical** 11:22 65:23 70:9
**surgically** 65:10 65:11
**surrounding** 53:8
**survive** 65:18
**sworn** 6:9 7:12 8:12 145:9
**symptoms** 84:16 124:12
**system** 24:15 43:16 44:6 65:13 81:4 99:9

**T**

**T** 118:16 119:1 145:1,1
**table** 104:3
**tag** 81:7
**take** 8:23 11:4 11:18 14:9,10 20:13 28:14 31:7 45:7 49:1 50:18,20 53:3 58:22 64:20 66:10 70:10 75:3 76:1 79:4 94:10 98:15,17 102:9 112:10 112:13 129:8 137:23
**taken** 1:17 4:4 4:10 5:8 53:18 54:2 70:17 79:13 88:12 98:3 102:6 110:3 125:6 139:4
**talk** 79:6 86:19 86:20 87:3,7 87:16 88:16,23 90:9,17 110:6 129:8 138:16
**talked** 40:3,9,13 54:15 72:14 88:13 90:19 93:23 100:22
**talking** 6:15 11:8 55:5 58:20 66:23 74:20 89:23 109:6 111:4 116:8 121:17 122:9 134:22 134:23 140:23 142:21
**talks** 84:15
**tally** 102:12
**task** 44:16
**teaching** 11:20 11:21 12:1
**team** 5:16 69:8 87:13
**technician** 51:20
**teenagers** 59:4
**tell** 17:7 38:4 44:7,8 53:22 56:20 61:6 80:9 92:22 97:1 100:12 103:22 116:17 130:11 132:9 141:3
**telling** 44:11 109:10 136:6
**tells** 21:5 60:23 102:1
**template** 85:10
**ten** 16:20 101:22
**tends** 111:16
**tentative** 45:22 45:23 46:1,7,7
**terminology** 9:21
**terms** 9:16 12:20 13:8 15:14 16:9 18:12 19:4 20:8 21:1 27:9 28:20 29:5 30:15 34:5 35:19 38:2 42:3,14 44:16 51:15 53:7 61:23 72:15 79:5 80:7 82:2 86:15 93:7 97:18 101:15 116:10 127:9 132:10 135:3 136:19
**terribly** 65:17
**testified** 8:7
**testify** 9:1 55:14
**testifying** 47:8
**testimony** 7:12 8:9,13,20 9:2 48:11 109:13
**text** 119:11,22
**text/page** 120:11
**Thank** 6:8 12:20 32:16 33:1 119:6 143:4
**thankfully** 60:5
**thanking** 141:10
**theoretical** 66:20 67:13
**therapy** 66:7

