# EXHIBIT L

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF NEW HAMPSHIRE
Civil Action No. 16-CV-00296

GARY AND BETHANNE TILLOTSON, as )
Parents of SEAN C. TILLOTSON, and )
BETHANNE TILLOTSON, as Administratrix )
for the ESTATE OF SEAN C. TILLOTSON, )
Plaintiffs, )
)
v. )
)
DARTMOUTH-HITCHCOCK MEDICAL CENTER, )
Defendant. )

Deposition of MICHELLE SHEPARD, MD, PhD taken on behalf of the Plaintiffs at the Dartmouth-Hitchcock Medical Center, Lebanon, New Hampshire, on Tuesday, March 14, 2017 at 9:00 a.m. before Sunnie Donath, RPR, LCR No. 159, a Licensed Court Reporter within and for the State of New Hampshire.



A P P E A R A N C E S

BRUCE W. FELMLY, ESQUIRE; NICHOLAS F. CASOLARO, ESQUIRE
McLane Middleton, Professional Association
900 Elm Street, PO Box 326
Manchester, New Hampshire 03105-0326
On behalf of the Plaintiffs

KAVEH S. SHAHI, ESQUIRE
Cleary, Shahi & Aicher, PC
PO Box 6740
Rutland, Vermont 05702-6740
On behalf of the Defendant

Also Present: Stephanie M. Stone, DHMC



INDEX OF EXAMINATION


| Witness | Examined By | Page | Line |
|---|---|---|---|
| Michelle Shepard, MD, PhD | | | |
| | Atty. Casolaro | 5 | 1 |


INDEX OF EXHIBITS


| | Page |
|---|---|
| 4 - Answers to Interrogatories | 20 |
| 5 - Responses to Document Requests | 22 |
| 12 - Preliminary Radiology Report | 68 |
| 14 - Autopsy Report | 94 |
| 24 - Exhibit from Dr. Yanofsky's deposition | 28 |
| 34 - Emergency Department Event Timeline | 35 |
| 40 - Dr. Shepard's Bio, St. Johnsbury Pediatrics | 9 |
| 41 - VT Board of Medical Practice License Information, Dr. Shepard | 10 |
| 42 - Summary Statement | 19 |


NOTE: The exhibits were retained by Attorney Casolaro.

* * * * *



STIPULATION

It is agreed that the deposition shall be taken in the first instance in stenotype and when transcribed may be used for all purposes for which depositions are competent under New Hampshire practice.

Notice, filing, caption and all other formalities are waived. All objections except as to form are reserved and may be taken in court at trial.

It is further agreed that, if the deposition is not signed within thirty (30)days after submission to counsel, the signature of the deponent is waived.

It is further agreed that exhibits may be retained by counsel until the time of trial.

MICHELLE SHEPARD, MD, PhD,
having been duly sworn to tell the truth,
testifies as follows:

Page 5

EXAMINATION BY ATTORNEY CASOLARO
Q. Good morning, Dr. Shepard. Thanks again for coming and traveling in this weather. You grew up in Vermont, right?
A. Yes.
Q. So you're used to it like the rest of us, but I appreciate it. I'm Nick Casolaro, again, from McLane Middleton. With me is Bruce Felmly. We represent the Plaintiff in the lawsuit of Gary and Bethanne Tillotson versus Dartmouth-Hitchcock Medical Center.
And, like we said before we went on the record, we'll have the usual stipulations, Kaveh?
ATTORNEY SHAHI: Yes.
ATTORNEY CASOLARO: Notice, filing, and caption. Other formalities are waived. All objections except to the form are reserved, and, upon your review of the transcript, if not signed after 30 days, a signature is waived. All sound agreeable?
ATTORNEY SHAHI: That sounds fine.
BY ATTORNEY CASOLARO:
Q. Okay. So, Dr. Shepard, just for the record, can you identify yourself, spell out your first and last name, and give us your employer and your address?

Page 6

A. Indeed. My name is Michelle, and that's M-I-C-H-E-L-L-E, and that's Shepard, S-H E-P-A-R-D. I am currently employed by Northeastern Vermont Regional Hospital in St. Johnsbury, Vermont.
Q. Okay. Have you been deposed before?
A. No, sir.
Q. Okay. Have you testified in court before?
A. No, sir.
Q. Okay. Well, I'm going to go over a couple of quick ground rules for you just so you have an understanding. So we want to give audible answers.
A. Um-hum.
Q. No um-hum's or huh-uh's just for the record. I'll try to let you finish your answer if you try to let me finish my question. Don't take offense if I say "hold on" or "let me finish". If you don't understand a question or if something I'm saying doesn't make sense to you, just let me know. I'm not a doctor, so, you know, this is your field and the terminology you're familiar with. So you can feel free to clarify something for me if you need to.
A. Okay.
Q. And, again, this is -- it's not an endurance

Page 7

contest. If you need to take a break at any time, just let me know.
A. Thank you.
Q. All I ask is, if there's a question pending, you can answer the question, and then we can take a break after that.
A. Okay.
Q. All right? All sound good to you?
A. Sounds good.
Q. So I want to start with your education. Give me a sense, starting with undergraduate, just walk me through that if you would.
A. Yeah. My undergraduate degree was at the University of Vermont. I got a bachelor of science degree in molecular genetics. Started in 1998. Finished in 2002. I then did two years as a research associate before joining the dual degree program, MD/PhD program at the University of Vermont College of Medicine. Started that program in 2004. Completed that program in 2011.
Q. Okay. And, after you completed your dual degree program, where did you do your residency?
A. I came to Dartmouth-Hitchcock here in Lebanon for

Page 8

my residency.
Q. And that was a pediatrics residency?
A. Yes, general pediatrics.
Q. Okay. Did you do any fellowships after that?
A. I did not.
Q. Okay. So you went from your residency to your current position at St. Johnsbury Pediatrics?
A. Yes, immediately on completion.
Q. Do you have any board certifications?
A. Yes, I am. I'm board-certified in general pediatrics through the American Board of Pediatrics.
Q. Other than pediatrics, are there any specific specialties that you have or anything like that?
A. No, there aren't.
Q. Okay. Do you have any academic appointments or teaching privileges?
A. Currently, no.
Q. Okay. Did you have previously?
A. No, but I am looking to join Dartmouth as a clinical teaching associate.
Q. Excellent. Okay. Other than the board certifications, do you have any medical association or society memberships?

A. Yes. I am a membership of the American Academy of Pediatrics and the American Medical Association.
Q. And how long have you held those memberships?
A. Both of them since graduation from residency in 2011.
Q. You graduated from your residency in 2014?
A. I'm sorry. 2014, yeah. Sorry.
Q. No, that's no problem. Any recent awards or honors that you've received?
A. During residency, I actually got a, a residency award for general pediatrics, basically. It was based on excellence in primary care. So I had one award from that. So the Continuity Clinic Award was what it was called.
Q. Okay. I'm going to show you what we can mark as Exhibit 40. Try to use prior exhibits from other depositions.
(Exhibit 40 was shown to the Witness.)
ATTORNEY SHAHI: Thank you.
THE WITNESS: Yeah.
BY ATTORNEY CASOLARO:
Q. Do you recognize that, Dr. Shepard? That's your bio for St. Johnsbury Pediatrics; is that correct?



A. Yes.
Q. And everything on here look accurate to you?
A. Yes, except I'm no longer with the American Physician Scientists Association.
Q. Okay. And, as part of your employment at St. Johnsbury Pediatrics, do you have, what hospital affiliations or privileges do you have?
A. Yeah. So it's Northeastern Vermont Regional Hospital.
Q. Okay. Is that the only one?
A. Yes.
Q. And are you currently licensed in Vermont?
A. Yes.
Q. Let's mark this one as well.
(Deposition Exhibit 41 marked.)
And so what I've shown you is -- this is a printout from the Vermont Board of Medical Practice showing your license information. Is that you on there?
A. That's me.
Q. Everything on here is accurate?
A. That is correct.
Q. Okay. And you have a supervisee, it looks like?



A. Yeah. She is a resident here at Dartmouth that spent some time with me for a month doing community pediatrics last year.
Q. Okay. Do you have any other medical, state medical licenses at the moment?
A. Not currently.
Q. Did you have a Vermont -- I'm sorry -- a New Hampshire medical license when you were a resident?
A. Yes, a training license.
Q. Have you been subject to any disciplinary actions before any boards of medicine?
ATTORNEY SHAHI: Again, anything that's been public.
THE WITNESS: Yeah. No.
BY ATTORNEY CASOLARO:
Q. No? So I want to go back to your time at Dartmouth. You did, you said it was a pediatrics residency?
A. Yeah.
Q. How many residents are in the pediatrics program?
A. So, generally, there are four. So they are a little smaller right now, honestly. So, when I was a resident, there were a total of eight residents in each



class.
Q. Class? Okay. And you said it's smaller now?
A. I believe they have six residents, but I'm not entirely sure.
Q. Okay. And that's a three-year program?
A. It is a three-year program.
Q. So, when you say class, it's, each class is a --
A. Yeah.
Q. -- program year?
A. Yes.
Q. Okay. In the spring of 2014, which, as you probably know, is the timeframe we're talking about for this case and the treatment involved in this case, specifically May of 2014, what year of your residency were you in?
A. That was my third year.
Q. So you were about to graduate, I guess, not graduate, but complete the residency in the summer?
A. Yes. I had to do a few extra months to pay back maternity leave that I took during my residency. So, rather than completing in June, I finished in August.
Q. Okay. And, at that time in May of 2014, you were participating or rotating through the emergency

Page 13

department?
A. Yes. Part of our clinical rotations involved a month each year in the emergency department.
Q. Okay. So the rotation itself lasted a month?
A. Yes.
Q. And, if you recall, in May, beginning of May, May 1st, at what point in the rotation would that have been?
A. Oh, they didn't always follow the exact monthly calendar, so I'm not sure what week it was in.
Q. Do you remember if it was towards the beginning? Middle? End?
A. I, I don't recall.
Q. Okay. Did you do another rotation after the emergency department before you completed the residency?
A. Yes. I did two, at least two other rotations after that. Yeah.
Q. And, most of these rotations, did they last a month?
A. Yes.
Q. And what were those other, those last two rotations that you did?

Page 14

A. I really do not remember what my last two rotations were. Let's see. I don't, I don't remember.
Q. All right, that's fine. By May of 2014, so in your third year of residency, how many emergency department rotations had you completed?
A. We had one month as a second-year and one month as a third-year resident. So that would have been my second rotation through the ER.
Q. So, as part of that rotation, what were the basic responsibilities, duties of a pediatrics resident in the emergency department?
A. Right. So we actually functioned slightly differently because there were also emergency room residents in the ER at the same time. We were generally tasked with children under the age of 21, and we would, in cooperation with one of the attendings, we would go in, collect the history, physical exam, review allergies, meds, all of that stuff with the family and the patient. We would then come together, present kind of your findings to the attending with your tentative plan which they would review.
Sometimes they would ask you more questions, ask you to get, gather more information, but you would come

Page 15

up with a plan together after running it by the attending, and then you would go about your treatment plan, whether that was, for example, cut and dried, a two-year-old comes in, ear pain on the exam, there's an ear infection. You present to the attending, Child with an ear infection, no allergies to amoxicillin. I would recommend a course of amoxicillin, follow-up as an outpatient.
In agreement, if that was felt to be appropriate, then that would be the discharge plan for the patient, and you would go back into the room, talk to the family about the plan, the follow-up, conditions for discharge.
Q. And so you mentioned the attendings. These are ER attendings or ED attendings that you would report to and discuss the plans with?
A. Yes, and there was one pediatric trained ER attending that was present for at least some of the shifts. Most of them were general ER attendings.
Q. Okay. And are you familiar with Dr. Norman Yanofsky --
A. Yes.
Q. -- as one of these attendings?

Page 16

A. Yes.
Q. Okay. Do you recall how many times you worked with Dr. Yanofsky?
A. Oh, no, but we did definitely work together multiple times, but --
Q. Okay.
A. He was there for both sets of rotations that I did. Yeah.
Q. So this was, the way you described it, it was sort of a team or a collaborative approach --
A. Absolutely.
Q. -- of care?
A. Yeah.
Q. And would all members of the team -- and by all I mean the nurses, the attendings, the residents -- be communicating with the family as part of this process if there was a younger person that came in?
A. Yes.
Q. And sort of running that plan and discussing treatment plans and various approaches to treatment and care, that was all part of the training process as you understood it --
A. Yes.

Q. -- as well?
A. Yes.
Q. Okay. So, other than speaking with Attorney Shahi -- and I don't want to know about those conversations -- what did you do to prepare for the deposition today?
A. Just reviewed the information from my chart that was given to me to review.
Q. And, when you say your chart, what specifically are you referring to?
A. My actual note from the emergency room.
Q. Did you discuss this case or Sean Tillotson or the treatment we're talking about with anybody else --
A. No.
Q. -- any other providers from Dartmouth-Hitchcock?
A. No.
Q. Any of your current colleagues or mentors or faculty members?
A. No.
Q. Okay. Family members?
A. No.
Q. Sorry. I have to ask because sometimes we hear people that talk to their third cousin about, Hey, I'm having a deposition today, and here's what I'm going to do. So I have to ask the question.



A. No. My husband knows I'm here, but he's nonmedical, and he does not want to hear any details about anything.
Q. Understood, understood. So you mentioned the chart, and I, I can show you that in a little bit. That was the, sort of the medical record, the notes that you provided or prepared as part of Sean Tillotson's care. Did you review any other documents in preparation for today?
A. Just the documents of, that were given to me from the attorneys. I didn't see any other documents. I don't have access to the EMR anymore, so --
Q. And what documents were those?
A. There were the ultrasound reports, the accession, basically, the ER report which tells --
Q. Is it an event log, ER event log?
A. Yes. Yeah.
Q. Okay. Anything else?
A. No.
Q. Did you review any deposition --
A. No.
Q. -- transcripts of other providers or anything like that?



And, as part of the preparation, as we understand it from Counsel, there was a summary statement prepared. Are you familiar with that?
A. Yes.
Q. Okay. And is -- you had a role in preparing that document?
A. Yes.
Q. Why don't we mark that one now?

(Deposition Exhibit 42 marked.)

Why don't you just quickly take a look at that, look through it? Okay. So, like I said, this has been provided by Counsel sort of as a summary statement of your recollection and review of some of the records in this case. Does everything in this document look accurate to you?
A. Yes.
Q. Okay. And, in preparing this statement, what documents did you review?
A. So my notes, my ER notes, the, the ED report log which had some nursing notes in it, the ultrasound report which had the preliminary findings from the resident as well as the final read by the attending, and, I believe, for documents that was the, that was it.



Q. Okay. Now, sort of in conjunction with this type of statement, I'm going to ask you a little bit about some other documents, and I'm -- it doesn't sound like you reviewed them, but I'm still going to ask the question. I'll still show them to you.

Part of this process in this lawsuit is called discovery, and, as part of the discovery process, there are questions, written questions, exchanged between the parties that have to be answered under oath as well as requests for documents for each party to provide, and so, as part of this case, our side as the Plaintiffs served both written questions, which we call interrogatories, and requests for production of documents on the hospital.

So I'm going to show you copies of both our questions and the hospital's responses first to the interrogatories, and this is actually a repeat exhibit. So we can use Exhibit 4 to Dr. Yen's deposition. Why don't you just flip through that for a moment, take a look?

(Exhibit 4 was shown to the Witness.)

(Pause for witness reading.)
ATTORNEY SHAHI: He's asking if you've seen this before, yeah.
THE WITNESS: Oh. No.
ATTORNEY SHAHI: Yeah.
BY ATTORNEY CASOLARO:
Q. So yeah.
A. No, I have not seen this before.
Q. Okay. So you have not seen any of these questions before?
A. No, sir.
Q. You've not seen that document itself but also the questions in the document?
A. No, no, sir.
Q. So you were not asked to provide any answers to any of these questions?
ATTORNEY SHAHI: To the extent that he's asking a question that relates to our conversation, you're not to respond to that, but, other than our conversation, you can answer.
THE WITNESS: No.
BY ATTORNEY CASOLARO:
Q. Okay. You see on the last page there there's, or



on the second-to-last page, Page 11, there's a signature of somebody named Kimberly Fleury who is a paralegal at the Office of the General Counsel here at Dartmouth-Hitchcock? Do you know Kimberly Fleury?
A. Not to my knowledge.
Q. Did you speak with Kimberly Fleury about any of the questions in this, in this document or anything about this case?
A. No.
Q. Okay. And this is going to seem a little repetitive, but I want to just do it for the record here. I'm going to give you now the, what I mentioned was the request for production of documents, and that was Exhibit 5 in Dr. Yen's deposition, so we're going to repeat that one as well. Just take a quick look through again and let me know if you've seen that document before or any of the questions in that document.
(Exhibit 5 was shown to the Witness.)
(Witness complies.)
A. No, sir, not seen this before.
Q. Have not --
A. No.



Q. -- seen any of the questions, specific questions, in here before?
A. No.
Q. Have you been asked to search for or provide any documents in response to any of these questions?
ATTORNEY SHAHI: Again, other than our conversations.
THE WITNESS: No, sir.
BY ATTORNEY CASOLARO:
Q. When were you notified of this lawsuit?
A. I believe it was early February, may have been late January, via email, of this year, 2017.
Q. And, after you were notified of the suit, what happened? Did you meet with Counsel?
A. Yes. We arranged through email a time to meet to review the case.
Q. And, as part of that meeting, who else was present?
A. It was just myself and Kaveh.
Q. And Attorney Shahi?
A. Yeah.
Q. And did you review documents at that meeting?
A. Yes.



Q. And were those the documents that we discussed earlier, the medical record, your notes, the emergency department timeline, event timeline, excuse me, the radiology reports?
A. Yes.
Q. Anything else that you reviewed during that meeting?
A. Other than there was an accession log for the EMR that we looked at and I think an accession log for the PACS system were the only other things that we looked at.
Q. And the accession log for the EMR, is that what they refer to as the EDH system here at Dartmouth?
A. Yes, yes, EDH.
Q. So you reviewed that?
A. We did not go into the medical record, but there was an Excel flow sheet that showed when each person had opened the chart or made changes to the document, that.
(Indicating.)
Q. That document? Yeah, I have that.
A. It was easier to look at on the computer.
Q. And you looked at it on a computer screen?

