EXHIBIT N

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

CIVIL ACTION NO: 16-296-LM
______________________________________x
GARY AND BETHANNE TILLOTSON, As Parents of SEAN C. TILLOTSON, and BETHANNE TILLOTSON, As Administratix for the ESTATE OF SEAN C. TILLOTSON,
Plaintiffs
-vs-
DARTMOUTH-HITCHCOCK MEDICAL CENTER,
Defendants
_______________________________________x

Videotaped deposition of BRIAN GIRARD in the hereinbefore-entitled action, taken by the Plaintiffs, pursuant to Notice before Michelle A. Howell, a duly qualified Notary Public in and for the State of Connecticut, held at the Law Offices of Clenenden & Shea, 400 Orange Street, New Haven, Connecticut on February 28, 2017, commencing at 11:57 a.m.



A P P E A R A N C E S:

REPRESENTING THE PLAINTIFFS:
Bruce W. Felmly
McLane Middleton
900 Elm Street
Manchester, NH 03101

REPRESENTING THE PLAINTIFFS:
Nicholas F. Casolaro
McLane Middleton
900 Elm Street
Manchester, NH 03101

REPRESENTING THE DEFENDANTS:
Kaveh S. Shahi
Law Offices of Cleary, Shahi & Aicher
110 Merchants Row, P.O. Box 6740
Rutland, VT 05702-6740

VIDEOGRAPHER:
Rocco N. Leone



S T I P U L A T I O N S

It is hereby stipulated and agreed by and between counsel for the respective parties that all formalities in connection with taking of this deposition, including time, place, sufficiency of and the authority of the officer before whom it is being taken may be and are hereby waived.

It is further stipulated and agreed that objections other than as to form are reserved to the time of trial.

It is further stipulated and agreed that a Notary Public may notarize said deposition.

It is further stipulated and agreed that the deposition is to be filed with the United States District Court for the District of New Hampshire upon request.

* * * * *



VIDEOGRAPHER: Good morning. This is tape one of the videotaped deposition of Brian Girard in the matter of Gary and Bethanne Tillotson versus Dartmouth-Hitchcock Medical Center being held before the U.S. District Court, District of New Hampshire. This deposition is being held at Clendenen & Shea, 400 Orange Street, New Haven, Connecticut on February 28, 2017 at 11:57 a.m. My name is Rocco Leone. I am the videographer. The court reporter is Michelle Howell. Counsel, please state your appearances for the record, whom you represent, after which the court reporter will swear in the witness.

MR. FELMLY: Good morning. I'm Bruce Felmly from McLane Middleton, and together with my colleague, Nick Casolaro, who's here, we represent the Tillotsons in this matter of the Plaintiffs.

MR. SHAHI: This is Kaveh Shahi for Dartmouth-Hitchcock Medical Center.

BRIAN GIRARD,

residing at 118 Old Stagecoach Road, Meriden, Connecticut 06450 having been duly sworn by the Court Reporter, was examined and testified as follows:

MR. FELMLY: Let me also note for the record that we stipulated, Counsel and I, that we will apply the usually stipulations which specifically include that all objections other than to form are preserved until the time of trial, and that the witness will have an opportunity to read the transcribed deposition and have 30 days for signature, after which if it's not signed, the signature will be waived. Is that agreeable, Counsel?

MR. SHAHI: Yes, it is.

DIRECT EXAMINATION
BY MR. FELMLY:

Q. Good morning, almost good afternoon, Dr. Girard. As was noted, my name is Bruce Felmly, and together with Attorney Casolaro, we represent the Plaintiffs in litigation that has been brought against Dartmouth-Hitchcock Medical Center arising



out of the death of their 17-year-old son, Sean Tillotson. My job here today is to take your testimony in the form of a deposition under oath. My goal and effort will be to ask you questions that you can understand, and if you don't understand the question, please bring that to my attention. I'll endeavor to correct it or make it clearer. One of the things that is occurring here is that the stenographer is taking a transcription of everything that any of us say in the room, and we're also on videotape. In order for that record to be accomplished clearly and to assist the stenographer, it's important we try not to speak over ourselves, and so it's important you try to wait until I finish my question. I'll try to afford you the same courtesy on your answer. That tends to sometimes be harder in conversation than just saying it, and so I may remind you from time to time to wait until I finish. Don't take offense at that.

A. No.

Q. If your counsel interposes an objection, he will most likely be objecting for the record, but if he instructs you differently, you'll follow his direction.



One of the other things is that it's helpful to try to answer in a narrative way, rather than the way we often converse in terms of saying mm-hmm or uh-huh or head nods, such as we're doing now, all of which are hard to spell, and so I may, if you do that, and it's very common, I may say is that a yes or is that a no. Again, don't take any offense at that. This is not an endurance contest. If you need a break, just bring it to our attention, and the only thing I ask is that you wait until you answer a question that's pending before we do that?

A. Okay.

Q. Does that all sound agreeable to you?

A. It does.

Q. Have you ever given a deposition previously?

A. No, sir.

Q. How about live testimony in a courtroom?

A. No.

Q. This is your first testimonial experience?

A. Correct.

Q. Have you ever served as an expert witness in any matter related to litigation or some claims process?

A. No.



Q. We've been provided a curriculum vitae that relates to your educational and work history, and I'm going to mark that in a moment, but first I'll show it to you and ask if you can identify it. Again, this was provided to us by the hospital. Does that appear to be a reasonably current CV?

A. This is current.

Q. If we could mark that -- we've been marking them consecutively. Michelle, I can tell you, I think what the -- we're at number -- the last one we marked was 29, so we're at Tillotson 30, I guess would be the way to mark it. Looking at your CV, you have it in front of you there, my understanding is that you're currently working at the Yale University School of Medicine, and that you're in a neuroradiology fellowship there?

A. That's correct.

Q. That began when? In September of this past year?

A. September 1st.

Q. And how long will that run?

A. One year.

Q. And is this sort of specialized training beyond the radiological residency that you had at Dartmouth-Hitchcock?

Page 9

A. It is.
Q. Is there any particular area of specialty or subcategory of radiology that you're really focused on?
A. Neuroradiology is an interest of mine, which is why I pursued further training in it, but my intent is to be a general radiologist.
Q. Just to help me understand it, neuroradiology, as distinguished, say, from diagnostic or other terms that might apply to it, is what?
A. Neuroradiology falls underneath the umbrella of diagnostic radiology with a specialization of the central nervous system, so brain, spine.
Q. So, it focusing on areas -- particular areas of the body that you would be more familiar with?
A. Correct.
Q. Your practice, I assume, in that fellowship involves primarily what? Clinical interaction with patients?
A. Limited.
Q. What does that mean?
A. The only time I would interact with a patient would be to perform a procedure.
Q. So your day-to-day activities would largely

Page 10

be characterized by what?
A. Going into a reading room and reading MRIs or CAT scans.
Q. That somebody else has taken and perhaps provided to you?
A. So, the way it works is the clinician orders the test, and then they get performed, and then it's uploaded to our PACS system, and then we read it off the list.
Q. Is that PACS system comparable to the radiological imaging system that was in use at Dartmouth-Hitchcock Medical Center?
A. It's a different system.
Q. Is PACS a generic term, or does that describe a manufacturer or a particular software?
A. I believe it's a generic term.
Q. And once you complete this year-long fellowship, do you have a plan or an intention with respect to practice?
A. General radiology. Small community hospital, hopefully.
Q. Any particular area of the world that you're thinking about?
A. Connecticut.
Q. Is that your home state?

Page 11

A. It is.
Q. Prior to the fellowship at Yale, my understanding is you were a resident at Dartmouth-Hitchcock Medical Center in Hanover. Is that right?
A. Correct.
Q. That began -- I guess it began first with an internal medicine internship at Dartmouth-Hitchcock. Is that right?
A. That's right.
Q. That was from 2011 to 2012?
A. Yes.
Q. Was it your intention, as you were going through the internal medicine internship, that you would focus or specialize in radiology?
A. Yes. So, the way it works is you match inter-radiology as a medical student. So, when I came to Dartmouth as a medicine intern, I was a preliminary medicine intern, meaning I would do one year of medicine and then transition to the radiology program.
Q. And part of the logic or notion of that, that it would give you a general grounding in anatomy and disease and related things that would be more general medicine before you get in the

Page 12

diagnostics of radiology?
A. Yes, of general medicine, yes.
Q. Then you were a resident in radiology for what appears to be four years from June of 2012 to June of 2016?
A. Correct.
Q. And in your -- it appears that your final year in Dartmouth-Hitchcock you were the chief resident?
A. That's correct.
Q. Before going to Hanover and Dartmouth-Hitchcock, you had received your medical degree at the Philadelphia College of Osteopathic Medicine, and that was training that took place between August of '07 and May of '11?
A. Correct.
Q. Before that, you had got what? A master in health sciences?
A. Correct.
Q. That was adjacent or part of your then career, which was -- if I read this correctly, a physician's assistant?
A. That's correct.
Q. I'm just a little confused about the dates and the training, you were a physician's assistant

Page 13

from 2002 to 2010, is that correct? I'm sort of looking at the licensure information at the bottom of the page. It says, "Physician's Assistant, Connecticut 2002?"
A. I see. So, I worked as a physician's assistant from 2002 to 2007, and when I was in medical school in Philadelphia, I paid for the license. So, it expired. I never practiced beyond 2007.
Q. From '07 to 2010, you were licensed, but you were engaged in your medical studies and weren't actually working as a physician's assistant?
A. That's correct.
Q. What was the nature of your work as a physician's assistant? What type of practice were you supporting, and what type of work were you doing?
A. I was in a radiology practice. I was an interventional radiology physician's assistant. I performed procedures.
Q. What is interventional -- I mean what's a good working definition of interventional radiology?
A. It's using imaging guidance to perform procedures -- invasive procedures.

Page 14

Q. This would be what? Realtime imaging of the patient while somebody is inserting a needle or some other piece of equipment so you can guide it?
A. Yes.
Q. And what type of procedures were you supporting? What type of interventions were occurring to the patients that you were assisting?
A. Lots of central venous access. I would perform superficial biopsies, place chest tubes, drain fluid off the abdomen, do joint injections, aspirations, change kidney tubes, feeding tubes, that's pretty much the bulk of the work.
Q. Your employer at that time was who?
A. Diagnostic Radiology Associates.
Q. That was located where?
A. Waterbury, Connecticut.
Q. And as a physician assistant supporting those radiological interventions, what would be your -- sort of description of the things you would do as tasks or responsibilities?
A. Primarily procedures.
Q. You would be what? Focusing the beam in the right place and turning on the equipment?
A. No. The majority of the work that I did was in conjunction with an ultrasonographer, because I

Page 15

had formal training in ultrasound or x-ray equipment. So, it was more on-the-job training.
Q. The ultrasonographer would be moving the ultrasonic probe across the patient's body?
A. Yes, they would -- if somebody had a fluid collection that needed to be drained, they would identify it for me, and then I would place the needle into it.
Q. I see. As a physician's assistant, would there be limitations on the types of interventions you would make as opposed to getting a physician involved, too?
A. Yes.
Q. There were certain procedures, that didn't necessarily require a licensed physician to do it, that you would perform?
A. Correct.
Q. And then other occasions where you'd say this is going to require the doctor to do it?
A. Yes.
Q. With respect to that period of time from 2002 to 2007, was the entire span of that time related to this type of interventional imaging?
A. It was.
Q. I presume that as a consequence of that, you

Page 16

decided that you had a stronger interest in this, and wanted to extend your education to actually becoming the doctor and ultimately the radiologist?
A. That's correct.
Q. I can do this, right?
A. Yes.
Q. In connection with the work that you did in these various interventions, whether it's draining collections of fluids or other interventions that you were involved in, did any of those involve the kidney?
A. Not by imaging.
Q. I'm not sure what that means?
A. Not by ultrasonography. I would change kidney tubes under fluoroscopy, which is realtime x-ray imaging, so I couldn't actually define the kidney -- the outer portion of the kidney, so basically there's a tube in the kidney, inject a little contrast in it, make sure the tube is in the right spot, put a wire through it, pull the catheter out, put a new one in, done.
Q. Having in mind that the case that brings us together involves issues relating to Sean Tillotson's kidney, and the radiographic imaging of them, including ultrasonography, would you be

Page 17

commonly involved, or how would you describe the extent of your involvement in those years as a physician's assistant in terms of imaging of the kidneys?
A. I had zero.
Q. In terms of what the kidney organ looks like on an ultrasonic diagnostic procedure, that was not something you dealt with?
A. That's correct.
Q. The first occasions when you would have been exposed to ultrasonic examination of the kidney, would be when in your career?
A. Probably -- well, I had some exposure to it as a physician assistant just in class for anatomy and physiology purposes, but as far as diagnostic imaging or imaging of the kidney as a PA, I had no exposure to that. I would say the majority of my training came at Dartmouth as a resident.
Q. In those years involved in physician assistant and interventional imaging, was there any particular professional who you regarded as a mentor or you think was important in terms of encouraging you to go forward with further studies in your career?
A. I think the whole group in general

Page 18

encouraged me, after I expressed some interest in going back to school. I can't say if it was one person in particular.
Q. In terms of your current certification status, your resume describes you as becoming board eligible in 2015. Does that continue to be the status?
A. That's correct.
Q. In terms of pursuing board certification or what needs to be completed before you become board certified, what additional steps would be necessary?
A. So, the way that the radiology board structure works is you take the first part of your board certification after the third year residency, and then once you pass that successfully, you take the second part 15 months after completion. So, I'm due to take the second part or the certifying exam in October of this year, 2017.
Q. You did successfully complete part one?
A. Correct.
Q. And that's the eligibility piece of it?
A. Yes.
Q. What's BLS, the certification reference that's on page two?

Page 19

A. Basic life support.
Q. That's sort of like EMT type training?
A. It's a course through the American Red Cross, I believe. You learn how to do chest compressions. Simple.
Q. It looks like in your years as a physician assistant, there was a certification process that applied to that job or responsibility, and you were, I gather, certified by that?
A. Correct.
Q. There's a variety of affiliations and awards and honors noted here, some publications, presentations. Just quickly looking over those, do those all seem to be accurate and complete?
A. Yes.
Q. Anything else, either new or in the works with respect to publications or presentations or any sort of statement where you would be providing knowledge to others on medicine?
A. No.
Q. Your book's not just about to come out?
A. No books for me.
Q. What's a poster? My kids have posters all over their rooms during the day, but I'm not sure what that is?

Page 20

A. At these meetings -- every society or every subspecialty radiology has a meeting, and people present posters there. So, it's an educational print that has a specific topic that's discussed.
Q. I don't see anything on the resume, but correct me if I'm wrong, that would relate to ultrasonic examination of the kidney or assessment of kidney masses or lesions, or things that might have bearing on the topics that would relate to the case that we're litigating in this matter?
A. Correct.
Q. Is it the case that you have not given seminars or presentations or speeches or other authoritative pronouncements with respect to the matters of renal interpretation through ultrasonography or examining the kidney for lesions or masses or diagnostic matters of that sort?
A. Correct.
MR. FELMLY: Could you mark this?
(Whereupon, Plaintiff's Exhibit 30, curriculum vitae, was marked for identification.)
BY MR. FELMLY:
Q. The events involving Sean Tillotson and the ultrasonograph of his kidney, in particular, that

Page 21

brings us here, although he had studies done previous, occurred on May 1st and to some degree into May 2nd of 2014, and you were one of the doctors involved in his care or his case on that date. Is that right?
A. That's correct.
Q. At that time in May of 2014, you would have been how far along in your radiological residency at Dartmouth-Hitchcock?
A. Second year. The end of my second year.
Q. The resident year runs from what date during the year?
A. July.
Q. So, July 1 to July -- or to June 30?
A. Correct.
Q. We, I think, took off the website, and I think this is done in 2016, so it's a little out of date to the date of Sean's treatment, but I'm showing you a listing of current residents that we took off that website. You're listed, and this is in the fourth year, and this was printed in June of 2016, really when you were completing your residency period in Lebanon. Is that right?
A. That's correct.
Q. I'm assuming these are individuals that you

Page 22

recognize or are familiar with because they're within your department. Is that right?
A. That's right.
Q. Two other individuals that were mentioned during one of the other depositions, actually the deposition of Dr. Stephanie Yen, were Dr. Towle and Dr. Lewis, both of whom, at least I understand, were residents in the radiology program back in May of 2014. Do you recognize them?
A. I do.
Q. And am I right they were residents at that time in that program?
A. John Towle is a resident, and I believe Justin Lewis is a fellow.
Q. Were they more senior or further along in their training than you were?
A. Yes.
Q. Do you happen to remember that being May of 2014 when they would be completing their fellowship or their residency? I suppose that's a way of asking, at least with respect to the resident, what year he was in?
A. Yes, so I believe they were towards the end of their respective years.
Q. Are those individuals, Towle and Lewis,

Page 23

people that you have any contact with now?
A. No.
Q. Have you spoken to them or communicated with them by e-mail or any other way regarding any matter relating to Sean Tillotson or this case?
A. No.
Q. Do I understand that you don't have a recollection of actually talking with them about this case, either at that time or since?
A. Correct.
Q. The treatment and the evaluation that Mr. Tillotson -- Sean Tillotson received on May 1 and 2, into the early morning hours of May 2, came through the emergency department at Dartmouth-Hitchcock. Is that correct?
A. That's correct.
Q. The records inform me that there was a resident in the emergency department that evening that interacted with Sean Tillotson named Michelle Shepard. Is that a name you're familiar with?
A. I am.
Q. And I believe from what Dr. Yen described to me in her deposition that Ms. Shepard -- or Dr. Shepard was a resident in pediatrics. Is that consistent with your understanding?

Page 24

A. I didn't know that.
Q. Have you read Dr. Yen's deposition?
A. No.
Q. It was also -- I should probably ask you. It was videotaped. You haven't seen the videotape of it?
A. No, sir.
Q. You don't know the content of Yen's testimony, I suppose?
A. No.
Q. Well, in any case, you have, I assume, read the medical records from Sean Tillotson's care, that May 1 and May 2 period, is that right?
A. That's right.
Q. You would have seen Michelle Shepard, who was a resident involved in his emergency care?
A. That's correct.
Q. Was she somebody known to you at that time, and by that, I don't mean you introduced yourself in the hall that evening, but somebody you had pre-existing contact with?
A. No.
Q. Hadn't worked together, at least as you can recall, at that point?
A. No, not that I can recall.

