UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| GARY  AND BETHANNE TILLOTSON, as Parents of SEAN C. TILLOTSON, and BETHANNE TILLOTSON, as Administratrix for the ESTATE OF SEAN C. TILLOTSON, | ) ) ) ) ) |
| Plaintiffs, | ) Civil Action No. 16-296 ) |
| v. | ) JURY TRIAL DEMANDED ) |
| DARTMOUTH-HITCHCOCK MEDICAL CENTER, | ) ) ) |
| Defendant. | ) ) ) ) ) |

**FIRST AMENDED COMPLAINT**

Plaintiffs Gary Tillotson and Bethanne Tillotson, as parents of Sean C. Tillotson, and

Bethanne Tillotson, as the duly-appointed Administratrix for the Estate of Sean C. Tillotson, by

and through their counsel, McLane Middleton, Professional Association, hereby complain

against Defendant Dartmouth-Hitchcock Medical Center.  Plaintiffs demand a jury trial on all

Counts.  In support of this First Amended Complaint, the Plaintiffs state as follows:

**PARTIES**

1.      Bethanne Tillotson is a resident of Bradford, Vermont, mother of Sean C.

Tillotson, and is the Administratrix of the Estate of Sean C. Tillotson, having been appointed by

the Vermont Superior Court, Orange District Probate Division on August 14, 2014 (Docket No.

144-7-14 Oepr).  At the time of his death, Sean C. Tillotson was a resident of Bradford,

Vermont.

2.      Gary Tillotson is a resident of Bradford, Vermont and the father of Sean C. Tillotson.

3.      Dartmouth-Hitchcock Medical Center ("DHMC") is a New Hampshire non-profit corporation with a principal place of business at One Medical Center Drive, Lebanon, New Hampshire 03756.  DHMC is licensed under New Hampshire Revised Statutes Annotated 151:2 and a "facility" as defined by the New Hampshire Patients' Bill of Rights statute, RSA 151:19.

4.      Pursuant to a Stipulation entered into by the parties (Docket No. 24), DHMC is agreed to be the proper Defendant in this matter and responsible under the doctrine of respondeat superior liability for all liability of the providers of medical services and care related to Sean Tillotson.  This stipulation applies as to DHMC and to this claim and litigation.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because it is a suit between citizens of different states, and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

6.      This Court has personal jurisdiction over DHMC because it is a licensed hospital in the State of New Hampshire, with a principal place of business in Lebanon, New Hampshire.

7.      Venue is proper in this judicial district under 28 U.S.C. §§ 1391 and 1400.

## ALLEGATIONS COMMON TO ALL COUNTS

8.      Sean Tillotson was a 17-year-old high school student from the Bradford, Vermont area who collapsed and died on June 30, 2014 while traveling through the Denver International Airport in Denver, Colorado in route to a youth leadership conference.

9.     Prior to his death, Sean was a healthy high school senior at Oxbow High School and resided with his parents in Bradford, Vermont.  He was an exceptional student, school leader, and member of the National Honor Society.

10.     Sean was also an outdoor enthusiast who enjoyed biking, hiking, canoeing, camping, downhill or cross-country skiing, hunting, fishing, target shooting, playing lacrosse, football and other sports.  He was an Eagle Scout by the age of 16 and was the first scout in Troop 778 to ever attain two palms:  a Bronze and Gold.  He was selected the American Legion Department of Vermont's Eagle Scout of the Year for 2013.  In addition, he was a member of the Caledonia Sharp Shooters and Green Mountain Shooting Sports 4H clubs and was a National 4H Shooting Sports Ambassador.

11.     By age 17, Sean had become a youth leader in his community.  He volunteered a significant amount of his time serving the Bradford Elementary School, doing trail work on Wrights Mountain, and supporting his community through volunteer work.

12.     Sean is survived by his parents Bethanne and Gary Tillotson.  Through this tragedy, Bethanne and Gary have lost their only son together.

13.     Sean lived a healthy life, with only minor medical problems including a history of asthma, and two knee procedures resulting from sports injury in September 2013 and April 2014. He had also been followed medically for a number of years for what was described to his family by providers as a "kidney cyst."  The initial presentation of this medical issue arose when Sean had blood in his urine just prior to his eighth birthday.  The cyst was described as a solid mass within his left kidney that was imaged and examined on multiple occasions, and deemed to be a benign calcified cyst.  When Sean became an adolescent, the annual follow-ups on the cyst were terminated.

14.     After experiencing blood in his urine on May 1, 2014, Sean and his mother went to DHMC emergency room for an evaluation.  Doctors performed an ultrasound on his kidneys, and his left kidney was read as "stable" and "unchanged" from previous exams.  DHMC did not conduct an extensive work-up after receiving the ultrasound results, and Sean was discharged that same day.