**thereabout** 118:12
**thereabouts** 101:15
**they'd** 100:21 140:19
**thing** 8:18 10:12 10:17 23:21 55:17 65:20 86:8 103:16 105:8 142:18
**things** 33:10 49:23 54:15 76:1 83:4 87:7 90:11 98:8,22 99:3,19 119:7 129:9,15 133:20 138:20
**think** 12:16 25:8 31:5,14,16,22 34:12,18 39:4 40:18 44:11 46:23 58:5,17 62:9 65:13,14 71:23 73:14 75:20 78:15 81:9 82:21 103:2 106:3 108:2 109:3 111:5 114:8 115:12 118:2 118:19 128:8 134:2 138:12 138:18 140:3 142:9
**thinking** 105:9 132:22
**third** 14:20 15:3 77:3
**third-year** 81:19
**thirty** 4:12
**thorough** 27:11 82:5
**thoroughness** 97:2
**thought** 91:17 103:21 116:14 127:20
**thoughts** 70:12 88:14
**three** 26:9 35:17 35:21,22 37:3 37:8 81:18 109:2
**three-month** 13:14 26:5 27:2
**threshold** 78:16
**throat** 20:18
**thrombus** 64:1 64:11 66:11,15 66:17,22 67:1 67:10,14
**Thursday** 32:9
**Tillotson** 1:5,6,6 1:8 2:4,5,5,6 5:11 20:2 24:19 27:13 39:4 41:8 61:3 69:22 76:5 77:15 91:22 96:8 115:4 119:2,19 130:12 141:1,8
**Tillotson's** 29:18 31:13 39:9 40:9 52:8 54:23 69:8 80:23 82:15 84:4
**Tillotsons** 31:20 42:13 43:8 44:13 49:6 86:11 96:21 99:11,15 108:10 131:3
**time** 5:1 6:3 10:3 16:15,15 17:2 17:3 20:5 21:20 22:7 25:4 26:10,17 27:19 29:19 30:8,11 33:4 34:6,14,17 36:19 37:15 42:22 43:19 44:8 45:7 46:3 49:11 51:4 57:12 69:19 70:14,18 73:18 77:9 79:14 81:11 90:22 91:3 92:17 100:6 104:17 108:7 115:5 118:2,14 122:18,20 123:7 127:13 130:7 131:2,14 133:20 139:2 141:15 143:6 143:11
**timeline** 23:19 128:4
**times** 9:7,10 37:8 130:13
**timing** 86:15 93:7
**tissue** 66:5 136:12
**tissues** 17:14
**title** 145:10
**titles** 20:12
**today** 6:14 9:16 68:21 82:8,22 115:16 118:2 128:22
**told** 43:9 57:16 58:16 75:13 86:10 95:20 96:23 97:23 99:15,21 109:3 109:14 115:16 121:22 124:3 135:18 140:3
**tool** 50:7
**top** 61:10 74:10 111:2 132:6,8
**topic** 19:21
**topics** 19:1
**total** 13:15,16,21
**totality** 49:1 110:3
**touch** 30:17
**touched** 139:12
**Towle** 39:16
**track** 11:17
**tracking** 140:19
**trail** 43:15 129:18
**trails** 43:13
**trained** 24:5 46:11 47:2 53:13
**training** 7:22 13:5,16 14:3 15:14 18:21,21 24:4,12 26:14 27:12 29:11 83:20
**transcribed** 4:5 5:4 6:5 54:9
**transcript** 145:11,15
**transcription** 145:7
**transition** 12:17
**transpired** 31:17
**trauma** 11:16
**traveled** 56:11 57:6
**traveling** 56:11 59:22
**treat** 11:22
**treating** 64:16
**treatment** 12:2 34:17 45:21,23 56:16 66:9,18 76:8 87:8 93:10 115:3
**trends** 116:17
**trial** 4:10 6:3
**tried** 32:21 74:14
**trigger** 136:18
**triggered** 69:11
**true** 76:13,23 77:4 97:7 99:6 109:5,14 114:22 115:7 121:3 140:21 144:2,15 145:6
**trust** 117:23
**try** 9:17,23 17:23 20:21 47:12 49:23 56:5 58:7,9 129:13 132:4
**trying** 11:5 32:19 33:14 46:13 53:1 59:4,11 66:1 68:19 73:12,16 73:17,19,23 74:4 76:2 85:2 86:7 90:6 92:11,13 113:6 113:18 114:13 114:14 126:1 126:16 138:20 141:11
**tumor** 55:6 57:2 57:5,14 59:9 59:10,15,16,22 60:7 61:21 62:3,11,19,23 63:16 64:1,1,7 64:11,14,21 66:2,11,17,21 67:3 69:5,23 70:3
**tumors** 59:2 60:16 124:4
**twice** 9:9 115:16
**two** 7:20 13:13

13:18,20 16:4 26:12 27:19 28:16 35:17 37:3,8 39:14 58:4 63:1 65:15 88:1 89:18 109:20 112:8,8,9 114:1 119:15 120:2
**two-year** 133:17
**two-years-later** 113:1
**type** 11:16 12:18 46:2 52:12,13 57:5,8 59:9,15 59:17,18 64:17 66:18 87:3 119:12 121:6 135:10
**typed-up** 37:4
**types** 17:13 59:19 63:5
**typical** 21:3 101:14
**typically** 52:13
**typing** 87:2