A. Yes.
Q. And that meeting in late January or February timeframe, was that the only meeting you've had with Counsel?
A. We met, actually, last week, and, yes, that was the only time we have met. I was unavailable to meet prior to that.
Q. Okay. So you met last week?
A. Yes.
Q. That was at the same meeting you're talking about, so there's been one meeting?
A. There's been one meeting, yes.
Q. Okay. I thought you had said January
A. That's when I got the original email.
Q. That's when you were contacted?
A. Yes, that's when I was contacted.
Q. I apologize.
A. I had limited availability in the month of February, so unable to do that.
Q. Understood. So there's been one meeting that was last week?
A. Yes.
Q. And you went over the documents we talked about?



A. Yes.
Q. So we'll move on to May 1st, the evening of May 1st, and I want to go back to the supplemental statement that you provided, if you would.
A. Yes.
Q. You mentioned this was an accurate summary of your recollections and your recall of the events that night?
A. Yes.
Q. I just want to confirm. Your specific recollection at this time is that Sean Tillotson was upset?
A. And his family, yes.
Q. And his family was upset?
A. Yes.
Q. Do you recall who Sean Tillotson was present with?
A. His mother was present.
Q. And both of them were upset?
A. Yes.
Q. Do you remember why they were upset?
A. He was scheduled to take the SAT's over the weekend, and putting him on bed rest would have made him unable to take it. They were very difficult to reschedule. They felt that that was a little



stringent, to have him on bed rest.
Q. Just want to confirm something. So it says in your statement here that following his -- your direct recollection of your involvement with Sean Tillotson's ED visit on May 1st 2014 is essentially that he was upset about the bed rest order following his discharge because he was scheduled to take the SAT later that month. I think you just said that he was scheduled to take the SAT that weekend. Do you recall which, which one it was?
A. I believe it was that he was to take it that weekend, but it was definitely to happen before they were, they thought they would be able to be cleared for urology.
Q. Okay. And then you also have a specific recall here that you were told by either Sean or his mother that Dr. Harris was Sean's pediatrician, correct?
A. Yes, that they used Bradford, Dr. Harris's office, for pediatric primary care.
Q. Okay. Do you remember why they felt that the bed rest order was extreme? I think that's what you said, that it was a little over the top or --
A. That we were being a little stringent?



Q. Yeah.
A. I don't remember the exact details. They, they just felt that this was a little bit being over-cautious, that sitting for the SAT's would not be harmful.
Q. You actually wrote a note, or I'll call it a doctor's note for lack of a better term, for, for Sean's school as part of that, didn't you?
A. I don't remember that exact. I wrote -- I always write a discharge for the family. We call that the after-visit instructions.
Q. Okay. Why don't I just mark this? And we already have it marked, so I'll just pull it up. Actually, you know what? Why don't we use a different one? That's a little bit bigger. Here you go. So this is Exhibit 24 from Dr. Yanofsky's deposition.
So, on the bottom of these pages, Dr. Shepard, there's marked page numbers. They're called Bates numbers.
(Exhibit 24 was shown to the Witness.)
A. Okay.
Q. Will you turn to Page 402? And, if you look at the top of that page --

A. Yes.
Q. -- it looks like a there's a letter there from you.
A. Yes.
Q. Does that refresh your recollection about whether you wrote Sean and his family a letter excusing him from school as well as a sort of an allowance or an accommodation to urinate during the SAT's?
A. Yes.
Q. Okay. And did you write that letter perhaps, or was that -- do you recall writing that letter at the request of Sean's parents --
A. I don't.
Q. -- Sean's mom?
A. I don't recall. I often did school notes for children as they were leaving the ER.
Q. And, in terms of the communication about bed rest and the need for bed rest, is that something that you were communicating to Sean and his mom?
A. Yes, myself and the nurse that were also going over the discharge instructions.
Q. And you were responsible for explaining the medical reasons for the bed rest requirement?



A. Yes, myself, and often Dr. Yanofsky or one of his co-colleagues, the attendings, would also go in so there was repetition of the discharge instructions.
Q. But, but did you provide the discharge instructions?
A. Yes.
Q. You wrote them, and you explained them to the patient that night?
A. Yes, yes.
Q. Okay. And part of that was the requirement for bed rest and the reason for requiring him to be on bed rest over the weekend?
A. Yes.
Q. Do you recall, in this specific instance with Sean Tillotson, whether Dr. Yanofsky also explained these discharge instructions to the patient?
A. I do not. They would often go in on their own time. It was not generally done together.
Q. Okay. But you may have had a nurse with you when you did your explanation?
A. I may have, but, again, they often went in afterwards because they had to have several forms signed from the family.



Q. Okay. So there would have been multiple people potentially coming through to see the patient and giving the explanation as to the discharge?
A. Yes.
Q. And you were part of that process?
A. Yes. The discharge process is actually quite lengthy and requires multiple people going in.
Q. Including the attending?
A. Yes.
Q. Okay. So we, we mentioned your specific recollection. I'll represent to you that Sean Tillotson was a 17-year-old boy at the time, May 1st 2014. He came into the ER or ED with, complaining of gross blood in his urine, hematuria. He came in with his mother about 6:50 p.m. I'll represent to you he also had a history of an echogenic focus or a cyst that was referred to as a cyst in the medical records on his left kidney. Were you aware of that?
A. Yes.
Q. Prior to that night, May 1st 2014, were you involved in any care of Sean Tillotson, or had you treated him before?
A. No, I had not.



Q. Had you treated anybody in his family before?
A. Not that I'm aware of.
Q. Was he aware -- was he known to you in any other way, Sean Tillotson or his family, prior to that night?
A. No.
Q. Okay. You also -- so you were the pediatric resident on an ED rotation. What would have been your shift that night?
A. They were -- actually, we had alternating shifts, but often they were 3:00 to midnight or 4:00 to 1:00 a.m. We had some occasional day shifts. So they actually rotated through the week.
Q. So that night it would have been either the 4:00 to 1:00 or the 3:00 to midnight, most likely, based on the time Sean came in?
A. The time that I was, most likely, yes.
Q. And you mentioned Dr. Yanofsky. He was the attending emergency department physician that night?
A. There's often two or three different attendings at the same time in the ER, and we will actually present patients to whichever attending is available and willing to take the case at the time, but he was one of the attendings present.

Q. And he was the attending that you presented the case to because he was available at the time --
A. Yes.
Q. -- for Sean Tillotson?
A. Yes.
Q. Do you recall who the other emergency department attendings were that night?
A. I do not.
Q. Now, you mentioned that there was sort of a team or collaborative approach to the emergency department. For a patient like this, like Sean Tillotson, 17-year-old complaining of blood in his urine, what would your role be as the pediatric resident?
A. So my role would be to review the vital signs collected by the nurse, to go into the room, review the history and the chief complaint with the family and the patient, review past medical history, surgical history, allergies, medication, pertinent family history, go through a focused review of systems, and then, after all of the data is collected, do a physical exam and then take that information and present that to the attending with a tentative plan.
Q. And the tentative plan -- and I ask this because,



sort of with the focus on the emergency department. So is there, is the objective to determine if the patient is in stable condition and can be discharged at some point or needs further treatment; is that what you're looking at in terms of developing a plan?
A. Yes. So, generally, there are people that come in in acute status that would be completely managed by the team all together, so a trauma, for example. For ill patients they would generally be assessed by a resident and determined if they were very ill, needed ICU admission; ill, needed floor admission; mildly ill, manage as an outpatient with follow-up, and then often there was the worried well as well, so reassurance.
But, yes, determining whether a person needed admission, whether the person needed further care in the ER or was stable to discharge home.
Q. Was your role in this process any different because you were a pediatric resident versus an emergency medicine resident?
A. Our roles are similar, other than I don't see older patients, and I certainly wouldn't do some of more the trauma that the ER residents would be a part of. That would be outside of my training.



Q. Okay. And Dr. Yanofsky or the other, whichever attending was assigned to this patient, their role was to essentially supervise you, make sure that your recommendations for care and the plan of care were sound, and basically approve or confirm what you were recommending for the particular patient?
A. That's part of the role. The additional part of the role is they do need to examine the patient as well and collect history, particularly anything they believe was, you know, not clear or needed further investigation. So, yes, they did take our assessment and our plan, but they also went in and did their own exam so they could corroborate that assessment and plan.
Q. Okay. Why don't we mark this? This, I'll show you. This would be -- well, it's going to be actually a prior exhibit. It will be the emergency department event timeline, for lack of a better word.
(Exhibit 34 was shown to the Witness.)
ATTORNEY CASOLARO: Do you need a copy, Kaveh?
ATTORNEY SHAHI: I brought it.



BY ATTORNEY CASOLARO:
Q. Okay. So, Dr. Shepard, this is the, one of the documents you reviewed in preparation for this deposition?
A. Yes.
Q. And this is what we've been, what you've described as an encounter summary or a -- or how would you describe it, a log, event log for the emergency department?
A. It's pretty complicated, but it appears to be a printout from the EMR of basically a, a timeline. However, I've noticed that a lot of it seems to be auto-generated by the EMR. So orders and then orders were canceled and then they were replaced, which appears to be just part of the EMR logging system. So, yes, some of it is actual documenting time. So vital signs have a time. That makes sense. But there are a few places where the labs are put on unit collect and then they're changed and then they're -- this lab in HL-7 is a, like a virtual space. So, if you read, you know, that's not a person. That's a, you know, a virtual space in the EMR.
Q. I'm sorry. Okay. So this, this entry here where

Page 37

there's -- I wasn't sure if that was a person's name either. So, where it says, "EDI, comma, lab in", and you said -- how do you pronounce it?
A. I think it says HL-7.
Q. HL-7?
A. Yeah.
Q. Okay. So that's not a user?
A. That is not a user, no. These are auto-generated from the EMR as changes to lab results or orders. Whereas, when it has a person's name, for example, Gina Chase Pinkney, the Registered Nurse, it says she did an assessment, a genitourinary assessment. So she went in while he urinated, and she documented that. So that has a time associated to it, although it's going to stamp the time of when she goes back to the computer to do it.
In the ER there was not real-time in that the computer was not in the room with the patient. You would have to go back to a workstation, log on, click the buttons, and then it would log the time at that time.
Q. And those logs, those times would be reflected in this type of log?

Page 38

A. Yes.
Q. Is that what you're saying?
A. Yes.
Q. Okay. You mentioned that there were some entries in here that, where there was showing changes or cancelled orders?
A. Yes.
Q. Did that seem unusual to you? Is that why you mentioned that?
A. Not unusual knowing this system. But it's changed. Every time the nurse acknowledges an order or the nurse collects an order, it then relogs it. So it is the same order, but it will often show itself relogged several different times with a different date.
Q. Okay. And I think we can have a pretty good understanding of the process by looking at this, and I can walk through it with you a little bit.
A. Sure.
Q. But I want to just go back to how you come to become assigned to this patient. So my understanding from prior deposition with Dr. Yanofsky is that, when a patient comes in, they go up on a board, and the patient's information and their sort of presenting

Page 39

symptoms are put up on a board, and the resident is assigned based on availability and the type of patient, the age of the patient, etc. Is all that accurate?
A. Yes.
Q. And, in this case, because Sean Tillotson was 17, is that how you came to be involved in his care?
A. Yes. That would have been a patient that was appropriate for me to see under the age of 22, and I tried to see as many patients as possible. Generally, you would have three, maybe a fourth, active patient at a time.
Q. And is it the case that you see the patient come up on the board and you take that patient, or is the patient assigned to you by someone?
A. No. We would self-assign often after talking to the other residents. So, if there was three residents working at the same time, which often occurred, two ER residents and a pediatric resident, or the anesthesia residents would sometimes rotate as well, you would look at the board, and, if there were five patients available but I already had three children and there was another child, one of the ER residents would take that patient, or, if there was three adults, they would

Page 40

then kind of look at the chief complaint and divide the labor.
Q. Okay. And I'm just looking on the first page of this. It looks like about 6:59, sort of in the middle down towards the bottom there, team member assigned, R. Stickney, Rachel Stickney. Was that another resident in the emergency department?
A. I don't believe so. All the residents would come up with MD after them.
Q. Okay.
A. And, pass, I have to be honest, I believe were the registration. So there was always someone that would come in and go over the insurance information, and that was often called a pass.
Q. Understood. And I ask that question because Dr. Yanofsky testified that there may have been a emergency medicine resident who initially took this patient but then, noticing the age of the patient, they determined that it was better for you to take the patient. So I just wasn't sure if that was a reference to her. It doesn't sound like that's the case, so --
You mentioned a little bit about the process. So there's obviously a triage when the patient comes in.

The nurse, I assume the nurse takes the vitals of the patient.
A. Um-hum.
Q. After you are assigned, which looks like happens on that first page there about 7:30 p.m., you mentioned that you would then meet with the patient, do a physical examination?
A. Yes.
Q. And what else happens during that initial meeting with the patient?
A. So, generally, a, as much of a history as you can document at the time. If it's a small child, there's not much history to gather, but, in this case, again, quickly running through their chief complaint, the history leading up to why they were there, their other, you know, review of systems, a brief past medical history, surgical history, allergies, and medications.
Q. And, in the case of Sean Tillotson, was that when you learned that he had a history of the cyst on his left kidney --
A. Yes.
Q. -- and also a history of prior hematuria?
A. I believe so.



Q. Do you recall any other medical history that Sean Tillotson or his mom passed on to you that evening?
A. Yes. He'd also had a recent knee surgery.
Q. Okay. So, after you get that treatment history, medical history, what happens next?
A. So that would be when you would do the brief assessment and plan to the attending and then place any orders and imaging labs.
Q. And, now, in that case, that would have been Dr. Yanofsky --
A. Yes.
Q. -- for Sean Tillotson?
A. Yes.
Q. And so the plan that evening was to order a series of labs; is that correct?
A. Labs and urinalysis, yes.
Q. And a urinalysis? There was also a consult with urology that evening, correct?
A. Via the phone, yes.
Q. And that was Dr. Rachel Moses?
A. I didn't remember exactly who I talked to, but it was the urology resident on call, or fellow.
Q. And you don't recall whether that was Dr. Moses or



someone else?
A. I do not.
Q. Dr. Shepard, I'm not seeing a reference to your discussion with the urology resident in this log.
A. Right.
Q. So do you have a sense of the timing of that conversation? Would it have been after you spoke with Dr. Yanofsky and sort of developed a preliminary plan or before?
A. I am not entirely sure of the timeline. It would have, based on the information that I had received from the patient and his mother, that would have been part of my plan would be to consult urology, who had followed him in the past. So, depending on how long the labs took to get back and the urinalysis took to get back, I would have paged the on-call urology resident.
Q. So you, you would have made the determination based on the patient's history that urology needed to be contacted, so then you probably confirmed that with Dr. Yanofsky, I would, based on, you know, your, how you describe the process?
A. Right. We would discuss it together.



Q. And he would say, Okay, call urology. Do you recall whether the urologist you spoke with that evening was a female or a male?
A. I do not recall.
Q. Do you recall the content of the conversation with the urologist?
A. I do not remember the details. Generally, when we consult a specialist, we try to give a short history of what brings them in with their past medical history, especially in this case, and seek their guidance as far as needs for further labs. We'd also review their vital signs and any labs that had returned in the meantime.
Q. And you would be reviewing this with the urology resident on the phone?
A. On the phone.
Q. Did the urology resident make a recommendation as to further treatment or care that evening to you?
A. It's my recollection that we discussed ultrasound of the kidneys, and that's all I remember.
Q. And would that have been something that the urology resident recommended to you or you recommended to her or you, you know, both agreed that ultrasound

was the proper next step?
A. I don't remember the details, but based on the review of the case --
Q. Yeah.
A. -- and any 17-year-old presenting with hematuria, especially with a history of a renal cyst, we would want a study that would accurately allow comparison to the prior studies. So, knowing he had had ultrasounds in the past, I would have said, Do you feel an ultrasound is appropriate next study?
Q. And, based on what happened, obviously, he or she -- you don't recall if it was a he or she, but that the urology resident agreed with you, and you ordered the retroperitoneal ultrasound for the patient?
A. Ultrasound, yes.
Q. Okay. Do you recall the purpose of the ultrasound?
A. So the purpose of the ultrasound was to compare, make a comparison to the prior ultrasounds and, especially with active new bleeding, to basically rule out a ruptured cyst as the cause of that bleeding.
Q. Other than ruling out the ruptured cyst, would the ultrasound also have been to be looking for changes in



the cyst as compared to the prior studies?
A. So looking for stability in the size of the cyst would be important.
Q. You mentioned the -- just to go back for your conversation with urology for a second, you mentioned that you looked at the EDH spreadsheet, for lack of a better word, as part of your preparation for today. I'll represent to you, and I can show it to you, that Dr. Moses, Dr. Rachel Moses from urology, who is a resident in urology, shows up in those records on the night of May 1st as reviewing Sean Tillotson's prior medical history and other parts of the record. Had you seen that? Had you seen her name when you looked at the --
A. As part of the --
Q. -- EDH report?
A. Yes, as part of the review we did last week.
Q. And did, did that indicate to you that she was actually the person, the resident, that you spoke with that evening?
A. Although I can't remember who I spoke with, it suggests that she was the resident who was on and had looked at his chart.



Q. Okay.
ATTORNEY SHAHI: Which exhibit number is that?
ATTORNEY CASOLARO: In terms of the priors, it would be --
ATTORNEY SHAHI: I mean the EDH that you were just referring to.
ATTORNEY FELMLY: It's going to be 19, I believe.
ATTORNEY CASOLARO: A couple of times. Yeah, 19 and then 25, yeah.
ATTORNEY SHAHI: Okay.
BY ATTORNEY CASOLARO:
Q. Now, Dr. Shepard, there's, based on your review of the records and your recollection of that evening, there's nothing to indicate to you that it wasn't Dr. Moses that you spoke with that evening, is there?
A. Well, there's no direct phone log or pager log to suggest I spoke with someone else, but I can't confirm that is who I spoke to.
Q. Would there have been a pager log for that type of communication? I mean, you would have paged her, right?



A. Right. So we used a system called Amion. It's an online system that gave you a list of which residents were covering which service, and then you would use that to page them.
Q. And that's literally spelled out A-M-I-O-N?
A. Yes.
Q. I think I've heard of that. And so that would have given you a list of who was on in terms of urology, radiology, and whatnot?
A. Yes.
Q. And that's how you determined who to page?
A. Yes.
Q. Do you recall, what was the Amion system? Was it on a computer, on, you know, a phone, tablet? What kind of system was it on?
A. Yeah. So it's actually freely available through the internet, but we used desktop computers in the ER.
Q. And that was something you would log into?
A. Yes.
Q. Okay. And would that track not just who was on that evening in a particular department, but would that also track the, the actual page that you made to the person?