Page 25

Q. How about her in terms of any communication, other than what might have passed between you on the evening of the treatment? Any contact with her since?
A. No.
Q. Know anything about what she's doing for her practice now?
A. Not at all.
Q. And no e-mails or calls or any other communication?
A. No, sir.
Q. There's another individual that was a resident involved, at least by record, that evening, although I will tell you the only reason I know that is by looking at audit trails, named Rachel Moses, and it's my understanding that Ms. Moses was a urology resident, and it is noted in the electronic audit document that she accessed records of Sean Tillotson that evening. Is Ms. Moses's name known to you?
A. Yes.
Q. What's your knowledge of her, or how do you know of her?
A. We had a urology conference. I can't remember the day of the week, maybe Thursday

Page 26

morning, where the radiologists and urologists would get together and talk about cases. So, I know her from that, more as an acquaintance. I didn't know her, personally, or didn't back then.
Q. Do you know if Sean Tillotson's case was ever the subject of one of those urology conferences?
A. No, not that I can remember.
Q. Were you at all aware as you were providing radiological treatment or assessment on the evening of May 1 of Ms. Moses being involved and accessing or reviewing any of the records?
A. I don't recall that.
Q. It's also possible from Dr. Yen's deposition and Dr. Yanofsky's deposition, who was the attending ER doctor that night -- the staff doctor, if you will, that Ms. Moses -- or Dr. Moses was actually contacted and had some involvement in assessing the case. Is any of that known to you or do you have that --
A. I don't recall talking or speaking to her.
Q. In terms of Dr. Moses, you know her, you had interaction with her in these conference, but none of that related to Sean Tillotson's treatment that night or any later assessment of his case?

Page 27

A. Correct.
Q. And you have not spoken to her about either this litigation or the deposition, or what she or you remember from that night?
A. No, sir.
Q. When you were at Dartmouth-Hitchcock as a radiology resident, as part of that training, do you obtain licensure in New Hampshire to practice?
A. I believe it's a temporary, like a training license.
Q. But you would have had one of those?
A. Yes.
Q. And, I'm assuming, received some form of privileges that enables you to treat and work with patients in the clinical setting?
A. Yes, I believe that's correct.
Q. At any point, temporary or otherwise, has your licensure in New Hampshire, was it ever the result of any discipline or examination or other administrative action?
A. No.
MR. SHAHI: Objection. I take that as you mean publicly.
BY MR. FELMLY:
Q. At any time in your professional career, has

Page 28

there ever been any professional medical discipline taken against you, either as a physician assistant or as a physician?
A. No.
MR. SHAHI: Just give me a chance to object. Again, the question, if it's a public announcement of something with discipline, the answer is no.
THE WITNESS: That's correct.
MR. SHAHI: Thanks.
BY MR. FELMLY:
Q. Have you ever been involved or has any of your care ever been the subject of any other claim or lawsuit or litigation of any sort?
A. No, sir.
Q. And is that true both during the years you were a physician's assistant as well as your years as a doctor?
A. Yes.
Q. My understanding from being contacted and being advised of this, at least, is that the New Hampshire Board of Registration of Medicine has some form of investigation that is ongoing in this case. Have you been contacted or informed by them about the existence of that investigation?

MR. SHAHI: Again, don't answer that question. That's confidential.

MR. FELMLY: The fact that he has been contacted or informed is not precluded from discovery.

MR. SHAHI: I disagree.

MR. FELMLY: I'd like to mark the document that I put in front of Dr. Girard as the next numbered exhibit, please?

(Whereupon, Plaintiff's Exhibit 31, a document, was marked for identification.)

BY MR. FELMLY:

Q. Do you have a recollection that when you were a resident at Dartmouth-Hitchcock that you entered into a resident agreement of appointment that related to your service and time at the hospital?

A. Yes.

Q. Have you had occasion to review that in connection with any aspect of this litigation or recently?

A. I haven't reviewed it.

Q. So, I'm going to show you what counsel for the hospital has provided as a copy of that



document. It has some redactions for the stipend or salary you received, which we agreed is no problem to take out. Let me just show that to you, and ask if you can identify it as the resident agreement that would have applied to your term of service there as you've been describing it to us?

A. This is for my third year of residency, right?

Q. You know, I guess I'm going to have to rely a bit on you on that. Let me just double check and make sure I got all that you need here. It was combined with other responses to discovery, so I'm trying to --

A. This is correct.

Q. I think the one we're looking at is for your third -- it looks like it's for your third level, which is July 1, '13 to June 30, '14, is that right?

A. Yes. May I?

Q. You'd get one of these each year?

A. Correct. There's one for the internship in medicine, which is a PGY1, and then I become a first year resident in radiology, although I'm designated as PGY2.

Q. Give me that last part again?



A. I was a PGY1 as an intern, and I was a first year radiology resident, but designated by the hospital as a PGY2.

Q. Why don't we mark that. Let me put a staple through it to keep it together easier.

A. It's a little confusing.

Q. It certainly can be to me. It's not that terribly pertinent.

MR. FELMLY: If Michelle can put a sticker on that one.

(Whereupon, Plaintiff's Exhibit 32, a document, was marked for identification.)

BY MR. FELMLY:

Q. As far as you know, Doctor, as you went through the various stages of your residency, at each point did you have an agreement or some sort of document that formally recognized your stature with Dartmouth-Hitchcock as you went through this program?

A. Yes, I had to sign a contract every year.

Q. And just looking at the document and looking at references that are in it, it makes reference to various graduate medical education policies and procedures, which references on the website, and I



haven't copied all of those, but I'm assuming there was a wide range of rules and regulations that governed this training relationship between you and Dartmouth-Hitchcock Medical Center?

A. I would agree with that.

Q. And you would have reviewed them, generally, at the time to try to stay current and knowledgeable about those?

A. (Witness nods head.)

Q. As far as you know, nobody ever brought to your attention that you were in some violation of any procedures or policies that would relate to your residency?

A. No.

Q. That was number 32. What I want to do -- the next topic that I want to address is to try to get an understanding of what you have done to inform yourself about the issues in this case, and what you've reviewed, who you may have talked to?

A. Sure.

Q. Let me just say at the outset. No part of my question is going to ask for communications that may have passed between you and your counsel, okay? So, even if you're confused about that, I'm not asking for that. I may ask have you met with him

and when, but I'm not going to ask what you said to him or what he said to you, or anything related to that. Do you understand?
A. I do.
Q. Because that would be attorney/client privilege.
A. I understand.
Q. We were provided the other day with a description that I understand has been reviewed with you, which summarizes recollections that you may have regarding the events of Sean Tillotson and his treatment, and it was sent to me on Friday, the 24th of February from your counsel with this e-mail, and it attaches a one-half page, I would say, description written in the third person, but my understanding is that this is based on information that you have reviewed and provided. So, my first question will be, are you familiar with what I'm talking about by way of this document?
A. Yes.
Q. I'm going to give you a copy of that. I'm attaching the memorandum only for purposes of identifying how it came to us, and Counsel has a copy as well, and by going into the process of how



this was prepared, I've assured Attorney Shahi that I'm not in any way constituting his communication of things you may have told him as a waiver of the privilege. He was contemplating information as a request that we made. So, there's nothing that I'm trying to suggest more broadly waives the privilege. I do want to be sure, though, that you agree with this, and so I'm assuming you've read it carefully and were involved in this preparation. Am I right about that?
A. That's correct.
Q. And that would have happened last week?
A. Last week. Two weeks ago.
Q. In the last several weeks?
A. Yes, two weeks ago.
Q. In anticipation of this deposition coming up, I gather?
A. That's correct.
Q. Other than Attorney Shahi being involved in communicating with you and you passing on your recollections with him to take this form down, was anybody else involved in the establishment of this document?
A. No.
Q. Just to belabor that for a second, you



didn't review it with other family members or other attorneys or friends who may know more about litigation or been through a lot of depositions or anything? Nobody else got involved in that matter?
A. No, sir.
MR. FELMLY: Why don't we mark the first page of that, the memo page, Michelle, as the next exhibit.
(Whereupon, Plaintiff's Exhibit 33, a document, was marked for identification.)
BY MR. FELMLY:
Q. I'm going to be asking you a lot of questions today about what happened on May 1 and perhaps May 2, and other dates, perhaps, and who you might have dealt with and the like, but just before we start that process, does this represent a summary of your best recollections of your interaction with Sean Tillotson and his radiological assessment or investigation back on May 1 and 2?
A. Yes.
Q. And as far as you believe, it's a truthful and accurate account?
A. Yes.



Q. Other than this account, which was prepared cooperatively with your counsel, for purposes of the discovery response, have you made any other either written or documentary, it could be electronic, description of the events of Mr. Tillotson's treatment?
MR. SHAHI: Again, other than any communications with the New Hampshire Board of Medicine. With that exception, you can answer the question.
THE WITNESS: With that exception, I haven't.
BY MR. FELMLY:
Q. I think I'm entitled to know if he has communicated with the New Hampshire Board of Medicine. So, I'm going to ask that question. You may or may not take a different position on that. Have you -- I don't want to fight about something that isn't an issue. Have you made a written communication to the New Hampshire Board of Medicine?
MR. SHAHI: Again, any inquiry by New Hampshire Board of Medicine is statutory to confidentiality, so I don't think he can answer that question.

Page 37

MR. FELMLY: I don't think the fact that he's given communication is a violation of whatever level of confidentiality that provides.
MR. SHAHI: I think the existence of an inquiry would be confidential itself.
MR. FELMLY: Well, if it was confidential, then they probably wouldn't have sent me the letter advising me about it, and asking who he was, and things of that information. So, the fact that there's an investigation is not confidential.
MR. SHAHI: I'm not privy to what you have.
MR. FELMLY: Well, I responded to it in the interrogatories you sent out and described it, and actually provided you the information.
BY MR. FELMLY:
Q. Other than any written description, have you provided any first person narrative or discussed any of these matters with the New Hampshire Board?
MR. SHAHI: Again, same objection. Don't respond to that.
BY MR. FELMLY:
Q. Now, beyond the New Hampshire Board of Registration, do I understand you to say, other

Page 38

than Mr. Shahi, as counsel, there have been no other writings or oral -- you know, first hand accounts that you provided anybody of Sean Tillotson's case or his treatment. Is that true?
A. That's true.
Q. Do you recall, not so much by precise date, but an approximate time when you learned of Sean Tillotson's tragic death?
A. Maybe beginning of July.
Q. I'll represent to you, although I was not involved at that time, I know that there was, because he was a resident of the Upper Valley, there were newspaper accounts related to his circumstances. Did you see any of those, or were you familiar with any of those?
A. No.
Q. Do you remember how it came to your attention that this young man that you had treated several months before had died?
A. Several years?
Q. You meant July of this year?
A. Correct.
MR. SHAHI: Last year.
BY MR. FELMLY:
Q. You're saying, essentially, contemporaneous

Page 39

with the claim being brought?
A. That's right.
Q. He died on June 30th of 2014. I thought you were referring to something in that 2014 time?
A. (Witness shakes head.)
Q. You don't have any recollection of seeing anything in the newspaper about that, any memorial services, and it was fairly widely circulated, which is why I'm asking about this, but you didn't see that?
A. No, I didn't read the news.
Q. You didn't receive any word from any of your colleagues or people that might have been involved to the effect of remember that kid that was in a couple months ago with the blood in his urine, you know he passed, nothing like that came to your attention?
A. Nothing.
Q. So, the first you learned of it was when legal action was brought and communicated to the hospital?
A. That's correct.
Q. And was that before you had left Lebanon, because I realize your residency was coming to a conclusion about the same time?

Page 40

A. It was right after I left.
Q. There is an indication by the hospital that there was, subsequent to Sean Tillotson's death, a morbidity and mortality procedure that took place where there was some level of assessment of the circumstances of his death. Did you participate in that review?
A. No.
Q. Did you have any knowledge of it?
A. No.
Q. Just not to box myself in directly, just to M&M, morbidity and mortality, do I understand your response to be, no matter what you call it, prior to June of 2016, when the litigation was commenced, you did not learn of or participate in any peer review or doctor-to-doctor or hospital investigation or examination or communication that related to this young man's death?
A. Correct.
MR. SHAHI: I'm going to allow him to answer, but without waiving any further privilege there may be, but he's already answered.
BY MR. FELMLY:
Q. Okay. I'm not in any way suggesting you're waiving a privilege, but there was nothing

involving any communication involving Sean Tillotson that you're aware of that occurred from, essentially, the spring of 2014 when you treated him until the lawsuit was brought?
A. Yes, that's right.
Q. Particularly as to privilege, there was no effort on your part or any contact with any attorney or anything that would relate to some anticipation of a lawsuit, nothing like that happened?
A. No.
Q. When do you believe -- strike that.
Once you learned of the litigation and the claim being brought in June of 2016, did there come a time where you reviewed Sean Tillotson's medical records?
A. Yes.
Q. What was the context of that? How long after that event did that happen?
A. I was made aware in early July. I met with Mr. Shahi in our risk management department at Dartmouth, and we reviewed the case.
Q. Did you ever access in this period of time, after you learned of the case in early July, did you ever access the records directly yourself



without the intervention of Counsel?
A. No.
Q. Did you obtain a copy of the records to be reviewed in your own quiet of your own study, if you chose to do so?
A. I think I received a copy of the ultrasound report.
Q. Your preliminary report or the final report, or both?
A. Both.
Q. But not other aspects of the either emergency room record or the history of radiological examinations of Sean?
A. The initial encounter that I had with Mr. Shahi in the risk management department, I reviewed the case and then we met subsequently and reviewed the medical record more extensively.
Q. Again, with your counsel?
A. Correct.
Q. But not on your own?
A. No, I don't have access to the system. It's impossible.
Q. Just for purposes of identification, other than Counsel Kaveh Shahi, who else was part of any of these reviews of the record, just the names and



positions they would have had?
A. So, Scott, I don't know his position.
Q. Monahan?
A. Scott Monahan.
Q. There is one. It could have been him.
A. And Stephanie.
Q. This is Dr. Yen?
A. No, I haven't spoken to Dr. Yen.
Q. You're talking about --
A. Somebody else from risk management.
MR. SHAHI: Stephanie Stone.
BY MR. FELMLY:
Q. Those would be the people that assisted or worked in that conference with respect to the review of the record?
A. That's correct.
Q. I know I'm overlapping a bit with things I asked you before, I do that a lot unfortunately, but I try to be sure on some of this stuff. I'm taking from your answer that other medical care providers that were involved in Sean's treatment did not join in that conference with you. So, it was not a group meeting?
A. That's correct.
Q. It was just you?



A. Just me.
Q. And just to give you the names of people, some of whom I mentioned before, just again to double check what interactions or communications you had with them. Dr. Stephanie Yen signed the final Sean Tillotson's report, and is somebody that was involved as an attending for Dartmouth-Hitchcock in connection with Sean's care. You have or have not spoken with her?
A. I have not.
Q. And what I mentioned before, Michelle Shepard, who was a resident that evening, although I believe she was on sort of a tour of duty of the emergency department as a pediatric resident, but she was there that night and was in the records, but this is not somebody you've ever spoken about this case with, is that true?
A. That's true.
Q. David Chavez was an attending in urology, who's been involved in Sean's care, seeing him both before and after May 1st, he's a urologist. Have you ever spoken with Dr. Chavez about Sean Tillotson's case or care?
A. No.
Q. There is a medical student who was working

Page 45

with Dr. Chavez, at least in a visit after May 1, that they both saw Sean at on May 9th, and her name is Jennifer Fantasia. She was a student at the medical school and working in the urology department. Again, have you ever talked with her or communicated with her about Sean Tillotson's case?
A. No.
Q. Is she known to you at all?
A. No. I have no idea who that person is.
Q. We talked about Dr. Towle and Dr. Lewis, who were residents or fellows, respectively, and again, my understanding is you had no discussion with them about Sean Tillotson's case?
A. Correct.
Q. Dr. Yanofsky is the attending in the emergency department and was on that evening.
A. Mm-hmm.
Q. He's on a number of the emergency department notes you would have mentioned or seen. Any discussions or communications with Dr. Yanofsky?
A. No.
Q. I'll also represent to you that Dr. Yanofsky has also been deposed in this case. Have you seen or reviewed his deposition?

Page 46

A. No.
Q. So, you do not have knowledge of his testimony?
A. Correct.
Q. And then I mentioned before, Rachel Moses, who was a doctor in the urology residency program, and she was known to you, but we established that you did not speak with her about Sean Tillotson's case?
A. Correct.
Q. There are various nurses and technicians and other people, coders and people that are involved in the medical process, many of whose names show up in the audit trail logs. I'm not going to go through all of those, but I will ask you, either refreshed by the names that I mentioned or anything else in your mind, are there any other people that would either be providers or administrative staff at Dartmouth-Hitchcock Medical Center that you believe you have talked with about Sean Tillotson?
A. No.
Q. In connection with the issues in this case or the contentions that are raised by the litigation, have you reached out or communicated with any professional colleagues or teachers or

Page 47

mentors or friends or family doctors, just thinking in 45 years of doing this, I've had people reach out to lots of different folks, sometimes it happens, sometimes it doesn't. Has that happened in your case?
A. No.
Q. So, you haven't discussed this really with anybody else?
A. No one.
Q. In terms of direct preparation, if I can call it that, in terms of preparing for the deposition, and I know you've met or communicated with Attorney Shahi on the supplemental statement, that we marked, which was your recollections. Have you, again, reviewed the medical record before coming here, recognizing that the last time I gather you did it was in July of 2016?
A. July 2016, and then two weeks ago when we met.
Q. And when you say we met, was that just with Attorney Shahi, or did that also involve Stephanie and Scott?
A. Just Stephanie.
Q. Did that review of the record also involve review of imaging?