15.     The May 1, 2014 ultrasound results were reviewed, and the final report prepared and signed by doctors Stephanie P. Yen, M.D. and Brian Girard, D.O. of DHMC's radiology group in Lebanon, New Hampshire.

16.     Dr. Girard conducted the May 1, 2014 ultrasound, and during the course of the examination, he measured the longitudinal length of Sean's left kidney as well as the area of echogenic focus or so-called "cyst" in Sean's left kidney.

17.     After acquiring an original set of still images, Dr. Girard made a decision to re-measure the longitudinal length of Sean's left kidney and the "cyst."  This re-measurement resulted from Dr. Girard's concern that the findings and measurements as originally performed by him were inaccurate.  Dr. Girard's re-measurements of the left kidney and cyst were significantly smaller than the original measurements.

18.     Dr. Girard also recorded moving images or "cine clips" as part of the May 1, 2014 ultrasound, which provide further views of the kidneys and the area of echogenic focus.

19.     DHMC did not communicate to or inform Sean or his parents of the fact that Dr. Girard "re-measured" the left kidney and cyst, nor did it communicate to or inform Sean or his parents of the re-measured length of the left kidney and cyst, or the fact that "cine clip" images were taken as part of the May 1, 2014 ultrasound.  There are no references to these re-

measurements in the notes from Sean's May 1, 2014 emergency department visit or anywhere else in Sean's DHMC medical records.

20.     In 2014, Sean was invited to participate in the American Wilderness Leadership conference in Jackson Hole, Wyoming.  It was determined and suggested by his providers that there was no reason to cancel his participation in this conference which was set for June 30th to July 6th.  On the morning of June 30th, Sean left Boston and while changing planes in Denver suddenly collapsed.  He was unable to be revived, and the coroner in Denver performed a full autopsy and examination.

21.     The autopsy results revealed that Sean had an extensive renal cell carcinoma in his left kidney, which had extended to adjacent blood vessels.  The report identified the size of this tumor as approximately 21.0 x 11.0 cm.  The acute mechanism of death was the formation of a blood clot and thrombosis of malignant tumor material, which dislodged and were passed through blood vessels into his lungs and heart.  Sean essentially had a pulmonary embolism-type event that resulted in an immediate arrest and death.

22.     The interpretation of Sean's kidneys was grossly inaccurate.  DHMC's ultrasound images of May 1, 2014 in fact demonstrate a large mass on Sean's left kidney measuring at least 7cm, which is completely omitted from the radiological report.  Due to the size of the mass, accepted practice would require it to be considered to be malignant and cancerous, until proven otherwise, and as such, the mass presented a critical finding for Sean, demanding immediate further assessment, with probable surgical intervention.

23.     Furthermore, the findings noted in the final radiology report signed by Dr. Yen on May 2, 2014 indicating the left kidney is "less well visualized, particularly the upper pole region" required further review.

24.     Proper interpretation of the ultrasonic study would have unquestionably led to identification of the presence of the malignant mass in Sean's left kidney.

25.     The renal cell carcinoma Sean exhibited at autopsy was of a papillary type, and he did not have evidence of metastasis of his cancer, including no evidence of metastasis into the pulmonary artery or lung.

26.     An accurate and timely diagnosis from the May 1, 2014 ultrasound, followed up by surgical intervention in treatment of the kidney mass would have, to a high degree of probability, avoided the emboli event and Sean's death on June 30, 2014.

27.     Moreover, the failure of the ultrasonic evaluation of May 1, 2014 to note and report the critical presence of a large mass in Sean's kidney resulted in Sean being deprived essential and urgently needed care.  Had the ultrasound been reported consistent with the presence of the evident highly-suspicious and malignant mass, Sean would have been referred for expedited evaluation and assessment of the presence of the probable malignancy.

28.     Under such circumstances the presence of the malignant mass would have been diagnosed and surgical intervention would have been scheduled as soon as possible.  The surgery would have resected the cancerous kidney and adjacent blood vessels impacted by the tumor, with reconstruction of the blood vessels.

29.     Sean would also have been a candidate for post-surgical medical therapies involving both chemotherapy, and subsequently-available immunotherapy treatments.

30.     Such surgical and medical intervention would have provided Sean with a strong probability of being cured and surviving his cancer.

31.     In September 2014, Mrs. Tillotson requested a copy of Sean's medical records from DHMC.  In October 2014, DHMC sent her certain records, but not the still images from Sean's May 1, 2014 ultrasound.