**U**

**U.S** 5:9
**Uh-huh** 44:9
**ultimately** 39:3
**ultrasonic** 18:4 42:4 45:12 46:12 51:8,16 83:12 90:21 97:5 101:10 110:13 125:7 126:1 135:19
**ultrasound** 37:5 43:5 94:14 95:5 98:14 103:23 110:2 114:8 122:5,10 126:12 130:22 131:19 135:16
**ultrasounds** 43:4 83:18 89:22 96:13 97:14 100:18 125:3
**um-hum** 10:21 18:3 27:5 43:17 54:10 65:8 71:9 73:4 77:20 78:3 90:4 103:14 116:22 118:23 120:22
**UMass** 79:21,22
**unchanged** 50:14 131:21
**uncommon** 44:18 98:23 106:3
**uncommonly** 65:16
**underneath** 93:1 102:11
**understand** 9:18 9:20 27:17 44:3,4 47:19 49:5 51:13,17 51:19 54:12 58:22 67:18 69:1,1 76:6 78:21 79:13 106:4,23 109:13 120:15 120:15
**understanding** 12:19 24:18 25:2 36:6 50:8 55:19 76:18 79:17 80:1 85:3 104:8 125:16 141:11
**understood** 13:18 58:18 111:8
**undertaken** 63:10 135:23
**unequivocally** 106:13
**UNITED** 1:1
**University** 25:19
**unsatisfied** 109:11
**unusual** 124:4
**upper** 22:3 124:19 127:8 128:17 132:12 135:22 136:10
**urgency** 63:12
**urgent** 69:16
**urine** 24:20 49:16 97:10 126:17
**urologic** 81:15 94:5
**urologically** 64:17
**urologist** 11:13 15:12 18:5 21:7 45:10,15 82:18 136:23
**urologists** 12:22 12:22
**urology** 11:19 12:20 13:9,10 13:11,14,19,20 14:1,2,20 15:4 16:1,6,10,11 18:13 19:12 21:12 22:10,13 22:20 24:23 25:19 26:20 40:16 45:11,11 54:22 60:10 79:15 84:2 92:21 118:22 120:20 123:23 139:6,9,19 140:17,18
**use** 10:20 71:5 112:23 113:15 145:9
**uses** 113:15
**usual** 5:22 142:19
**usually** 19:14 45:7 50:18 51:12 71:3 82:20 87:11,21 88:6,20 89:2 90:22 100:3,11 100:15 101:19 102:9 112:2
**Utah** 25:19
**utero** 11:15

**V**

**V** 1:10
**vacation** 41:10 140:7,20
**vaguely** 79:20 79:23 81:23
**Valley** 22:3
**variability** 112:11 113:18 113:19
**variable** 111:19
**variance** 48:6
**variation** 89:5 104:6 124:10
**varies** 91:1 101:20
**variety** 131:8
**various** 17:4 19:1 29:11 56:14 74:14 83:4 103:23 130:9
**vary** 101:23 111:20,21 114:9
**varying** 112:1
**vein** 61:18,20 65:1 67:4,5,8
**veins** 57:3
**vena** 61:19 63:19,22 64:12 65:2 66:15 67:6,9
**verbage** 132:2,9
**Vermont** 2:9
**versus** 5:11 55:12
**vessel** 67:11
**vessels** 65:22 66:1
**video** 1:16 7:5 9:20 52:4 54:8
**VIDEOGRAP...** 5:1 70:14,18 138:22 139:2 143:11
**videotaped** 5:4
**view** 48:13
**viewer** 131:10
**views** 48:17
**virtually** 11:6
**visit** 33:12,22 38:16 39:2 42:12 43:4,6,7 52:13 83:22 84:2,8 87:22 93:12,20 95:11 103:20 141:8 142:7
**visiting** 81:6 82:19
**visits** 43:3
**visual** 50:7,7
**visualization** 127:8,17 128:17
**visualize** 126:22 127:1 135:20
**visualized** 132:17
**visualizing** 124:19
**Vitae** 3:10