A. No, it would not. The paging system through the hospital is separate.
Q. Do you know if the pager records for your page of the urology resident that evening are available?
A. I have no idea how they would keep the log, but --
Q. Would there have been a log associated with the pager?
A. I'm not sure if it would be an, just an electronic log. I'm not sure how they keep that data or if it is kept.
Q. Okay. Now, I know you can't specifically recall if it was Dr. Moses or not, but can you confirm that it was one person in urology that you spoke with that evening?
A. I would have paged the, the resident on call. I don't remember speaking to more than one person.
Q. Okay. It wouldn't have been an attending as well?
A. Generally, the process would be that the resident would call the attending if that needed to occur.
Q. Okay. And was there only the one conversation with the urology resident?
A. I don't recall.
Q. You don't recall if there were more than one, if



you had more than one conversation?
A. Right. I, I know I spoke to them once, but we may have spoken again once the data was collected.
Q. Meaning, once the other test results came in, the ultrasound results came in, you may have spoken to the urology resident again after that?
A. Yes.
Q. As part of the order of the ultrasound, what information are you providing to radiology?
A. So, generally, a very brief, often just 17-year-old, hematuria, history of cyst, rule out rupture, very cut and dried with the information that you're, that you have and that you're looking to gather.
Q. And, as part of the process of ordering the ultrasound, do you first page the radiology resident?
A. That generally depends on the time of day and the test. For most radiology orders, for example, an x-ray, there's no need to involve the radiology resident. You would order the x-ray. The x-ray would be completed. The radiology resident would look at it, or often the ED attendings would also look at it and then formulate a plan from there. At nighttime often



the formal reads would not be available. So, if you needed something more rapidly, you would page the resident on call to get a preliminary or a wet read.
Q. And that's what was done in this case with Sean Tillotson?
A. I don't remember speaking with the resident, but, especially considering the time of day, in order to get a preliminary result, it would often require speaking directly with a resident.
Q. Now, I want to just take a step back for a second. I'm talking first about when you're ordering the actual ultrasound.
A. Yes.
Q. You're saying you don't recall speaking with the resident as part of ordering the ultrasound?
A. Right.
Q. Okay. Because I understand you, you also communicated with the resident when the results came back and the resident, the radiology resident, was giving you the wet read results, as you described it. Is that correct?
A. So I'm a little confused.
Q. Yeah. I can explain it again if you want.



A. Yeah. Sorry.
Q. So, when you go to order the ultrasound --
A. Yes.
Q. -- in this case, it's the evening time. It's not necessarily after hours, but it's getting later in the evening. I'm asking first, Did you, do you have a communication or conversation with the resident at that time when you're placing the order for the ultrasound?
A. Not necessarily. For an ultrasound, especially in the evening, occasionally you would have to call them first because they would be the ones performing the study, versus daytime hours there's ultrasound technicians that would perform the study. So the call to them at the time of placing an order would generally just be to notify them that, This is an order that needs to be done this evening. Are you available to do an ultrasound?
Q. And, in this case -- I think that's, you're saying that that's how the process would usually work. Is that how the process worked in this case?
A. I don't remember the details. I don't need to speak with them to place the order --
Q. Okay.

A. -- but, to ensure that the study gets done, occasionally, that requires giving them a call, finding out when they'll be available.
Q. And I'll get into a little bit more about your conversations with radiology after the results come in, but just in going back to this timeline for a second, so it looks like -- and we're on Page 311 there, 22:45, so 10:45. There's a note that says, "The patient returns from ultrasound". It looks like the nurse was trying to get another, either another clean catch of the urine or a look at the urine, at least, and it sounds like Sean went to the bathroom before the nurse could come in and look and flushed. After the patient comes back, what happens next for you?
A. After he returns? Generally, awaiting the, the read or the report from the resident. Ultrasounds are very difficult to look at without training, so that would not be something I would feel comfortable looking at myself as a pediatric resident.
Q. And, when we say ultrasound, talking about a couple different things. So there's the ultrasound report, obviously, but then there's also the actual films or images.



A. Yes.
Q. So what you're saying is that the actual films or images would be difficult for you to look at as a pediatric resident and interpret; is that what you're saying?
A. Absolutely.
Q. So you would need the resident, the radiology resident, to give you his preliminary evaluation or report?
A. Yes.
Q. So, essentially, when, even though the patient comes back, there's a waiting period, obviously?
A. Yes.
Q. Any other tests or labs or any other sort of physical exam happening during that sort of waiting period?
A. Often, it was my practice to continually check in with the patient and the family, make sure there hasn't been the development of any new symptoms, and generally just talking with nursing about, you know, when vitals needed to be repeated, if labs needed to be repeated.
Q. Okay. It looks like, based on this timeline, Dr. Shepard -- so, if you look at the bottom of that



page, it turns to 23, so, essentially, three minutes after the result comes in. So, if you look at 22:57, 23 is where it indicates the imaging preliminary result comes in. Then down at the bottom it is a reference, a note from you where it talks about departure condition. So is it literally a period of time of three minutes passes where you get the result and then you make the determination that the patient is ready to be discharged?
A. So this entry, I'll say, into the log actually just enters when his result was entered, when he entered it into the computer as a preliminary result. I can't recall the exact time we spoke. So, in this case, no, generally, three minutes would not be enough time, and my, generally, my timeline includes talking with the resident, so radiology.

I would have then spoke again with the attending, This is the plan for discharge. Then it takes, you know, a longer than three minutes to even put in the orders for discharge in the EMR, and then you need to discuss that with the nurse, the patient's being discharged. You need to discuss it with the family, the patient's being discharged. So, often, that whole,



from the beginning of the clicking the discharge button in the, the Electronic Medical Record to the point of discharge can take 45 minutes or longer.

But in this timeline there are many things that are missing. So there's no documentation when he left the ER. There's no documentation when he arrived in radiology. There's no documentation other than when he returned, but, again, her note is only when she opened it up in the EMR and put her note in. So the actual time that she assessed the patient may have been, give or take, you know, minutes to tens of minutes. So I would have to know what time we actually spoke on the phone to tell you.
Q. So sort of in the middle of that page it talks about the ultrasound retroperitoneal complete. These are your entries in this timeline --
A. Yes.
Q. -- correct? So you're getting some communication that these events are occurring and they're being completed, and then you're entering them into the, into the record?
A. So this actual -- and they're all separated by one second.

Q. Right.
A. This is three different entries telling you that I placed an order for an ultrasound and told the EMR I wanted one. So that's, that just tells you that the order is complete.
Q. I understand. So you mentioned the radiology resident. How many radiologists were involved that evening?
A. I don't recall. Generally, one resident is on call in the evenings.
Q. How many radiologists did you have conversations with?
A. I don't recall.
Q. But you know it was at least the radiology resident?
A. Resident.
Q. And that was Dr. Brian Girard?
A. I don't, I didn't remember who it was I spoke to, but it would have been, again, paged through the Amion system, the on-call radiology resident.
Q. But, based on your review of the records in preparation for the deposition and learning about this case, you would have seen that that was Dr. Brian



Girard --
A. It appeared --
Q. -- as the resident, correct?
A. It appeared that Dr. Girard was on call, yes.
Q. Do you recall working with Dr. Girard generally as a resident?
A. Generally, we wouldn't have crossed paths, unless you were calling for an order or -- you know, the radiology residents had a very different role than pediatric residents. So, if we ordered a, you know, a, an ultrasound on a patient on the floor, it would be completed. They'd come back upstairs. We would occasionally talk to the resident via the phone, but we generally didn't interact.
Q. Okay. So you know it was at least one member of the radiology department that you spoke with that evening?
A. Yes.
Q. And, based on the records, it was likely Dr. Girard, but you don't have a specific recollection?
A. I don't remember specifically.
Q. Did you speak with any of the attending radiologists?



A. I don't recall, but that generally would again be the resident contacting their attending.
Q. The specific specialty's --
A. Yes.
Q. -- resident speaking with their attending?
A. Yes.
Q. Okay. Did you recall seeing any reference in the records, or was there anything in the records that you reviewed that indicated that you spoke with Dr. Yen?
A. No.
Q. Who I will represent to you is, was an attending radiologist.
A. I did not speak with Dr. Yen.
Q. Now, you said that the discharge process can be lengthy. So, obviously, after you get the radiology results, and I'll talk about that in a minute, but you -- I take it it was you -- made the determination that the patient was stable?
A. So, in consult with the urology resident, the ED attending, and myself, the vital signs that we reviewed were stable, and the follow-up plan was agreed upon.
Q. Agreed upon by everybody involved?
A. So the, again, yes. So the ED attending, the



urology resident or fellow.
Q. So, when the ultrasound results come back in, there would have been a discussion with the radiology resident?
A. Yes.
Q. It sounds like, based on what you're saying, there would also have been a discussion, another discussion with the urology resident and then a discussion with your attending, Dr. Yanofsky.
A. Yes.
Q. And, based on all of those discussions, it was a sort of a collaborative or the team's decision that the patient was stable, not in acute distress, and was ready to be discharged?
A. That is correct.
Q. Is that a correct sort of description of the process?
A. Yes.
Q. After that decision is made, walk me through what happens.
A. Yes. So the first thing, so the ER has an additional level of complexity than the same Electronic Medical Record, for example, on the pediatric floor.

In the ER you would need to go to their tracker board and mark them as ready for discharge, which is where these little boxes come up, and they say "stable" or "transferred to ICU", or etc., and then "discharge teaching given", you check that box. "Follow-up review given", "verbalized understanding given". So that is just step one. So that's my clicking the box in the EMR.

Q. Right. And that's reflected on this log?

A. Right. And then, after that happens, any orders for discharge need to be placed. So, if you would like them to get an additional lab after discharge, if they need to be followed up or have a consult, that would be ordered. Say they need a fasting blood sugar next week. That would be ordered as a discharge order to be done after, after discharge. So all of those would be placed as part of that plan.

The next thing that would happen is you would type up discharge instructions. At least most of us would type discharge instructions to be given as a piece of paper to the patient and family. So, as a resident, I would go in, make sure they understood the discharge instructions, talk to them about what the follow-up



was, what orders were placed, and what their next step was, restrictions, of course.

And then, after that, often the ER attending would come in, make sure there was no more questions about discharge, that everybody was happy with the plan for follow-up care, and then the nurse would come in, and the nurse would again go through all the orders for discharge, any medications for discharge, any orders for discharge, and go through their discharge sheet.

Once all of those things were complete and things like, you know, IV removed, you know, changed back into their home clothes, etc., then they would actually leave, physically leave the unit, but the nurses would bring in a set of paperwork that had to be signed acknowledging they had received their discharge instructions.

Q. Okay. So, in this case, let me just back up to that discussion with urology, radiology, and Dr. Yanofsky that we just talked about. Were you informed at all whether the radiology resident, Dr. Girard, spoke with his attending in radiology?

A. I don't recall that as part of our discussion.

Q. And how about the same question for the urology



resident?

A. Yeah. I don't remember that as part of our discussion either.

Q. In this case, there was, part of the discharge instruction or order was a referral to pediatric urology, correct?

A. Yes.

Q. What else -- what were the other discharge orders for Sean Tillotson?

A. So there was no additional labs that were ordered. So, basically, his discharge would have been bed rest, follow-up with urology, you know, and then always as part of my discharge I would put, Return to the ER or call for, dot, dot, dot, so several different cases. Depending on the presenting complaint, they would have different reasons to return to the ER.

Q. And this is in the record here, but if I can, I can point to you, point it to you if you need, but there were, there was also a discussion of symptoms that would prompt immediate reevaluation?

A. Yes.

Q. What were those symptoms for Sean Tillotson?

A. Can I review that?



Q. Yeah. It would be on page, Page 295.

ATTORNEY SHAHI: I have the -- are you talking about the discharge instructions?

ATTORNEY CASOLARO: Yeah. I mean, it's part of the ED note, but it sort follows where it says, "Patient discharged home in stable condition with close urology follow-up as an outpatient", and then right under that it says, "Discuss symptoms that prompt immediate reevaluation".

THE WITNESS: So, yes. So, when I discharge a patient, immediate reevaluation in his case, the number one would be worsening bleeding, and then I generally write it down exactly what I would like them to call for, and I believe I saw that information as part of my after-visit instructions to the patient. But worsening bleeding, for sure, would have been the most important.

BY ATTORNEY CASOLARO:

Q. Yeah. Well, if you look at Page 375, that's actually the discharge instructions.

A. Thank you. Yes. So worsening bleeding, dizziness, new pain, because he had not had any reports of pain, or fainting. So, in that case, signs of

hemodynamic instability, dizziness, fainting from significant blood loss. Now, of course, I would explain that to the family in words they can understand. So dizziness and fainting would be signs of loss of blood volume. But also, you know, significant change in the amount of bleeding he was having would be a sign to be seen more promptly than the urology planned follow-up.
Q. Okay. And part of that, part of the instruction was bed rest. We talked about that.
A. Yes.
Q. The patient was upset about that. The decision for the bed rest restriction was made due to, as referenced in the discharge instructions, ultrasonic evidence of a change in the cyst that might be causing or contributing to the bleeding?
A. In that, from review of the chart, that's what I, I understand. I was under that impression.
Q. And that, that impression or that instruction in the notes or in your discharge instructions resulted from, like you talked about, was the sort of the team communication, the discussions with the radiology resident, possibly the discussions with the urology



resident, the discussions with Dr. Yanofsky, everybody agreed that this was the discharge plan, correct?
A. Yes.
Q. And you don't recall any confusion as to that plan at the time, do you?
A. No, I don't recall that.
Q. And, also the nurse, specifically Nurse Chase Pinkney, was also involved in that collaboration or decision?
A. She would have been made aware to reinforce that as part of the discharge instructions, yes.
Q. Okay. Other than Dr. Yanofsky, the nursing staff, the urology resident, the radiology resident, who else did you speak with or to on the evening of May 1st?
A. I don't recall speaking to anyone else that evening.
Q. Do you recall who else was present or treated Sean Tillotson that evening?
A. No, I do not.
Q. So I want to go back to the ultrasound, the results of the ultrasound. In this timeline it's, you know, roughly 10:57. There's a note from the radiology department that talks about the imaging preliminary



result. Now, you also mentioned that there was a wet read that would have been done by the radiology resident?
A. Yes.
Q. When the result comes back in, what, what does that look like? What are you seeing from radiology?
A. So are you asking what --
Q. Meaning is it, do you see the actual imaging films, do you see a report, do you see a summary, or do you have a conversation with the radiology resident?
A. In, in this case, I don't remember the exact details, but, generally, the, the Electronic Medical Record reports, you can pull the report. So it will give you their typed report that was entered. You have to go into a separate system to look at the imaging. There is often a link between them to pull it up. But this would be just a written report that you can get from the Electronic Medical Record.
Q. So you don't recall seeing the actual imaging in this case?
A. I do not.
Q. Is that commonly something you would have done is to also look at the imaging for a patient like this?



A. Not in the case of an ultrasound. As I mentioned, in my expertise this would not be anything I would be comfortable looking at. It's very difficult to piece together the pictures based on, you know, how they took them, whereas he did the actual study. He can -- and he's trained to look at those images.
Q. Right. So you're relying on his expertise to both inform you about what he saw but also explain his preliminary report to you?
A. Yes.
Q. So and why don't I show you the preliminary report? Because I think you've testified that you you've seen this already, but that would be 27, well, 12 as well, 12 or 27. Here you go.
(Exhibit 12 was shown to the Witness.)
Q. So if you -- yeah. It's sort of in reverse order, so, if you flip to the last page, that is Dr. Girard's preliminary report that he dictated the night of May 1st. Now, is that what you would have seen when the imaging results came back that evening?
A. If I was to bring up the report, yes, this is what I would find on the report of that.
Q. I think it continues, actually, onto the --

A. Sorry.
Q. It starts on that page. And you said, If you would have seen this. Do you have a specific recollection of seeing this report that evening?
A. I don't.
Q. Prior to -- strike that. Do you recall seeing or reviewing any of Sean Tillotson's prior studies that evening?
A. I don't recall specifically, but, again, I would have read the ultrasound reports, not looked at the actual studies.
Q. Would it have been your practice to look at prior reports?
A. Especially in light of the mother informing me of a history, if it was available in our system, often we would look at the report.
Q. And you can't recall whether or not you did that in this case?
A. I don't remember specifically.
Q. Based on your review of the records and the PACS audit trail that you mentioned you looked at as well as the electronic audit trail, did any of your review of those records indicate to you that you did look at



prior studies or reports?
A. Right. So I, as part of my, as part of my ER note, I did have the read from the, the most recent prior report. I do not recall looking at the ultrasounds before that date.
Q. And you're, when you say your note --
A. Yes.
Q. -- you're talking about -- and it's actually on that document, page, Page 294.
(Indicating Exhibit 24.)
A. I recall quoting.
Q. Yeah, it's on Page 294 --
A. Yes.
Q. -- that first paragraph, "Per the last ultrasound report", and then there's the quote: "Left renal mass, most consistent with calcial diverticulum containing calcification versus complex cyst with wall calcification, unchanged from previous ultrasound and not significantly changed dating back to 2005".
So you're quoting that in your note?
A. Yes.
Q. And that suggests to you that you would have reviewed that most recent study --