Page 48

A. It did.
Q. Did it include both still shots, as well as -- what do they call them? Cine clips?
A. I think the first time we met, we reviewed the cines. The most recent time, I didn't review the cines.
Q. Just to get a sense of it, that meeting that you had in July of 2016 that involved Attorney Shahi, as well as Mr. Monahan and Ms. Stone, approximately how many hours did that visit last?
A. I don't remember that. I can't even guess. Maybe an hour, two hours. I don't remember.
Q. How about the most recent visit, a couple weeks ago, about how long did that last with Stephanie and Attorney Shahi?
A. That was a couple hours.
Q. When you say we reviewed the medical records, did you also review, apart from things that may be Sean Tillotson's defined technical medical record, did you look at things like audit trails and other hospital documentation that may relate to the treatment that was provided him, and when and where it happened?
A. Limited, but we did review.
Q. You don't have copies of the audit trails, I

Page 49

assume?
A. No, I don't.
Q. You know what I'm talking about when I refer to the audit trails?
A. Yes.
Q. You've seen them?
A. Yes.
Q. They're just -- again, there are -- and I'm sure I'm not using correct terminology on this, there are, essentially, two different forms of audit trails that have been provided to us, and they have been marked. One is specific to the radiology's PACS system, if we call it that, where it shows individuals, sometimes by name, sometimes by CIS reference, at various times entering that system with notations as to the purpose for which, very brief, sometimes cryptic, while they're entering it, view images, or transcribe report, or something like that. That's a system that's familiar to you, I assume?
A. Yes.
Q. And would be part of what you used when you were a resident there to access imaging that would be electronically stored?
A. I would access the PACS. Is that what you're referencing?

Page 50

Q. Yes, the PACS system?
A. Yes.
Q. Do you know that there can be reporting of those entries? In other words, the system software has the ability to identify the time that various users entered and what they did with the system?
A. Yes.
Q. And would that be something that, as part of your work as a radiology resident, you would be commonly involved in doing? It would be part of your day-to-day activities?
A. To review the audit trail?
Q. Well, it's first asked to go into the system and review materials. That would be, I assume, the way you would commonly access images, right?
A. The way it worked at Dartmouth is you would access the PACS to view the images, then it would bring up the patient's medical record, so then you can look at the documentation as it relates to the images, maybe look a little bit about the history, but I'm not sure if that answers your question.
Q. It's helpful. Would it be a dual screen type of monitor situation, so you can have the report up and the image at the same time?

Page 51

A. Yes.
Q. Sort of a seamless ability to move back and forth between the printed word and the actual video images?
A. Yes, more or less.
Q. It's goal is to be seamless?
A. Yes.
Q. That's a system that I assume, based on your familiarity with radiology, is not unique to Dartmouth-Hitchcock?
A. No.
Q. That's the way radiologists work these days?
A. Correct.
Q. There's also an E audit trail, which if I understand it, and it has been described to me by several providers in their depositions, but I may have it wrong. This is a system, not the PACS system, but an audit trail that shows when providers at the facility go into the patient's medical records, and can identify when, for example, Rachel Moses -- Dr. Moses wants to look at some portion of Sean Tillotson's record, there's an audit trail that can be prepared to show that by time and various numbers and information that would try to identify what she's doing, just as an example. Are you familiar with that system?

Page 52

A. Yes.
Q. Are you reviewed the E audit trail in this case?
A. I don't remember if we reviewed that.
Q. You have reviewed the PACS audit trail?
A. Yes.
Q. Have you conducted any medical research or investigation dealing with any of the issues that might be presented in Mr. Tillotson's case, for example, issues involving 17-year-old, or thereabout, kids developing renal masses, and the propensity or rareness or commonness of that, issues relating to how to identify the margins or edges of organs that you may be wanting to put gallopers on, or measure their length or their size, what various traits or appearances, masses, or lesions on the kidney might have? Anything at all where you've gone into -- being a doctor, you know how to medical research, I'm sure?
A. Right.
Q. Anything to try to familiarize yourself, get a better handle on it, understand what's being alleged in this case, anything at all like that?
A. I have not.

Page 53

Q. Have you -- again, you have not consulted, personally, with anybody to try to address any of those topics?
A. No.
Q. When I say any of those topics, or anything at all that may relate to this case having been brought and raising some of those issues?
A. No, the only person I've spoken with is Mr. Shahi and Scott, and Stephanie. That's it.
Q. Have you undergone any training or education that is specific to ultrasonic examination of the kidney in terms of the issue of how to identify the size or how to describe the size from an image of the kidney, either longitudinally or otherwise?
A. Yes.
Q. Where would you have been trained, or where would you have learned that?
A. We learned that during our years at Dartmouth as residents.
Q. Is that all clinically based in terms of on-the-job training looking at patient images, or is there also -- some people call it didactic training, lectures, or other more formal presentations that are not necessarily based on one particular patient's experience?

Page 54

A. Yes, we had didactic lectures, and we also had hand-on training with ultrasound.
Q. In terms of when that happens in your residency, the didactic portion of it, any lectures or seminar, or things of that sort, where would that have occurred with respect to renal ultrasounds in terms of timing in your experience in your residency?
A. We, at Dartmouth, had a curriculum, so it was kind of a -- I can't remember how long it lasted. We had like an introduction our first year, and it kind of went over the basic of all the imaging, and then subsequent to that, we had formal lectures on various parts, sometimes it was the kidney, sometimes the liver or gallbladder with respect to ultrasound, and then there was also teaching at the workstation. So, if there was an interesting case, or if there was a point that the attending wanted to make, we would discuss it there.
Q. As to ultrasonic examination of the kidney, who would have been the instructor or the senior person, that you recall, as presenting the sessions that you attended?
A. I can't recall. There was a variety of

Page 55

providers -- radiologists at Dartmouth who were attendings in the ultrasound department, and I can't tell you if one or the other gave what kidney lecture.
Q. Did you gain an understanding of why -- just again focusing on the kidney for a moment, why the size of that organ is considered, or may be considered as important, in terms of it's radiological assessment or evaluation?
A. Yes.
Q. What are some of the things that bear on the size of the organ?
A. What do you mean bear on?
Q. Why is it important to evaluate or to -- as you're looking at the organ, to assess it's size in relation to certain norms and parameters?
A. So, it's nice -- for example, for a pediatric patient, you'd like to see that it grows over time. If it didn't grow, that would warn us of something. If a kidney changes size rapidly over a short period of time, that's important. It could indicate something underlying. If it shrinks, of course, that's a problem. If it's distended, it could change the length or shape. All of those reasons, and a bunch of others, are

Page 56

reasons why it's important to know about the length of the kidney or the width.
Q. Is the fact that people are provided with two kidneys, so there's a right and left that you're able to evaluate or compare, does that provide any significance when you're looking at the size of these organs?
A. It gives a nice reference. If the patient has a normal other kidney. If a patient has an abnormal kidney, it's hard to reference the contralateral side.
Q. All things being equal, if one of the kidneys is seen to be in a normal range or size range, you would want the other kidney to have comparative size features rather than be sharply different?
A. Correct.
Q. When I say you'd want, you would take note if it was sharply different and that would be something you need to follow on?
A. Yes.
Q. What's causing that?
A. Right.
Q. In connection with Sean Tillotson, who's 17 years of age, and I think weighed about 180 or 82

Page 57

pounds in May of 2014, would he be thought to have what you'd be looking for as the size of an average adult male's kidneys?
A. I would suppose, but I'd have to review the literature. I don't know the exact measurements or where people fall in that range. He was a big kid, so I would imagine he would have adult kidneys.
Q. Do you know what is thought to be the range -- when I say thought by, what do authorities generally describe as the appropriate size and range of the adult kidney?
A. I couldn't tell you specifically.
Q. So, how do you know then whether or not, when you're looking at it and doing this kind of a study, whether the kidney is appropriately sized or not if you don't know the normal range?
A. I'm sure I knew the normal range when I was doing renal ultrasounds. I haven't done renal ultrasounds in well over a year, so I don't really remember the measurements.
Q. But with part of the instruction that you had received at? Dartmouth-Hitchcock in this area where you would be provided instruction, either didactically or clinical intervention, would that have included teaching or providing you information

Page 58

about what should be the normal expectation for the size of an adult's kidney?
A. Yes.
Q. Are you aware that Dr. Yen has written a chapter in the Oxford American Handbook of Radiology. Are you familiar with the fact that she did that?
A. I maybe heard it in passing, but I don't know.
Q. So, she wrote the ultrasonography section, and I'm assuming -- you're going to tell me in a minute, but I'm assuming since she seems from her deposition to be involved in the radiological residency program and have responsibilities for that, she would have been somebody you worked closely with while you were at Dartmouth-Hitchcock?
A. Absolutely.
Q. In terms of your residency, what were the administrative interactions or what degree of either direction or supervision would you have experienced Dr. Yen in connection with?
A. Well, she was our program director toward the end, so we met quite a bit, especially as the chief resident. So, in that regard, so a lot of administrative work, we worked in the reading room

Page 59

together. She gave us lectures, and she would even come in the room and scan with us on occasion.
Q. I didn't hear the last word?
A. She would scan with us.
Q. You're saying she would actually take ultrasounds with you using the probe?
A. Yes. I can't remember if she actually did that, or, you know, she was definitely in the room at times, so, yes.
Q. So, she's highly engaged in the training program that you were involved while you were in Lebanon?
A. Very much so.
Q. And somebody, I assume -- correct me if I'm wrong, you have a high professional regard for?
A. Very much so.
Q. And regard her to be very knowledgeable and experienced with respect to ultrasonography and radiology issues?
A. Yes.
Q. And I don't need to mark this, but just for reference here, in her ultrasonography chapter in the book, American Handbook of Radiology, under kidney, she says, "normal kidney size in an adult" -- and then it has that thing, which I think means

Page 60

ranges from, "10 to 13 centimeters (usually within" -- and then those funny two marks again, which I think means a range of -- "1 centimeter from the other)", and I guess I'm asking you, does that refresh your recollection of what you would expect to find in an adult?
A. Yes.
Q. And I suppose if somebody came in and they were 7'4, and were playing halfback or more likely tackle for a professional football team, they may have a larger kidney than somebody who is 5'8" or 10, right?
A. Yes, that's reasonable.
Q. But Sean Tillotson would have been probably expected to have a kidney size that would be in that 10 to 13 centimeter range?
A. I would agree with that.
Q. On this issue of compatibility or comparison with the other kidney, they don't have to be exactly the same size, but you're looking for a relationship within, give or take, 1 centimeter of the other. That's your understanding?
A. Yes.
Q. And that makes sense, because you don't want one kidney to be affected by other forces, disease,

Page 61

or other incidents that cause it to be disproportionately different in size unless you have a good explanation as to why that's so?
A. That's correct.
Q. Now, when you were treating Sean Tillotson on the evening of May 1st, and doing the ultrasound and evaluating it, I'm presuming you were aware that, from the history you received, that he had had prior ultrasonic evaluations and radiology had been followed for kidney issues?
A. Correct.
Q. And, indeed, looking at the PACS system, I can identify various other studies taken in previous years that you appear to have access to have reviewed to gain information from what was happening then. Is that a fair statement?
A. Yes.
Q. Again, that's important, I gather, to the clinician, because when you're following somebody and he's now got a current set of symptoms that includes blood in his urine, you are looking to see how things might have changed, if they have, from what was evaluated previously?
A. Yes.
Q. Have you ever reviewed Sean Tillotson's

Page 62

autopsy report?
A. No.
Q. What is -- in general terms, are you aware that on June 30th of 2014, he died?
A. I'm aware of that, yes.
Q. Have you seen the complaint that we filed in this case?
A. That's what I saw. Yes, I saw the complaint.
Q. There are some facts set forth in the complaint. They're not in dispute, I don't believe. I'll represent to you that Sean had left his home and was on his way to a youth leadership conference or retreat in Wyoming. He was changing planes, traveling alone in the Denver airport, and he collapsed at that time, and shortly thereafter was pronounced dead, and was then examined by the medical examiner in Denver, who did an autopsy report, that's a matter of record in this case. When he was evaluated in the autopsy, they found a mass that they described to be malignant in his left kidney and extending to some degree out of the kidney into adjacent vessels that was 21 centimeters by 11 centimeters in size, and they have -- they did pathology and there's various

Page 63

descriptions of the type of cancer that was present, and I'll represent to you that, unfortunately, portions of that tumor embolized, if that's the correct word, through his blood stream, to his heart and lungs, and that was the mechanism of his collapse, and, presumably, the mechanism of his tragic death. Is any of that, some of which was in the complaint, information consistent with what you understood happened to this young man?
A. Yes, based on the complaint that was filed with Dartmouth, and what I read there, I believe all that was in there.
Q. Do you have any personal knowledge about any of the events of his death or what happened to him in that tragic circumstance?
A. I do not.
Q. You have not been in touch, for example, the people in Colorado who may have attended him or the medical examiner people, or any of the first responders, or anybody else?
A. No.
Q. You have no first-hand knowledge of what might have befallen him that day in Colorado?
A. No.
Q. Do you have any knowledge or first-hand

Page 64

information about the Tillotson Family, or know anything about them or Sean from community context, or a friend of a friend, or I know a guy, or anything else?
A. No.
Q. So, through the family, other than meeting them and the context of care and portions of the family, Mr. Tillotson and Sean, I know you met, you don't have any other knowledge about that?
A. I do not.
Q. I'll represent to you that he had been followed from about age eight initiating with blood in his urine, which was reported, and led to an evaluation ultrasonically over a number of years, and you've seen through the PACS system, I know that those studies are available, and some of which you reviewed. Is that true?
A. That's true.
Q. He was also a recipient of a CT scan back in an early period of time. In very general terms, it was thought by his providers that there was an area of echogenicity -- I'm sure I'm mispronouncing it.
A. No, that's correct.
Q. An area of radiological focus through the ultrasound that they were following, and they would

watch and they would size, and they would comment that it seemed to be not changing, et cetera. That process did not continue every year, in particularly as he became a teenager, it skipped some years, and he had had -- I think his last evaluation of that sort about two years before, in 2012, before his death, but in any case, is that description I've provided you in very general terms conform to you. Do you understand what he had gone through in terms of care and following?
A. Just based on the radiology I saw, clinically, I have no idea what happened and why those exams were skipped, and what his clinicians were thinking. I would agree with that course of radiologic imaging.
Q. Is it of significance -- for example, you're on May 1st, trying to assess what might be the cause of this frank bleeding that's occurring and showing up in his urine, to know of or to examine the earlier studies that he had been followed for? In other words, is that prior history of any significance to you as a diagnostician?
A. Absolutely.
Q. Why is that? What is it about that that's important to you?



A. To see if there's any change over time.
Q. And the idea would be he's now got a new symptom today, which is bleeding in his urine, is this perhaps related to some change in what's going on in his kidney?
A. It's one of the items that I would look at when reviewing -- in doing his study.
Q. When you received the order for this assessment from the emergency room department, and I think this is referenced in your supplemental summary, you commented that it was to check for the possibility that there might be a rupture of his kidney, is that right?
A. That's what the emergency department was concerned about.
Q. "An ultrasonic order from the ED to rule out a ruptured cyst on the left kidney." Would I be right in assuming that that would certainly be one of the things that might, in some cases, cause the kind of symptoms he was suffering, right?
A. Yes.
Q. But there are other things that could be causing bleeding that would show up in his urine, as well, is that right?
A. That's right.



Q. When you do the evaluation ultrasonically, would I be correct that you're not in a narrow, in terms of field of view, only looking at, "do I see rupture here?" I'm assuming you would be looking, following the protocol for this type of a renal ultrasonography, looking for abnormalities of other sorts that might show up?
A. That's correct.
Q. Am I correct in assuming what the emergency room doctor is saying is, "this might be something we think, you know, could possibly be explained by rupture, would you look for that," but they're not limiting you or structuring this in a way that doesn't cause you to go through what would be the sort of standard care for evaluating this kind of symptomology?
A. No, I wouldn't.
Q. You're going to look for it all?
A. Everything.
Q. Assume -- well, is there anything about the information relating to Sean's death and, particularly, the fact that he was found to have this malignant mass and to have suffered these embolized tissue necrosis into his heart and lungs, that you've received data or information that



suggests that it's incorrect? In other words, "no, that's not what happened to him." Do you have information to the contrary about his death and his circumstances in Denver?
MR. SHAHI: Again, other than discussions with Counsel.
BY MR. FELMLY:
Q. So, I'm asking you -- I've represented to you a summary of what the autopsy report says as it's pertinent to it?
A. Yes.
Q. If you said to me, "well, I've seen something else. I saw the second autopsy report that I don't know exists, or I've looked further into this, or I think it was different." I'm assuming you've not seen any other documentation about that, that would educate you differently. You told me you haven't talked to people about what happened to him. You're not a recipient or possessed with knowledge that would say, "those facts you've described and you put in the complaint, Mr. Felmly, are not consistent with some other body of information." You haven't heard that?
MR. SHAHI: Again, other than

discussions with Counsel, you can answer.
THE WITNESS: No, whatever was in the complaint -- I guess I'm not really understanding your question.
BY MR. FELMLY:
Q. Well, I'm not interested -- I mean if you say to me, "look, Counsel described to me their theory of the case." I'm not at all interested in that. If you said to me, "Counsel provided me with an affidavit of the medical examiner that had different information." That is actually not predicted by Counsel, that would be providing facts. I'm assuming you have not received from your legal team first-hand facts relating to what happened to this boy, have you?
MR. SHAHI: He can answer what documents he's seen, but you started with that, and then you switch with general information. So, you can answer the question, whether or not you've seen any documents that provide information relative to what Counsel has described to you and alleged in the complaint about the circumstances of Mr. Tillotson's death.
THE WITNESS: I haven't seen any documents.