32.     In 2015, through counsel, Plaintiffs requested Sean's ultrasound images, and DHMC provided still images from the May 1, 2014 ultrasound and other prior radiologic studies.

33.     Neither the records that DHMC provided in 2014 nor the records it provided to Plaintiffs' counsel in 2015 included the re-measured images or cine clips from the May 1, 2014 ultrasound.  These records also did not include Dr. Girard's "preliminary" ultrasound report from the May 1, 2014 ultrasound, which DHMC did not provide to Plaintiffs' counsel until January 19, 2017.

34.     Remarkably, Plaintiffs did not learn that the images were re-measured, that re-measured images existed in Sean's medical record, and that cine clip images were taken as part of the May 1, 2014 ultrasound until Dr. Yen's deposition on January 31, 2017.

## COUNT I
### (Negligence – Wrongful Death of Sean C. Tillotson)

35.     Plaintiffs hereby incorporate by reference all of the preceding allegations and make them a part of this Count as if set forth fully at length herein.

36.     Defendant DHMC had a duty to exercise the degree of skill, care, diligence, knowledge, and learning ordinarily exercised and possessed by the average medical care facility, taking into account the existing state of knowledge in the practice of medicine generally, specifically, including, but not limited to, the duty to take all steps necessary to protect Sean Tillotson as a patient of the hospital; the duty to safeguard him from abnormal or detrimental findings to the extent possible; the duty to ensure that Sean Tillotson was evaluated, diagnosed, and provided with recommendations for appropriate treatment; the duty to ensure that Sean

Tillotson's ultrasound results of May 1, 2014 were properly reviewed, evaluated, and followed up on; the duty to ensure that its physicians and/or health care professionals, including but not limited to its radiologists and radiologic technologists, consulted with appropriate medical providers regarding follow up treatment of Sean Tillotson's left kidney; the duty to ensure that its physicians and/or health care professionals, including but not limited to its radiologists and radiologic technologists, assessed and understood the significance of the results of Sean Tillotson's May 1, 2014 ultrasound; the duty to ensure that its physicians and/or health care professionals, including but not limited to its radiologists and radiologic technologists, ordered follow-up testing based on the results of Sean Tillotson's May 1, 2014 ultrasound; the duty to ensure that its physicians and/or health care professionals, including but not limited to its radiologists and radiologic technologists, ordered additional treatment based on the results of his May 1, 2014 ultrasound; the duty to ensure that its physicians and/or health care professionals, including but not limited to its radiologists and radiologic technologists, documented the abnormal finding from Sean Tillotson's May 1, 2014 ultrasound; the duty to ensure that its physicians and/or health care professionals, including but not limited to its radiologists and radiologic technologists, referred Sean Tillotson to another physician based on the results of his May 1, 2014 ultrasound; the duty to communicate the abnormal finding in the May 1, 2014 ultrasound to Sean Tillotson and his parents; the duty to communicate the abnormal finding in the May 1, 2014 ultrasound to Sean Tillotson's primary care physician; the duty to provide Sean Tillotson, his urology physician, his primary care physician, or any other relevant health care provider with documentation of the abnormal finding from the May 1, 2014 ultrasound; the duty to review and take responsibility for Sean Tillotson's records at DHMC; the duty to ensure that hospital staff, employees, and/or agents understand and follow its written policies; the duty to

train hospital staff, employees, and/or agents in the implementation of its written policies; the

duty to ensure that its transcriptionists follow hospital policy and include the primary care

provider on all test results, including ultrasounds; the duty to manage and operate the hospital in

such a way as to ensure that its patients receive all medical information; and any and all

additional duties as may have arisen from the obligations of accepting Sean Tillotson as a

patient.

      37.     DHMC disregarded these duties, failed to exercise the degree of skill, care,

diligence, knowledge and learning ordinarily exercised and possessed by the average medical

care facility, taking into account the existing state of knowledge in the practice of medicine

generally, specifically, including, but not limited to, failing to take all steps necessary to protect

Sean Tillotson as a patient of the hospital; failing to safeguard him from abnormal or detrimental

findings to the extent possible; failing to ensure that Sean Tillotson was evaluated, diagnosed,

and provided with recommendations for appropriate treatment; failing to ensure that Sean