**W**

**W** 2:2
**wait** 142:13
**waived** 4:9,14 6:2,6
**walk** 87:22
**want** 24:6 32:14 34:16 40:22 52:17 53:2 68:22 70:11 102:14,23 104:8 108:23 117:3 123:7 132:21
**wanted** 142:15
**wasn't** 8:10 58:13 59:9 81:21 96:3 97:3 105:2 114:17 115:3 120:6,17 123:16,16 135:7,7,8 142:8
**watch** 97:14 135:9
**way** 7:3 11:4 17:20 21:1,2 21:21,21 22:11 24:3,14,15 33:3 47:14 51:8 52:5 58:12 60:16 67:11 70:4 73:17 74:15 75:3,16 82:1 83:22 84:1 90:15 92:19 93:15 110:19 113:20 118:7 127:17 130:17 132:4 133:7 134:2 136:7 139:12 141:23
**we'll** 5:21 9:16 14:11 32:15,15 58:11 75:21 79:2 87:7,12 87:14 88:22 89:3 90:23 94:10 143:7
**we're** 5:14 10:8 10:11 19:2 34:12 35:5 54:6 66:22 70:10,15 77:2 102:21 110:23 116:7 117:1,20 123:11 134:22 134:23 139:2 142:21,21 143:13
**we've** 5:20 40:18 53:18 54:2,14 87:10 89:7 118:17
**website** 3:4 14:15
**week** 21:3 141:21
**weeks** 35:13 69:16 93:9 114:21
**weighs** 61:13
**went** 15:19 43:11 72:9 77:23 88:15 95:7 101:10 108:16 109:11 114:11 130:12
**weren't** 109:3 115:9 140:3
**West** 145:19
**wet** 94:14,19 98:4,10 105:6 120:3
**white** 61:17
**whoa** 98:16,19
**widespread** 61:16
**witness** 6:4 9:13 28:6 29:23 72:5
**witnesses** 32:20 36:7 53:18
**word** 75:5 120:16 132:13 132:15
**words** 8:8 81:5 111:7 121:2 127:5,16 134:12,14
**work** 11:13,21 12:4 15:9 18:12 21:1 23:9,10 24:16 25:20 26:23 27:20 60:15 71:8 80:7,10 82:3,15 84:15 91:23 116:9 122:2
**worked** 17:3 26:10 27:4 76:19 81:1 82:10 92:14
**working** 11:23 23:6 26:14,19 37:11 80:23 89:7 92:21 122:11
**works** 41:15 88:6
**workup** 127:21 136:18,19
**workups** 44:19
**World** 14:20 15:3
**worried** 133:18
**wouldn't** 53:22 85:7 99:21 115:15 125:18 128:5 135:9 137:7 138:7,13
**wound** 122:4
**write** 33:20 86:5 86:6 87:7 141:9
**writing** 17:8 58:7 78:10 110:12 141:18
**writings** 17:19 18:1
**written** 8:23 37:4 71:10 77:13,23 78:9 78:9
**wrong** 139:16
**wrote** 84:8 98:13
**Wyoming** 56:10

**X**

**xray** 19:22 49:1 87:11
**xrays** 87:20 89:4 137:12

**Y**

**Yanofsky** 40:5 54:5 93:16
**Yanofsky's** 84:5
**Yeah** 78:6 133:14
**year** 13:13,20 26:7,9 27:2 119:2
**years** 11:15 16:20 20:4 21:19 34:8,10 49:18 81:18 97:13 109:2 110:2 112:8,9 113:21 126:19
**Yen** 39:8 127:14 131:20 137:15 138:10
**Yen's** 54:3 61:9 128:12
**yesterday** 28:15 116:19 118:1
**yield** 135:12
**young** 59:3,5 60:3 97:9,12 101:15 102:3 120:21 126:17
**youth** 56:9