A. The most recent study --
Q. -- report?
A. -- or the most recent urology note with the study in it.
Q. But it says, "Per the last ultrasound report".
A. Right.
Q. So that most likely would have been an actual --
A. Most likely.
Q. -- radiology prepared ultrasound report --
A. Yes.
Q. -- as opposed to a urologist's review of that report?
A. Right.
Q. Now, you get this preliminary report from or you get -- you think you may have seen the preliminary report from Dr. Girard in writing?
A. I don't recall looking at the report prior. I, in this case, especially with an ultrasound I was waiting on, most likely would have paged him for his preliminary verbal report. Again, that's where I often would call it a wet read. Because we're speaking, and I am quoting what he's saying.
Q. And, in this case, you don't have a specific



recollection of talking to Dr. Gerard, but based on your review of the records, it indicates to you that that did happen here?
A. Right.
Q. There was a wet read, that Dr. Girard communicated that to you?
A. Right. So and I would again have said who I spoke to, so, Wet read per radiology resident. I don't know which radiology resident, but, based on who was on call, Dr. Girard. What I heard and what I documented was a change in the appearance of the complex left renal cyst.
Q. Correct. And you're looking at Page 295 of your note?
A. Yes, I am.
Q. So you're quoting, basically, you're quoting the conversation, and that makes its way into the note?
A. Yes.
Q. So your understanding at that time was that Dr. Girard was representing to you that there was a change in the appearance of the complex left cyst?
A. Yes.
Q. That's an actual quote from what he would have

said to you?
A. That's what I believe I heard him say, yes.
Q. Okay. Now, when you have that conversation -- or let me step back for a second.
Do you remember anything else from the conversation you had with Dr. Girard?
A. I don't remember the details, no.
Q. I know you don't remember the details, but do you remember anything else from that conversation? Anything stand out to you?
A. No, sir.
Q. After you have your conversation with Dr. Girard, did you discuss what he had told you with Dr. Yanofsky?
A. That generally would have been my next course of action.
Q. And you likely would have also discussed it with the urology resident?
A. I believe so. I don't recall.
Q. Did you learn at some point that Dr. Girard actually had, after he completed the initial study, he went back in, took issue with his initial measurements of the left kidney as well as the cyst, and made a remeasurement of the left kidney and the cyst after the



study was performed?
A. I was unaware of that at the time of my note.
Q. You were unaware of that at the time, but were you, have you since learned that that was the case?
ATTORNEY SHAHI: Again, other than conversations with Counsel.
THE WITNESS: No, not other than conversations with Counsel.
BY ATTORNEY CASOLARO:
Q. I don't want to -- I'm not interested in your discussions with Counsel, but are you aware that, now, that there was a remeasurement of the left kidney and the cyst?
ATTORNEY SHAHI: Again, other than any conversations we've had, you can testify as to what you've seen in any of the medical records you looked at, but other than our conversations.
ATTORNEY CASOLARO: Well, I'm not asking for what he told you. I'm just asking, Are you presently aware that there was a remeasurement of the left kidney as well as the cyst?
ATTORNEY SHAHI: Well, again, I think you are if, if the source of information is conversation with



Counsel. So you can answer, but other than conversations with me.
THE WITNESS: So in the --
ATTORNEY CASOLARO: Well, I, well, it's, obviously, note my disagreement with that position. I mean, I'm asking her what her current knowledge is. I don't care if it came from you or anybody else. I don't think it matters, but I'm just asking, Are you presently aware?
ATTORNEY SHAHI: Again, you can answer the question but other than information, any information that came from Counsel.
BY ATTORNEY CASOLARO:
Q. So Dr. Girard was deposed in this case, and, during his deposition, I'll represent to you that he, he testified that he did go back and remeasure both the left kidney and the so-called cyst in the left kidney. Is that consistent with your understanding of what happened?
ATTORNEY SHAHI: Okay. Again, other than any understanding based on conversations with Counsel, you can answer.
THE WITNESS: So this is a very confusing



question.
ATTORNEY SHAHI: Yeah.
THE WITNESS: So I've reviewed the results, and in the results he puts a measurement of 11.9, and that is all the information I would have had, and, in my conversation with the radiology resident, that measurement itself would almost -- I'm not sure he would communicate it to me because that doesn't mean a lot to me as far as radiologic terms. So, as far as my involvement in the care, the exact measurement would not have changed my understanding or plan.
BY ATTORNEY CASOLARO:
Q. I understand it might not have changed your understanding or plan, but it's your testimony that you don't recall him specifically communicating that fact to you at the time?
A. No, he did not.
Q. And you've only since learned about that subsequently?
ATTORNEY SHAHI: Okay. Again, only if you have learned -- and the question, I think, is, what, referring to the remeasurement? So, again, if you've learned of that through any conversations with Counsel,

you're not to respond to the question, but, if you've learned it from any of the records you've reviewed, you can.

THE WITNESS: So there was no -- I didn't find it anywhere in the records that there was a remeasurement. That was not documented.

ATTORNEY FELMLY: So let me just interrupt for just a second so we're clear on where we are going from here. You're instructing her not to answer based on the fact that, if she has to draw on facts you may have provided her, she is not to respond; is that right?

ATTORNEY SHAHI: Any information that --

ATTORNEY FELMLY: I just want to tee it up properly for the court.

ATTORNEY SHAHI: Yeah, any information that I've provided her would be attorney-client, so --

ATTORNEY FELMLY: Not when you provide factual information.

ATTORNEY SHAHI: I disagree.

ATTORNEY FELMLY: Well, that's the issue we're going to have. I just want to be clear on it, but we can go on.



ATTORNEY SHAHI: If she has looked at a document, she can answer, but, if it's based on conversation with Counsel, I don't see how you distinguish between the contents, but, anyways, fine.

BY ATTORNEY CASOLARO:

Q. And there's nothing in the records indicating there was a remeasurement?

A. No, there were not.

Q. In looking at the preliminary report, you'll agree there's no reference in there to changes to the so-called cyst, correct?

A. Right. And he's calling it an echogenic focus, and, specifically, the measurement of 11 millimeters is unchanged.

Q. Right. So it actually says in there it's unchanged as opposed to there was a change. So you're not getting the information that you put in your discharge instructions and your notes about a change in the cyst from the preliminary written report?

A. No.

Q. You're getting that from what Dr. Girard verbalized to you on the phone?

A. Of what I understood that he verbalized to me,



yes.

Q. Based on your discussion with Dr. Girard that evening and also your review of his preliminary, dictated preliminary report, there was nothing indicating to you that additional imaging was necessary for this patient?

A. That was not communicated to me from him, and that's not recommended in the preliminary report.

Q. So is that something you would have determined -- whether, whether it's the need for more imaging or other sort of follow-up care, radiologic care, that's something that you would have been relying on him to tell you as the radiology resident?

A. Actually, in this situation I would have been relying on the specialist to review the radiologist's finding and often the actual study themselves and make that determination.

Q. And, by specialist, you're referring to the urology resident?

A. The pediatric urologist in this case, so the attending. Often, I should clarify that often the urology resident on call was not pediatric trained. They would have some training, but they weren't



specialized in pediatric urology, hence why that referral after the fact would go to the most specialized.

Q. Okay. So I think if -- I think what I'm understanding what you're saying is, at that time -- so you would have been relying on the urology specialist during the follow-up appointment to make that determination if further imaging or other studies were necessary?

A. Unless the urology resident felt that that was necessary urgently, yes.

Q. And, in this case, there's nothing indicating to you that the urology resident felt that that was necessary on an urgent basis that evening?

A. Right.

Q. And, essentially, when you get the report from radiology, you get the written notes or the written dictation of the preliminary report, you're relying on the conclusions both presented to you on the phone and in that report? You're not drawing your own conclusions about this patient?

A. No, I would not read the study myself. I would rely on their expertise.

Q. So, in the context of the, your review of the ultrasonic examination with Dr. Girard, that is an example of the collaborative sort of team approach that you discussed earlier today?
A. Yes.
Q. And he would describe to you -- you place the order, you get the results back, you wait for the results, you speak with him, and he describes to you his impressions, correct?
A. Generally, yes.
Q. And it's, it's your job to receive that data and also reflect it in the records and convey it to the patient accurately, correct?
A. Yes.
Q. And it's your practice, or at least at that time it seems like it was your practice to place in your notes quotes, actual quotes from what the specialists or the radiologists would say to you?
A. Yes, or paraphrase in this case as I didn't put it in quotation marks.
Q. But it was based on what he was conveying to you?
A. Verbally, yes.
Q. And you would have, as part of the process, part



of the discharge process, conveyed your instructions to the patient to the nurse who ultimately would present the discharge instructions to sign with the patient?
A. Yes.
Q. And that's all part of the process --
A. That's part of the process.
Q. -- of communicating? Okay. And, based on all of that, the plan was bed rest, discharge or discharge with bed rest over the weekend with an ASAP follow-up appointment with urology?
A. Yes.
Q. And I'm sorry. I think that we've talked about this a little bit, but, as part of that communication and conveyance to the patient during discharge, Dr. Yanofsky, as the attending, would have been part of that as well?
A. Generally, yes.
Q. And I just want to understand something. I'm sorry if I'm jumping around. I just want to understand something about your communication with the urology resident who I've represented to you is Dr. Moses.
Is it your testimony that you would not have spoken with Dr. Moses after receiving the radiology



report?
A. I don't recall, but, often, we would discuss, before final discharge, the plans based on all the labs and imaging that had been obtained.
Q. So it's something that likely would have happened, but you don't have a specific recollection of it?
A. Right. I would be likely to speak with them.
Q. I just want to turn quickly to the notes for a second. This is Page 293 of that big packet. Starts on Page 293, but you can scroll through to Page 296, Dr. Shepard.
A. Yes.
Q. There's a, what looks like a signature line from you at the top of that page dated May 2nd 2014 at 3:14 p.m.
A. Yes.
Q. So the next day after the patient was discharged, you would have gone back into the notes, to the record, to review them and to sign them; is that how that process worked?
A. So, generally, as I mentioned, because we did not have computer systems in the room with us, we would often take written notes and then complete the



electronic chart. It had to be completed within 24 hours of the visit.
Q. Okay. So this process of or this, this line here where you're putting the date of 5/2 and the time stamp, that's you completing that process of putting this into the electronic record?
A. Yes. The electronic record time stamps when that was signed.
Q. Now, are you actually physically in the hospital that next day completing this process?
A. For the ER notes, yes.
Q. For the ER notes --
A. Yes.
Q. -- you said yes? Okay. And, as part of your call it a final review and transcription of these notes into the actual electronic record, are you reviewing anything else as part of the patient's record that day, the next day?
A. Generally, I use, and to be the most accurate you should use the information you had at the time of the patient encounter and the, you know, discharge. So I would have used the written notes that I had. Generally, anything else that would be reviewed is

because the EMR makes you check through each section. So you have to check allergies, check medicines, check social history, check --

And so that's just part of the actual note. It requires you to do each one of those sections, not necessarily having to reopen the past, but that is part of the actual document. So, generally, no, I would not go back and look for any additional information or additional results because those were not the data I had at the time of the encounter.

Q. Right. So and, for example, something like the final ultrasound report that was prepared by the attending radiologist the next day, that's not something you would have looked at as you're finalizing and preparing your notes from the night before?

A. Even if I had reviewed that, that would not become part of that record because that information was not accurate at the time that I didn't have that information.

Q. You didn't have it, right?

A. Yes.

Q. Did you, other than in preparation for your deposition, did you, at some point, look at the final



report?

A. I don't recall looking at it.

Q. At that time?

A. At that time.

Q. So the only time you have, you specifically recall looking at the final report is in preparation for your deposition and part of your involvement in this case?

A. That's correct.

Q. So you were not aware at the time that Dr. Yen was indicating in her final report that a CT may be helpful for further evaluation?

A. No, sir.

Q. That's not something you would have been aware of on May 2nd?

A. That's not -- I don't believe that I had that information. I don't recall looking at that report.

Q. If you had that information on May 2nd at the time you were finalizing your notes from the night before, would that have changed any of the follow-up care or the course of treatment that you recommended for this patient?

A. No, sir. Because he would have been, as part of my discharge plan, speaking directly to urology that



day -- so that's the 2nd -- for a scheduled follow-up. This information would have been reviewed by the specialist to determine what would be next.

Q. Okay. And by the specialist you mean both radiology and urology?

A. Generally, in this case, it would have been the pediatric urologist because he would have the expertise to actually look at the ultrasound himself and determine if he concurred with radiologist's finding.

Q. I see. Did you speak with anybody the next day, on May 2nd?

A. In regards to this case?

Q. In regards to this case.

A. I don't recall.

Q. Would you, would it be part of your practice to talk to Dr. Yanofsky as the attending as you're completing the note and signing the note --

A. No.

Q. -- for the night before?

A. No. And, depending on the schedule, he may not even have been working that following day.

Q. So you think you were working in the hospital that following day and you would have done this in the



actual hospital in the emergency room?

A. Generally, that was my practice, yes.

Q. Okay. Did you speak with Dr. Yen the next day?

A. I don't recall ever speaking with Dr. Yen.

Q. Is there anything in the records that you have reviewed, any of them, in preparation for today that indicate or suggest to you that you would have spoken to anybody on May 2nd about Sean Tillotson, whether it's Dr. Yanofsky, Dr. Yen, Dr. Girard, anyone else in radiology? There's, I'll represent to you there were two other radiology residents or fellows, John Towle and Justin Lewis. Did you speak to either of them?

A. I don't recall talking to anyone else.

Q. Okay. I know you don't recall, but what I'm asking is, Is there anything in the records that you have reviewed today or in preparation for today or as part of this case that suggest to you or indicate to you that you did speak with anybody that day?

A. No, sir.

Q. I want to go back for a second, Dr. Shepard, to the, first, your note, your ED note there on Page 295. We've talked about this where it says under imaging there was a wet read, the radiology resident, and these

Page 89

are your notes, correct?
A. Yes.
Q. This is something you wrote?
A. This is.
Q. The ED, the radiology resident in this, what you described as a paraphrase here is communicating to you by phone that, "There was a change in appearance of the complex left renal cyst, comma, no significant interval change in size". You see that, correct?
A. Yes, I do.
Q. And then in the discharge instruction that we've talked about that you also prepared which is on Page 375 --
A. Yes.
Q. -- and it says there in the second sentence, "Renal ultrasound showed a change in the left renal cyst which may be contributing to the bleeding". Those are also your notes, correct?
A. Yes.
Q. Now, both of these findings are obviously important enough that they, they are made part of this patient's record and reflected in the notes and the discharge instructions. They're important enough a

Page 90

finding to make their way into those records, correct?
A. Yes.
Q. Okay. And this is -- and these are the types of findings, you would agree, that would require some type of follow-up care with the patient?
A. Yes, and that was what was recommended and order for referral was placed.
Q. So and let me just take a step back for a second. The finding in the discharge instructions where it says, "Renal ultrasound showed a change in the left cyst, renal cyst, which may be contributing to the bleeding", that goes a little bit further than the wet read from the radiologist, correct, in that it's, it is saying that this change may be contributing to the bleeding?
A. Yes. That was my interpretation.
Q. And was that your interpretation based on conversations with urology or the urology resident?
A. I don't remember the details of speaking with her.
Q. Would that have been something you would have discussed with the urologist or the specialist, as you described them?
A. I would have discussed with her his presenting

Page 91

signs, his history, and could this be a, could there be some sort of relationship between the two?
Q. So you're saying it's, it's possible that your communication with Dr. Moses could have led to this conclusion that the change in the cyst was maybe contributing to the bleeding, but what you're saying is that you think that that was your interpretation or your conclusion?
A. Yes. Based on the information that I had, that was the conclusion I made.
Q. And why was that your conclusion?
A. So, based on the information I had, he had bleeding. He had what I had heard was a change, and, to me, if you have two things going on from a similar system, they may be related. But that's also why I wrote, "May be contributing", because it just as well may not have been as you can see in more detail in my assessment and plan. It is generally my practice to tell the family the things I am most concerned about, especially those that I believe will warrant follow-up so that children won't be lost to follow-up.
So, in this case, the most concerning thing would be that this cyst was causing some bleeding, versus

Page 92

overexertion which would be more common in any other 17-year-old. But in my, you know, preparation for sending him home, I wanted them to know what the most concerning things were and the reasons they needed to be seen even more urgently than an ASAP referral.
Q. And your -- so you would have expected that this finding of the change in the cyst as well as the finding or conclusion or impression that it might be contributing to the bleeding is something that would have been discussed during the follow-up appointment with urology?
A. Would have been addressed, yes.
Q. It was important enough that it should have been or would have been?
A. That was, that was my belief, but not being the, the specialist, that's why I reached out to all of the specialists in the case.
Q. And let me just clarify something. You said you recommended the follow-up with urology faster than ASAP. I'm not sure what that is.
A. Oh, no. So, if they had worsening bleeding or he had signs of instability, he should come back to the ER rather than waiting for that appointment, right,

because ASAP may be two days, and it may be five, or it may be seven, but these are the things I would say, In the meantime, please don't wait. Come back.
ATTORNEY CASOLARO: Okay. I'm just about done. I'm going to take a look at my notes, and why don't we take a short break if that's okay?
(A recess was taken from 11:09 a.m. to 11:12 a.m.)
BY ATTORNEY CASOLARO:
Q. So, Dr. Shepard, after Sean's visit to the ER on May 1st and you went back and finalized your notes the next day, did you have any further discussions or communications with any providers at Dartmouth-Hitchcock about Sean Tillotson specifically?
A. Not that I recall.
Q. Okay. Sean was seen, obviously, for the follow-up appointment with urology on May 9th. Are you aware of that?
A. I wasn't aware of the specifics.
Q. Okay. Did you speak with anyone in urology, any of the pediatric urologists, prior to that appointment?
A. No.
Q. Did they try to contact you?
A. Not that I'm aware, no.



Q. When did you learn that Sean Tillotson had passed away?
A. Not until discussions with Counsel.
Q. Okay. So you didn't, you did not become aware of it at the time --
A. No, sir.
Q. -- on June 30th 2014?
A. No.
Q. Okay. Are you aware of the cause of Sean Tillotson's death?
A. Again, only --
ATTORNEY SHAHI: Yeah.
THE WITNESS: -- only through our discussions.
BY ATTORNEY CASOLARO:
Q. Why don't we just mark this just to have it? Yeah, it's 14, yeah.
(Exhibit 14 was shown to the Witness.)
And this is an exhibit previously marked Exhibit 14 from Dr. Yen's deposition. Dr. Shepard, I'll represent to you this is Sean Tillotson's autopsy report. Have you seen this document before?
A. No, I have not.



Q. So you'll see that, as part of the report, the cause of death was a pulmonary thromboembolism type event and that Sean Tillotson was, had a large 21-by-11 centimeter tumor, malignant tumor, in the left kidney and that tumor particles broke off from that tumor and traveled to his heart which caused the embolic type event and led to his death. Were you aware of that?
ATTORNEY SHAHI: Other than discussions --
THE WITNESS: Other than -- yeah. No.
BY ATTORNEY CASOLARO:
Q. So you didn't learn of the cause of death except from your conversations with Counsel?
ATTORNEY SHAHI: Again, you're not to disclose our conversations, yeah.
THE WITNESS: Right, right.
BY ATTORNEY CASOLARO:
Q. But my question is, Aside from your conversations with Counsel, you didn't learn of his death, the cause of his death, from some independent source, other source?
A. No. I was unaware he had passed away.
Q. Okay. Were you aware that there was a mortality and morbidity review for Sean Tillotson?



A. I was not.
Q. Were you consulted or contacted to participate in such a review?
A. No.
Q. Okay. Have you had any conversations with a Dr. Adam Weinstein of Dartmouth-Hitchcock about this case?
A. About this case, no.
Q. Have you had any conversations with a Dr. Steven Sargent of Dartmouth-Hitchcock about this case --
A. I'm not.
Q. -- Sean Tillotson? Okay. After you had learned that Sean had passed away, did you go back into his medical records at all?
A. No. I just learned it through Counsel, and I don't have access.
ATTORNEY SHAHI: Oh, yeah. So, anyways, again, no disclosure of what you've learned through Counsel.
THE WITNESS: Okay.
BY ATTORNEY CASOLARO:
Q. And I realize that you learned after you had left Dartmouth-Hitchcock.