BY MR. FELMLY:
Q. Do you have any reason to believe that the sizing of the tumor, that was described by the Denver medical examiner, which I represented as 21 by 11 centimeters is incorrect?
A. Without -- I'm not a pathologist. I wasn't there. A giant tumor, I can't say much about it.
Q. So, that autopsy happens on July 1st of 2014. So, we're essentially two months out from the occasion where you were ultrasonically examining that kidney. Would you agree with me that it's more probably than not that a tumor of that size was present to some degree on May 1st of 2016?
A. Based on my imaging, I didn't see a tumor there.
Q. I'm asking you now with the benefit of this hindsight, and as a physician that understands the anatomy and understands these processes, and recognizing that sometimes things are not visible to you in ultrasonography, do you think it's more probably than not, in retrospect, that it was there? Maybe not at 21, but a significant lesion?
A. I would agree that there was a tumor there.
Q. Have you looked at all at the issue of



sizing or the rate of tumor growth of renal carcinoma to try to get a sense as to what might be either the speed or the percentage growth that might occur in a 60-day period?
A. No.
Q. I want to turn to the procedures that are followed in connection with events or shifts, if I can call it such, as the one you were on on the evening of May 1st when you came in contact with Sean, and try to get an understanding as to how things happen, who schedules what, how things are reviewed, how reports are prepared, and I'll bounce around a little bit, but that's where I'm going.
A. Okay.
Q. My understanding is that you were a radiology resident that was on duty, if I can use that term, on an evening shift that would have included the evening hours of May 1st, is that right?
A. That's right.
Q. If you can recall, what's the hours of that sort of tour of duty for that night shift? When does it ordinarily -- I'm sure there's some variation, but what's the normal sort of time period of that at that time?



A. Back then, 8 a.m. to 8 a.m.
Q. You would have started the morning of May 1, and you were going to be at the hospital and go off at 8 a.m. on the morning of the 2nd?
A. Correct.
Q. How broad is your responsibility in terms of radiological events in the hospital? Are you covering all departments, all in, or is it just the emergency department, or what's the scope of your responsibility?
A. I have to think back. When I was a resident on call back then, things have changed significantly, it was mostly urgent study, so STAT primarily from the emergency department, or STAT floor cases. That's what we were responsible for, if I can remember correctly.
Q. And how many -- I was going to say people like you. How many residents would be on tour, if you will, or on shift at that 24 hour, 8 a.m. to 8 a.m., period?
A. In the radiology department?
Q. Yes.
A. Just me, starting at 5 p.m., on-call by myself.
Q. So, during the more typical workday, the 8

to 5 period of the day, there are others on duty?
A. Yes.
Q. But the night shift, presumably, because it has less volume, because it's not going to have a lot of elective type of procedures, you're going to have people that need urgent care coming in, it's going to be a smaller staff servicing those?
A. Correct.
Q. And you're going to be it?
A. That's correct.
Q. My understanding is on that day, Stephanie Yen had some responsibility to this matter as attending, is that accurate?
A. So, she was the ultrasound attending the following morning. I'm not sure if she was the actual attending on-call that night. So, when I was a resident, back when we were taking solo calls, there would be a, quote, unquote, "body person" or "general radiologist" on-call for questions, and there would be a neuroradiologist on-call for questions, and then the following morning we would review those cases with the respective sections, so ultrasound, chest, MSK, body, neuro.
Q. I'm not sure I entirely understand what



on-call means. That doesn't necessarily mean in the building?
A. They were not in the building.
Q. After 5 p.m., they were not in the building?
A. Right.
Q. They may have well been in the building, I gather, earlier in the day?
A. That's correct.
Q. And they're going to be back in the building after 8 a.m. the following morning?
A. That's correct.
Q. Just for an example, it's not Sean's case, but there's a horrible traumatic car crash, and three and four people are badly injured, and all kinds of bones are broken, head injuries, the whole nine yards, and you're the person in the building, and emergency department says, "we got a real problem here. You're going to be involved." Is it likely that other people are going to be made available for that kind of a situation in the building, or are you going to cover all of that, and deal with patient one and patient two, and somebody has a femur, and somebody may have a concussion, are you doing it all?
A. No, in that case, when the volume gets so



overwhelming, we would call the attending in.
Q. You would have a list and you would know who that person is?
A. That's correct.
Q. This is not like, "can I ask you to do a favor?"
A. No, that's their job.
Q. It was my understanding, and I'm just speaking to this as my understanding, because I took her deposition for four or five hours, or whatever it turned out to be, that she was the person on-call that evening.
A. Okay.
Q. And the PACS audit reflects the fact that she entered that system and reviewed certain images that evening. It also indicates, and she testified, that she was coming in the next morning, and something like 8:04, she's back online in the hospital looking at things, but at any rate, if you needed help, if you say, "my goodness, the volume is just terrible." She would have come in. Presuming, I'm right, that she's the attending. The attending would have come in, if I'm right that it was her, she would have come in?
A. Absolutely.



Q. Would I also be right that you as, what are then, a second year resident?
A. That's right.
Q. If you said, "I don't know what this is. I need some help on it." You're trained, and it's your responsibility to reach out to that attending, is that true?
A. That's true.
Q. And that might involve saying, "you have to come in here and look at this," or it might involve contacting the attending at her home or wherever she might be, saying, "I need your assistance?"
A. That's right.
Q. So, you have a way to get in touch with the attending when they're on-call?
A. That's right.
Q. I'm assuming during the entire period of your residency, you drew that night shift a lot of times. This wasn't a once in a lifetime event for you, I'm guessing, for your multiple year residency?
A. That's correct.
Q. There would have been, am I right, many occasions where you would have had some ability or requirement in your mind to contact the attending,

who was off-site, to get input advice, different thoughts, or to request assistance?
A. That's correct.
Q. How common is that? In general terms?
A. I can't even -- I guess it all depends on the strength of the resident on-call, in addition to the volume at the time.
Q. I'm talking about Brian Girard?
A. Oh, for me?
Q. If you said to me, "look, the last thing I'd ever do in my life is call an attending, because I don't want to be" --
A. No, I am not an hero.
Q. I don't need a precise number, but is this something that when you're on the night shift, you know, one out of five nights, you might have some contact or send an e-mail or have a phone call with the attending, or is this something that would happen, you know, twice a year? What's the relative frequency of something like this?
A. I would say that I was in touch with the attending during my second year a handful of times. I can't even give you a number, to be completely honest.
Q. What would be the typical manner of



communication? What most often would be the way that's done? Do you call their cell?
A. Call their cell or page them.
Q. You folks had pagers that will electronically provide a notice to the attending, who will have that somehow instantly go off, and that tells them call Dr. Girard?
A. Yes.
Q. And he or she who's the attending will know that you're on?
A. Absolutely, yes.
Q. And does the pager allow you to say anything substantively about it or just I need you?
A. Yes, there's a text function on it.
Q. So, it might say --
A. I would put something like, "want to review a case, please call."
Q. If, alternatively, you can get on the cell phone and say, "Dr. Yen, listen, this is the situation I've got. I wonder if I can ask you to take a look at something." That can happen and it does happen?
A. Yes.
Q. And it's supposed to happen if you have the level of concern that says, "I need more expertise



from somebody who has more experience than I do?"
A. That's correct.
Q. And, indeed, that is the responsibility of both the attending and the resident to have that kind of communication in the exercise of providing great patient care or excellent patient care, because you want to make sure that if somebody is uncertain about something that they do their best to try to get more information or more expertise?
A. That's right.
Q. So, this is not an imposition. It's not discouraged?
A. No.
Q. Nobody gets mad if you call?
A. No.
Q. Are those mechanisms of communication, the pager or the cell phone, sort of the exclusive way that happens or do you -- lawyers tend to live by smartphones and e-mails. Do you also use e-mail?
A. No, I never used it.
Q. So, the pager function has a texting ability that allows information to be sent?
A. Yes, unless they changed it since I've been a resident.
Q. Do you know if that information is archived?



In other words, if you sent a pager notation, hypothetically, on the evening of May 1, and said Dr. Yen, I need to have you review a case. Is that something that would be preserved?
A. I have no idea.
Q. If you called on a cell phone, in terms of the preservation of that, it's going to be dependent on what the person's cell phone provider may or may not have. If you had made a cell phone call on that evening, either to the attending or to somebody else that evening, would those records of yours still be available?
A. Yes, I think so.
Q. Have you checked at all to determine if -- and I'm, obviously, not interested in calls that are personal or anything?
A. Right.
Q. I'm interested in whether or not there was any communication between you and Dr. Yen that evening. Have you checked to see if there was any cell phone?
A. No.
Q. You don't know?
A. I have no idea, nor did I check.
Q. So, on this subject, according to Exhibit

Page 81

33, and it's written in the third person, but I'm assuming it comes to you, and I'm asking you under oath. You do not recall whether you spoke to Dr. Yen about Sean's ultrasound?
A. That's correct.
Q. And by that, I'm taking it in the way it's phrased, which is, at any time?
A. That's right.
Q. And I realize we're harping back to events that are now more than two years ago, but the timeframes when this answer would apply would be, for number one, during the evening of May 1, when you were the resident on-call, and she was the attending off-site, and during that night and into the early morning hours up until 8 o'clock in the morning, when your shift ends, you don't know or recall whether there was any communication with her?
A. That's correct.
Q. If there was, it most probably would have occurred by either the pager or cell phone?
A. Yes, or the hospital phone.
Q. Now, let me -- there's a new media has come in. So, tell me about the hospital phone?
A. I could have called, I guess, her home

Page 82

phone. I can't remember how she preferred to be contacted, but I could have called her or paged her using either my cell phone or the hospital phone.
Q. The hospital phone would be somewhere on a desk or somewhere in your workstation area, right?
A. Right there.
Q. And then the question becomes what number -- "I want Stephanie Yen." What number do you dial for that? You would either be dialing her cell?
A. Or her home.
Q. If you dialed her extension in the hospital, do you know if it would be forwarded to her home?
A. I don't know that.
Q. While you might have used the hospital phone to access her, you probably would have called, if you did call, you would have called a number that you knew to be associated with her, and that would, presumably, be, at least off hours, her home or her cell?
A. That's correct.
Q. Or you hit a pager number, which would be linked into what? Her cell? She has a separate device?
A. Yes, it's a separate pager. You carry it and you go through -- you can either dial it in and

Page 83

send a numerical text, or you can go in through their computer system at Dartmouth, and you can type it in.
Q. But, again, resident on duty -- we're already in the world where you're not going to pester or contact the person off-site for trifles or things that aren't important, this is something you're doing because you need assistance or experience or insight, or something, you're probably going to want that done pretty quickly, aren't you?
A. If I need help, yes.
Q. To get it quickly as opposed to, "hey, by the way, have you seen this article in a radiology magazine or something," this is something where you're going to likely do it by the pager or by cell phone, aren't you?
A. Yes.
Q. When that happens, a couple of means of communication comes to mind, one is it's on the phone, and she picks up and you talk about it, and you say, "look, I have this particular patient. I have this particular issue. I'm a little concerned about this. I'm not concerned about that. I'd like you to take a look at these images. Can you

Page 84

look at them tomorrow. Can you look at them. I'm really kind of concerned, I'd like you to look at them tonight." You can do that, right?
A. Yes.
Q. She described to me that, at her home, she did access imaging that evening on Sean Tillotson, and this is in her deposition, sworn testimony, and that she did it through her laptop computer, and as I understood it, she entered the PACS system through that portal or through that device, and was able to review images. Is that consistent with your understanding of what the capabilities of that are?
A. Absolutely.
Q. You've done that?
A. Yes, I have.
Q. This is not uncommon?
A. No.
Q. She described to me that the laptop doesn't have quite the -- I'm going to say precision or the clarity of the presentation or the review monitors that might be present in the reading room, but that it's certainly adequate to give an assessment of what the imaging looks like?
A. I would agree with that.

Page 85

Q. So, let's just assume, hypothetically, that there's a particular image from the ultrasonography that you want her input on it, and you want her to look at it?
A. Mm-hmm.
Q. And you want her to look at it that night, okay?
A. Yes.
Q. That's my hypothetical, if you will, and you want to talk to with her about it?
A. Yes.
Q. Can she bring that image up while you have it up, so you can both, from your separate locations, discuss and compare your observations of it?
A. Yes.
Q. And, indeed, that would be important, I assume, to a collegial interaction involving a visual image?
A. Yes.
Q. In order to gain her expertise and experience, it would be preferable to have her looking at it, while you're looking at it, and while you're communicating?
A. That's right.

Page 86

Q. And that's an experience that you have had as a resident and as a radiologist, and it seems to be something that occurs from time to time?
A. Yes.
Q. And are trained that you can make that happen?
A. Yes.
Q. And I'm assuming, encouraged, that if you think you need insights on a particular reading, and you're uncertain, and you think that the attending could be of help, "please do that, please schedule it," so that you're both looking at it from your respective locations, and get that input with regard to it?
A. That's right.
Q. And you don't remember if that type of interaction with Dr. Yen occurred on the evening of May 1?
A. That's right.
Q. But you can't exclude that possibility?
A. I can't. I don't remember what happened that night. I'm sorry.
Q. Just so we understand why I'm asking some of this. Are you aware that the PACS system that evening indicates that shortly before your

Page 87

preliminary report was transcribed at about 10:57, you both, Dr. Yen and yourself, were examining the image at the same time, 10:51?
A. Yes, but possibly independent of each other.
Q. That was one of two possibilities that was in my mind when I thought of that question last night?
A. Mm-hmm.
Q. There is the opportunity for each of you to access the system and not do the sort of -- to not be communicating together at the moment you're looking at it?
A. That's correct.
Q. Would you agree with me, in light of what you say about the timing of the re-measurements you did of the images, that -- I think you were saying it would have happened between 10:10 and 10:57 p.m. This is right in the middle of your paragraph?
A. Yes. The re-measurements would be after the time-stamped ultrasound images. So, basically, take the ultrasound images, they're stored, and then you transfer them, you end the exam, it gets transmitted to PACS, then you go back on the workstation and review them, and then I can do whatever I want with the images at that time.

Page 88

Q. So, the 10:57 is sort of a -- not wall, but the time bar at the back end, because you know that's the time that's associated with the issuance of your preliminary report. Is that right?
A. Yes.
Q. So, whatever remeasuring took place, it had to happen before you issued the preliminary report, because the resizing, if you will, of the longitudinal dimension of the left kidney, the 11.9 that you described it as it's size, is in the report at 10:57?
A. That's correct.
Q. Whatever review or rethinking or remeasuring or reconsideration you made of the films that were done, or the images that were prepared earlier, that has taken place before 10:57?
A. Yes. Whenever the preliminary report was done, the measurements that are in that preliminary report are the measurements that I made in that time period. I wouldn't be able to go back and change my preliminary report, and you guys would have access to that, if I made two preliminary reports.
Q. Let me show you a document that I received -- I think I got it yesterday. Yes, I think it was

yesterday. The document that I'm showing you is an emergency department -- patient care timeline is what it's called, and this document was brought up in the deposition of the emergency room attending, Dr. Yanofsky, and he said he had reviewed this document before his deposition. I'll represent to you this is not a document that is in the Sean Tillotson sort of formal or specific medical record, but it is a hospital, Dartmouth-Hitchcock Medical Center generated document, and leaving aside how it's prepared and whatever, Dr. Yanofsky indicated to me in his deposition that it was a helpful summary of when things happened, and it's, obviously, drawn in some fashion, probably through expensive software from data in the record, and in particular, what I want to focus on is over on the second to the last page of this document, where if you go to timing at 10:45 -- and again, I'm thinking of the transcription time of the release of your preliminary report is 10:57, and I'm trying to ask the question, when might you have been remeasuring and re-looking at the images after they had been completed? It indicates that at 10:45 the patient has returned from ultrasound?

A. Mm-hmm.



Q. And in light of that time and in light of the fact that I read your supplementary summary, that we marked, as saying that you did the remeasuring after the patient had left the ultrasound table or the place where that occurred, do I have that right?

A. Yes.

Q. And I don't know how long it takes to bring the patient from where you ultrasonically examine him back to the ER. Is that a matter of a short distance, or long distance, or what?

A. It's not a very long distance, but it all depends on the transport who's called to bring him back, sir.

Q. We have a timeline that tells us he's back in the emergency room at 22:45. We don't know when that journey began for him from transport from ultrasonography, although there's quite a bit of precision in these timeframes that are used in these reports. I mean as in -- not just the seconds or the minutes, but also sometimes the seconds. Does the that help in terms of knowing that he -- you know, they're reflecting him as back -- and I'm really saying, if you look at the entries that are there, they're quite precise. In



other words, can we be fairly assured that he probably was reported back in the ER quite close to 22:45?

MR. SHAHI: I'm just objecting to the form.

BY MR. FELMLY:

Q. Do you understand my question? Let me try to clarify, because it's not entirely clear.

MR. SHAHI: It was a very long question or statement.

MR. FELMLY: I don't disagree with you. I'm going to try to make it clearer.

BY MR. FELMLY:

Q. What I'm trying to do is to try to get an idea of when you're probably remeasuring these, because we know it's after he left, and I realize this is not precise because we don't have a videotape of him leaving, but we do have a fairly precise indication of when he arrives back in the emergency room.

MR. SHAHI: Objection to the form.

BY MR. FELMLY:

Q. And so my question to you is, does that assist you, as you think in terms of the window of 10:10 to 10:57, that it was likely that you're



doing your remeasuring closer to the 10:57 end of that window rather than the 10:10 end of that window?

MR. SHAHI: Objection to the form. You can answer.

THE WITNESS: What's that? I can answer?

BY MR. FELMLY:

Q. You can answer.

A. I made the images sometime after -- or I made the re-measurements sometime after 10:09 and before 10:57. When? It's just impossible to say when I did it, unless -- I just don't know.

Q. I know we're running short on tape, and I'll just go a little bit longer, and then we'll take a break and change the tape.

As you sit here, you don't have a recollection of talking with Dr. Yen that evening from her location at her home about Sean's case or any questions you have, is that correct?