Tillotson's May 1, 2014 ultrasound results were reviewed, evaluated, and followed up on; failing

to ensure that its physicians and/or health care professionals, including but not limited to its

radiologists and radiologic technologists, assessed and understood the significance of the results

of Sean Tillotson's May 1, 2014 ultrasound; failing to ensure that its physicians and/or health

care professionals, including but not limited to its radiologists and radiologic technologists,

ordered follow-up testing based on the results of Sean Tillotson's May 1, 2014 ultrasound;

failing to ensure that its physicians and/or health care professionals, including but not limited to

its radiologists and radiologic technologists, ordered additional treatment based on the results of

his May 1, 2014 ultrasound; failing to ensure that its physicians and/or health care professionals,

including but not limited to its radiologists and radiologic technologists, documented the

abnormal finding from Sean Tillotson's May 1, 2014 ultrasound; failing to ensure that its physicians and/or health care professionals, including but not limited to its radiologists and radiologic technologists, referred Sean Tillotson to another physician based on the results of his May 1, 2014 ultrasound; failing to communicate the abnormal finding in the May 1, 2014 ultrasound to Sean Tillotson or his parents; failing to communicate the abnormal finding in the May 1, 2014 ultrasound to Sean Tillotson's primary care physician; failing to provide Sean Tillotson, his urology physician, his primary care physician, or any other relevant health care provider with documentation of the abnormal finding from the May 1, 2014 ultrasound; failing to review and take responsibility for Sean Tillotson's records at DHMC; failing to ensure that hospital staff, employees, and/or agents understand and follow its written policies; failing to train hospital staff, employees, and/or agents in the implementation of its written policies; failing to ensure that its transcriptionists follow hospital policy and include the primary care provider on all test results, including ultrasounds; failing to manage and operate the hospital in such a way as to ensure that its patients receive all medical information; and breaching any and all additional duties as may have arisen from the obligations of accepting Sean Tillotson as a patient. The Defendants' negligent conduct may include other acts of negligence specifically related to the treatment of Sean Tillotson which have not yet been identified and the Plaintiffs reserve the right to further specify his claims against the Defendants up to and including the time of trial.

38.     In accordance with the Stipulation of the parties, and in light of the facts, DHMC physicians and/or health care professionals, including but not limited to Dr. Yen and Dr. Girard, other radiologists and radiologic technologists, and physicians and other providers charged with Sean Tillotson's care were express, apparent and/or implied agents of DHMC, which is liable for

all the acts and omissions of these individuals, and its other employees and agents, under the

doctrines of *respondeat superior* and vicarious liability.

39.     As a direct and proximate consequence of DHMC's breaches of duties and actions

described above, Sean Tillotson suffered losses and damages, including, but not limited to, his

untimely and wrongful death from complications of his undiagnosed renal cancer, losing a

clearly probable cure of his renal cancer which would have been achievable with proper follow-

up starting on May 1, 2014, loss of enjoyment of life, dramatically reduced life expectancy and

increased risk of impending death, loss of income, loss of earning capacity, and other expenses

and other lost economic benefits and damages.

## COUNT II
### (Statutory Claim for Bethanne and Gary Tillotson, as Parents of Sean C. Tillotson, Pursuant to RSA 556:12, III)

40.     Plaintiffs hereby incorporate by reference all of the preceding allegations and

make them a part of this Count as if set forth fully at length herein.

41.     As a result of each Defendant's negligence as set forth herein, Mr. and Mrs.

Tillotson have lost the familial relationship with their minor son Sean.

42.     The Plaintiffs are entitled to recovery of damages pursuant to the provision of

RSA 556:12, III.

## COUNT III
### (Violation of the Patients' Bill of Rights by DHMC)

43.     Plaintiffs hereby incorporate by reference all of the preceding allegations and

make them a part of this Count as if set forth fully at length herein.

44.     The New Hampshire Patients' Bill of Rights, RSA 151:19-30, sets forth

requirements for health care facilities to adopt policies and procedures to protect patients

admitted to these facilities.  Pursuant to RSA 151:20, hospitals must adopt policies and

procedures and provide these to admitted patients.

45.     These policies and procedures must include those rights set forth in RSA 151:21

at a minimum, including, but not limited to:

> IV. The patient shall be fully informed by a health care provider of his or her
> medical condition, health care needs, and diagnostic test results, including the
> manner by which such results will be provided and the expected time interval
> between testing and receiving results, unless medically inadvisable and so
> documented in the medical record, and shall be given the opportunity to
> participate in the planning of his or her total care and medical treatment, to refuse
> treatment, and to be involved in experimental research upon the patient's written
> consent only. For the purposes of this paragraph "health care provider" means any
> person, corporation, facility, or institution either licensed by this state or
> otherwise lawfully providing health care services, including, but not limited to, a
> physician, hospital or other health care facility, dentist, nurse, optometrist,
> podiatrist, physical therapist, or psychologist, and any officer, employee, or agent
> of such provider acting in the course and scope of employment or agency related
> to or supportive of health care services.
>
> . . .
>
> X.  The patient shall be ensured confidential treatment of all information
> contained in the patient's personal and clinical record, including that stored in an
> automatic data bank, and the patient's written consent shall be required for the
> release of information to anyone not otherwise authorized by law to receive it.
> Medical information contained in the medical records at any facility licensed
> under this chapter **shall be deemed to be the property of the patient**. The
> patient shall be entitled to a copy of such records upon request.
>
> (emphasis supplied)