**Z**

**0**

**0009** 112:17
**03105-0326** 2:4
**03756** 6:23
**05702-6740** 2:9
**06** 42:8

**1**

**1** 24:22 39:2 62:20 70:15 93:4 97:4 101:1 108:21 110:6 115:14 118:12 132:8 133:23 139:7 141:14 142:2 142:17
**1.1** 110:15 111:14 112:22 113:15
**1.3** 112:7
**10:26** 70:14
**10:41** 70:18
**10:53** 118:12
**1010** 61:13
**11** 57:1,13 61:15 63:2 103:7 112:22 132:11 133:10
**110** 2:8
**12** 101:22,22 132:4
**12:08** 139:2
**12:18** 143:11
**123** 3:6
**13** 110:21
**13.5** 102:19
**13th** 54:7

**14** 1:17 3:10 26:6 61:8
**143** 3:8 145:6
**14th** 54:7
**15.8** 102:14 103:8 105:1
**16-296** 5:8
**16-296-LM** 1:10
**17** 3:4 56:8 119:2
**17-year-old** 49:15 101:14
**18** 11:15
**19** 129:7
**1959** 7:2
**1988** 15:17
**1999** 16:10
**19th** 7:2
**1st** 27:15 38:16 62:10 69:20

**2**

**2** 3:12 13:15 25:7 38:20 39:3 114:16 115:15 130:11 143:12
**2.2** 109:22 110:7 110:15 111:3 111:13,14 112:23 113:10 113:15
**2004** 38:9 42:7 130:21 134:3
**2010** 16:11 109:23 110:17 112:14,18 113:13 114:5 115:12 116:8
**2012** 110:8,14,22 111:7,11 113:12 115:11 116:8
**2014** 24:18,22 26:6,18,19 27:15,22 29:19 30:9,23 31:13 32:1,8 34:19 55:21 56:8 62:10 69:19 118:12 130:19
**2017** 1:17 5:6 35:5 144:13 145:9,20
**2020** 16:21
**21** 57:1,13 61:15 63:1
**216** 89:14
**2294838** 130:20
**24** 1:17 84:5 89:14 96:6 145:9
**24th** 5:6 35:5
**275** 96:5
**28** 3:12
**29** 3:12
**295** 94:9,13
**2nd** 44:14 69:20 96:17 97:1 128:11 129:22 130:9

**3**

**3** 38:20
**3:31** 130:22
**30** 3:12 4:12 6:5 6:6
**308** 84:3
**30th** 30:10 55:21 56:8 69:22
**313** 84:12
**313-349** 3:6
**315** 84:17,19
**316** 89:17
**317** 117:9 118:10
**326** 2:3
**34** 3:12
**357** 96:4
**375** 96:6
**3rd** 2:8 145:19

**4**

**4** 13:15 26:9 71:19 110:8 111:7
**4/9/10** 111:12
**4:37** 130:23
**410** 61:7,12
**44** 3:4,10 17:18
**45** 3:5 77:7
**46** 3:6 123:12
**47** 3:7 143:14

**5**

**5** 71:20 145:6
**5/9** 95:12
**5/9/2014** 3:8
**50** 62:15

**6**

**6** 3:2
**60** 62:15
**6740** 2:8
**68** 3:12

**7**

**7** 111:1
**72** 3:12
**77** 3:5
**78** 3:12

**8**

**8** 13:21 19:5
**88** 15:20
**89** 15:20,23

**9**

**9** 5:1,7 62:11,20 113:12
**900** 2:3
**91** 15:23 16:2
**95** 16:2,6
**96** 16:6,7
**97** 16:7
**9th** 33:10 42:14 49:5 69:20 76:7 79:10 80:22 86:17 93:20 95:12 96:18,21 98:7 103:15 106:15 110:8 114:17 114:18 115:10 122:21 123:21 128:11 130:11 130:18 131:1,9 131:18 141:2,9