Page 97

A. Yes.
Q. So you wouldn't have had access to the records?
A. I would not have had access to these records.
ATTORNEY CASOLARO: I have nothing further. Thank you again for your time, and safe travels home, everybody.
ATTORNEY SHAHI: Thank you as well. No questions.

(Whereupon at 11:17 a.m. the deposition was adjourned.)

* * * * *

Page 98

I have carefully read the foregoing transcript of my deposition given on Tuesday, March 14, 2017, and the answers made by me are true and correct.

-------------------------
MICHELLE SHEPARD, MD, PhD

STATE OF ________________________
_________________________________ SS.

At _________________________________, in said County, this ___________ day of __________________________, 2017, personally appeared before me the above-named MICHELLE SHEPARD, MD, PhD and made oath that the foregoing answers subscribed by her are true.

------------------------------
Notary Public

My Commission expires:

--------------------

Page 99

CERTIFICATE

I, Sunnie Donath, Registered Professional Reporter and Licensed Court Reporter, duly authorized to practice Shorthand Court Reporting in the State of New Hampshire, hereby certify that the foregoing pages, numbered 1 through 99, are a true and accurate transcription of my stenographic notes of the deposition of MICHELLE SHEPARD, MD, PhD, who was first duly sworn by me on Tuesday, March 14, 2017 for use in the matter indicated on the title sheet, as to which a transcript was duly ordered;

I further certify that I am neither attorney nor counsel for, nor related to or employed by any of the parties to the action in which this transcript was produced, and further that I am not a relative or employee of any attorney or counsel employed in this case, nor am I financially interested in this action.

Dated at Westminster, Vermont this 20th day of March, 2017.

Sunnie Donath, RPR, LCR

**A**

**able** 27:13
**above-named** 98:15
**Absolutely** 16:11 54:6
**academic** 8:15
**Academy** 9:1
**access** 18:13 96:16 97:2,3
**accession** 18:15 24:8,9,12
**accommodation** 29:8
**accurate** 10:2,21 19:16 26:6 39:3 84:19 85:18 99:6
**accurately** 45:7 81:13
**acknowledges** 38:11
**acknowledging** 62:15
**action** 1:3 73:15 99:14,18
**actions** 11:10
**active** 39:10 45:20
**actual** 17:10 36:16 48:22 51:11 53:22 54:2 56:9,22 67:8,19 68:5 69:11 71:7 72:23 79:16 81:17 84:16 85:4,7 88:1
**acute** 34:7 60:13
**Adam** 96:6
**additional** 35:7 60:22 61:12 63:10 79:5 85:8,9
**address** 5:23
**addressed** 92:12
**adjourned** 97:10
**Administratrix** 1:5
**admission** 34:11 34:11,15
**adults** 39:23
**affiliations** 10:7
**after-visit** 28:11 64:15
**age** 14:15 39:3,8 40:18
**agree** 78:9 90:4
**agreeable** 5:18
**agreed** 4:3,10,14 44:23 45:13 59:21,22 66:2
**agreement** 15:9
**Aicher** 2:6
**allergies** 14:18 15:6 33:18 41:17 85:2
**allow** 45:7
**allowance** 29:7
**alternating** 32:9
**American** 8:11 9:1,2 10:3
**Amion** 48:1,13 57:19
**amount** 65:6
**amoxicillin** 15:6 15:7
**anesthesia** 39:18
**answer** 6:14 7:5 21:20 75:1,10 75:22 77:9 78:2
**answered** 20:11
**answers** 3:9 6:11 21:15 98:3,17
**anybody** 17:12 32:1 75:7 87:10 88:8,18
**anymore** 18:13
**anyways** 78:4 96:17
**apologize** 25:17
**appearance** 72:11,21 89:7
**appeared** 58:2,4 98:15
**appears** 36:10 36:15
**appointment** 80:7 82:10 92:10,23 93:16 93:20
**appointments** 8:15
**appreciate** 5:7
**approach** 16:10 33:10 81:3
**approaches** 16:20
**appropriate** 15:9 39:8 45:10
**approve** 35:5
**arranged** 23:15
**arrived** 56:6
**ASAP** 82:9 92:5 92:20 93:1
**Aside** 95:17
**asked** 21:15 23:4
**asking** 21:2,18 52:6 67:7 74:18,19 75:6 75:8 88:15
**assessed** 34:9 56:10
**assessment** 35:11,13 37:12 37:12 42:7 91:18
**assigned** 35:2 38:20 39:2,14 40:5 41:4
**associate** 7:17 8:20
**associated** 37:14 49:6
**association** 2:2 8:22 9:2 10:4
**assume** 41:1
**attending** 14:20 15:2,5,18 19:23 31:8 32:18,21 33:1 33:22 35:2 42:7 49:17,19 55:17 58:22 59:2,5,11,20 59:23 60:9 62:3,21 79:21 82:15 85:13 87:16
**attendings** 14:16 15:14,15,15,19 15:23 16:15 30:2 32:19,23 33:7 50:22
**attorney** 3:20 5:1,13,14,19 5:20 9:19,21 11:12,15 17:3 21:2,5,6,17,22 23:6,9,20 35:20,22 36:1 47:2,4,6,8,10 47:12,13 64:2 64:4,18 74:5,9 74:14,18,22 75:4,10,13,20 76:2,12,20 77:7,13,14,16 77:18,20,21 78:1,5 93:4,8 94:12,15 95:8 95:10,13,16 96:17,21 97:4 97:7 99:13,16
**attorneys** 18:12
**attorney-client** 77:17
**Atty** 3:4
**audible** 6:11
**audit** 69:21,22
**August** 12:21
**authorized** 99:3
**autopsy** 3:12 94:21
**auto-generated** 36:13 37:8
**availability** 25:18 39:2
**available** 32:21 33:2 39:21 48:16 49:4 51:1 52:16 53:3 69:15
**awaiting** 53:15
**award** 9:11,12 9:13
**awards** 9:8
**aware** 31:18 32:2,3 66:10 74:11,20 75:9 86:9,13 93:16 93:18,23 94:4 94:9 95:7,22
**A-M-I-O-N** 48:5
**a.m** 1:13 32:11 93:7,7 97:10

**B**

**bachelor** 7:14
**back** 11:16 12:19 15:11 26:3 37:15,19 38:19 43:15,16 46:4 51:10,19 53:6,14 54:12 58:12 60:2 62:11,17 66:20 67:5 68:20 70:19 73:4,21 75:16 81:7 83:18 85:8 88:20 90:8 92:22 93:3,10 96:13
**based** 9:11 32:14 39:2 43:11,19,21 45:2,11 47:14 54:22 57:21 58:19 60:6,11 68:4 69:20 72:1,9 75:21 77:9 78:2 79:2 81:21 82:7 83:3 90:17 91:9,12
**basic** 14:9
**basically** 9:11 18:16 35:5 36:11 45:20 63:11 72:16

**basis** 80:14
**Bates** 28:18
**bathroom** 53:12
**bed** 26:21 27:1,6 27:20 29:17,18 29:23 30:11,11 63:11 65:10,13 82:8,9
**beginning** 13:6 13:11 56:1
**behalf** 1:12 2:4 2:8
**belief** 92:15
**believe** 12:3 20:1 23:11 27:11 35:9 40:8,11 41:23 47:9 64:14 73:2,18 86:15 91:20
**Bethanne** 1:4,5 5:9
**better** 28:7 35:18 40:19 46:7
**big** 83:9
**bigger** 28:15
**bio** 3:15 9:23
**bit** 18:6 20:4 28:3,15 38:17 40:22 53:4 82:13 90:12
**bleeding** 45:20 45:21 64:12,16 64:21 65:6,16 89:17 90:12,15 91:6,13,23 92:9,21
**blood** 31:14 33:12 61:14 65:2,5
**board** 3:16 8:9 8:11,21 10:17 38:22 39:1,13 39:20 61:1
**boards** 11:11
**board-certified** 8:10
**bottom** 28:17
40:5 54:23 55:4
**box** 2:3,7 61:5,7
**boxes** 61:3
**boy** 31:12
**Bradford** 27:18
**break** 7:1,5 93:6
**Brian** 57:17,23
**brief** 41:16 42:6 50:10
**bring** 62:14 68:21
**brings** 44:9
**broke** 95:5
**brought** 35:22
**Bruce** 2:2 5:8
**button** 56:1
**buttons** 37:20

**C**

**C** 1:4,5 2:1 99:1 99:1
**calcial** 70:16
**calcification** 70:17,18
**calendar** 13:10
**call** 20:14 28:6 28:10 42:22 44:1 49:15,19 51:3 52:10,13 53:2 57:10 58:4 63:14 64:14 71:21 72:10 79:22 84:14
**called** 9:14 20:8 28:18 40:14 48:1
**calling** 58:8 78:12
**canceled** 36:14
**cancelled** 38:6
**caption** 4:7 5:15
**care** 9:12 16:12 16:21 18:9 27:19 31:21 34:15 35:4,4 39:6 44:18 62:6 75:7
76:10 79:11,11 86:19 90:5
**carefully** 98:1
**case** 12:13,13 17:11 19:15 20:13 22:8 23:16 32:22 33:2 39:5,12 40:21 41:13,18 42:9 44:10 45:3 51:4 52:4 52:18,20 55:14 57:23 62:17 63:4 64:11,23 67:11,20 68:1 69:18 71:18,23 74:4 75:14 79:20 80:12 81:19 86:7 87:6,12,13 88:17 91:22 92:17 96:7,8 96:10 99:17
**cases** 63:14
**Casolaro** 2:2 3:4 3:20 5:1,7,14 5:20 9:21 11:15 21:6,22 23:9 35:20 36:1 47:4,10 47:13 64:4,18 74:9,18 75:4 75:13 76:12 78:5 93:4,8 94:15 95:10,16 96:21 97:4
**catch** 53:10
**cause** 45:21 94:9 95:2,11,18
**caused** 95:6
**causing** 65:15 91:23
**Center** 1:8,13 5:10
**centimeter** 95:4
**certainly** 34:21
**certifications** 8:9,22
**certify** 99:5,12
**change** 65:6,15 72:11,21 78:16 78:18 89:7,9 89:16 90:10,14 91:5,13 92:7
**changed** 36:19 38:11 62:11 70:19 76:11,13 86:19
**changes** 24:18 37:9 38:5 45:23 78:10
**chart** 17:6,8 18:6 24:18 46:23 65:17 84:1
**Chase** 37:11 66:7
**check** 54:17 61:5 85:1,2,2,2 85:3
**chief** 33:16 40:1 41:14
**child** 15:5 39:22 41:12
**children** 14:15 29:16 39:21 91:21
**Civil** 1:3
**clarify** 6:20 79:21 92:18
**class** 12:1,2,7,7
**clean** 53:10
**clear** 35:10 77:8 77:22
**cleared** 27:13
**Cleary** 2:6
**click** 37:19
**clicking** 56:1 61:7
**Clinic** 9:13
**clinical** 8:20 13:2
**close** 64:6
**clothes** 62:12
**collaboration** 66:8
**collaborative** 16:10 33:10
60:12 81:3
**colleagues** 17:16
**collect** 14:17 35:9 36:18
**collected** 33:15 33:20 50:3
**collects** 38:12
**College** 7:18
**come** 14:19,23 34:6 38:19 39:12 40:8,13 53:5,13 58:12 60:2 61:3 62:4 62:6 92:22 93:3
**comes** 15:4 38:22 40:23 53:14 54:12 55:2,4 67:5
**comfortable** 53:18 68:3
**coming** 5:3 31:2
**comma** 37:2 89:8
**Commission** 98:20
**common** 92:1
**commonly** 67:22
**communicate** 76:8
**communicated** 51:18 72:5 79:7
**communicating** 16:16 29:19 76:15 82:7 89:6
**communication** 29:17 47:22 52:7 56:18 65:22 82:13,20 91:4
**communicatio...** 93:12
**community** 11:2
**compare** 45:18
**compared** 46:1
**comparison** 45:7,19

**competent** 4:6
**complaining** 31:13 33:12
**complaint** 33:16 40:1 41:14 63:15
**complete** 12:18 56:15 57:5 62:10 83:23
**completed** 7:19 7:21 13:15 14:5 50:21 56:20 58:12 73:20 84:1
**completely** 34:7
**completing** 12:21 84:5,10 87:17
**completion** 8:8
**complex** 70:17 72:11,21 89:8
**complexity** 60:22
**complicated** 36:10
**complies** 22:20
**computer** 24:22 24:23 37:15,18 48:14 55:12 83:22
**computers** 48:17
**concerned** 91:19
**concerning** 91:22 92:4
**conclusion** 91:5 91:8,10,11 92:8
**conclusions** 80:19,21
**concurred** 87:9
**condition** 34:3 55:5 64:6
**conditions** 15:12
**confirm** 26:9 27:2 35:5 47:19 49:12
**confirmed** 43:20
**confused** 51:22
**confusing** 75:23
**confusion** 66:4
**conjunction** 20:3
**considering** 51:7
**consistent** 70:16 75:18
**consult** 42:17 43:13 44:8 59:19 61:13
**consulted** 96:2
**contact** 93:22
**contacted** 25:15 25:16 43:20 96:2
**contacting** 59:2
**containing** 70:16
**content** 44:5
**contents** 78:4
**contest** 7:1
**context** 81:1
**continually** 54:17
**continues** 68:23
**Continuity** 9:13
**contributing** 65:16 89:17 90:11,14 91:6 91:16 92:9
**conversation** 21:18,20 43:7 44:5 46:5 49:20 50:1 52:7 67:10 72:17 73:3,6,9 73:12 74:23 76:6 78:3
**conversations** 17:4 23:7 53:5 57:11 74:6,8 74:15,17 75:2 75:21 76:23 90:18 95:12,14 95:17 96:5,9
**convey** 81:12
**conveyance** 82:14
**conveyed** 82:1
**conveying** 81:21
**cooperation** 14:16
**copies** 20:17
**copy** 35:20
**correct** 9:23 10:22 27:17 42:15,18 51:21 56:18 58:3 60:15,16 63:6 66:2 72:13 78:11 81:9,13 86:8 89:1,9,18 90:1,13 98:4
**corroborate** 35:13
**counsel** 4:12,15 19:3,13 22:3 23:14 25:4 74:6,8,11 75:1 75:12,21 76:23 78:3 94:3 95:12,18 96:15 96:19 99:13,16
**County** 98:13
**couple** 6:9 47:10 53:21
**course** 15:7 62:2 65:2 73:14 86:20
**court** 1:1,14 4:9 6:7 77:15 99:3 99:4
**cousin** 17:22
**covering** 48:3
**co-colleagues** 30:2
**crossed** 58:7
**CT** 86:10
**current** 8:7 17:16 75:6
**currently** 6:3 8:17 10:12 11:6
**cut** 15:3 50:12
**cyst** 31:16,17 41:19 45:6,21 45:22 46:1,2 50:11 65:15 70:17 72:12,21 73:22,23 74:13 74:21 75:17 78:11,19 89:8 89:17 90:11,11 91:5,23 92:7

**D**

**Dartmouth** 8:19 11:1,17 24:13
**Dartmouth-Hi...** 1:8,12 5:10 7:23 17:14 22:4 93:13 96:6,10,23
**data** 33:20 49:9 50:3 81:11 85:9
**date** 38:14 70:5 84:4
**dated** 83:14 99:19
**dating** 70:19
**day** 32:11 50:17 51:7 83:17 84:10,17,18 85:13 87:1,10 87:21,23 88:3 88:18 93:11 98:13 99:20
**days** 5:17 93:1
**daytime** 52:12
**death** 94:10 95:2 95:7,11,18,19
**decision** 60:12 60:19 65:12 66:9
**Defendant** 1:8 2:8
**definitely** 16:4 27:12
**degree** 7:13,15 7:17,21
**department** 3:14 13:1,3,15 14:5,11 24:3 32:18 33:6,10 34:1 35:17 36:9 40:7 48:21 58:16 66:23
**departure** 55:5
**depending** 43:14 63:15 87:20
**depends** 50:17
**deponent** 4:12
**deposed** 6:5 75:14
**deposition** 1:12 3:13 4:3,11 10:15 17:5,23 18:21 19:10 20:20 22:14 28:16 36:4 38:21 57:22 75:15 85:23 86:7 94:20 97:10 98:2 99:8
**depositions** 4:6 9:17
**describe** 36:8 43:22 81:6
**described** 16:9 36:6 51:20 89:6 90:22
**describes** 81:8
**description** 60:16
**desktop** 48:17
**detail** 91:17
**details** 18:3 28:2 44:7 45:2 52:21 67:12 73:7,8 90:19
**determination** 43:18 55:8 59:17 79:17 80:8
**determine** 34:2 87:3,9
**determined** 34:10 40:19 48:11 79:9
**determining** 34:14
**developed** 43:8

**developing** 34:5
**development** 54:19
**DHMC** 2:10
**dictated** 68:18 79:4
**dictation** 80:18
**different** 28:14 32:19 34:17 38:14,14 53:21 57:2 58:9 63:14,16
**differently** 14:13
**difficult** 26:22 53:17 54:3 68:3
**direct** 27:3 47:18
**directly** 51:9 86:23
**disagree** 77:20
**disagreement** 75:5
**discharge** 15:10 15:13 27:6 28:10 29:21 30:3,4,16 31:3 31:6 34:16 55:18,20 56:1 56:3 59:14 61:2,4,11,12 61:15,16,19,20 61:22 62:5,8,8 62:9,9,15 63:4 63:8,11,13 64:3,10,20 65:14,20 66:2 66:11 78:18 82:1,3,8,8,14 83:3 84:21 86:23 89:11,23 90:9
**discharged** 34:3 55:9,22,23 60:14 64:6 83:17
**disciplinary** 11:10
**disclose** 95:14
**disclosure** 96:18
**discovery** 20:9,9
**discuss** 15:16 17:11 43:23 55:21,22 64:8 73:13 83:2
**discussed** 24:1 44:19 73:16 81:4 90:21,23 92:10
**discussing** 16:19
**discussion** 43:4 60:3,7,7,8 62:18,22 63:3 63:19 79:2
**discussions** 60:11 65:22,23 66:1 74:11 93:11 94:3,14 95:8
**distinguish** 78:4
**distress** 60:13
**DISTRICT** 1:1 1:2
**diverticulum** 70:16
**divide** 40:1
**dizziness** 64:22 65:1,4
**doctor** 6:18
**doctor's** 28:7
**document** 3:10 19:7,15 21:12 21:13 22:7,17 22:18 24:18,21 41:12 70:9 78:2 85:7 94:22
**documentation** 56:5,6,7
**documented** 37:13 72:10 77:6
**documenting** 36:16
**documents** 18:9 18:11,12,14 19:19 20:1,5 20:12,16 22:13 23:5,22 24:1 25:23 36:3
**doing** 11:2
**Donath** 1:13 99:2,23
**dot** 63:14,14,14
**Dr** 3:13,15,16 5:2,21 9:22 15:20 16:3 20:20 22:14 27:17,18 28:16 28:17 30:1,15 32:17 35:1 36:2 38:21 40:16 42:10,20 42:23 43:3,8 43:21 46:9,9 47:14,17 49:12 54:23 57:17,23 58:4,5,20 59:9 59:13 60:9 62:19,21 66:1 66:12 68:17 71:16 72:1,5 72:10,20 73:6 73:12,13,19 75:14 78:21 79:2 81:2 82:15,21,23 83:11 86:9 87:16 88:3,4,9 88:9,9,20 91:4 93:9 94:20,20 96:6,9
**draw** 77:10
**drawing** 80:20
**dried** 15:3 50:12
**dual** 7:17,21
**due** 65:13
**duly** 4:22 99:3,9 99:11
**duties** 14:10