A. That's correct.

Q. You cannot, categorically, say that did not happen, however?

A. That's right.

Q. And if it happened, could it have involved

Page 93

the discussion of remeasuring the size of the longitudinal dimension of the kidney?
MR. SHAHI: Objection to the form. You can answer.
THE WITNESS: We would have discussed all aspects of the case, yes.
BY MR. FELMLY:
Q. I mean this is a situation where after you're done taking the images, you go back to start preparing your preliminary report, and in that process, you look at those images and you say I want some more information?
A. That's right.
Q. And the reason you did that and made the additional measurements was to try to clarify or satisfy yourself with more information?
A. Mm-hmm.
Q. Is that true?
A. That's true.
Q. And part of the more information you wanted was -- you had, when you did your first images and had placed markers, using the procedure you had been trained with to try to identify the longitudinal dimension of the kidney, you noted at some point in that process that those size markers

Page 94

were larger than what would have been expected. One was 15.8 centimeters. One was 13.5 centimeters?
MR. SHAHI: Objection to the form.
BY MR. FELMLY:
Q. Is that a fair statement?
MR. SHAHI: Again, same objection.
THE WITNESS: Does that mean I can answer?
MR. SHAHI: Yes.
THE WITNESS: Yes, the initial images I made were on the fly, per say, so I went back to the workstation, as I tended to do over my residency, I would often remeasure things.
BY MR. FELMLY:
Q. So, when you saw 15.8 and 13.5, particularly where the right kidney was 11 point -- I forgot the number, but it was in the 11. There was a significant discrepancy between the size comparison from what your measurements at least showed?
A. That's correct.
Q. And that a concern -- that discrepancy with the right kidney would be a concern and would need to be followed up and answered as to why that's happening, right?

Page 95

A. If I thought those measurements were real, yes.
Q. And if those measurements are real, for the left kidney, this is an abnormal sized kidney?
A. That's correct.
Q. You're asking yourself the question, did I place the markers in the wrong place and get readings that are not accurate and need to be redone?
A. That's right.
Q. And that's what results in the remeasuring?
A. That's right.
Q. And that type -- let me just ask you. Had that particular experience, I'm talking about the longitudinal size of a kidney, which has very specific renal imaging policies at the hospital, indicates they should be measured two times?
A. Mm-hmm.
Q. You would have then known what the average size of an adult's kidney would be?
A. That's right.
Q. Had the situation ever occurred before where you said, "I don't think these measurements on the longitudinal size of the kidney is correct, and I need to go back and do these over." It's that

Page 96

specific. I'm not asking about a spleen or a pancreas, the longitudinal size of a left kidney, have you ever had a situation where you're saying, "I think these markers are not in the right place." Can you remember that happening?
A. There's no way I can remember that.
Q. I'm not saying -- my question doesn't require you to say I'm assuring you that never happened before. I'm just saying, do you have a conscious memory of such an example?
A. No.
Q. You could be saying to me, "Actually, Mr. Felmly, that happened on January 25th?"
A. No, I don't have a recollection of that.
Q. Thank you. Why don't we take our break here. The tape needs to be changed. We've been going a long time. Let's take a 10 or 15 minute break. Is that agreeable?
MR. SHAHI: That's fine.
VIDEOGRAPHER: Time is 1:53 p.m. We are going off the record.
(Whereupon, a discussion was held off the record.)
(Whereupon, Plaintiff's Exhibit 34, a document, was marked for

Page 97

identification.)

VIDEOGRAPHER: Time is 2:08 p.m. This is tape two of the deposition of Brian Girard. You may go ahead.

MR. FELMLY: Thank you. Just as we were going off the record for the brief break, we took this emergency room document, the timeline, we marked as Exhibit 34. I just wanted to note that on the record.

BY MR. FELMLY:

Q. Let me go back to what I was asking you about involving the procedure when you're on duty in the hospital and the attending is out of the hospital, such as was the case on May 5 -- excuse me, May 1 with Dr. Yen. You've described how you can reach her at home through the paging or through the telephone, if you feel the need to do so. Is there also any procedure that requires you to regularly report to her? In other words, is there part of this process where you would update her on each occasion when you'd have the night shift the day before?

A. During the evening hours?

Q. Yes, or whenever. Do you have a process where you meet in the morning or?

Page 98

A. Yes.

Q. Tell me what that process is, whereby the resident that was on the night shift informs or updates the attending on what happened?

A. Sure. We read off a list, and I'm just giving you an overview. If you read X number of chest x-rays, you do X number of ultrasounds, and do X number of body CTs, each respective section within the radiology department has experts in those fields, and they read those out. So, the resident is supposed to, in the morning, review those cases that were read by those sections in the morning with the attending that's on that day.

Q. When you say reads those out and reports on these, is this a face-to-face meeting, or do you write a report, or do you get on the conference call? How is this accomplished?

A. It's usually done in person.

Q. When it's not done in person, how is it done?

A. I guess it could be done by phone call, but although I've never experienced that. It's always been face-to-face. Back then it was always a face-to-face interaction.

Q. And in connection with this case now, do you

Page 99

have a recollection -- I gather from your note and your supplemental response, you don't have a recollection of meeting with Dr. Yen to report on the morning of May 2nd?

A. That's correct.

Q. That may have happened, that commonly would happen, I gather is what you're saying, but you don't know if it did happen?

A. That's right.

Q. When that occurs, is it just the resident that was on the night shift that is present, or would other residents, perhaps, with some of this other information you were talking about also be reporting in? Does this meeting involve two people or more than two people?

A. It's usually the attending on. Sometimes there's other residents in the room. I would walk in. I would review the case with the attending. I would say, "do you think there are any changes," what have you, and then I would leave.

Q. Does that happen at about 8 o'clock as you're packing up to go home?

A. Yes, or very soon thereafter.

Q. And the location of that -- when that meeting happens, the location that that generally

Page 100

occurs at is called what? What's that place?

A. The reading room.

Q. And tell me what -- where that is and what the characteristics of that are?

A. Each section has their own reading room. So, for ultrasounds, specifically, if I can recall correctly, there was three workstations in the reading room. One for the attending and one for various residents, and that was immediately adjacent to the ultrasound workrooms, where the ultrasound techs would work, and they would periodically come in and out during the day to review cases. So, that would have been the place that I would have reviewed the case.

Q. In connection with these other residents, and I'm representing to you that Dr. Towle and Dr. Lewis are shown in the PACS report of viewing some of the images that are involved here. Would they commonly get access to or be asked to review images for some teaching purpose or something?

A. Sure, yes. That's part of the learning process to review cases throughout the day.

Q. Is this a formal presentation? Is there sort of a methodology to this, the way the officer of the watch in a military context would present to

Page 101

the commanding officer about the events of the night before?
A. No. So, I would come in, and I would say, "these are the cases I had. Just take a look, or have you looked at them." They would either say, you know, "I thought this was bad, or everything looked great," and that would be it.
Q. Dr. Yen described in her deposition that she did enter the PACS system and reviewed some of Sean Tillotson's images, both with respect to the May 1 study that you had done and also some of the earlier studies that had been done, and she described that she did that on her laptop, and, you know, not to claim that I'm exactly quoting her, the gist of it was that she was sort of orienting herself and thinking of what the morning was going to bring, and she was taking a look at things from the point of view of just getting a sense of what was going to be sort of in front of her when she got into the hospital the next morning. So, I'm wondering the extent to which you had experience with her doing that previously, or knew that she did that, or was there something unique or special about the evening of May 1?
A. That's her routine.

Page 102

Q. And in connection -- would her routine be to go come back, commonly, and look at prior studies that might have been taken years before?
A. You probably have to ask her, but it was her -- if you were on-call with her, she cannot let work go. She would always be on looking at images to make sure everything was okay. So, whether or not she reviewed other studies when she was looking at that, I can't comment, but most radiologists look at old images while they're reviewing the current ones.
Q. If she had been in your presence -- in other words, if it was during the normal workweek, not the evening and she was right down the hall from you or, perhaps, even walking by the ultrasonography suite or room, and you were in that process where you were making the decision whether you were going to remeasure any of the prior images and see the longitudinal size, for example, is it likely you would have asked for her insight or view on that rather than simply -- if she was readily available, in other words, not going to have to call her at home or anything, but she's right there would you have said something to the effect of "what do you think about this size imaging on this

Page 103

kidney?"
A. You know, probably not, based on those images. After reviewing them previously, the remeasurement that I made, I thought then and I still feel, is pretty accurate to the size of the kidney at that time.
Q. So, you don't think you would have talked with her about that?
A. Not immediately, no. I would have reviewed the case like a resident, and at a further time we would have discussed it, but at that time, I don't think I would have spoken with her.
Q. Am I correct, because there's no reference in the report that you prepared or in any other documentation that, at least I'm aware of, that indicates there have been this remeasuring process that you had undertaken? It's not described.
A. You mean in my preliminary report?
Q. Right.
A. That's correct.
Q. I'm talking about the young man's hospital record does not say --
A. I remeasured the kidney?
Q. Right.
A. Right.

Page 104

Q. Having some concern about 15.8, 13.5, I decided to go back -- none of that is present?
A. No.
Q. The issue here is that you were looking at it and saying --
MR. SHAHI: Can Brian close the door? There's a lot of noise.
MR. FELMLY: Sure.
BY MR. FELMLY:
Q. I am correct that there's no medical record reference to the remeasuring process or the reasons that caused you to do it?
A. That's right.
Q. If Dr. Yen was aware of that she would have had to have obtained that information from you. Is that true?
MR. SHAHI: Objection.
THE WITNESS: I'm not sure what you're asking me.
BY MR. FELMLY:
Q. Do you know if Dr. Yen was aware that you had developed a concern about the size of the kidney and remeasured it?
MR. SHAHI: Objection to the form, but go ahead.

Page 105

THE WITNESS: No, I have no idea.
BY MR. FELMLY:
Q. If on the one hand, based on the difference in size between the left and the right that you originally measured, based on where you placed the markers -- are they called calipers?
A. They're calipers. That's correct.
Q. You made a decision, based on your visual assessment of the probable size and configuration of the left kidney, where to place the calipers?
A. At the time of the ultrasound.
Q. At the time of what?
A. The ultrasound realtime, yes.
Q. That is an effort to try to see visually where the lateral and medial margins of this organ are, and to place the markers in a place that will, as best you can do it, identify the longitudinal length, is that right?
A. That's right.
Q. And you do it two times?
A. That's right.
Q. And you do it two times, in part, because that's the required policy that exists under the radiology standards that apply, is that right?
A. That's right.

Page 106

Q. Is the two times to try to get it right? Is that the reason for doing it two times -- here by the way, we got this from Counsel, this is the renal imaging guidelines that Attorney Shahi forwarded us, and these were the ones that were in effect in 2014, and this indicates that "maximum measurements, minimum of 2, of renal length should be performed of both kidneys." You would have known that was the policy at the time and were trying to conform to that?
A. That's correct.
Q. Is the two times because these could have some variation and you want to confirm this important measurement?
A. Yes.
Q. The reason you want to confirm it is for the reasons we talked about before, where if they're abnormally large or small, there could be medical concerns or issues that could affect the patient?
A. That's right.
Q. You had already on two occasions marked -- I guess you freeze the study and you placed the measurements on images that are time-stamped at a particular time when you do that?
A. That's right.

Page 107

Q. And then the machine, or software related to the machine, makes the calculation of the centimeter distance between those two calipers, which defines the centimeter longitudinal length?
A. That's right.
Q. In one case here, it defined that length as 13.5, which is higher than is reported as normal for an adult, and the other one was 15.8, which is much higher than what is reported as normal?
A. That's right.
Q. And significantly higher than a 1 centimeter permitted variation between the left and the right kidney. So, these are not what you're expecting to see on the study, is that true?
A. Yes.
Q. So, you've got these unexpected findings that show the size is normal higher than is expected to be, and do you know notice that during the realtime study? In other words, you've made these markers, does this then print-up and say, Dr. Girard, it's 15.8 and 13.5, or does that only get programmed a half-hour later when the software runs or something? Does it show up right away?
A. It shows up, yes.
Q. You would have known at that time, because in that study the right kidney is done before the left, what the right kidney was?

Page 108

A. That's correct.
Q. When it showed up as 13.5 and then the next study is 15.8, are you saying, "I don't like that?"
MR. SHAHI: Objection.
BY MR. FELMLY:
Q. Or words to that effect, "this is unusual, or what do you make of that?"
A. No. Ultrasound is a dynamic and a very individualized modality, and often times, I would make measurements that I would go back and review on the workstation.
BY MR. FELMLY:
Q. Do you think during the actual study while the patient was physically there, you did not notice that these were higher than would have been expected?
A. No, I don't think so.
Q. If you had noticed it, would you have then done the re-calipering right then? In other words other, rather than going back and superimposing it on a prior prepared image, wouldn't you say, "I could do this a third time or a fourth time, or as many times as I want," right?

Page 109

A. That's true. You can take as many images as you want, but I think sometimes when you review the images on a workstation, you look at a whole picture a little bit more clearly. You're not as rushed. The patient is not there, and sometimes the measurements that you make, change.

MR. FELMLY: So, let's mark this study. It's attached to Attorney Shahi's memorandum, if Michelle can do that.

(Whereupon, Plaintiff's Exhibit 35, a study, was marked for identification.)

BY MR. FELMLY:

Q. I know I asked you this about your cell phone and you answered that. Do you know if the paging system archives would record or save messages that might have been sent between two practitioners on May 1, 2014?

A. I have no idea if they archive that sort of information.

Q. So, in terms of this study, when did you actually go back and review the prior ultrasonography and radiology that was available to you on the PACS system involving Sean in relation to the remeasurement and the preparation of your report?

Page 110

A. I probably reviewed the imaging after the study was performed. So, when I was making the comparison -- so, I had the images that I took, and then I go back and I look at the old studies to compare to what we have currently.

Q. So, when you were actually doing the probe manipulation and doing the actual imaging, you didn't have, at that point, a conscious understanding, even generally, of what the size of the kidney organs had been in earlier studies, or how this echogenic area that they had been following looked like? That didn't come to you until after you completed your study?

A. That's possible. Sometimes I would review the studies beforehand, and sometimes I didn't. I can't tell you with any sort of confidence if I looked at his study before I did his ultrasound.

Q. You know with respect to this study, because you've been informed of his history, that it's going to be important for you to look at the earlier studies and, particularly, the area that they had been following as a possible renal cyst, and you would want to look at that structure or that area that they were identifying upon to see whether it continued to show up here, because you

Page 111

had years of following that?

A. Right.

Q. You think you only started making those comparisons to see whether or not that echogenic area of focus had changed after you had made all of your images and made those first caliper placements on size and things, more likely than not?

A. I would agree with that.

Q. So, it now becomes very important when you're sitting down to begin to form your impressions, that you say now, "I need to look at those earlier studies to see if anything is changing here?"

A. That's right.

Q. We know when you did that, because the PACS study will tell us when you went into the earlier numbered studies, which have accession session numbers on them so we can identify by time, when Brian Girard, MD goes in and looks at those, is that right?

A. That's right.

Q. And we know when you're working on the May 1 study you're working on, because, similarly, that has it's own accession number, and we can also identify when Dr. Yen goes in to the May 1 study,

Page 112

and we can also identify when she goes into the earlier studies, because the numbers will track those entries as practitioners look at those images, is that fair?

A. Yes.

Q. This is Exhibit 9 in Yen's deposition. This is the PACS report. I don't know if you have a copy handy or if you've seen it before, but this is all of the reports for Sean's studies. So, this is not just the May 1 one, this includes his knee operations and a variety of other things, and we're going to focus on just several of them. The first two pages is, essentially, the listing of people who are identified in the reports and a helpful indication of who they are in terms of job description. If you -- maybe it's helpful to sort of put a dog-ear or put a finger on it, if you use -- because we'll come back to it in a bit, the May 1 study, that would be on Bates number, which is the Dartmouth-Hitchcock Medical Center numbers at the bottom of the page. That study, which is the May 1, 2014 study, is accession number 5769872, and you'll see that beginning on page 64. So, why don't you turn to page 64, and you will see -- and I guess I would ask you to confirm by looking at

Page 113

the dates that begin running at 9:37 that evening, is that the study that is the one you're going to be working on with Sean Tillotson that evening?
A. Yes.
Q. This is it?
A. Yes, I think so.
Q. The way this is broken up is the first three-quarters of the page, which is number 64 by Bates number, is the May 1 entries, and then when you get to that bold line that is about two-thirds or three-quarters of the way down the page, and beginning at 8:04 a.m., is the entries for the May 2, and then there are some entries that follow that on the second page. Does that all seem accurate to you?
A. Yes.
Q. Looking at that, there's a number of entries by somebody named, Maureen Adams, relating to what seems to be the scheduling or the setup of the exam. What is Ms. Adams doing in the 9:37 to -- it goes up to about 9:20 p.m. What is her role, and what is she doing as reflected by this PACS report?
A. So as far as I can tell, Maureen -- I don't know who Maureen is. She might have been the tech on-call that night. So, what her job would be is

Page 114

to start and complete the exam for me.
Q. But my understandings, and I will also tell you, sir, that this is confirmed by the Tillotsons. Mrs. Tillotson's recollection is that the person who actually was in the room while Sean was being ultrasound and operating the probe was a male, and she believes it was you, and I think you believe it was you, is that right?
A. Oh yes.
Q. So, I'm just not sure -- I understand there's a technician and stuff. Maureen may be supporting personnel here, but she was not manually doing this exam, I gather?
A. No.
Q. When we see exam begun, exam information reviewed and edited at 10:20 -- I don't know what exam arrival at 10:20 means, exam completed at 10:20, are these events that are involving Brian Girard, MD? Are you the person who's involved in starting this exam and working on this patient?
A. So, I could tell you the process.
Q. Sure.
A. I don't know this, but the way it works is the emergency department will call me and say we need an ultrasound on Sean Tillotson, and I say,

Page 115

"okay, thank you." As soon as I have time, what I do, is I go to tell the x-ray technician who's on-call, she's not even an ultrasonographer, then what would happen is, she would start the exam in the system, I would do the exam, I would tell her, "I'm done. "Please, complete this study." So, then the study is available to view on PACS. That's all her role is. She's in a separate room at a computer workstation.
Q. As best you can tell us from this, you are actually with the patient and conducting the ultrasonic exam at about what time?
A. Sometime after 9:40'ish, because my first timestamps are 9:48, so I could have taken a handful of images before that. I could have ultrasounded the patient. You could have been started in the exam, I could have talked with them, get a little history, and that could have occurred any time after the exam was started, I suppose. So, any time after 10:17.
Q. Any time after 10:17 is when it's, what, over, or what? I'm just trying to figure out exam begun, what does that word mean? Is that when the probe is starting to be passed over his body or not, because there are earlier timestamp images?