46.     Upon information and belief, DHMC has attempted to adopt the language set

forth in the New Hampshire Patients' Bill of Rights in its own patient rights and responsibilities

policy, although it has left certain required provisions out of this policy.

47.     Without limitation, and inclusive of all other provisions of the Patients' Bill of

Rights, at all pertinent times, the DHMC's Patient Rights and Responsibilities policy states that

patients "have the Right to . . . Know about your diagnosis or illness so that you can take part in

the planning of your care and treatment, understand your options and know how decisions will affect your health and well-being" as well as "Know the information in your medical record." *See* http://www.dartmouth-hitchcock.org/about_this_site/patient_rights.html.

48.    In violation of the New Hampshire Patients' Bill of Rights, DHMC's policy does not inform patients of their right to be fully informed of diagnostic test results.

49.    Moreover, in further violation of the New Hampshire Patients' Bill of Rights and DHMC's own Patient Rights and Responsibilities policy, DHMC, by way of its employees, agents, apparent agents and/or any "health care provider" as defined by the statute, failed to inform Sean and his parents of the complete diagnostic test results of the ultrasound he received at DHMC on May 1, 2014, and failed to provide Plaintiffs with a complete copy of Sean's personal and clinical record, which is Sean's property pursuant to RSA 151:21, X.

50.    DHMC did not provide Plaintiffs or their counsel accurate or complete information as to Sean Tillotson's medical records in this case.  In addition to the failure to provide the complete radiological records including the re-measured images and the real time moving cine clips, DHMC did not provide the "preliminary report" prepared by Dr. Girard until January 19, 2017.  That preliminary report includes dramatic differences from the "final" report prepared and issued by Dr. Yen on May 2, 2014.

51.    A comparison of the "preliminary" and final reports make it clear that Dr. Girard did not appreciate the discrepancies and concerns raised by the imagery.  As a consequence, communications between Dr. Girard and other medical providers caring for Sean Tillotson and following up on his care were characterized by failures in documentation, follow through and treatment.  The course of communication was not fully documented, but also is now interpreted by the providers inconsistently.

52.     This violation of the New Hampshire Patients' Bill of Rights, and DHMC's own Patient Rights and Responsibilities policy, entitles Plaintiffs to damages in the amount of "$50 for each violation per day or part of a day or for all damages proximately caused by the violations, whichever is greater."

53.     The Plaintiffs are therefore entitled to payment of damages by the Defendant in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request the Court to enter judgment as follows:

A.      Award Plaintiffs compensatory damages, exemplary damages, and attorneys' fees, costs and expenses under each count of this First Amended Complaint, in an amount to be determined at time of trial, together with pre-judgment and post-judgment interest accrued thereon; and

B.      Award such other and further relief this Court shall deem just and proper.

## DEMAND FOR A JURY TRIAL

Pursuant to Rules 38 and 39 of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury on all issues triable as of right by a jury.

Dated: September 7, 2017                          Respectfully submitted,

                                                  BETHANNE AND GARY TILLOTSON, as
                                                  Parents of SEAN C. TILLOTSON, and
                                                  BETHANNE TILLOTSON  as
                                                  Administratrix for the ESTATE OF SEAN
                                                  C. TILLOTSON

                                                  By their attorneys,

                                                  McLANE MIDDLETON,
                                                  PROFESSIONAL ASSOCIATION

                                                  /s/ Bruce W. Felmly

Bruce W. Felmly, N.H. Bar No. 787
bruce.felmly@mclane.com
Nicholas F. Casolaro, N.H. Bar No. 20612
nicholas.casolaro@mclane.com
900 Elm Street, P.O. Box 326
Manchester, New Hampshire 03105-0326
Telephone: (603) 625-6464
Facsimile: (603) 625-5650

### CERTIFICATE OF SERVICE

I certify that on September 7, 2017 I served the foregoing document via ECF electronic transmission in accordance with the Court's Supplemental Rules for Electronic Case Filing to the registered participants as identified on the Notice of Electronic Filing, and paper copies will be sent to those indicated as non-registered participants, if any.

/s/ Bruce W. Felmly
Bruce W. Felmly