**E**

**E** 2:1,1 99:1,1
**ear** 15:4,5,6
**earlier** 24:2 81:4
**early** 23:11
**easier** 24:22
**echogenic** 31:16 78:12
**ED** 15:15 19:20 27:5 31:13 32:7 50:22 59:19,23 64:5 88:21 89:5
**EDH** 24:13,14 46:6,16 47:6
**EDI** 37:2
**education** 7:10
**eight** 11:23
**either** 27:16 32:13 37:2 53:10 63:3 88:12
**electronic** 49:8 56:2 60:22 67:12,18 69:22 84:1,6,7,16
**Elm** 2:3
**email** 23:12,15 25:14
**embolic** 95:6
**emergency** 3:14 12:23 13:3,15 14:4,11,13 17:10 24:2 32:18 33:6,10 34:1,19 35:17 36:8 40:7,17 88:1
**employed** 6:3 99:13,17
**employee** 99:16
**employer** 5:23
**employment** 10:5
**EMR** 18:13 24:8 24:12 36:11,13 36:15,22 37:9 55:20 56:9 57:3 61:8 85:1
**encounter** 36:7 84:21 85:10
**endurance** 6:23
**ensure** 53:1
**entered** 55:11 55:12 67:14
**entering** 56:20
**enters** 55:11
**entirely** 12:4 43:10
**entries** 38:4 56:16 57:2
**entry** 36:23 55:10
**ER** 14:8,14 15:14,17,19 18:16,17 19:20 29:16 31:13 32:20 34:16,22 37:17 39:17,22 48:17 56:6 60:21 61:1 62:3 63:13,16 70:2 84:11,12 92:22 93:9
**especially** 44:10 45:6,20 51:7 52:9 69:14 71:18 91:20
**ESQUIRE** 2:2,2 2:6
**essentially** 27:5 35:3 54:11 55:1 80:16
**ESTATE** 1:5
**evaluation** 54:8 86:11
**evening** 26:2 42:2,14,18 44:3,18 46:20 47:15,17 48:21 49:4,14 52:4,6 52:10,16 57:8 58:17 66:14,16 66:18 68:20 69:4,8 79:3 80:14
**evenings** 57:10
**event** 3:14 18:17 18:17 24:3 35:18 36:8 95:3,7
**events** 26:7 56:19

**everybody** 59:22 62:5 66:1 97:6
**evidence** 65:15
**exact** 13:9 28:2 28:9 55:13 67:11 76:10
**exactly** 42:21 64:13
**exam** 14:17 15:4 33:20 35:13 54:15
**examination** 3:1 5:1 41:7 81:2
**examine** 35:8
**Examined** 3:2
**example** 15:3 34:8 37:10 50:18 60:23 81:3 85:11
**Excel** 24:17
**excellence** 9:12
**Excellent** 8:21
**exchanged** 20:10
**excuse** 24:3
**excusing** 29:6
**exhibit** 3:13 9:16,18 10:15 19:10 20:19,20 20:23 22:14,19 28:15,20 35:17 35:19 47:2 68:15 70:10 94:18,19,19
**exhibits** 3:7,20 4:14 9:16
**expected** 92:6
**expertise** 68:2,7 80:23 87:7
**expires** 98:20
**explain** 51:23 65:3 68:8
**explained** 30:7 30:15
**explaining** 29:22
**explanation** 30:20 31:3
**extent** 21:17
**extra** 12:19
**extreme** 27:21
**E-P-A-R-D** 6:2

**F**

**F** 2:2 99:1
**fact** 76:15 77:10 80:2
**facts** 77:10
**factual** 77:19
**faculty** 17:17
**fainting** 64:23 65:1,4
**familiar** 6:20 15:20 19:4
**family** 14:18 15:11 16:16 17:19 26:12,13 28:10 29:6 30:23 32:1,4 33:16,18 54:18 55:22 61:21 65:3 91:19
**far** 44:10 76:9,9
**faster** 92:19
**fasting** 61:14
**February** 23:11 25:2,19
**feel** 6:20 45:9 53:18
**fellow** 42:22 60:1
**fellows** 88:11
**fellowships** 8:4
**Felmly** 2:2 5:8 47:8 77:7,14 77:18,21
**felt** 15:9 26:23 27:20 28:3 80:10,13
**female** 44:3
**field** 6:19
**filing** 4:7 5:14
**films** 53:23 54:2 67:9
**final** 19:23 83:3 84:15 85:12,23 86:6,10
**finalized** 93:10
**finalizing** 85:14 86:18
**financially** 99:17
**find** 68:22 77:5
**finding** 53:2 79:16 87:9 90:1,9 92:7,8
**findings** 14:20 19:22 89:20 90:4
**fine** 5:19 14:3 78:4
**finish** 6:14,15,16
**finished** 7:16 12:21
**first** 4:4 5:22 20:18 40:3 41:5 50:16 51:11 52:6,11 60:21 70:14 88:21 99:8
**five** 39:20 93:1
**Fleury** 22:2,4,6
**flip** 20:21 68:17
**floor** 34:11 58:11 60:23
**flow** 24:17
**flushed** 53:13
**focus** 31:16 34:1 78:12
**focused** 33:19
**follow** 13:9
**followed** 43:14 61:13
**following** 27:3,6 87:21,23
**follows** 4:23 64:5
**follow-up** 15:7 15:12 34:12 59:21 61:5,23 62:6 63:12 64:7 65:8 79:11 80:7 82:9 86:19 87:1 90:5 91:20,21 92:10 92:19 93:15
**foregoing** 98:1 98:17 99:5
**form** 4:9 5:16
**formal** 51:1
**formalities** 4:8 5:15
**forms** 30:22
**formulate** 50:23
**four** 11:21
**fourth** 39:10
**free** 6:20
**freely** 48:16
**functioned** 14:12
**further** 4:10,14 34:4,15 35:10 44:11,18 80:8 86:11 90:12 93:11 97:4 99:12,15

**G**

**Gary** 1:4 5:9
**gather** 14:23 41:13 50:14
**general** 8:3,10 9:11 15:19 22:3
**generally** 11:21 14:15 30:18 34:6,9 39:9 41:11 44:7 49:18 50:10,17 52:14 53:15 54:19 55:14,15 57:9 58:5,7,14 59:1 64:13 67:12 73:14 81:10 82:17 83:21 84:19,23 85:7 87:6 88:2 91:18
**genetics** 7:15
**genitourinary** 37:12
**Gerard** 72:1
**getting** 52:5 56:18 78:17,21
**Gina** 37:10
**Girard** 57:17 58:1,4,5,20 62:21 71:16 72:5,10,20 73:6,12,19 75:14 78:21 79:2 81:2 88:9
**Girard's** 68:17
**give** 5:23 6:11 7:10 22:12 44:8 54:8 56:10 67:14
**given** 17:7 18:11 48:8 61:5,6,6 61:20 98:2
**giving** 31:3 51:20 53:2
**go** 6:9 11:16 14:17 15:2,11 24:16 26:3 28:15 30:2,17 33:15,18 37:19 38:19,22 40:13 46:4 52:2 61:1 61:22 62:7,9 66:20 67:15 68:14 75:16 77:23 80:2 85:8 88:20 96:13
**goes** 37:15 90:12
**going** 6:9 9:15 17:23 20:4,6 20:17 22:10,12 22:14 29:20 31:7 35:16 37:14 47:8 53:6 77:8,22 91:14 93:5
**good** 5:2 7:8,9 38:15
**graduate** 12:17 12:18
**graduated** 9:6
**graduation** 9:4
**grew** 5:3
**gross** 31:14
**ground** 6:10
**guess** 12:17

**guidance** 44:10

**H**

**Hampshire** 1:2 1:13,14 2:3 4:6 11:8 99:5
**happen** 27:12 61:18 72:3
**happened** 23:14 45:11 75:19 83:5
**happening** 54:15
**happens** 41:4,9 42:5 53:14 60:20 61:10
**happy** 62:5
**harmful** 28:5
**Harris** 27:17
**Harris's** 27:18
**hear** 17:21 18:3
**heard** 48:7 72:10 73:2 91:13
**heart** 95:6
**held** 9:3
**helpful** 86:10
**hematuria** 31:14 41:22 45:5 50:11
**hemodynamic** 65:1
**Hey** 17:22
**history** 14:17 31:16 33:16,17 33:17,18 35:9 41:11,13,15,17 41:17,19,22 42:1,4,5 43:19 44:8,9 45:6 46:12 50:11 69:15 85:3 91:1
**HL-7** 36:20 37:4 37:5
**hold** 6:15
**home** 34:16 62:12 64:6 92:3 97:5
**honest** 40:11
**honestly** 11:22
**honors** 9:9
**hospital** 6:4 10:6 10:9 20:16 49:2 84:9 87:22 88:1
**hospital's** 20:18
**hours** 52:5,12 84:2
**huh-uh's** 6:13
**husband** 18:2

**I**

**ICU** 34:10 61:4
**idea** 49:5
**identify** 5:22
**ill** 34:8,10,11,11
**images** 53:23 54:3 68:6
**imaging** 42:8 55:3 66:23 67:8,15,19,23 68:20 79:5,10 80:8 83:4 88:22
**immediate** 63:20 64:9,11
**immediately** 8:8
**important** 46:3 64:17 89:21,23 92:13
**impression** 65:18,19 92:8
**impressions** 81:9
**includes** 55:15
**Including** 31:8
**independent** 95:19
**INDEX** 3:1,7
**indicate** 46:18 47:16 69:23 88:7,17
**indicated** 59:9 99:10
**indicates** 55:3 72:2
**indicating** 24:20 70:10 78:6 79:5 80:12 86:10
**infection** 15:5,6
**inform** 68:8
**information** 3:16 10:18 14:23 17:6 33:21 38:23 40:13 43:11 50:9,12 64:14 74:23 75:11,11 76:5 77:13,16 77:19 78:17 84:20 85:8,17 85:19 86:16,17 87:2 91:9,12
**informed** 62:20
**informing** 69:14
**initial** 41:9 73:20,21
**initially** 40:17
**instability** 65:1 92:22
**instance** 4:4 30:14
**instructing** 77:9
**instruction** 63:5 65:9,19 89:11
**instructions** 28:11 29:21 30:3,5,16 61:19,20,23 62:16 64:3,15 64:20 65:14,20 66:11 78:18 82:1,3 89:23 90:9
**insurance** 40:13
**interact** 58:14
**interested** 74:10 99:17
**internet** 48:17
**interpret** 54:4
**interpretation** 90:16,17 91:7
**interrogatories** 3:9 20:15,19
**interrupt** 77:7
**interval** 89:8
**investigation** 35:11
**involve** 50:19
**involved** 12:13 13:2 31:21 39:6 57:7 59:22 66:8
**involvement** 27:4 76:10 86:7
**issue** 73:21 77:21
**IV** 62:11

**J**

**January** 23:12 25:2,13
**job** 81:11
**John** 88:11
**Johnsbury** 3:15 6:4 8:7 9:23 10:6
**join** 8:19
**joining** 7:17
**jumping** 82:19
**June** 12:21 94:7
**Justin** 88:12

**K**

**Kaveh** 2:6 5:12 23:19 35:21
**keep** 49:5,9
**kept** 49:10
**kidney** 31:18 41:20 73:22,23 74:12,20 75:17 75:17 95:4
**kidneys** 44:20
**Kimberly** 22:2,4 22:6
**kind** 14:19 40:1 48:15
**knee** 42:3
**know** 6:18,19 7:2 12:12 17:4 22:4,16 28:14 35:10 36:21,21 41:16 43:21 44:23 48:14 49:3,11 50:2 54:20 55:19 56:11,12 57:14 58:8,10,15 62:11,11 63:12 65:5 66:22 68:4 72:8 73:8 84:21 88:14 92:2,3
**knowing** 38:10 45:8
**knowledge** 22:5 75:6
**known** 32:3
**knows** 18:2

**L**

**lab** 36:19 37:2,9 61:12
**labor** 40:2
**labs** 36:18 42:8 42:15,16 43:15 44:11,12 54:14 54:21 63:10 83:3
**lack** 28:7 35:18 46:6
**large** 95:3
**lasted** 13:4
**late** 23:12 25:2
**lawsuit** 5:9 20:8 23:10
**LCR** 1:14 99:23
**leading** 41:15
**learn** 73:19 94:1 95:11,18
**learned** 41:19 74:4 76:18,21 76:23 77:2 96:12,15,18,22
**learning** 57:22
**leave** 12:20 62:13,13
**leaving** 29:16
**Lebanon** 1:13 7:23
**led** 91:4 95:7
**left** 31:18 41:20 56:5 70:15

72:11,21 73:22 73:23 74:12,20 75:17,17 89:8 89:16 90:10 95:4 96:22
**lengthy** 31:7 59:15
**letter** 29:2,6,10 29:11
**Let's** 10:14 14:2
**level** 60:22
**Lewis** 88:12
**license** 3:16 10:18 11:8,9
**licensed** 1:14 10:12 99:3
**licenses** 11:5
**light** 69:14
**limited** 25:18
**line** 3:2 83:13 84:3
**link** 67:16
**list** 48:2,8
**literally** 48:5 55:6
**little** 11:22 18:6 20:4 22:10 26:23 27:22,23 28:3,15 38:17 40:22 51:22 53:4 61:3 82:13 90:12
**log** 18:17,17 19:20 24:8,9 24:12 36:8,8 37:19,20,23 43:4 47:18,18 47:21 48:18 49:5,6,9 55:10 61:9
**logging** 36:15
**logs** 37:22
**long** 9:3 43:14
**longer** 10:3 55:19 56:3
**look** 10:2 19:11 19:12,15 20:22 22:15 24:22 28:22 39:20 40:1 50:21,22 53:11,13,17 54:3,23 55:2 64:19 67:6,15 67:23 68:6 69:12,16,23 85:8,23 87:8 93:5
**looked** 24:9,10 24:23 46:6,13 46:23 69:10,21 74:16 78:1 85:14
**looking** 8:19 34:5 38:16 40:3 45:23 46:2 50:13 53:18 68:3 70:4 71:17 72:13 78:9 86:2,6,16
**looks** 10:23 29:2 40:4 41:4 53:7 53:9 54:22 83:13
**loss** 65:2,5
**lost** 91:21
**lot** 36:12 76:9

**M**

**M** 2:10
**male** 44:3
**malignant** 95:4
**manage** 34:12
**managed** 34:7
**Manchester** 2:3
**March** 1:13 98:3 99:9,20
**mark** 9:15 10:14 19:9 28:12 35:15 61:2 94:16
**marked** 10:15 19:10 28:13,18 94:19
**marks** 81:20
**mass** 70:15
**maternity** 12:20
**matter** 99:10
**matters** 75:8
**McLane** 2:2 5:7
**MD** 1:12 3:3 4:21 40:9 98:7 98:16 99:8
**MD/PhD** 7:18
**mean** 16:15 47:6 47:22 64:4 75:6 76:8 87:4
**Meaning** 50:4 67:8
**measurement** 76:4,7,10 78:13
**measurements** 73:21
**medical** 1:8,13 3:16 5:10 8:22 9:2 10:17 11:4 11:5,8 18:7 24:2,16 29:23 31:17 33:17 41:16 42:1,5 44:9 46:12 56:2 60:23 67:12,18 74:16 96:14
**medication** 33:18
**medications** 41:17 62:8
**medicine** 7:19 11:11 34:19 40:17
**medicines** 85:2
**meds** 14:18
**meet** 23:14,15 25:6 41:6
**meeting** 23:17 23:22 24:7 25:2,3,10,11 25:12,20 41:9
**member** 40:5 58:15
**members** 16:14 17:17,19
**membership** 9:1
**memberships** 8:23 9:3
**mentioned** 15:14 18:5 22:12 26:6 31:10 32:17 33:9 38:4,9 40:22 41:5 46:4,5 57:6 67:1 68:1 69:21 83:21
**mentors** 17:16
**met** 25:5,6,8
**Michelle** 1:12 3:3 4:21 6:1 98:7,16 99:8
**middle** 13:12 40:4 56:14
**Middleton** 2:2 5:8
**midnight** 32:10 32:14
**mildly** 34:11
**millimeters** 78:13
**minute** 59:16
**minutes** 55:1,6 55:14,19 56:3 56:11,11
**missing** 56:5
**molecular** 7:15
**mom** 29:14,19 42:2
**moment** 11:5 20:21
**month** 11:2 13:3 13:4,20 14:6,6 25:18 27:8
**monthly** 13:9
**months** 12:19
**morbidity** 95:23
**morning** 5:2
**mortality** 95:22
**Moses** 42:20,23 46:9,9 47:17 49:12 82:21,23 91:4
**mother** 26:16 27:16 31:15 43:12 69:14
**move** 26:2
**multiple** 16:5 31:1,7
**M-I-C-H-E-L-...** 6:2