Page 116

A. No, no. I'm not sure what exam begun means. I really don't.
Q. We know from the actual images that there are precise timestamps when particular freeze shots were order or done by you, right?
A. Yes.
Q. That tells us precisely when this is happening?
A. Right.
Q. I was having difficulty squaring it with exam begun and exam completed, but maybe you are too, I don't know?
A. Yes. What I just described to you is the general procedure of how things are started and ended in the system, and how we interact with the technician. That's all I really know.
Q. Let's go to the 2010 examination of Sean's ultrasound, and let me just get the page number for you, try to get you cued in on that. So, I think that is on page 44 and 45. If you look at Bates number 45, this is accession number 4133970, and it is being done on -- the examination was originally done back in 2010 on April 9th?
A. Mm-hmm.
Q. That was a record or images that you

Page 117

accessed on the evening of May 1, is that true, according to the PACS study?
A. It looks that way.
Q. It looks like you did that starting at 9:26 in the evening?
A. Mm-hmm.
Q. Does that seem to indicate that before you actually did the examination of Sean, you looked at some of these images or not?
A. Yes, that makes sense.
Q. The first image that we have time-stamped from your May 1 ultrasound of him is at what time in the evening? The first one. It won't be on there, it would be on -- do you recall when the first image was that is actually in the set of his images?
A. No.
Q. Let me see if I can find that. What I've got in my hand, we marked all of his images earlier.
A. Okay.
Q. This is image 1 of 36 on May 1st. It's a right kidney long. It is that accession number, and it says 214832, which I'm taking to be -- the next one is 214841, and so on down the line. I'm

Page 118

assuming, at least the first time, you did a screen -- or, actually, I don't know if you've got a shutter or how you get these pictures?
A. No, if you just scan over, and there's a freeze button on the machine.
Q. So, the first time that you froze and took an image that you wanted to preserve as part of this record was at 9:48, and it may be that you had operated the probe for a little bit of time before that, right?
A. Mm-hmm.
Q. It tells us that you likely had gone back and looked at the 2010 imagery before you started it, right?
A. Yes.
Q. It also looks like you did that -- you did some clinical information viewed at 9:28, is that likely going to the report to see what that looked like, or what clinical information would you likely have viewed?
A. I would have probably looked at the images and then the report that went along with the images.
Q. And that would be -- clinical information viewed would be consistent with looking at the

Page 119

report?
A. I think that's a good -- yes. Sure.
Q. And then 9:29, it also says, "finalized results inquiry." Do you know what results inquiry means?
A. I have no idea what that means.
Q. Similarly, if you look at the 2005 study, and let me try to get you the accession number, it's going to be a similar situation. If you look at Bates number page -- no, that's not it actually. Hang on a second. I'm trying to get the right number here. Maybe it's the 12 -- excuse me for a moment while I try to find it. The challenge here is we have a bunch of knee operations and other things that are in the same timeframe. What I'm looking for is the 2012 injury?
A. 48.
Q. 48. Thank you. Again, look at the evening of May 1 and see if you can identify for me, if you look at -- yes, okay, so on page 48 of Yen Exhibit 9, it appears that at 9:34 in the evening you viewed the images, and then there was a gap, and you're back looking at them again at 10:33. So, does that suggest that you had a look at some of, at least, the prior examinations before you started

Page 120

the actual ultrasonic evaluation of Sean, and then after it was over, probably in that period where you're gearing up to write the report, you went back and looked at some of the other ones again?
A. Yes.
Q. It appears that Dr. Yen is looking at this 2012 report that evening, as well, is that true, at 11:45?
A. It looks that way, yes.
Q. If you go to page 28 of the Bates numbers and you look at May 1st -- on the evening of May 1st. At this time, it's 10:51, and you are looking at imagery, this would be six minutes or so before your preliminary report is issued, and there's also an indication that Dr. Yen is looking at that 2004 study, which I'll represent is the first ultrasound, I believe, done on Sean's kidney at 11:46 p.m., is that right?
A. I see this page on 28. 11:46, yes, I see that timestamp.
Q. Now, if we go back to the May 1 exam and we look at the evening --
BY MR. SHAHI: It's 64.
MR. FELMLY: Yes. Page 64.
BY MR. FELMLY:

Page 121

Q. Dr. Yen is looking at that examination at 11:47 -- from 11:44 to about 11:50, she seems to look at things that are recorded in the PACS system, is that right?
A. It looks that way, yes.
MR. SHAHI: I'm sorry to -- you can ignore this. Just for my own identification, I think you said earlier, the PACS showed that they were both looking at the image at the same time, and I wasn't seeing that, but you can ignore my comment, and tell me later. I just didn't see it.
MR. FELMLY: I'll correct if I'm wrong on that. I believe that there are images that she's -- she's certainly looking at the same images that night. Whether their exact time, I don't know.
MR. SHAHI: I apologize.
MR. FELMLY: I may have misspoken.
BY MR. FELMLY:
Q. What I'm trying to find out is, do you have any information that suggests, or was there communication between you, as to why she was tracking into the earlier images as you were that evening from home?
A. It's common practice to look at old images

Page 122

when you're reviewing a new study. I'm not sure what she was doing at home, probably doing her due diligence. She was involved with the case. She reviewed the case, looked at the old images to see if there were any big changes, just as I did when I did my exam. That's what I'm guessing, but I can't speak for what she did that night.
Q. What you would have had in your mind, as you began the ultrasonic examination, is what the kidney, particularly the left kidney, had looked like on prior examinations before you started to run the probe over his body and visualize it?
A. That's correct.
Q. And would have been sensitive to and actually purposely looking, when you did that, for changes that would compare in some disproportionate way to what you had just seen in his prior image?
A. That's right.
Q. And you would also be looking at -- so, what did that echogenic area look like in those studies that they had been following?
A. That's right.
Q. Is it your testimony that when you actually did these studies that you thought that they looked the same or comparable?

Page 123

A. I did.
Q. Did not notice the differences in the quality of the echogenic area or it's size?
A. I didn't.
Q. Did you notice any situations where they had to remeasure the left kidney because there was any confusion about what might be the lateral or medial dimension of the organ?
A. On the prior exams?
Q. Right.
A. I can't remember that.
Q. We received two sets of what were represented to us to be the entire set of images for Sean Tillotson. One, before we brought suit in this case, that we reviewed, and then one that came to us after suit was brought?
A. Mm-hmm.
Q. Neither of those contained the remeasured images that you've been discussing with us.
A. Mm-hmm.
Q. In other words, they were not provided us.
A. Okay.
Q. Do you know how it would happen, or how it could happen that somebody who was trying to fulfill an appropriate legal request for images and

Page 124

copies of images would not either access or provide the remeasured version of those?
A. I can't speak to that. I have no idea how the images are processed, or how they're delivered to outside parties.
Q. Do you know if they are stored in a way that does not cause them to come up when somebody goes into the PACS system?
A. I don't know the answer to that.
Q. In other words, how do you know whether when the next day Dr. Yen accesses the images, the remeasured images, of which there are several, were present or not?
A. Based on what I wrote in my preliminary report. It states I measured it at 11.9. Whether or not -- she must have seen the remeasured.
Q. That's what I don't know. You're saying she would have seen 11.9. She would have seen something that had 11.9 on it. She would have said --
A. I agree or disagree.
Q. That's a possibility. The other possibility is that she may not have seen it, and took your word for it and not noticed it. I don't know. I'm just saying -- what's your level of confidence,

Page 125

knowing what you know about the PACS system, that these are stored in a way that would make them available, in the context of my representation to you that on two occasions I got sets that didn't include them?
MR. SHAHI: Objection to the form. Go ahead.
THE WITNESS: I don't even know how I could answer that question.
BY MR. FELMLY:
Q. That's fair.
A. I can tell you that in my experience on other services, when things are measured, I can see them, and why you receive the images that you received, I can't speak to that at all.
Q. You're saying from your other experience when people have remeasured things, you can see that?
A. Correct.
Q. And that was at Dartmouth-Hitchcock or in other places?
A. That's right. Even down here, yes.
Q. But it was the case at Dartmouth-Hitchcock, you could see remeasures?
A. As far as I can remember, yes. That's

Page 126

correct.
Q. Let me just show you some exhibits that we've marked previously. Actually, what I want is the films that we marked in the earlier deposition, but they don't have the exhibit numbers on them. In Dr. Yen's deposition, I marked some images, and because we're on video and our operator will have to tell me if we're going to be able to capture this or not, I'm going to show these to you. I'm going to try to orient our testimony, or your testimony, to what is set forth here. The image that was number 9 of the series of 36 on May 1, 2014 is -- and I'll just hold it up so you can look at it, and also if our operator can focus in on that, it's labeled right kidney long, and it's a study that was done, I guess, as the ninth image in that series, and if I understand it, it's a view of the right kidney, which would be the kidney shaped bean structure that's seen in this area here?
A. That's correct.
Q. When we talk about calipers, there are cross marks that are placed by the radiologist at each end of what's perceived to be the kidney, and then the computer tries to determine what that size is for that right kidney, and calculates it as 11.7

Page 127

centimeter, and then prints it on the document. Is that right?
A. That's right.
Q. That's printed where on the document? Where do you see that?
A. (Indicating.)
Q. The right kidney had not been perceived as abnormal. They weren't following that, but part of the complete exam would be to look at the right kidney as well as the left, is that correct?
A. Yes.
Q. The next image, which is 21:57 in terms of time, is numbered -- is not the next one in the series, but the next one we marked. Just what does the exhibit sticker say, Dr. Girard, over the top, 16?
A. 16131.
Q. It was number 14 in the series of 36, and that's shown up there in the left corner. This is now the left kidney being measured on the longitudinal axis, and you, again, are placing, in your examination, calipers where you believe the longitudinal endpoints of the organ are located, is that true?
A. On these realtime images, that's what I

Page 128

measured.
Q. You could just use your finger, if you can, or perhaps use this pen, you can show us where you put the calipers?
A. Here and here. (Indicating.)
Q. That translated into a measurement of 13.5, which had it been noted by you at the time, would have been significantly different than the 11.7 that had been measured moments before for the right kidney, is that true?
MR. SHAHI: Objection to the form. Go ahead.
BY MR. FELMLY:
Q. Is that correct?
A. Yes.
Q. So, had you noted it at the time, and I realize you're doing things, and you're going to go back and look at it later, if you noted it then, you would have said, "I'm concerned about that size measurement?"
A. Yes.
Q. I am presuming that the exercise of judgment as to where you put the calipers is informed by your knowledge of both what radiographic images look like and also what a kidney looks like?

Page 129

A. Correct.
Q. You felt at the time you placed those images, and if you can hold it up again, that you were seeing -- I'm not sure whether you call it the diameter because it's not a circular object, but you're seeing the outer lateral and medial margins of it, and you felt at that time that you could identify and use your judgment where to put the markers?
A. At the time I did this, I put these markers on here, yes.
Q. And when you do that, looking at the -- is that the left pole or the upper pole of the kidney?
A. Upper and lower.
Q. When you're doing it at the upper pole, there is, visually on the film, differences in shading, is there not?
A. Correct.
Q. And those have a curved shape or radius to them that, at the time you did it, you felt were reflective of where the left pole margin of the kidney was?
A. Sure. Yes.
Q. That doesn't necessarily mean that it is kidney, does it?

Page 130

A. That's correct. This could be any sort of artifact, shadowing.
Q. Or it could be another mass?
A. I don't agree with that.
Q. Well, I'm not asking you, do you think this shows a mass?
A. Yes.
Q. I'm asking you a mass that was present could show a difference in shading between the mass and adjacent tissue, correct?
A. It could.
Q. And part of the job of the radiologist is to make sure when you're measuring the longitudinal size of the kidney, that you're measuring kidney, not some other tissue, correct?
A. Correct.
Q. Then on the next shot, 15 of 36, now done at 215743, so immediately sequentially, you took the second shot of the left longitudinal size of the kidney, and again, you marked the area with the calipers where you believe the kidney was located, because you thought that represented kidney tissue that you were marking?
A. At the time, correct.
Q. And when you did that, the computer

Page 131

imprinted and told you, and now us, that this distance between those markers is 15.8 centimeters, which is now quite remarkably larger than the right kidney, and quite remarkably larger than what you would expect to see in a 17-year-old boy with a normal kidney, true?
A. Yes.
Q. And very much remarkably larger than what had ever been shown in any of his prior studies going back to 2004, some of which you had looked at, right?
A. Yes.
Q. Had you ever seen a normal kidney at 15.8 centimeters on a longitudinal measurement?
A. In a 6'8" linebacker.
Q. Had you noted this at the moment you were doing the exam, you would have said this is not normal or acceptable, or this needs to be checked further?
A. Well, that's why I took several images, both transverse and longitudinal, and then I reviewed them on the workstation and reinterpreted them.
Q. Part of the reason you took two of the left kidney longitudinal is because it's the one specific multiple tests that's actually required by

Page 132

the renal guidelines, that we noted. It's actually called out as a requirement, is it not?
A. It is.
Q. Now, what you could have done, if you had chosen, is take additional longitudinal measurements, if you wanted more definition of that, there would have been no proficient or technological limitation if you said, "I want more -- the patient is there. "I want to get a better look at this." You could have done that, right?
A. I could have.
Q. Now, in addition to these measurements, which are shown on Exhibits 16, 17, and 15, from the Yen deposition, you are also seeing this in realtime and watching this on the video -- I call it a video, but a realtime moving image, is that right?
A. That's right.
Q. In addition to doing these frozen images, that become the still pictures we're looking at here, you also -- either you or the machine decides that we're going to do some video clips of this to represent what the realtime imagery looked like, is that right?
A. That's right.

Page 133

Q. Why is that helpful to the diagnostic radiologist who is looking at this and assessing this? Why is having a preserved copy of the video of the imagery important?
A. It gives the person viewing the images a better sense of what the kidney looks in realtime rather than frozen images.
Q. So, if you're evaluating for a particular shading differential or some sort of differentiation between portions of the tissues, looking at in realtime and seeing it, might give you a different angle, different perception on what this structure might be?
A. I agree with that.
Q. They're an important part of what you're seeing that goes beyond simply what we're now seeing in these frozen shots that you take?
A. Correct.
Q. When was the last time you reviewed -- are they called cine clips?
A. Cine.
Q. How do you spell that?
A. C-I-N-E.
Q. So, the cine clips are these mini videos that become part of this study, and they show

Page 134

several different motion picture studies of you doing the actual probe movement and what you see?
A. Yes.
Q. And the last time you looked at the cine clips for Sean Tillotson's May 1 exam was when?
A. July.
Q. Of last year?
A. Yes.
Q. And when you reviewed it, did you look carefully to see if it provided you any better sense or impression of the area that is now shown on Exhibit 15, for example, with the 15.8 centimeter change in tissue differentiation or shading, at least, and did it give you any better sense as to why you thought, when you marked this, that was the end of his kidney rather than perhaps another mass?
A. I cannot honestly remember what the cine images looked like, because we didn't review them in our most recent meeting.
Q. But it's probable that those images would contain images of the left kidney, right, and show what were seeing in part of in these exhibits that are before us right now?
A. It would give us a different perspective of

Page 135

the left kidney, the cine images.
Q. When you went back and remeasured the imagery, and that was just before you issued your report, we were talking about how you took the 13.5 sized image, which was 14 of 36, and again, take a look at this, this is a copy, is it not, of the image with the remarking or remeasuring that you did, is that right?
A. That's right.
Q. So, when the time comes, you're trying to get more information or better definition or get a better handle on why this image showed 13.5, when you used the calipers, as applied using your judgment during the study, you go back and you are now bringing up that image and superimposing new data on that older image. Do I have that right?
A. That's correct.
Q. And what you did with respect to this image is you looked at the area of the kidney and you decided -- well, what did you decide about the placement of your original caliper and why you were no longer comfortable with that?
A. I'm guessing back at the time --
Q. Don't guess, but give me your best judgment.
A. Looking at these now, I can clearly see the

Page 136

contour of the kidney, where I remeasured, whereas here, I could almost -- you could almost see the liver come up through the shadowing here, which tells me this caliper is outside the expected location of what I presumed to be the contour of the kidney on this measurement -- on this frozen image.
Q. Let me just ask you some things about this. Is this part of the margin of the kidney up here?
A. Yes.
Q. And this is an organ that we've seen repeatedly in other imagery going back to 2004 for Sean. So, we know it has sort of an oval or elliptical size, right?
A. Correct.
Q. This is kidney? This is kidney?
A. Yes.
Q. It's going to come around, somehow, to get back over here, right?
A. That's right.
Q. Is this kidney here?
A. This is kidney here.
Q. What happens with this oval or elliptical image when you get right about here? How does it get down to down there?

A. You can clearly see a hyperechoic area here, which I believe is the lower portion of the -- I don't know where -- upper pole of the kidney, and then you can see it coming across very clearly here, and you can tell a difference in echogenicity of the renal here versus there.

Q. This is kidney coming in this line -- this curve, and you're saying what? If it had gone the way you think, it would have gone more like that, wouldn't it?

A. No, the kidneys aren't shaped like that. The kidneys look like a bean. This is a renal hilum, so it almost looks like a bean, like this. (Indicating.)

MR. FELMLY: Let's, first of all, mark this image that you're looking at as the next exhibit.

(Whereupon, Plaintiff's Exhibit 36, an image, was marked for identification.)

BY MR. FELMLY:

Q. So, what I'm going to want to do here, Dr. Girard, as best you can do it for me, based on where your marker as to the end of the upper pole of the kidney is, is to mark on this exhibit with something that will hopefully read as best as we



can do it, what you think is the approximate bean shape size of this kidney that you're now remeasuring. Let's try to do it with this yellow highlighter, and we'll --

MR. SHAHI: I don't have a problem letting the witness do that, but it should be a color that we don't have to argue about later.

MR. FELMLY: Right, but at the moment, we're doing --

BY MR. FELMLY:

Q. I don't have any objection if you want to use this ballpoint red pen. I don't have a fuchsia medical highlighter with me, but why don't you use your red ballpoint pen, and we're going to have you initial it. So, where you're starting is the end of the upper pole of the kidney, is that correct?