**N**

**N** 2:1
**name** 5:23 6:1 37:1,10 46:13
**named** 22:2
**necessarily** 52:5 52:9 85:6
**necessary** 79:5 80:9,11,14
**need** 6:21 7:1 29:18 35:8,20 50:19 52:21 54:7 55:20,22 61:1,11,13,14 63:18 79:10
**needed** 34:10,11 34:14,15 35:10 43:19 49:19 51:2 54:21,21 92:4
**needs** 34:4 44:11 52:16
**neither** 99:12
**new** 1:2,13,14 2:3 4:6 11:7 45:20 54:19 64:22 99:5
**NICHOLAS** 2:2
**Nick** 5:7
**night** 26:7 30:8 31:20 32:4,8 32:13,18 33:7 46:11 68:18 85:15 86:18 87:19
**nighttime** 50:23
**nonmedical** 18:3
**Norman** 15:20
**Northeastern** 6:3 10:8
**Notary** 98:19
**note** 3:20 17:10 28:6,7 53:8 55:5 56:8,9

64:5 66:22 70:3,6,20 71:3 72:14,17 74:2 75:5 85:4 87:17,17 88:21 88:21
**notes** 18:7 19:20 19:20,21 24:2 29:15 65:20 78:18 80:17 81:17 83:8,18 83:23 84:11,12 84:15,22 85:15 86:18 89:1,18 89:22 93:5,10 99:7
**Notice** 4:7 5:14
**noticed** 36:12
**noticing** 40:18
**notified** 23:10 23:13
**notify** 52:15
**number** 47:2 64:12
**numbered** 99:6
**numbers** 28:18 28:19
**nurse** 29:20 30:19 33:15 37:11 38:11,12 41:1,1 53:9,12 55:21 62:6,7 66:7,7 82:2
**nurses** 16:15 62:13
**nursing** 19:21 54:20 66:12

**O**

**oath** 20:11 98:16
**objections** 4:8 5:15
**objective** 34:2
**obtained** 83:4
**obviously** 40:23 45:11 53:22 54:12 59:15 75:5 89:20 93:15
**occasional** 32:11
**occasionally** 52:10 53:2 58:13
**occur** 49:19
**occurred** 39:17
**occurring** 56:19
**offense** 6:15
**office** 22:3 27:18
**Oh** 13:9 16:4 21:4 92:21 96:17
**okay** 5:21 6:5,7 6:9,22 7:7,21 8:4,6,15,18,21 9:15 10:5,10 10:23 11:4 12:2,5,11,22 13:4,14 15:20 16:2,6 17:3,19 18:19 19:6,12 19:18 20:3 21:9,23 22:10 25:8,13 27:15 27:20 28:12,21 29:10 30:10,19 31:1,10 32:6 35:1,15 36:2 36:23 37:7 38:4,15 40:3 40:10 42:4 44:1 45:16 47:1,12 48:20 49:11,17,20 51:17 52:23 54:22 58:15 59:7 62:17 65:9 66:12 73:3 75:20 76:20 80:4 82:7 84:3,14 87:4 88:3,14 90:3 93:4,6,15 93:19 94:4,9 95:22 96:5,12 96:20
**older** 34:21
**once** 50:2,3,4 62:10
**ones** 52:11
**online** 48:2
**on-call** 43:16 57:20
**opened** 24:18 56:8
**opposed** 71:11 78:16
**order** 27:6,21 38:11,12,13 42:14 50:8,20 51:7 52:2,8,14 52:15,22 57:3 57:5 58:8 61:15 63:5 68:16 81:7 90:6
**ordered** 45:13 58:10 61:14,15 63:10 99:11
**ordering** 50:15 51:11,15
**orders** 36:13,13 37:9 38:6 42:8 50:18 55:20 61:10 62:1,7,8 63:8
**original** 25:14
**outpatient** 15:8 34:12 64:7
**outside** 34:23
**overexertion** 92:1
**over-cautious** 28:4

**P**

**P** 2:1,1
**packet** 83:9
**PACS** 24:10 69:20
**page** 3:2,8 21:23 22:1,1 28:18 28:22,23 40:3 41:5 48:4,11 48:22 49:3 50:16 51:2 53:7 55:1 56:14 64:1,1 64:19 68:17 69:2 70:9,9,12 72:13 83:9,10 83:10,14 88:21 89:12
**paged** 43:16 47:22 49:15 57:19 71:19
**pager** 47:18,21 49:3,7
**pages** 28:17 99:5
**paging** 49:1
**pain** 15:4 64:22 64:23
**paper** 61:21
**paperwork** 62:14
**paragraph** 70:14
**paralegal** 22:3
**paraphrase** 81:19 89:6
**parents** 1:4 29:12
**part** 10:5 13:2 14:9 16:16,21 18:8 19:2 20:8 20:9,13 23:17 28:8 30:10 31:5 34:22 35:7,7 36:15 43:12 46:7,15 46:17 50:8,15 51:15 61:17 62:22 63:2,4 63:13 64:4,15 65:9,9 66:11 70:2,2 81:23 81:23 82:5,6 82:13,15 84:14 84:17 85:4,6 85:17 86:7,22 87:15 88:17 89:21 95:1
**participate** 96:2
**participating** 12:23
**particles** 95:5
**particular** 35:6 48:21
**particularly** 35:9
**parties** 20:11 99:14
**parts** 46:12
**party** 20:12
**pass** 40:11,14
**passed** 42:2 94:1 95:21 96:13
**passes** 55:7
**paths** 58:7
**patient** 14:19 15:10 30:8,16 31:2 33:11,17 34:2 35:2,6,8 37:18 38:20,22 39:2,3,7,10,12 39:13,14,23 40:18,18,20,23 41:2,6,10 43:12 45:14 53:8,13 54:11 54:18 55:8 56:10 58:11 59:18 60:13 61:21 64:6,11 64:15 65:12 67:23 79:6 80:21 81:13 82:2,3,14 83:17 84:21 86:21 90:5
**patients** 32:21 34:9,21 39:9 39:20
**patient's** 38:23 43:19 55:21,23 84:17 89:22
**Pause** 21:1
**pay** 12:19
**PC** 2:6
**pediatric** 15:17 27:19 32:6 33:13 34:18 39:18 53:19 54:4 58:10 60:23 63:5 79:20,22 80:1

87:7 93:20
**pediatrician** 27:17
**pediatrics** 3:15 8:2,3,7,11,11 8:12 9:2,11,23 10:6 11:3,17 11:20 14:10
**pending** 7:4
**people** 17:22 31:1,7 34:6
**perform** 52:13
**performed** 74:1
**performing** 52:11
**period** 54:12,16 55:6
**person** 16:17 24:17 34:14,15 36:21 46:19 48:23 49:13,16
**personally** 98:14
**person's** 37:1,10
**pertinent** 33:18
**PhD** 1:12 3:3 4:21 98:7,16 99:8
**phone** 42:19 44:15,16 47:18 48:14 56:13 58:13 78:22 80:19 89:7
**physical** 14:17 33:20 41:7 54:15
**physically** 62:13 84:9
**physician** 10:4 32:18
**pictures** 68:4
**piece** 61:20 68:3
**Pinkney** 37:11 66:8
**place** 42:7 52:22 81:6,16
**placed** 57:3 61:11,17 62:1 90:7
**places** 36:18
**placing** 52:8,14
**Plaintiff** 5:9
**Plaintiffs** 1:6,12 2:4 20:13
**plan** 14:21 15:1 15:3,10,12 16:19 33:22,23 34:5 35:4,12 35:14 42:7,14 43:8,13 50:23 55:18 59:21 61:17 62:5 66:2,4 76:11 76:14 82:8 86:23 91:18
**planned** 65:8
**plans** 15:16 16:20 83:3
**please** 93:3
**PO** 2:3,7
**point** 13:7 34:4 56:2 63:18,18 73:19 85:23
**position** 8:7 75:5
**possible** 39:9 91:3
**possibly** 65:23
**potentially** 31:2
**practice** 3:16 4:6 10:17 54:17 69:12 81:15,16 87:15 88:2 91:18 99:4
**preliminary** 3:11 19:22 43:8 51:3,8 54:8 55:3,12 66:23 68:9,11 68:18 71:14,15 71:20 78:9,19 79:3,4,8 80:18
**preparation** 18:10 19:2 36:3 46:7 57:22 85:22 86:6 88:6,16 92:2
**prepare** 17:5
**prepared** 18:8 19:4 71:9 85:12 89:12
**preparing** 19:6 19:18 85:15
**present** 2:10 14:19 15:5,18 23:18 26:15,16 32:20,23 33:21 66:17 82:2
**presented** 33:1 80:19
**presenting** 38:23 45:5 63:15 90:23
**presently** 74:19 75:9
**pretty** 36:10 38:15
**previous** 70:18
**previously** 8:18 94:19
**primary** 9:12 27:19
**printout** 10:17 36:11
**prior** 9:16 25:7 31:20 32:4 35:17 38:21 41:22 45:8,19 46:1,11 69:6,7 69:12 70:1,4 71:17 93:20
**priors** 47:4
**privileges** 8:16 10:7
**probably** 12:12 43:20
**problem** 9:8
**process** 16:16,21 20:8,9 31:5,6 34:17 38:16 40:22 43:22 49:18 50:15 52:19,20 59:14 60:17 81:23 82:1,5,6 83:20 84:3,5,10
**produced** 99:15
**production** 20:15 22:13
**Professional** 2:2 99:2
**program** 7:17 7:18,19,20,22 11:20 12:5,6,9
**prompt** 63:20 64:8
**promptly** 65:7
**pronounce** 37:3
**proper** 45:1
**properly** 77:15
**provide** 20:12 21:15 23:4 30:4 77:18
**provided** 18:8 19:13 26:4 77:11,17
**providers** 17:14 18:23 93:12
**providing** 50:9
**public** 11:13 98:19
**pull** 28:13 67:13 67:16
**pulmonary** 95:2
**purpose** 45:16 45:18
**purposes** 4:5
**put** 36:18 39:1 55:19 56:9 63:13 78:17 81:19
**puts** 76:4
**putting** 26:21 84:4,5
**p.m** 31:15 41:5 83:15

**Q**

**question** 6:15,17 7:4,5 18:1 20:7 21:18 40:15 62:23 75:11 76:1,21 77:1 95:17
**questions** 14:22 20:10,10,14,18 21:9,13,16 22:7,17 23:1,1 23:5 62:4 97:8
**quick** 6:10 22:15
**quickly** 19:11 41:14 83:8
**quite** 31:6
**quotation** 81:20
**quote** 70:15 72:23
**quotes** 81:17,17
**quoting** 70:11 70:20 71:22 72:16,16

**R**

**R** 2:1 40:6 99:1
**Rachel** 40:6 42:20 46:9
**radiologic** 76:9 79:11
**radiologist** 59:12 85:13 90:13
**radiologists** 57:7 57:11 58:23 81:18
**radiologist's** 79:15 87:9
**radiology** 3:11 24:4 48:9 50:9 50:16,18,19,21 51:19 53:5 54:7 55:16 56:7 57:6,14 57:20 58:9,16 59:15 60:3 62:18,20,21 65:22 66:13,22 67:2,6,10 71:9 72:8,9 76:6 79:13 80:17 82:23 87:5 88:10,11,23 89:5
**rapidly** 51:2
**reached** 92:16
**read** 19:23 36:20 51:3,20

53:16 67:2 69:10 70:3 71:21 72:5,8 80:22 88:23 90:13 98:1
**reading** 21:1
**reads** 51:1
**ready** 55:8 60:14 61:2
**realize** 96:22
**really** 14:1
**real-time** 37:17
**reason** 30:11
**reasons** 29:23 63:16 92:4
**reassurance** 34:13
**recall** 13:6,13 16:2 26:7,15 27:9,15 29:11 29:15 30:14 33:6 42:1,23 44:2,4,5 45:12 45:16 48:13 49:11,22,23 51:14 55:13 57:9,13 58:5 59:1,7 62:22 66:4,6,15,17 67:19 69:6,9 69:17 70:4,11 71:17 73:18 76:15 83:2 86:2,5,16 87:14 88:4,13 88:14 93:14
**receive** 81:11
**received** 9:9 43:11 62:15
**receiving** 82:23
**recess** 93:7
**recognize** 9:22
**recollection** 19:14 26:10 27:4 29:5 31:11 44:19 47:15 58:20 69:4 72:1 83:6
**recollections** 26:7
**recommend** 15:7
**recommendati...** 44:17
**recommendati...** 35:4
**recommended** 44:22,22 79:8 86:20 90:6 92:19
**recommending** 35:6
**record** 5:11,21 6:13 18:7 22:11 24:2,16 46:12 56:2,21 60:23 63:17 67:13,18 83:18 84:6,7,16,17 85:17 89:22
**records** 19:14 31:17 46:10 47:15 49:3 57:21 58:19 59:8,8 69:20 69:23 72:2 74:16 77:2,5 78:6 81:12 88:5,15 90:1 96:14 97:2,3
**reevaluation** 63:20 64:9,11
**refer** 24:13
**reference** 40:20 43:3 55:4 59:7 78:10
**referenced** 65:14
**referral** 63:5 80:2 90:7 92:5
**referred** 31:17
**referring** 17:9 47:7 76:22 79:18
**reflect** 81:12
**reflected** 37:22 61:9 89:22
**refresh** 29:5
**regards** 87:12 87:13
**Regional** 6:3 10:8
**Registered** 37:11 99:2
**registration** 40:12
**reinforce** 66:10
**related** 91:15 99:13
**relates** 21:18
**relationship** 91:2
**relative** 99:16
**relogged** 38:14
**relogs** 38:12
**rely** 80:23
**relying** 68:7 79:12,15 80:6 80:18
**remeasure** 75:16
**remeasurement** 73:23 74:12,20 76:22 77:6 78:7
**remember** 13:11 14:1,2 26:19 27:20 28:2,9 42:21 44:7,20 45:2 46:21 49:16 51:6 52:21 57:18 58:21 63:2 67:11 69:19 73:5,7,8,9 90:19
**removed** 62:11
**renal** 45:6 70:15 72:12 89:8,16 89:16 90:10,11
**reopen** 85:6
**repeat** 20:19 22:15
**repeated** 54:21 54:21
**repetition** 30:3
**repetitive** 22:11
**replaced** 36:14
**report** 3:11,12 15:15 18:16 19:20,22 46:16 53:16,22 54:9 67:9,13,14,17 68:9,12,18,21 68:22 69:4,16 70:4,15 71:2,5 71:9,12,14,16 71:17,20 78:9 78:19 79:4,8 80:16,18,20 83:1 85:12 86:1,6,10,16 94:22 95:1
**Reporter** 1:14 99:3,3
**Reporting** 99:4
**reports** 18:15 24:4 64:22 67:13 69:10,13 70:1
**represent** 5:8 31:11,15 46:8 59:11 75:15 88:10 94:21
**represented** 82:21
**representing** 72:20
**request** 22:13 29:12
**requests** 3:10 20:12,15
**require** 51:8 90:4
**requirement** 29:23 30:10
**requires** 31:7 53:2 85:5
**requiring** 30:11
**reschedule** 26:23
**research** 7:16
**reserved** 4:9 5:16
**residency** 7:22 8:1,2,6 9:4,6 9:10,10 11:18 12:14,18,20 13:16 14:4
**resident** 11:1,8 11:23 14:7,10 19:23 32:7 33:13 34:9,18 34:19 39:1,18 40:7,17 42:22 43:4,17 44:15 44:17,22 45:13 46:10,19,22 49:4,15,18,21 50:6,16,20,21 51:3,6,9,15,18 51:19,19 52:7 53:16,19 54:4 54:7,8 55:16 57:7,9,15,16 57:20 58:3,6 58:13 59:2,5 59:19 60:1,4,8 61:21 62:20 63:1 65:23 66:1,13,13 67:3,10 72:8,9 73:17 76:6 79:13,19,22 80:10,13 82:21 88:23 89:5 90:18
**residents** 11:20 11:23 12:3 14:14 16:15 34:22 39:16,16 39:18,19,22 40:8 48:2 58:9 58:10 88:11
**respond** 21:19 77:1,11
**response** 23:5
**responses** 3:10 20:18
**responsibilities** 14:10
**responsible** 29:22
**rest** 5:6 26:21 27:1,6,21

29:17,18,23 30:11,12 63:11 65:10,13 82:8 82:9
**restriction** 65:13
**restrictions** 62:2
**result** 51:8 55:2 55:3,7,11,12 67:1,5
**resulted** 65:20
**results** 37:9 50:4 50:5 51:18,20 53:5 59:16 60:2 66:21 68:20 76:3,4 81:7,8 85:9
**retained** 3:20 4:15
**retroperitoneal** 45:14 56:15
**return** 63:13,16
**returned** 44:12 56:8
**returns** 53:9,15
**reverse** 68:16
**review** 5:16 14:17,21 17:7 18:9,21 19:14 19:19 23:16,22 33:14,15,17,19 41:16 44:11 45:3 46:17 47:14 57:21 61:5 63:23 65:17 69:20,22 71:11 72:2 79:3,15 81:1 83:19 84:15 95:23 96:3
**reviewed** 17:6 20:6 24:6,15 36:3 59:9,20 70:23 76:3 77:2 84:23 85:16 87:2 88:6,16
**reviewing** 44:14 46:11 69:7 84:16
**right** 5:4 7:8 11:22 14:3,12 43:5,23 47:23 48:1 50:2 51:16 57:1 61:9,10 64:7 68:7 70:2 71:6 71:13 72:4,7 77:12 78:12,15 80:15 83:7 85:11,20 92:23 95:15,15
**role** 19:6 33:13 33:14 34:17 35:2,7,8 58:9
**roles** 34:20
**room** 14:13 15:11 17:10 33:15 37:18 83:22 88:1
**rotate** 39:19
**rotated** 32:12
**rotating** 12:23
**rotation** 13:4,7 13:14 14:8,9 32:7
**rotations** 13:2 13:17,19,23 14:2,5 16:7
**roughly** 66:22
**RPR** 1:13 99:23
**rule** 45:20 50:11
**rules** 6:10
**ruling** 45:22
**running** 15:1 16:19 41:14
**rupture** 50:12
**ruptured** 45:21 45:22
**Rutland** 2:7