A. That's right.

Q. And where you're now going to is the lower pole of the kidney?

A. Upper. This is the spleen, so this is lower. This is lower. This is upper.

MR. SHAHI: Is that coming through with you're writing. I don't see it.

MR. FELMLY: Let me suggest we try to get a better pen.



BY MR. FELMLY:

Q. Let me just take a look at what you've done and see if we can, first of all, make it out. Well, you have written a fairly solid line on that, and that's the -- which pole? The lower pole?

A. That would be the lateral margin.

Q. So, the lateral margin runs from over where your new caliper notation was, this way?

A. That's right.

Q. So now, what I'm trying to figure out is how does this bean shape area -- I see you have marked shading there, but you also have marked shading down here, and I'm trying to understand how we drop down to this area down here in a bean shape --

A. Kidney is shaped like a bean.

Q. So, on the back of the imagery, you're showing us what you think has happened in terms of the shape of that?

A. That's the shape of a kidney.

Q. With regard to where this kidney goes from this point, at the upper pole margin, where does it connect to the place that's up above?

A. You can't see it here because of this artifact -- what I believe is artifact. So, this is the best estimate that I can give, based on



images. This is where I can see the margin of the renal capsule to here. (Indicating.) That's why I measured it this way.

Q. Let me just -- you can put that down, if you would, for a second.

So, why didn't you measure against the 15.8 shaped kidney -- in other words, Exhibit 15, which is a larger size, and presumably would be a greater concern as to the information you're receiving, why did you not use that as the remeasuring baseline?

A. Because I can't even make this out that this is a kidney. I can see the renal capsule here, but then we lose the hilum from the shadow in here. So, I wouldn't be confident measuring this structure, because I would have no upper boundary to place the caliper, whereas on this one, I can clearly see the lower margin of the renal -- or the upper margin of the renal capsule here.

Q. Are you influenced, as you're doing this, with the assumption that it would be unusual and, indeed, rare for a 17-year-old kid to have a kidney at 13.5 centimeters, and there should probably be a length closer to 11.7 or the mid 11's? In other words, are you influenced by the fact that, you know, we should be getting measurements here that

Page 141

are in the mid 11's?
A. No. That would imply that I'm ignoring important data, and just making measurements to satisfy my preconceived notions of what a kidney might be.
Q. Is there any discussion or consideration on your part as to what you had earlier thought was tissue, this area on this exhibit that is the --
A. That looks like a big shadow to me, which is why I marked it there, and I still agree with my --
Q. But I'm trying to find out why you didn't think it looked like a big shadow an hour before when you put the caliper there?
A. I see, yes.
Q. In other words, if it was certain to you that was a shadow, you never would have put a caliper on there as the end of the pole of the kidney?
A. That's true.
Q. What caused you to discount the question of, "what is that dark area there that, an hour ago, I thought was tissue enough that, on two occasions, I marked it with a caliper?"
A. So, I guess -- I don't want to say I guess. When I was taking the realtime images, I was taking

Page 142

quick photos, and then when I went back and looked again, I realized that those weren't very good, and residents have a tendency to make measurements which aren't always exactly perfect, realtime.
Q. You've obviously considered, knowing about this case and with the terrible hindsight that we have about what happened to Sean and what was found at his postmortem?
A. Yes.
Q. "That I wonder if there's a possibility that this area was tissue, and it was just unfortunately not healthy kidney tissue, but something else." You have to have thought about that?
A. In hindsight?
Q. Yes.
A. I still agree with these current measurements, and I -- is there possibly something there? It's hard to say.
Q. Now, the other thing that you did that night, when you went back and remeasured, was that you also took a different look at the echogenic image that was presented, and you remeasured that on two occasions, is that right?
A. Yes.
Q. In fact, your initial -- do you recall what

Page 143

your initial measurement was of the area of echogenicity was before you remeasured?
A. Looking back, I think it was 20 millimeters or something.
Q. And did you note, when you examined that against Sean's prior studies done over the years, that that was much larger than what they had been earlier reading?
MR. SHAHI: Objection.
BY MR. FELMLY:
Q. Were you aware that there was a discrepancy between your then current measurement and his prior measurements?
MR. SHAHI: Same objection.
MR. FELMLY: You can answer.
MR. SHAHI: You can answer. I'm just objecting to the form of the question.
THE WITNESS: I see. I remeasured the echogenic area. I'd have to look at the images again.
BY MR. FELMLY:
Q. Let's see if we can help you with that. So, this is not blown-up, but -- hang on a second. That's not the one we want. Image 31 of 36, which I'm showing you in the non-enlarged version,

Page 144

appears to me to be a measurement that you made during the examination, using the small calipers, of the echogenic area that had been followed over the years, right?
A. Yes.
Q. The size measurement that you got when you measured that was what? In millimeters?
A. In this one here?
Q. Yes.
A. 21.5.
Q. And when you went back, at the time you were writing your report and you looked more carefully at this, and by now, you've reviewed images on several occasions from the past, had it become known or did you become aware of the fact that the size that you're measuring there is larger than what it had been measured previously?
MR. SHAHI: Objection to form.
THE WITNESS: Does that mean I can answer?
MR. SHAHI: Yes.
THE WITNESS: Yes.
BY MR. FELMLY:
Q. So, in addition to being concerned about the longitudinal length of the kidney and the size,

Page 145

where you had exercised your original judgment of caliper placement, you also became concerned, when you were doing your report, about the fact that the area of echogenicity was larger and you wanted to remeasure that as well?
MR. SHAHI: Objection.
BY MR. FELMLY:
Q. Is that true?
MR. SHAHI: Objection to form. You can answer.
THE WITNESS: Looking at this now, I understand why I went back and remeasured it.
BY MR. FELMLY:
Q. Why is that?
A. These are very distinct parallel, almost repeated, shadows underneath this central area here. So, looking at this now, this looks like artifact to me, so I went back and remeasured it. I assume you're going to show me the 11 millimeter measurement, which I remember was more representative of what I think the echogenic focus was.
Q. So, this happens, functionally though, in terms of the data that's obtained, roughly the same or in a companion way, to what happens with the

Page 146

measurements on the longitudinal scale of the kidney. In the examination, you make judgment calls as to what areas you want to measure, and then you place the markers, that you think are appropriate in your judgment, on that imagery to decide how big the area you're focusing on is. Is that true?
A. That's true.
Q. And when you got that result, you said, "I'm not sure that's right? That looks too big?"
MR. SHAHI: Objection.
BY MR. FELMLY:
Q. Is that true?
A. At the time that I did this, I took a measurement of this structure, and I may or may not have known what the original size was or if I had -- if I don't remember what the echogenic focus looked like.
Q. But my point is, you then went back and did additional studies on it in an effort to remeasure, is that true? When you did the remarking on the longitudinal length of the kidney, you also superimposed new markings on the image, that we were just talking about, to try to decide how big it actually was. Is that true?

Page 147

A. That's true.
Q. So, this, for example, is a superimposed remarking that you did before you issued your report, is that right? These would have been your markings that you made?
A. These are my markings.
Q. You then chose how much of the echogenic -- echogenic means an area that is enlightened or showing up?
A. Right.
Q. Just so we're clear what we're talking about, you are putting calipers to measure this area that has a lightened area supposedly in the kidney, and this is an area that had been followed for years for this boy, right?
A. That's correct.
Q. And you're focused on that because you know they've been looking at that. You measured it out at -- in your original work, you measured it out at 2.15 centimeters, and now you're going back at it and saying, "well, this may be artifact. I wonder if it's really that big," and you remeasure it out of a concern that the data you originally got when you placed the calipers may have been incorrect?
A. That's right.

Page 148

Q. So, there are really two different things happening as you're preparing to write your report with respect to Sean's study in terms of reassessment, one is, you're going to reassess whether or not the size of the kidney, longitudinally of the left kidney, needs to be reexamined and remeasured, and you're also saying or looking at the area of echogenicity, and saying, "I think we need to remeasure that because that earlier finding may be too large, as well." True?
A. I remeasured them to get what I thought was a better representation of what those structures were.
Q. Is this a situation where you have these kind of concerns, where your original judgment in marking size and measuring is now being reexamined or questioned by you, do these add up, sort of arithmetically, one issue, plus issue number two, equals two, or do they add up, one issue, plus another issue of questionable, adds up to some higher value, because it may mean you don't know what's going on with his kidney?
MR. SHAHI: Objection to the form. You can answer.
THE WITNESS: I think they're -- in

this case, looking at these as a resident back then, it looks like they were two distinct entities. So, this was a kidney that was measured not very well by a second year resident, who made an attempt to draw a better measurement, and then this, here, was just to make sure that this area of the kidney had not changed significantly between the prior exams.

MR. FELMLY: Michelle, if we can mark this remeasurement, please?

(Whereupon, Plaintiff's Exhibit 37, an image, was marked for identification.)

MR. SHAHI: What's happening with the original exhibits, do you know?

MR. FELMLY: I don't know, honesty, as I sit here. I'll come back to you on that. We have to know the answer to it, but I have a couple of things on my mind at the moment.

BY MR. FELMLY:

Q. Let me show you an image that was shot at 22:01. So, this is a couple of minutes later, and this is now a transverse view of the left kidney. So, it's a different -- the one you measured of the echogenicity before was left kidney long, and this, "sup," means what? Supine?



A. Superior.

Q. So, that's looking down at it?

A. It's the top part.

Q. "Trans inf," means what, sir?

A. Inferior.

Q. So, you're looking at it from the other side of the body?

A. The bottom.

Q. But you're still looking at the same area of echogenicity, just from a different angle?

A. Correct.

Q. And you have decided to do an additional measurement out of your efforts to what? Double check or raise concern whether the 2.15 was accurate or not?

MR. SHAHI: Objection. You can answer.

THE WITNESS: It just looks like I remeasured this to make sure that I had internal agreement with the prior measurement of 11.5.

BY MR. FELMLY:

Q. And at this point, there's no question that you know what this has been measured at in earlier studies?

A. That's right.

Q. If it was different than that -- in other



words, if the new data you're measuring is different than the old data, that's an issue that needs to be followed up, right?

A. If there was a change, absolutely.

Q. If the 2.15 was correct, that needed to be followed up, absolutely?

A. Yes.

Q. Now, you're looking at it, saying, "I wonder if it's really 2.15. Let's measure it." You measure it two different times by placing the calipers in different locations, and you get 11.1 and 11.5, and that's within the range that had previously been experienced, and you're more comfortable with it?

A. Yes, but again, you're implying that I made measurements to suit my -- what I thought was stable. I don't agree with that.

MR. FELMLY: So, let's mark that one.

(Whereupon, Plaintiff's Exhibit 38, an image, was marked for identification.)

MR. FELMLY: I didn't mark the PACS audit trail, because we had marked it in Yen's deposition, and there's no reason to duplicate it.

BY MR. FELMLY:

Q. Are you familiar with the policy that



existed in the Dartmouth-Hitchcock Medical Center radiology department back in 2014 for dealing with either critical case results or unexpected findings?

A. Yes.

Q. First of all, what is that policy? What is the subject of what that deals with?

A. From what I recall, an unexpected finding would be something that when you're reviewing images is outside of what you expect to find. So, the best example I can give is, if you're getting a CAT scan of your abdomen for right upper quadrant pain, and there's a giant lung mass at the right lung base. In a critical finding, I believe, if I recall correctly, we had a set of specific critical findings, which would be something that was imminently life-threatening, and those fell into those categories.

Q. So, when you're going through the relook, if you will, or more carefully examining these images, including the sized images that show 13.5 and 15.8 as the longitudinal dimension of the left kidney. You told me before that you made remeasurements because those were unexpectedly large findings. Is that true?

Page 153

MR. SHAHI: Objection.
THE WITNESS: I wouldn't say they were unexpectedly large. I would just say that they weren't -- the images I took, initially, didn't capture what I felt was the best representation of that structure after reviewing the images later.
BY MR. FELMLY:
Q. Actually, I'll represent to you, you actually did say it was unexpected. Okay?
A. Okay.
Q. Now, I understand you remeasured because of that. My real question is, does the finding of those kind of size markers that would be, if not explained, a concern or a need for follow-up, is that within the unexpected results or unexpected finding category?
A. If a kidney had grown -- if there was a mass on the upper pole of the kidney that had grown, I would say that that was an unexpected finding.
Q. Does part of the unexpected findings policy deal with how a report should be written when they're present, in order that the system that runs the software involved can scan for and actually spot trigger terms that enables future follow-up?
A. I don't recall -- definitely, what happens

Page 154

-- as far as I know, if there was an unexpected finding, it would be dictated in the impression of the report, and then through some sort of process, I'm not sure if an e-mail would go out to the practitioner to review the image, or if they would get a phone call from the radiology department. I'm not sure how that works.
Q. Well, I was really -- that, I know is part of the finding, too, and I wasn't really asking about that, but if you take a look at Bates number 23 on the document that I've given you, which is the page called, "Communication of Unexpected Findings," that's section 3.3. It says, "Every transcribed preliminary and final radiology report is scanned daily by the CIS system for trigger terms. Reports containing these terms prompt a flag notice on the work list of all clinicians listed on the exam requisition." And it, actually, above says, "The exam report must include one or more of the following trigger terms, unexpected findings, additional examinations recommended" -- it almost seems like there is a software that, if people use these trigger words, will pick it up, and that will aid follow-up down the road. Am I reading that correctly?

Page 155

A. I think that's a reasonable interpretation of what this says.
Q. In the report for Sean Tillotson, there's actually a reference to the issue of whether he should have additional examinations, isn't there?
A. There is. Dr. Yen's.
Q. And so, is that something that you put in the report or Dr. Yen put in the report?
A. I did not put that in my preliminary report.
Q. So, the situation we're dealing with -- and I'm just going to -- if we marked this report in her deposition, I'm just going to -- you've read this, I'm sure, previously. You're well familiar with it?
A. Yes, I have.
Q. So, this Exhibit 12 in Yen's deposition, it contains both the preliminary report, but it also contains Dr. Yen's final report, and then in the impression portion of the report -- well, why do it with me talking about it. The way this works -- or the way it was provided to me by the hospital, the page -- the bottom of page 256 and 257 is your preliminary report, is that correct?
A. Yes.
Q. And then the portion that's on page 255 and

Page 156

the top of page 256 is what Dr. Yen signed as the final report, and that became the final version, correct?
A. Yes.
Q. So, when you finished your report, you did not think any further examination needed to be commented on?
A. That's correct.
Q. So, you are comfortable with this report, you're comfortable with the findings, you have satisfied yourself for whatever issues were present that caused you to remeasure, and you are saying that this is unchanged from the prior exams, and this is a stable echogenic focus in this child, and you don't say anything further needs to be done?
A. Correct.
Q. And then Dr. Yen does something different, doesn't she?
A. She does.
Q. You have no recollection of talking with her about what she saw in these studies that caused her to do something different?
A. That's correct.
Q. Because what she did in her impression is to say, or add to the sentence that you had previously

Page 157

written, "that CT may be helpful for further evaluation," right?
A. Can I see that?
Q. And what was it that caused her to say that?
A. You would have to ask her.
Q. I did.
A. I can't read her mind. I don't know -- she's an expert in the field of radiology and ultrasound. When I did my exam, I didn't see anything that made me nervous or thought there was a change, and she must have seen something, and I don't recall going over the study with her that prompted her to put that statement in there.
Q. You guys are working -- excuse the familiarity. You doctors are working together in a supervised relationship, where you are being reviewed, and she has to sign for and take responsibility for your professional actions and judgment. Is that true?
A. Yes.
Q. So, it's pretty critical for you and she to understand whether you are of the same mind with respect to health findings with respect to a patient, is it not?
A. Yes.

Page 158

Q. So, it would be critical for you to know what was it about the study that made Dr. Yen either more nervous or have a heightened degree of concern so she is adding a further sentence to your report, on a preliminary basis, to make it the final version saying, "CT may be helpful for further evaluation?"
MR. SHAHI: Object to the form.
BY MR. FELMLY:
Q. That's important for you to know, not just for her to know, isn't it?
MR. SHAHI: Same objection.
THE WITNESS: Yes, but she might have seen something -- yes, I don't know. I can't answer that.
BY MR. FELMLY:
Q. And you don't think if you and she had discussed this issue of why she added a reference that references additional studies or an additional study, you don't think that's the type of thing you would likely remember, if it had occurred, if you had that discussion?
A. Three years later, no.
MR. SHAHI: Objection to form.
BY MR. FELMLY:

Page 159

Q. So, first things first, this issue would have been first noted by you in July of 2016 when you carefully reviewed the records, and you certainly would have noticed?
A. Yes.
Q. And did notice, that she added a sentence that said, "CT may be helpful for further evaluation," which cuts it down to two years later, right?
A. Yes.
Q. And you have never followed up or asked her or had any discussions about what she was thinking about when this was made?
A. No, not that I can recall.
Q. Whatever it was that caused her to be concerned or nervous or want more follow-up, you don't know what it was or what she drew out of this study that took her to that mindset to add this line to the report?
MR. SHAHI: Objection.
THE WITNESS: I don't remember, sir.
MR. FELMLY: Let 's mark -- we'll just go by Exhibit 12. It has already been marked. Thank you.
BY MR. FELMLY:

Page 160

Q. Now, you are aware, and you address it in your supplemental findings or interrogatory response, I guess I'm going to call it, that there are two references in the emergency department record that reference the renal ultrasound examination as reflecting changes in connection with Sean Tillotson's previously evaluated renal cyst?
A. Yes.
Q. And you've read those entries?
A. I have.
Q. Am I correct that your job that evening would have been, one of many, to accurately communicate the impressions of this study, that had been requested to be performed, to the emergency room personnel who had ordered the examination?
A. That's right.
Q. I'm assuming that you're trained, and work as hard as you can, to try to get those things right and make sure you're communicating that information accurately, so that their treatment decisions can be followed up on?
A. Correct.
Q. You don't actually have a memory, if I'm from the information that is in your supplemental

Page 161

response, of the conversation you had, where the communication about what your findings were, was made?
A. That's right.
Q. Do you know if you had any discussion with the emergency room personnel about the fact that there had been a re-look, if you will, at some of the images and you had done some remeasuring?
A. No.
Q. You don't know if you told them that or not?
A. No, I wouldn't have discussed that with them.
Q. You're now aware that, not only did it get communicated into the record, that there were changes or concerns with the study, but that was actually made part of the discharge instructions that the parents were provided, or the mother was provided when Sean and she left the hospital?
A. Yes, I learned about those recently.
Q. And that there was then coordination with the neurology department to actually schedule quite -- on an expedited basis, actually, because they were going to originally do it later, and then they made it May 9th, to get that follow-up because of those concerns that were communicated from what the

Page 162

emergency room people say the ultrasonic radiology resident told them?
MR SHAHI: Objection to the form.
THE WITNESS: Mm-hmm.
BY MR. FELMLY:
Q. And you understand this is the sequence of communications that are in the record. I'm not making this up.
A. I understand that, yes.
MR. SHAHI: Let me just put my objection on the record. Go ahead.
BY MR. FELMLY:
Q. I'm assuming you have no explanation for how that happened?
A. What ended up in the ED record?
Q. Right, or how the miscommunication that you say happened?
A. I can't. It's a quick phone call to an emergency department resident at night. I don't know if she misheard me. As you can tell me, I don't speak very loudly. I don't know if I was speaking softly that night, and she misunderstood what I said. I'm not sure.
Q. Ultimately, now, with the most tragic of hindsight, there could be little doubt that Sean

Page 163

would have benefited from a CT scan taking place shortly after May 1, 2017, true, more likely than not?
MR. SHAHI: Objection to form.
THE WITNESS: It's really hard for me to answer that question. I'm not a clinician. We provide a service of images, and those images are taken in context with the patient's clinical presentation.
BY MR. FELMLY:
Q. I'm not asking you how he would have necessarily been treated by a urologic treatment team. What I am asking you, isn't it more probable than not, particularly in light of what you told me earlier in this deposition, that you believe that the mass that was found at autopsy, 60 days later, at 21 x 11 centimeters was likely present in some size or form on May 1, isn't that a lesion? Had there been a CT scan performed with him, in what you know about the capacity and components of CT, more probably than not, would have been discovered in such an exam?
A. Again, it also depends on how big the tumor was at that time. We don't know the type of tumor or the genetics of that tumor.