**S**

**S** 2:1,6
**safe** 97:5
**Sargent** 96:10
**SAT** 27:7,9
**SAT's** 26:20 28:4 29:8
**saw** 64:14 68:8
**saying** 6:17 38:2 51:14 52:18 54:2,5 60:6 71:22 80:5 90:14 91:3,6
**says** 27:2 37:2,4 37:11 53:8 64:5,8 71:5 78:15 88:22 89:15 90:10
**schedule** 87:20
**scheduled** 26:20 27:7,8 87:1
**school** 28:8 29:7 29:15
**science** 7:14
**Scientists** 10:4
**screen** 24:23
**scroll** 83:10
**Sean** 1:4,5 17:11 18:8 26:10,15 27:4,16 29:6 29:19 30:14 31:11,21 32:4 32:15 33:4,11 39:5 41:18 42:1,12 46:11 51:4 53:12 63:9,22 66:17 69:7 88:8 93:13,15 94:1 94:9,21 95:3 95:23 96:12,13
**Sean's** 27:17 28:8 29:12,14 93:9
**search** 23:4
**second** 14:8 46:5 51:10 53:6 56:23 73:4 77:8 83:9 88:20 89:15 90:8
**second-to-last** 22:1
**second-year** 14:6
**section** 85:1
**sections** 85:5
**see** 14:2 18:12 21:23 31:2 34:20 39:8,9 39:12 67:8,9,9 78:3 87:10 89:9 91:17 95:1
**seeing** 43:3 59:7 67:6,19 69:4,6
**seek** 44:10
**seen** 21:2,8,9,12 22:16,21 23:1 46:13,13 57:23 65:7 68:13,19 69:3 71:15 74:16 92:5 93:15 94:22
**self-assign** 39:15
**sending** 92:3
**sense** 6:17 7:11 36:17 43:6
**sentence** 89:15
**separate** 49:2 67:15
**separated** 56:22
**series** 42:14
**served** 20:14
**service** 48:3
**set** 62:14
**sets** 16:7
**seven** 93:2
**Shahi** 2:6,6 5:13 5:19 9:19 11:12 17:3 21:2,5,17 23:6 23:20 35:22 47:2,6,12 64:2 74:5,14,22 75:10,20 76:2 76:20 77:13,16 77:20 78:1 94:12 95:8,13 96:17 97:7
**sheet** 24:17 62:9 99:10
**Shepard** 1:12 3:3,16 4:21 5:2 5:21 6:2 9:22 28:17 36:2 43:3 47:14 54:23 83:11 88:20 93:9 94:20 98:7,16 99:8
**Shepard's** 3:15
**shift** 32:8
**shifts** 15:19 32:9 32:11
**short** 44:8 93:6
**Shorthand** 99:4
**show** 9:15 18:6 20:7,17 35:15 38:13 46:8 68:11
**showed** 24:17 89:16 90:10
**showing** 10:18 38:5
**shown** 9:18 10:16 20:23 22:19 28:20 35:19 68:15 94:18
**shows** 46:10
**side** 20:13
**sign** 65:7 82:3 83:19
**signature** 4:12 5:18 22:2 83:13
**signed** 4:11 5:17 30:23 62:14 84:8
**significant** 65:2 65:6 89:8
**significantly** 70:19
**signing** 87:17
**signs** 33:14 36:17 44:12 59:20 64:23 65:4 91:1 92:22
**similar** 34:20 91:14
**sir** 6:6,8 21:11 21:14 22:21 23:8 73:11

86:12,22 88:19 94:6
**sitting** 28:4
**situation** 79:14
**six** 12:3
**size** 46:2 89:9
**slightly** 14:12
**small** 41:12
**smaller** 11:22 12:2
**social** 85:3
**society** 8:23
**somebody** 22:2
**sorry** 9:7,7 11:7 17:21 36:23 52:1 69:1 82:12,19
**sort** 16:9,19 18:7 19:13 20:3 29:7 33:9 34:1 38:23 40:4 43:8 54:14,15 56:14 60:12,16 64:5 65:21 68:16 79:11 81:3 91:2
**sound** 5:18 7:8 20:5 35:5 40:21
**sounds** 5:19 7:9 53:12 60:6
**source** 74:23 95:19,20
**so-called** 75:17 78:11
**space** 36:20,22
**speak** 22:6 52:22 58:22 59:13 66:14 81:8 83:7 87:10 88:3,12 88:18 93:19
**speaking** 17:3 49:16 51:6,8 51:14 59:5 66:15 71:21 86:23 88:4 90:19
**specialist** 44:8
79:15,18 80:6 87:3,4 90:21 92:16
**specialists** 81:17 92:17
**specialized** 80:1 80:3
**specialties** 8:13
**specialty's** 59:3
**specific** 8:12 23:1 26:9 27:15 30:14 31:10 58:20 59:3 69:3 71:23 83:6
**specifically** 12:14 17:8 49:11 58:21 66:7 69:9,19 76:15 78:13 86:5 93:13
**specifics** 93:18
**spell** 5:22
**spelled** 48:5
**spent** 11:2
**spoke** 43:7 44:2 46:19,21 47:17 47:19,20 49:13 50:2 55:13,17 56:12 57:18 58:16 59:9 62:21 72:7
**spoken** 50:3,5 82:23 88:7
**spreadsheet** 46:6
**spring** 12:11
**SS** 98:10
**St** 3:15 6:4 8:7 9:23 10:6
**stability** 46:2
**stable** 34:3,16 59:18,21 60:13 61:3 64:6
**staff** 66:12
**stamp** 37:15 84:5
**stamps** 84:7
**stand** 73:10
**start** 7:10
**Started** 7:15,19
**starting** 7:11
**starts** 69:2 83:9
**state** 1:14 11:4 98:9 99:4
**statement** 3:17 19:3,13,18 20:4 26:4 27:3
**STATES** 1:1
**status** 34:7
**stenographic** 99:7
**stenotype** 4:4
**step** 45:1 51:10 61:7 62:1 73:4 90:8
**Stephanie** 2:10
**Steven** 96:9
**Stickney** 40:6,6
**STIPULATION** 4:1
**stipulations** 5:12
**Stone** 2:10
**Street** 2:3
**strike** 69:6
**stringent** 27:1 27:23
**studies** 45:8 46:1 69:7,11 70:1 80:8
**study** 45:7,10 52:12,13 53:1 68:5 70:23 71:1,3 73:20 74:1 79:16 80:22
**stuff** 14:18
**subject** 11:10
**submission** 4:12
**subscribed** 98:17
**subsequently** 76:19
**sugar** 61:14
**suggest** 47:19 88:7,17
**suggests** 46:22
70:22
**suit** 23:13
**summary** 3:17 19:3,13 26:6 36:7 67:9
**summer** 12:18
**Sunnie** 1:13 99:2,23
**supervise** 35:3
**supervisee** 10:23
**supplemental** 26:3
**sure** 12:4 13:10 35:3 37:1 38:18 40:20 43:10 49:8,9 54:18 61:22 62:4 64:16 76:7 92:20
**surgery** 42:3
**surgical** 33:17 41:17
**sworn** 4:22 99:9
**symptoms** 39:1 54:19 63:19,22 64:8
**system** 24:10,13 36:15 38:10 48:1,2,13,15 49:1 57:20 67:15 69:15 91:15
**systems** 33:19 41:16 83:22
**S-H** 6:2

**T**

**T** 99:1,1
**tablet** 48:14
**take** 6:15 7:1,5 19:11 20:21 22:15 26:20,22 27:7,9,11 32:22 33:21 35:11 39:13,22 40:19 51:10 56:3,11 59:17 83:23 90:8 93:5,6
**taken** 1:12 4:4,9 93:7
**takes** 41:1 55:18
**talk** 15:11 17:22 58:13 59:16 61:23 87:16
**talked** 25:23 42:21 62:19 65:10,21 82:12 88:22 89:12
**talking** 12:12 17:12 25:10 39:15 51:11 53:20 54:20 55:15 64:3 70:8 72:1 88:13
**talks** 55:5 56:14 66:23
**tasked** 14:15
**teaching** 8:16,20 61:5
**team** 16:10,14 33:9 34:8 40:5 65:21 81:3
**team's** 60:12
**technicians** 52:13
**tee** 77:14
**tell** 4:22 56:13 79:13 91:19
**telling** 57:2
**tells** 18:16 57:4
**tens** 56:11
**tentative** 14:20 33:22,23
**term** 28:7
**terminology** 6:19
**terms** 29:17 34:5 47:4 48:8 76:9
**test** 50:4,18
**testified** 6:7 40:16 68:12 75:16
**testifies** 4:23
**testify** 74:15
**testimony** 76:14 82:22

**tests** 54:14
**Thank** 7:3 9:19 64:21 97:5,7
**Thanks** 5:2
**They'd** 58:12
**thing** 60:21 61:18 91:22
**things** 24:10 53:21 56:4 62:10,10 91:14 91:19 92:4 93:2
**think** 24:9 27:8 27:21 37:4 38:15 48:7 52:18 68:12,23 71:15 74:22 75:8 76:21 80:4,4 82:12 87:22 91:7
**third** 12:16 14:4 17:22
**third-year** 14:7
**thirty** 4:11
**thought** 25:13 27:13
**three** 32:19 39:10,16,21,23 55:1,6,14,19 57:2
**three-year** 12:5 12:6
**thromboembo...** 95:2
**Tillotson** 1:4,4,5 1:5 5:9 17:11 26:10,15 30:15 31:12,21 32:4 33:4,11 39:5 41:18 42:2,12 51:5 63:9,22 66:18 88:8 93:13 94:1 95:3,23 96:12
**Tillotson's** 18:9 27:4 46:11 69:7 94:10,21
**time** 4:15 7:1 11:2,16 12:22 14:14 23:15 25:6 26:10 30:18 31:12 32:15,16,20,22 33:2 36:16,17 37:14,15,20,21 38:11 39:11,17 41:12 50:17 51:7 52:4,8,14 55:6,13,15 56:10,12 66:5 72:19 74:2,3 76:16 80:5 81:15 84:4,7 84:20 85:10,18 86:3,4,5,9,17 94:5 97:5
**timeframe** 12:12 25:3
**timeline** 3:14 24:3,3 35:18 36:11 43:10 53:6 54:22 55:15 56:4,16 66:21
**times** 16:2,5 37:22 38:14 47:10
**timing** 43:6
**title** 99:10
**today** 17:5,23 18:10 46:7 81:4 88:6,16 88:16
**told** 27:16 57:3 73:13 74:19
**top** 27:22 28:23 83:14
**total** 11:23
**Towle** 88:11
**track** 48:20,22
**tracker** 61:1
**trail** 69:21,22
**trained** 15:17 68:6 79:22
**training** 11:9 16:21 34:23 53:17 79:23
**transcribed** 4:5
**transcript** 5:17 98:2 99:11,15
**transcription** 84:15 99:7
**transcripts** 18:23
**transferred** 61:4
**trauma** 34:8,22
**traveled** 95:6
**traveling** 5:3
**travels** 97:5
**treated** 31:22 32:1 66:17
**treatment** 12:13 15:2 16:20,20 17:12 34:4 42:4 44:18 86:20
**triage** 40:23
**trial** 4:9,15
**tried** 39:9
**true** 98:4,17 99:6
**truth** 4:22
**try** 6:14,14 9:16 44:8 93:22
**trying** 53:10
**Tuesday** 1:13 98:2 99:9
**tumor** 95:4,4,5,5
**turn** 28:22 83:8
**turns** 55:1
**two** 7:16 13:17 13:17,22 14:1 32:19 39:17 88:11 91:2,14 93:1
**two-year-old** 15:4
**type** 20:3 37:23 39:2 47:21 61:18,20 90:4 95:2,6
**typed** 67:14
**types** 90:3

**U**

**ultimately** 82:2
**ultrasonic** 65:14 81:2
**ultrasound** 18:15 19:21 44:19,23 45:10 45:14,15,17,18 45:23 50:5,8 50:16 51:12,15 52:2,8,9,12,17 53:9,20,21 56:15 57:3 58:11 60:2 66:20,21 68:1 69:10 70:14,18 71:5,9,18 85:12 87:8 89:16 90:10
**ultrasounds** 45:8,19 53:16 70:5
**Um-hum** 6:12 41:3
**um-hum's** 6:13
**unable** 25:19 26:22
**unavailable** 25:6
**unaware** 74:2,3 95:21
**unchanged** 70:18 78:14,16
**undergraduate** 7:11,13
**understand** 6:16 19:2 51:17 57:6 65:4,18 76:13 82:18,19
**understanding** 6:11 38:16,20 61:6 72:19 75:18,21 76:11 76:14 80:5
**understood** 16:22 18:5,5 25:20 40:15 61:22 78:23
**unit** 36:18 62:13
**UNITED** 1:1
**University** 7:14 7:18
**unusual** 38:8,10
**upset** 26:11,13 26:17,19 27:6 65:12
**upstairs** 58:12
**urgent** 80:14
**urgently** 80:11 92:5
**urinalysis** 42:16 42:17 43:15
**urinate** 29:8
**urinated** 37:13
**urine** 31:14 33:12 53:11,11
**urologist** 44:2,6 79:20 87:7 90:21
**urologists** 93:20
**urologist's** 71:11
**urology** 27:14 42:18,22 43:4 43:13,16,19 44:1,14,17,22 45:13 46:5,9 46:10 48:9 49:4,13,21 50:6 59:19 60:1,8 62:18 62:23 63:6,12 64:7 65:8,23 66:13 71:3 73:17 79:19,22 80:1,6,10,13 82:10,20 86:23 87:5 90:18,18 92:11,19 93:16 93:19
**use** 9:16 20:20 28:14 48:3 84:19,20 99:9
**user** 37:7,8
**usual** 5:12
**usually** 52:19

**V**

**v** 1:7
**various** 16:20
**verbal** 71:20
**verbalized** 61:6

78:22,23
**Verbally** 81:22
**Vermont** 2:7 5:4 6:3,4 7:14,18 10:8,12,17 11:7 99:19
**versus** 5:10 34:18 52:12 70:17 91:23
**virtual** 36:20,22
**visit** 27:5 84:2 93:9
**vital** 33:14 36:16 44:12 59:20
**vitals** 41:1 54:20
**volume** 65:5
**VT** 3:16

**W**

**W** 2:2
**wait** 81:7 93:3
**waiting** 54:12,15 71:18 92:23
**waived** 4:8,13 5:15,18
**walk** 7:11 38:17 60:19
**wall** 70:17
**want** 6:11 7:10 11:16 17:4 18:3 22:11 26:3,9 27:2 38:19 45:7 51:10,23 66:20 74:10 77:14,22 82:18,19 83:8 88:20
**wanted** 57:4 92:3
**warrant** 91:20
**wasn't** 37:1 40:20 47:16 93:18
**way** 16:9 32:4 72:17 90:1
**weather** 5:3
**week** 13:10 25:5 25:8,21 32:12 46:17 61:15
**weekend** 26:21 27:9,12 30:12 82:9
**Weinstein** 96:6
**went** 5:11 8:6 25:23 30:21 35:12 37:12 53:12 73:21 93:10
**weren't** 79:23
**Westminster** 99:19
**wet** 51:3,20 67:1 71:21 72:5,8 88:23 90:12
**we'll** 5:12 26:2
**we're** 12:12 17:12 22:14 53:7 71:21 77:8,22
**we've** 36:6 74:15 82:12 88:22 89:11
**whatnot** 48:9
**whichever** 32:21 35:1
**willing** 32:22
**witness** 3:2 9:18 9:20 11:14 20:23 21:1,4 21:21 22:19,20 23:8 28:20 35:19 64:10 68:15 74:7 75:3,23 76:3 77:4 94:13,18 95:9,15 96:20
**word** 35:18 46:7
**words** 65:3
**work** 16:4 52:19
**worked** 16:2 52:20 83:20
**working** 39:17 58:5 87:21,22
**workstation** 37:19
**worried** 34:13
**worsening** 64:12 64:16,21 92:21
**wouldn't** 34:21 49:17 58:7 97:2
**write** 28:10 29:10 64:13
**writing** 29:11 71:16
**written** 20:10,14 67:17 78:19 80:17,17 83:23 84:22
**wrote** 28:6,9 29:6 30:7 89:3 91:16

**X**

**x-ray** 50:19,20 50:20

**Y**

**Yanofsky** 15:21 16:3 30:1,15 32:17 35:1 38:21 40:16 42:10 43:8,21 60:9 62:19 66:1,12 73:13 82:15 87:16 88:9
**Yanofsky's** 3:13 28:16
**yeah** 7:13 9:7,20 10:8 11:1,14 11:19 12:8 13:18 16:8,13 18:18 21:3,5,7 23:21 24:21 28:1 37:6 45:4 47:10,11 48:16 51:23 52:1 63:2 64:1,4,19 68:16 70:12 76:2 77:16 94:12,17,17 95:9,14 96:17
**year** 11:3 12:9 12:14,16 13:3 14:4 23:12
**years** 7:16
**Yen** 59:9,13 86:9 88:3,4,9
**Yen's** 20:20 22:14 94:20
**younger** 16:17

**0**

**03105-0326** 2:3
**05702-6740** 2:7

**1**

**1** 3:4 99:6
**1st** 13:7 26:2,3 27:5 31:12,20 46:11 66:14 68:19 93:10
**1:00** 32:10,14
**10** 3:16
**10:45** 53:8
**10:57** 66:22
**11** 22:1 78:13
**11.9** 76:4
**11:09** 93:7
**11:12** 93:7
**11:17** 97:10
**12** 3:11 68:14,14 68:15
**14** 1:13 3:12 94:17,18,20 98:3 99:9
**159** 1:14
**16-CV-00296** 1:3
**17** 39:5
**17-year-old** 31:12 33:12 45:5 50:11 92:2
**19** 3:17 47:8,11
**1998** 7:15

**2**

**2nd** 83:14 86:14 86:17 87:1,11 88:8
**20** 3:9
**20th** 99:19
**2002** 7:16
**2004** 7:19
**2005** 70:19
**2011** 7:20 9:5
**2014** 9:6,7 12:11 12:14,22 14:3 27:5 31:13,20 83:14 94:7
**2017** 1:13 23:12 98:3,14 99:9 99:20
**21** 14:15
**21-by-11** 95:3
**22** 3:10 39:8
**22:45** 53:7
**22:57** 55:2
**23** 55:1,3
**24** 3:13 28:15,20 70:10 84:1
**25** 47:11
**27** 68:13,14
**28** 3:13
**293** 83:9,10
**294** 70:9,12
**295** 64:1 72:13 88:21
**296** 83:10

**3**

**3:00** 32:10,14
**3:14** 83:14
**30** 5:17
**30th** 94:7
**30)days** 4:11
**311** 53:7
**326** 2:3
**34** 3:14 35:19
**35** 3:14
**375** 64:19 89:13

**4**

**4** 3:9 20:20,23
**4:00** 32:10,13
**40** 3:15 9:16,18
**402** 28:22
**41** 3:16 10:15
**42** 3:17 19:10
**45** 56:3

**5**

**5** 3:4,10 22:14 22:19
**5/2** 84:4

**6**

**6:50** 31:15
**6:59** 40:4
**6740** 2:7
**68** 3:11

**7**

**7:30** 41:5

**9**

**9** 3:15
**9th** 93:16
**9:00** 1:13
**900** 2:3
**94** 3:12
**99** 99:6