Page 164

Q. When I say more probably than not, that means -- in the world that we're dealing with, not do I -- can you tell me to an absolute certainty? Can you tell me to 99 percent? Do you think it is more likely than not, which I'm going to represent to you in the world of probability, means more than 50 percent likely, not 100 percent, is it more than 50 percent likely that a CT scan, in your opinion, taken a short time after the May 1 examination, knowing what we know retrospectively about what was in his body on July 1 when the autopsy was done, would have discovered the presence of that mass?
MR. SHAHI: Objection to form. You can answer.
THE WITNESS: I think it would have added to the ultrasound. Whether or not it would have discovered that tumor, that caused his unfortunate demise, it's hard to say, because we don't know how big that tumor was at that time.
BY MR. FELMLY:
Q. I'm not sure what you mean by added to the ultrasound. It may be that that wouldn't have been the last step in the examination. I mean you're saying it might have put in motion a series of further inquires that, more likely than not, would

Page 165

have discovered it. You can't say that CT would have done it on it's own. Is that what you're sort of saying?
A. Yes.
Q. Let me rephrase it then. Had there been a CT scan done properly, within proper standards of care, and knowing with hindsight what we know about what was developing in his body, is it probable that would have either found or put in motion steps that, more likely than not, would have resulted in discovering the nature of the disease he had?
MR. SHAHI: Objection to the form. You can answer.
THE WITNESS: I think it would have been reasonable to get a CT scan at some point to add to the other information we had at the time that he presented at Dartmouth.
BY MR. FELMLY:
Q. And if it had been done, knowing the efficacy of that, and perhaps it would lead to other steps, it's more likely than not that it would have provided meaningful information in that assessment?
MR. SHAHI: Same objection.
THE WITNESS: What assessment?

Page 166

BY MR. FELMLY:
Q. In trying to find out. In other words, it's one thing to say I think a CT would have been a reasonable step?
A. Yes.
Q. The reason for that is that CTs often provide a technology and a power of observation that exceeds just ultrasound by itself, and provides better definition, right?
A. Yes.
Q. Knowing that and knowing, again, the remarkable knowledge that we learn, because this is a decedent who had an autopsy?
A. Right.
Q. Even if the CT didn't immediately show a tumor in all of it's dimensions, is it probable, 50.01 plus that it would have led to the discovery, either through that exam or other similarly ordered exams, to find the lesion that was there?
A. I don't disagree that it would have set things in motion to possibly find this tumor.
Q. And that's the issue that I'm raising. I'm distinguishing -- so, here's possibility, okay? 50 percent or less possible -- I'm really interested in whether -- I'm doing an assessment, here, using

Page 167

these markers, because these are the polar markers of probability and possibility. I'm not interested in whether it was 1 in a 100 that would have found it. More than 50 percent of the time, that type of series of exams or exams, with a situation where 60 days later you have a 21 centimeter by 11 centimeter lesion, would find that lesion, true?
MR. SHAHI: Objection to form.
THE WITNESS: Do I think a CT would have been helpful? Is that what you're asking me?
BY MR. FELMLY:
Q. No. Would have likely, more than 50 percent of the time, would have found such a situation, had it been undertaken and carefully prepared and studied?
MR. SHAHI: Same objection.
THE WITNESS: It's such a hard question to answer. I can't say with certainty, it would have found anything.
BY MR. FELMLY:
Q. I'm not asking with certainty.
A. Greater than 50.1 percent?
MR. SHAHI: Same objection.
MR. FELMLY: Yes.
THE WITNESS: I'm just not sure.

Page 168

BY MR. FELMLY:
Q. If it were your patient, you would want, in that setting, a CT to be done?
MR. SHAHI: Same objection to form.
THE WITNESS: Again, it's a hard question, because I'm not a clinician. I can recommend things, but to tell you that a CT scan would have found a tumor and saved his life, I can't answer that question.
BY MR. FELMLY:
Q. So, looking at the way Sean Tillotson's case was handled from a radiological point of view that evening, where an initial review was made of records by you, his past records, where you do a study, and you mark tissue in places that you think is reflecting the longitudinal dimension of the kidney, the left kidney, and making markers as to what you thought was the area of echogenicity, and then, when you are preparing your report, you take a second look at the markers for the longitudinal size of the kidney, and you do remeasurement of that, and you also remeasure the size of echogenicity, and there is, according to you, a measure of miscommunication between you and the emergency department, because rather than what you

Page 169

say you tried to communicate, which was that there's no changes of significance, they understand there are, and then the discharge instructions say, "it may be contributing to his bleeding," and they schedule a urology follow-up, and Dr. Yen adds to your report, in the final version, that a CT scan may be helpful here, even though you didn't think that was necessary or helpful. Would you do this case the same way if it confronted you tomorrow?

MR. SHAHI: Please note my objection to the form, if that's even a question. Go ahead.

THE WITNESS: I wouldn't change anything. I agree with the measurements that I made. I agree with my interpretation of that report from 2014, and I agree with Dr. Yen's final impression on the ultrasound.

BY MR. FELMLY:

Q. Including the fact that a CT may be helpful?

A. I think it would be helpful. Whether or not it would have found the tumor, it's hard to say.

Q. Well, the only reason you'd suggest that a CT would be helpful is if you had some concern about what you saw in the ultrasound, right? I mean you don't CT people walking up and down the street, just to see what's going on in their body.

Page 170

You're not even permitted to order or request or advise for a CT unless you think there's sufficient information before you to justify that expensive and further radiological exposure of the patient for the study, right?

A. Yes.

Q. It's not, "oh, let's throw in a CT while you're here," right?

A. Right.

Q. So, how can you say you agreed with the CT may have been helpful, if you're totally comfortable with what you saw that day after you did a number of remeasurements?

A. Because Dr. Yen is the expert, and I trust her opinion. What I'm telling you is I don't disagree with her final report.

Q. But you have no belief that you ever either called her up or talked to her, or she said to you, "you know, Brian, on all of the facts we got here and all these remeasurements, let me just add something else to your report. I think this kid would benefit from a CT." You don't have any memory or belief that conversation ever happened, do you?

MR. SHAHI: Object to the form.

Page 171

THE WITNESS: I don't recall that conversation occurring.

MR. FELMLY: Let me ask that we take a break at this point. I'm certainly almost done. I want to take a couple of minutes to look at my notes, and I'll try to do that as quickly as I can. If we can go off the record on that basis, I'll try to finish up as soon as possible.

VIDEOGRAPHER: Time is 3:51 p.m. We are going off the record.

(Whereupon, a discussion was held off the record.)

VIDEOGRAPHER: Time is 3:59 p.m. This is the beginning of tape 3 of the deposition of Brian Girard.

BY MR. FELMLY:

Q. Back on the record. Dr. Girard, just a couple of other thing, and I think I'll be done, at least.

I asked Dartmouth-Hitch Medical Center, and their counsel, if they could determine the number of renal ultrasounds that had been performed by both you and Dr. Yen, and what I'm about to show you is Counsel's e-mail to me that communicated that information, and what it indicates in this

Page 172

e-mail of February 13, is that, "Dr. Girard from September of 2013 to June of 2016 had 324 renal ultrasounds," and I'm assuming there's some way they know that, but I'm not doubting that. What I am interested in, though, is whether -- in light of the fact that the events that bring us here were in May of 2014, which is two years earlier, and wondering whether the number of renal ultrasounds might increase as your experience in residency program continued, what would be a reasonable approximation of what was likely to be the number that would have been in 2014? In other words, might you have 100 under your belt there, or something?

A. You know, I don't know, but you can certainly get that information, if you like. They can break that down for you.

Q. Obviously, Dr. Yen had much more experience than you did, but she had been practicing in that field for many more years?

MR. FELMLY: So, Why don't we just mark that. Michelle, we're at 39.

(Whereupon, Plaintiff's Exhibit 39, an e-mail, was marked for identification.)

BY MR. FELMLY:

Page 173

Q. If you could go to page 65 in what has been marked as Exhibit 9 in Dr. Yen's deposition, there is an entry at the end of this reported section, right before the various redactions occur, and I might come back to that in a minute, but on -- what's reported as May 17, 2014, although it's not the easiest read when these numbers are superimposed on a black bar. It indicates that you went back into this case at 1:02, and an image was viewed, and then at 1:05, it says, "report signed by Brian Girard," and I guess my first question is, do you remember re-accessing Sean Tillotson's case on that occasion on May 17?
A. No.
Q. And you do reference it in the supplementary paragraph, and you say that was sort of in the queue of things. I have no idea what that means, but it almost sounds, to me, there's some checklist you have to complete?
A. That's correct.
Q. Why would that involve going back and re-looking at the images, rather than simply saying, "oh yes, I can assign that?"
A. You know, I can't remember if the images come up when we had to sign our queue, or if I

Page 174

opened it just to refresh my memory of what it was, and then signed it off.
Q. I apologize if this just reflects my lack of familiarity with the process, which is certainly the case. Why, as the author of the preliminary report, but not the author of the final report, are you signing the report?
A. To get credit.
Q. What does that mean?
A. It was a form of tracking -- so, Dartmouth had two different kinds of systems when I was a resident there, and the first one was under a certain dictation type, where I would have to sign off or just acknowledge that I had read the report, it was signed. I had to sign it to get credit for it. So, I had a list, and I would just go through them and sign them.
Q. But I'm not sure -- I mean I'm not sure what the credit gets you?
A. The 324 on that list, it's a tracking.
Q. I see. It's reflecting your professional experience?
A. Yes, as far as I remember, what it was at that time. So, it would always comes across, we would get an e-mail, or some other sort of

Page 175

correspondence, and we would have to sign off on the report.
Q. It sounds like you were not doing a professional reevaluation of the medical findings in doing this on the 17th?
A. No, absolutely not.
Q. This is sort of catching up on the statistics that relate to your practice?
A. Correct.
Q. My colleague reminds me that I didn't really complete any of the portion of the questioning going back to how you got trained in the renal ultrasound discipline or activity. You've described that, during your residency, there would be occasions when there would be both clinical oversight and direction, but there would also sometimes be lectures or information provided on how to do examinations, including renal ultrasounds. Did any of that, the more formal training part from more senior radiologists, involve written materials or outlines or recommended readings, or anything that would go to the question of, "this is how we recommend you do a renal ultrasound," as opposed to, "let me tell you how I do it?"

Page 176

A. Yes, there was a variety of texts at the time that were recommended to us. I can't tell you what they were. Dr. Yen might have that information.
Q. Was there a syllabus, or were there course materials that were prepared at that time? I mean obviously --
A. I believe that each section has a curriculum, or they did at that time, and I can't recall what that curriculum is. You'd have access to that, of course, if you needed it.
Q. Are there textbooks or manuals that relate to ultrasonic examination -- and I'm sure Dr. Yen would say read my book, but are there particular manuals or texts that you have in mind, as somebody who's now much more focused on this, that would likely have been in that group that you were looking at then? You know, Johnson on Ultrasounds?
A. There's requisites.
Q. What is it?
A. Requisites. It's a whole series of books.
Q. And these are a series with the dividing features being what? Types of the -- parts of the body?
A. Yes. There's a requisite for ultrasound.

There's a request for neuroradiology. There's a requisite for musculoskeletal imaging, et cetera.
Q. And those -- I'm not saying they were the only ones. Those would have been included in the group of things you were looking at at the time?
A. Yes.
Q. Do you remember if there things like seminar outlines or lecture materials, or things that were part of -- like sort of curriculum, that would have included kidney, renal type?
A. We had kidney lectures, multiple of them. I just don't know if we had --
MR. FELMLY: Kaveh, I'm going to present a request for training materials as they may be available relating to what Dr. Girard has described, and I'll follow that up with you.
BY MR. FELMLY:
Q. Thank you very much. I appreciate your patience.
VIDEOGRAPHER: Time is 4:08 p.m. The deposition of Brian Girard has now been concluded, and we are going off the record.
COURT REPORTER: Would you like to order a copy of the transcript?
MR. SHAHI: Yes.



(Whereupon, the deposition was concluded at 4:09 p.m.)



JURAT

I have read the foregoing pages and hereby acknowledge the same to be a true and correct record of the testimony.

______________________

Subscribed and sworn to
___________________________________.
Before me this __________ day of _______________, 2017.

_____________________________________
Notary Public
My Commission Expires:



CERTIFICATE

STATE OF CONNECTICUT
ss: New Haven
COUNTY OF NEW HAVEN

I, Michelle A. Howell, a Notary Public in and for the State of Connecticut, duly commissioned and qualified and authorized to administer oaths, do hereby certify that I was attended at the Law Offices of Clenenden & Shea, 400 Orange Street, New Haven, Connecticut on February 28, 2017, commencing at 11:57 a.m., by counsel for the respective parties as appears in the herein-entitled cause and the deponent named in the foregoing deposition, to wit: Brian Girard; that said deponent was by me duly sworn and thereupon testified as appears in the foregoing deposition; that said deposition was taken stenographically by me in the presence of counsel for the respective parties and reduced to typewriting under my direction; that the foregoing is a true and correct transcript of the testimony.

I also certify that I am neither of counsel nor attorney to either of the parties to said suit, nor am I an employee of either party to

Page 181

said suit, or of either counsel in said suit, nor am I interested in the outcome of said cause.

Witness my hand and Seal as such Notary Public at New Haven, Connecticut this 28th of February, 2017.

Michelle Howell

MICHELLE HOWELL
COURT REPORTER
NOTARY PUBLIC

My Commission Expires:
May 31, 2018

CSR NO. 00524

Page 182

DEPOSITION OF: Brian Girard
TAKEN: February 28, 2017

INSTRUCTIONS FOR READING AND SIGNING

1. TO WITNESS: PLEASE READ THE ENCLOSED COPY OF YOUR DEPOSITION.
2. AFTER READING THE DEPOSITION, APPEAR BEFORE A NOTARY PUBLIC AND SIGN BEFORE HIM/HER ON THE PAGE INDICATED AND HAVE THE NOTARY PUBLIC SIGN WHERE INDICATED ON SIGNATURE PAGE.
3. IF THERE ARE ANY CORRECTIONS TO BE MADE IN THE TRANSCRIPT, PLEASE DO NOT MAKE THEM ON THE TRANSCRIPT.
4. PLEASE USE THE ATTACHED FORM FOR LISTING ANY AND ALL CORRECTIONS.
5. DO NOT MAKE CHANGES JUST TO RESTATE YOUR TESTIMONY.
6. PLEASE RETURN SIGNATURE PAGE AND CORRECTION PAGE TO COUNSEL OF RECORD AND SEND COPIES OF SIGNATURE PAGE AND CORRECTION PAGE TO:

DEL VECCHIO REPORTING SERVICES, LLC
117 RANDI DRIVE
MADISON, CT 06443
THANK YOU.

Page 183

CORRECT PAGE

NAME OF CASE: GARY AND BETHANNE TILLOTSON, As Parents of SEAN C. TILLOTSON, and BETHANNE TILLOTSON, As Administratix for the ESTATE OF SEAN C. TILLOTSON VS. DARTMOUTH-HITCHCOCK MEDICAL CENTER

NAME OF WITNESS: BRIAN GIRARD

PAGE LINE NOW READS SHOULD READ

Page 184

I N D E X

DIRECT EXAMINATION BY MR. FELMLY..........Pgs.5-177

(EXHIBITS RETAINED BY COUNSEL)

E X H I B I T S

Plaintiff's Exhibit 30
Curriculum vitae..............................Pg.20
Plaintiff's Exhibit 31
Document.....................................Pg.29
Plaintiff's Exhibit 32
Document.....................................Pg.31
Plaintiff's Exhibit 33
Document.....................................Pg.35
Plaintiff's Exhibit 34
Document.....................................Pg.96
Plaintiff's Exhibit 35
Study.......................................Pg.109
Plaintiff's Exhibit 36
Image.......................................Pg.137
Plaintiff's Exhibit 37
Image.......................................Pg.149
Plaintiff's Exhibit 38
Image.......................................Pg.151
Plaintiff's Exhibit 39

E-mail.......................................Pg.172